IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JEFF HULBERT, et. al.,                    :

      Plaintiffs,                              :

v.                                        :          Civil Case No. GLR-18-0461

SGT. BRIAN T. POPE, et al.,               :

      Defendants.                             :

## MEMORANDUM OPINION

THIS MATTER is before the Court on Defendants Sgt. Brian T. Pope ("Sgt. Pope")

and Colonel Michael Wilson's ("Col. Wilson") Motion to Dismiss (ECF No. 11). The

Motion is ripe for disposition, and no hearing is necessary. See Local Rule 105.6 (D.Md.

2018). For the reasons outlined below, the Court will grant in part and deny in part the

Motion.

## I.      BACKGROUND[1]

Plaintiff Maryland Shall Issue, Inc. ("MSI") is a gun-owners' rights group whose

membership includes twin-brother Plaintiffs Jeffrey Hulbert and Kevin Hulbert

(collectively, the "Hulberts"). For several years, the Hulberts and others have peacefully

demonstrated on the public sidewalks outside the State House in Annapolis, Maryland, in

protest of laws and policies they believe violate the Second Amendment. (Compl. ¶¶ 1, 21–

---

[1] Unless otherwise noted, the Court takes the following facts from the Complaint
and accepts them as true. See Erickson v. Pardus, 551 U.S. 89, 94 (2007) (citing Bell Atl.
Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

23, ECF No. 1). During those demonstrations, Maryland Capitol Police ("MCP") officers typically asked the picketers to move to a different location, and they declined, citing their right to demonstrate on a public sidewalk. (Id. ¶ 26).

On February 5, 2018, the Hulberts and approximately five other people were picketing on the sidewalk near the State House. (Id. ¶¶ 24–25). Sgt. Pope approached them and informed them that, because of a new policy ordered by his supervisor, Col. Wilson, their demonstration needed to move to the Lawyer's Mall, an area beyond the sidewalk that generally requires a permit for any demonstration. (Id. ¶¶ 27–28). After asking the demonstrators to move to the Lawyer's Mall, Sgt. Pope left the area. (Id. ¶ 29). While some of the picketers moved to the Lawyer's Mall, (id. ¶ 32), the Hulberts remained on the sidewalk, (id. ¶¶ 30, 33). Jeff Hulbert kept holding his sign, believing that the police order to move was unlawful, (id. ¶ 33), and Kevin Hulbert began using his cell phone to record the events, (id. ¶ 30).

Sgt. Pope "returned to the area and arrested Jeff Hulbert, placing him in handcuffs." (Id. ¶ 33). Sgt. Pope directed another officer to arrest and handcuff Kevin Hulbert. (Id. ¶ 35). The officers then searched the Hulberts and transported them to the Annapolis City Police precinct. (Id. ¶ 36). After an hour and forty-five minutes in the precinct, the officers cited and released the Hulberts. (Id. ¶¶ 37–38). The citations charged the Hulberts with willful failure "to obey a reasonable and lawful order of a law enforcement officer to . . . prevent a disturbance of the public peace." (Id. ¶ 38; Defs.' Mot. Dismiss [Defs.' Mot."] Exs. A.1, A.2, ECF No. 11-1 at 23, 25).

The next day, after videos of the arrests appeared on the internet, the Hulberts participated in media interviews on the sidewalk in front of the State House. (Id. ¶¶ 46–47). The Hulberts told the journalists that their arrests were unlawful because they had a constitutional right to protest on the public sidewalks. (Id. ¶ 47).

Col. Wilson stood nearby during the interviews and approached the Hulberts when the interviews concluded. (Id. ¶ 48). Col. Wilson told them that he and other MCP officers had spent "all day" reviewing negative media coverage of the arrests. (Id. ¶ 49). He then presented two new citations to each of the Hulberts. (Id. ¶ 50). All four of the new citations were signed by Sgt. Pope and dated February 6, 2018. (Id. ¶ 51). Two of the citations charged that, on February 5, 2018, the Hulberts "refuse[d] to leave Lawyer's Mall a property of state of Maryland public agency during regular business hours upon being requested to do so by said Pope and when the defendant was acting in a manner disruptive of and disturbing to the conduct of normal business." (Id. ¶ 54; Defs.' Mot. Exs. B.1, B.3). The other two citations charged that, "at Lawyer's Mall-sidewalk public," the Hulberts "prevent[ed] or disturb[ed] the general public from obtaining services provided on the property or obstruct[ed] walks." (Id. ¶ 54; Defs.' Mot. Exs. B.2, B.4). Plaintiffs allege that the statements in the new citations are untrue, and that they were issued in retaliation for the Hulberts' public comments about their arrests. (Id. ¶¶ 53, 55–58).

On February 14, 2018, the Hulberts and MSI sued Col. Wilson and Sgt. Pope in their official and individual capacities. (Id. at 1). In their ten-Count Complaint, Plaintiffs allege Defendants: violated Plaintiffs' rights under the First Amendment to the U.S. Constitution by arresting them during a lawful demonstration (Count I) and while Kevin

3

Hulbert was lawfully filming police officers (Count II); violated Plaintiffs' First Amendment rights by retaliating against them for their picket sign messages on February 5, 2018 and for their media comments on February 6, 2018 (Count III); violated Plaintiffs' Fourth Amendment rights by performing an unreasonable search and seizure and arrest without probable cause (Count IV) and by using excessive force (Count V); violated the Plaintiffs' free speech rights under Article 40 of the Maryland Declaration of Rights (Count VI); violated the Hulberts' rights under Articles 24 and 26 of the Maryland Declaration of Rights, , to be free from unreasonable search and seizure (Count VII) and excessive force (Count VIII); falsely arrested the Hulberts (Count IX); and falsely imprisoned the Hulberts (Count X). (Id. ¶¶ 72–146). Plaintiffs bring their federal constitutional claims under 42 U.S.C. § 1983 (2018) (Id. ¶¶ 6, 9, 74, 79, 84). Plaintiffs seek declaratory and injunctive relief, as well as compensatory and punitive damages. (Id. ¶ 6).

On April 11, 2018, Defendants filed their Motion to Dismiss. (ECF No. 11). On May 8, 2018, Plaintiffs filed an Opposition. (ECF No. 14). On May 22, 2018, Defendants filed a Reply. (ECF No. 15).

## II.    DISCUSSION

### A.    <u>Standard of Review</u>

The purpose of a motion under Federal Rule of Civil Procedure 12(b)(6) motion is to "test[ ] the sufficiency of a complaint," not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." <u>King v. Rubenstein</u>, 825 F.3d 206, 214 (4th Cir. 2016) (quoting <u>Edwards v. City of Goldsboro</u>, 178 F.3d 231, 243 (4th Cir. 1999)). A complaint fails to state a claim if it does not contain "a short and plain statement

of the claim showing that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2), or does not

"state a claim to relief that is plausible on its face," Ashcroft v. Iqbal, 556 U.S. 662, 678

(2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is facially

plausible "when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing

Twombly, 550 U.S. at 556). "Threadbare recitals of the elements of a cause of action,

supported by mere conclusory statements, do not suffice." Id. (citing Twombly, 550 U.S.

at 555). Though the plaintiff is not required to forecast evidence to prove the elements of

the claim, the complaint must allege sufficient facts to establish each element. Goss v. Bank

of America, N.A., 917 F.Supp.2d 445, 449 (D.Md. 2013) (quoting Walters v. McMahen,

684 F.3d 435, 439 (4th Cir. 2012)), aff'd sub nom. Goss v. Bank of America, N.A., 546

F.App'x 165 (4th Cir. 2013).

In considering a Rule 12(b)(6) motion, a court must examine the complaint as a

whole, consider the factual allegations in the complaint as true, and construe the factual

allegations in the light most favorable to the plaintiff. Albright v. Oliver, 510 U.S. 266, 268

(1994); Lambeth v. Bd. of Comm'rs, 407 F.3d 266, 268 (4th Cir. 2005) (citing Scheuer v.

Rhodes, 416 U.S. 232, 236 (1974)). But, the court need not accept unsupported or

conclusory factual allegations devoid of any reference to actual events, United Black

Firefighters v. Hirst, 604 F.2d 844, 847 (4th Cir. 1979), or legal conclusions couched as

factual allegations, Iqbal, 556 U.S. at 678.

**B.** **Extra-Pleading Materials**

The general rule is that a court may not consider extrinsic evidence when resolving a Rule 12(b)(6) motion. See Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC, 794 F.Supp.2d 602, 611 (D.Md. 2011). However, this general rule is subject to several exceptions. First, a court may consider documents attached to the complaint, see Fed.R.Civ.P. 10(c), as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic, see Blankenship v. Manchin, 471 F.3d 523, 526 n.1 (4th Cir. 2006). Second, a court may consider documents referred to and relied upon in the complaint "even if the documents are not attached as exhibits." Fare Deals Ltd. v. World Choice Travel.com, Inc., 180 F.Supp.2d 678, 683 (D.Md. 2001); accord New Beckley Mining Corp. v. Int'l Union, United Mine Workers of America, 18 F.3d 1161, 1164 (4th Cir. 1994). Third, a Court may consider matters of public record. Philips v. Pitt Cty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009). In the event that any of these properly considered extra-pleading materials conflict with the "bare allegations of the complaint," the extra-pleading materials "prevail." Fare Deals, 180 F.Supp.2d at 683; accord RaceRedi Motorsports, LLC v. Dart Mach., Ltd., 640 F.Supp.2d 660, 664 (D.Md. 2009).

Defendants attach six exhibits to their Motion: (1) the February 5, 2018 citation issued to Kevin Hulbert, (Defs.' Mot. Ex. A.1); (2) the February 5, 2018 citation issued to Jeff Hulbert, (Defs.' Mot. Ex. A.2); (3) the February 6, 2018 citation issued to Kevin Hulbert under Maryland Code Annotated, Criminal Law ["CR"] Article § 6-409(b),[2] (Defs.

---

[2] In pertinent part, CR § 6-409(b) provides that, "[a] person may not refuse or fail to leave a public building or grounds, or a specific part of a public building or grounds,

Mot. Ex. B.1); (4) the February 6, 2018 citation issued to Kevin Hulbert under Code of Maryland Regulations ("COMAR") 04.05.01.03,[3] (Defs.' Mot. Ex. B.2); (5) the February 6, 2018 citation issued to Jeff Hulbert under CR 6-409(b), (Defs.' Mot. Ex. B.3); and (6) the February 6, 2018 citation issued to Jeff Hulbert under COMAR 04.05.01.03, (Defs.' Mot. Ex. B.4). The Complaint refers to and relies on all six of these citations, and Defendants do not dispute their authenticity. Accordingly, the Court will consider them when assessing Defendants' Motion.

## C.    **Analysis**

Defendants advance three main arguments in their Motion: (1) they are entitled to Eleventh Amendment immunity in their official capacities; (2) they are entitled to qualified immunity; and (3) they are entitled to statutory state personnel immunity for the state law claims. Plaintiffs counter that they have adequately pled their claims and that Defendants are not entitled to any type of immunity. The Court addresses the Defendants' arguments in turn.

---

during regular business hours if . . . the surrounding circumstances would indicate to a reasonable person that the person who refuses or fails to leave . . . is acting in a manner disruptive of and disturbing to the conduct of normal business by the government unit that owns, operates, or maintains the public building or grounds . . . and an authorized employee of the government unit asks the person to leave." Md. Code Ann., Crim. Law § 6-409(b) (West 2018).

[3] In pertinent part, COMAR 04.05.01.03 provides that, "[a]n individual shall be subject to arrest if the individual . . . [p]revents or disturbs the general public from obtaining services provided on the property . . . or . . . [o]bstructs . . . [w]alks." Md. Code Regs. 04.05.01.03 (Feb. 15, 2019).

### 1.    Eleventh Amendment Immunity

Plaintiffs sue Defendants in both their individual and official capacities. A suit may be maintained against state officials acting in their official capacities only to the extent that it seeks injunctive or declaratory relief. Ex Parte Young, 209 U.S. 123 (1908) (holding that the Eleventh Amendment allows prospective relief against a state official to prevent future constitutional or statutory violations). State officials acting in their official capacities are outside the class of "persons" who can be sued for damages under § 1983. Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989). State officials may, however, be sued for damages in their individual capacities. Hafer v. Melo, 502 U.S. 21, 23 (1991).

Plaintiffs seek relief of multiple types, including declaratory and injunctive relief, and money damages.[4] The parties appear to agree that Plaintiffs cannot pursue money damages against Defendants in their official capacities; Plaintiffs may only pursue declaratory and injunctive relief against Defendants in their official capacities and money damages in their individual capacities. (See Pls.' Opp'n to Defs.' Mot. Dismiss & Cond. Req. Hearing ["Pls.' Opp'n"] at 31–32, ECF No. 14; Defs.' Mot. at 5–6). Accordingly, the

---

[4] "Plaintiffs seek a declaration that Defendants violated their clearly established constitutional rights as set forth in this Complaint; a declaration that Defendants' restriction on Plaintiffs' speech violates the U.S. Constitution and 42 U.S.C. § 1983 as set forth in this Complaint; a preliminary and permanent injunction enjoining the enforcement of Defendants' speech restriction as set forth in this Complaint; and all compensatory, punitive and other damages recognized by law for the tortious and constitutional violations stated herein." (Compl. ¶ 6).

Court will grant the Motion to the extent the Complaint seeks money damages against Defendants in their official capacities.

### 2. Qualified Immunity

Defendants argue that they are entitled to qualified immunity from Plaintiffs First Amendment and Fourth Amendment claims (Counts I through V). For the reasons that follow, the Court cannot yet make that determination.

The doctrine of qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); West v. Murphy, 771 F.3d 209, 213 (4th Cir. 2014). Qualified immunity protects government officials when they have made "mere mistakes in judgment, whether the mistake is one of fact or one of law." Butz v. Economou, 438 U.S. 478, 507 (1978). As "an immunity from suit rather than a mere defense to liability, . . . [qualified immunity] is effectively lost if a case is erroneously permitted to go to trial." Mitchell v. Forsyth, 472 U.S. 511, 526 (1985) (emphasis removed). Accordingly, the pre-discovery resolution of qualified immunity questions is preferred when possible. See Anderson v. Creighton, 483 U.S. 635, 640 n.2 (1987).

There is a two-prong test to determine if a government official is protected by qualified immunity: (1) whether the facts that the plaintiff has alleged or shown "make out a violation of a constitutional right"; and (2) whether that right was "clearly established" at the time of the purported violation. Pearson v. Callahan, 555 U.S. 223, 232 (2009) (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001)). Courts have discretion to resolve these

two prongs in whichever order they deem appropriate, based on the circumstances of the case. Id. at 236. The answers to both prongs must be in the affirmative for a plaintiff to prevail. Batten v. Gomez, 324 F.3d 288, 293–94 (4th Cir. 2003) (considering the issue in the context of a police officer's motion for summary judgment on qualified immunity grounds). Once the defendant raises qualified immunity as a defense, the plaintiff bears the burden of proof on the first prong, that is, whether a constitutional violation occurred. Henry v. Purnell, 501 F.3d 374, 377 (4th Cir. 2007) (citing Bryant v. Muth, 994 F.2d 1082, 1086 (4th Cir. 1993)). The defendant bears the burden on the second prong, that is, that the right was not clearly established at the time of the violation. Id. at 378 (quoting Wilson v. Kittoe, 337 F.3d 392, 397 (4th Cir. 2003)).

The second prong involves a three-step analysis. First, the court identifies "the specific constitutional right allegedly violated." Collinson v. Gott, 895 F.2d 994, 998 (4th Cir. 1990). Second, the court inquires whether at the time of the alleged violation, that right was "clearly established." Id. Third, the court assesses "whether a reasonable person in the official's position would have known that his conduct would violate that right." Id.; see Cloaninger ex rel. Cloaninger v. McDevitt, 555 F.3d 324, 331 (4th Cir. 2009) (explaining that a right is "clearly established" when "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted" (quoting Saucier, 533 U.S. at 202)).

The first two steps in this analysis present pure questions of law. Collinson, 895 F.2d at 998. The third step "may sometimes require factual determinations respecting a defendant's conduct and its circumstances," but the ultimate application of the objective analysis in the third step "is also a matter of law for the court." Id.; see Willingham v.

Crooke, 412 F.3d 553, 560 (4th Cir. 2005) ("[W]e hold that the legal question of a defendant's entitlement to qualified immunity under a particular set of facts should be decided by the court, not by the jury.").

The third step's reasonableness inquiry "turns on the 'objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken.'" Pearson, 555 U.S. at 244 (2009) (quoting Wilson v. Layne, 526 U.S. 603, 614 (1999)). The operation of the reasonableness inquiry "depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." Anderson, 483 U.S. at 639. The Supreme Court has instructed that the right an official is alleged to have violated must have been "clearly established" in a more particularized sense: "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Id. at 640. The Court quickly clarified, stating, "[t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." Id. (internal citation omitted).

Therefore, even when a plaintiff proves that an official has violated his rights, the official may nevertheless be entitled to qualified immunity "if a reasonable person in the 'official's position could have failed to appreciate that his conduct would violate' those rights." Torchinsky v. Siwinski, 942 F.2d 257, 261 (4th Cir. 1991) (quoting Collinson, 895 F.2d at 998). In this way, the qualified immunity standard allows mistakes—"[e]ven law enforcement officials who 'reasonably but mistakenly conclude that probable cause is present' are entitled to immunity." Hunter v. Bryant, 502 U.S. 224, 227 (1991) (quoting

Anderson, 483 U.S. at 641). This allowance for mistakes is "ample"—the qualified immunity standard protects "all but the plainly incompetent or those who knowingly violate the law." Id. at 229 (quoting Malley v. Briggs, 475 U.S. 335, 343, 341 (1986) (internal quotation marks omitted)). This allowance "exists because 'officials should not err always on the side of caution' because they fear being sued." Id. (quoting Davis v. Scherer, 468 U.S. 183, 196 (1984)). "If reasonable mistakes were actionable, difficult questions of discretion would always be resolved in favor of inaction, and effective law enforcement would be lost." Torchinsky, 942 F.2d at 261.

The Court addresses each Count in turn.

### a.      First Amendment

### i.      Demonstration (Count I)

Here, the legal question of qualified immunity is not yet amenable to disposition because factual questions about the alleged policy remain unanswered.

With regard to the first prong, Plaintiffs contend that Defendants violated two of their constitutional rights under the First Amendment. The first right was the "right to engage in protected speech" by "peacefully demonstrating by holding a sign on the public sidewalk." (Compl. ¶¶ 74–75). In support of this right, Plaintiffs cite, among other case law, United States v. Grace, 461 U.S. 171 (1983) (striking down a statute that made it a crime to protest on the public sidewalk in front of the Supreme Court building), and Schneider v. New Jersey, 308 U.S. 147 (1939) ("The streets are natural and proper places for the dissemination of information and opinion; and one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in

some other place."). This case law would seem to indicate that the Plaintiffs have alleged sufficient facts in the Complaint to make out a violation of a constitutional right.[5] But "peacefully demonstrating by holding a sign on the public sidewalk" is not an absolute right, because the government is permitted to burden free expression in certain circumstances, particularly where the government policy or regulation is content-neutral. See, e.g., Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288, 298–99 (1984); Ross v. Early, 746 F.3d 546, 560 (4th Cir. 2014).[6] Therefore, the Court needs to know the content of the alleged new policy in order to determine, under the first prong of the qualified immunity analysis, whether Defendants violated Plaintiffs' constitutional rights.

---

[5] Defendants argue that they did not violate the Hulberts' First Amendment rights by asking them to move the short distance to the Lawyer's Mall to continue their activities, and that the arrests and citations they issued were for failing to obey the officers' lawful order to move, not for demonstrating or filming the officers. Defendants contend that, by ordering the Hulberts to move, Sgt. Pope was simply enforcing COMAR 04.05.01.02 and COMAR 04.05.01.03, which address the use of sidewalks on property owned by the Department of General Services. However, neither of those COMAR regulations proscribes the Hulberts' conduct as alleged in the Complaint. Plaintiffs specifically allege that their actions did not disrupt or disturb normal business or obstruct the sidewalks (Compl. ¶¶ 57–58). For purposes of this Motion, the Court assumes the facts of the Complaint to be true, leaving Defendants' argument about whether Plaintiffs were, in fact, violating the cited state regulations for discovery and perhaps a later motion.

[6] Defendants argue the rights at issue here were not clearly established at the time of the purported violation, citing Ross, 746 F.3d at 560. But, at this stage, this case is distinguishable from Ross, in which officers were granted qualified immunity for enforcing a written policy, described in a court-ordered injunction, requiring protesters to move to a designated area of sidewalk during a public event. 746 F.3d at 550, 560–61. Whereas the U.S. Court of Appeals for the Fourth Circuit had a written policy to assess in Ross, the policy at issue here remains undefined. The Court is, therefore, not persuaded at this point that the allegedly infringed rights at issue were not clearly established at the time of the Hulberts' arrests and citations.

The Court confronts the same uncertainty with regard to the second prong of the qualified immunity test. As alleged in the Complaint, the Hulberts and Defendants had a years-long interaction regarding the right to protest on the sidewalk. During the past incidents, the Hulberts and their fellow protesters were allowed to continue their demonstration, despite the existence of the state laws and regulations Sgt. Pope listed on their February 2018 citations. Thus, the relevant inquiry is the nature of the new "policy" that Col. Wilson allegedly devised, and that Sgt. Pope first enforced on February 5, 2018 when he cited and arrested the Hulberts. Plaintiffs do not plead the content of the policy. Without discovery regarding the precise contours of that policy, if it exists, the Court cannot, as directed by <u>Anderson</u>, 483 U.S. at 639–40, answer the third step of the second prong of the qualified immunity analysis: whether a reasonable officer could believe that enforcing the policy would violate the protesters' clearly established constitutional rights as alleged by Plaintiffs and supported with Supreme Court First Amendment jurisprudence. At this stage, therefore, Defendants have not carried their burden as to the second prong of the qualified immunity analysis.

In sum, the Court requires additional factual information to ascertain whether Defendants violated Plaintiffs' First Amendment rights by creating or enforcing the new policy, and whether any of Plaintiffs' constitutional rights that Defendants may have violated were clearly established under existing law. As a result, the Court will deny the Motion without prejudice to the extent it seeks to dismiss Count I on the grounds of qualified immunity.

### ii.     Filming (Count II)

Plaintiffs define the second First Amendment right Defendants violated as the right to peacefully observe and film police actions in public spaces without interfer[ence]," (Comp. ¶ 3); "to film police conduct from a safe and respectful distance, (id. ¶ 41); or the "right to engage in protected speech" by "videotaping the peaceful demonstration . . . on the public sidewalk," (Compl. ¶¶ 79–80). In support of the right to film officers, Plaintiffs cite several circuit opinions outside this circuit. Gericke v. Begin, 753 F.3d 1, 7–8 (1st Cir. 2014) (holding that an arrest of a citizen for illegal wiretapping when she recorded a traffic stop without interfering with the police activity violated her First Amendment rights); Smith v. City of Cumming, 212 F.3d 1332, 1333 (11th Cir. 2002) ("The First Amendment protects the right to gather information about what public officials do on public property, and specifically, a right to record matters of public interest"); Fordyce v. City of Seattle, 55 F.3d 436, 439 (9th Cir.1995) (recognizing a "First Amendment right to film matters of public interest" in a case where police officers interfered with a citizen seeking to film a public demonstration directed in part against the police).

In their Motion and Reply, Defendants do not engage with the developing case law surrounding the right to film police officers. Instead, they argue, as they did with respect to Count I, that they did not violate Plaintiffs' First Amendment rights by asking them to move from the sidewalk to the Lawyer's Mall. But if Plaintiffs were not violating any law, as they allege in their Complaint, they were not obligated to move from the public sidewalk. And if they had a First Amendment right to demonstrate or film on the sidewalk when Sgt. Pope arrested them, then their arrests would be a violation of their First Amendment rights.

Therefore, as with Count I, the Court requires additional factual information to ascertain, in the first prong of the qualified immunity analysis, whether Defendants violated Plaintiffs' First Amendment rights by creating or enforcing the new policy. With respect to the second prong of the analysis, Defendants make no argument about whether the right to film officers was clearly established at the time. The Defendants, therefore, do not carry their burden and are not entitled to qualified immunity at this stage of the case. As a result, the Court will deny the Motion without prejudice to the extent it seeks to dismiss Count II on the grounds of qualified immunity.

### iii.      Retaliation (Count III)

Defendants argue that they are also entitled to qualified immunity from Plaintiffs' allegations of retaliation. The Court again concludes that it is premature to decide the qualified immunity issue.

To plead a § 1983 retaliation claim for violation of First Amendment rights, the plaintiff must allege that: (1) his speech was protected; (2) the defendant's alleged retaliatory action adversely affected the plaintiff's constitutionally protected speech; and (3) there is a causal relationship between the speech and the defendant's retaliatory action. Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 685–86 (4th Cir. 2000). Here, Plaintiffs contend that two instances of First Amendment retaliation occurred: (1) when Sgt. Pope arrested and handcuffed the Hulberts on February 5, 2018; and (2) when Col. Wilson issued the additional citations on February 6, 2018.[7]

---

[7] The sequence of events undermines Plaintiffs' claim that Col. Wilson was retaliating for the comments the Hulberts made to the media on February 6, 2018. Plaintiffs

Defendants' argument that qualified immunity applies is again premised on their contentions that their actions did not violate Plaintiffs' First Amendment rights and that probable cause supported the arrests and criminal charges. As noted above, without additional factual development regarding the policy Defendants sought to impose and enforce, the Court cannot determine whether Plaintiffs' speech was impermissibly restricted or whether a reasonable officer would have believed that the Defendants' actions would infringe on Plaintiffs' clearly established First Amendment rights. As a result, the Court will deny the Motion without prejudice to the extent it seeks to dismiss Count III on grounds of qualified immunity.

### b. Fourth Amendment (Counts IV and V)

Defendants also contend that they are entitled to qualified immunity from Plaintiffs' claims that Defendants violated their Fourth Amendment rights against unreasonable search and seizure and excessive force. The Court agrees in part.

There is no respondeat superior liability under § 1983. Love-Lane v. Martin, 355 F.3d 766, 782 (4th Cir. 2004). Thus, "for an individual to be liable under § 1983, it must be 'affirmatively shown that the official charged acted personally in the deprivation of the plaintiff's rights.'" Garraghty v. Commonwealth of Va., Dep't of Corr., 52 F.3d 1274, 1280 (4th Cir. 1995) (quoting Wright v. Collins, 766 F.2d 841, 850 (4th Cir. 1985)). It is well-

do not allege that Sgt. Pope was present during the media interviews, yet the new citations were signed by Sgt. Pope, indicating that they would have had to be written and signed before the media interviews occurred. However, construing the Complaint to allege that the social media coverage of the arrests prompted Col. Wilson's ire, (Compl. ¶ 4), the Court will not dismiss the retaliation claim pertaining to the additional citations at this stage.

settled, however, that "supervisory officials may be held liable in certain circumstances for the constitutional injuries inflicted by their subordinates." Baynard v. Malone, 268 F.3d 228, 235 (4th Cir. 2001) (quoting Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994)). Supervisory liability "is not based on ordinary principles of respondeat superior, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" Id. (quoting Slakan v. Porter, 737 F.2d 368, 372 (4th Cir. 1984)). To establish supervisory liability, a plaintiff must demonstrate:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff;

> (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices [ ]; and

> (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

Id. (quoting Shaw, 13 F.3d at 799).

In this case, Plaintiffs do not allege that Col. Wilson was present in front of the State House on February 5, 2018. Plaintiffs do not plead that Col. Wilson had actual or constructive knowledge that Sgt. Pope would arrest or handcuff the Hulberts that day, instead of simply issuing them citations. Nor do Plaintiffs plead that Col. Wilson seized the Hulberts or used any excessive force on February 6, 2018 when he presented them with the second set of citations. See Martinez v. Carr, 479 F.3d 1292, 1299 (10th Cir. 2007)

(holding that the issuance of a citation does not rise to the level of a Fourth Amendment seizure); DiBella v. Borough of Beachwood, 407 F.3d 599, 603 (3d Cir. 2005) ("The type of constitutional injury the Fourth Amendment is intended to redress is the deprivation of liberty accompanying prosecution, not prosecution itself."). As a result, Plaintiffs' Fourth Amendment claims in Counts IV and V cannot proceed against Col. Wilson.

As to Sgt. Pope, however, the issue of qualified immunity on Plaintiffs' Fourth Amendment claims rests, essentially, on the same factual question as the First Amendment claims: whether a reasonable officer could believe that his order to Plaintiffs to move to the Lawyer's Mall was lawful, thereby supporting the subsequent arrest for failure to obey a lawful order. Because factual questions remain regarding the policy and its constitutionality the Court cannot make a qualified immunity determination regarding Plaintiffs' Fourth Amendment claims at this time.

Accordingly, with respect to qualified immunity as to Counts IV and V, the Court will grant the Motion as to Col. Wilson and deny it without prejudice as to Sgt. Pope.

### 3. Maryland Tort Claims Act Immunity

Defendants contend that each of the state-law claims in the Complaint, Counts VI through X, must be dismissed under the immunity provided by the Maryland Tort Claims Act ("MTCA"), Md. Code Ann., State Gov't § 12-105 (West 2018). The Court agrees in part.

The MTCA protects defendants acting within the scope of their public duties from liability, so long as they act "without malice or gross negligence." Id.; Md. Code Ann., Cts. & Jud. Proc. ["CJP"] § 5-522(b) (West 2018). Unlike § 1983 immunity, which turns on an

objective assessment, MTCA immunity turns on the defendant's subjective intent. <u>Okwa v. Harper</u>, 757 A.2d 118, 138 (Md. 2000). Whether particular conduct constitutes "malice" or "gross negligence" is an issue typically reserved for a jury. <u>See</u> <u>Newell v. Runnels</u>, 967 A.2d 729, 763 (Md. 2009) ("This Court has recognized consistently that the determination of whether a State actor enjoys State personnel immunity is a question for the trier of fact.").

### a. State Constitutional Claims (Counts VI – VIII)

Plaintiffs plead that Defendants' conduct amounted to an intentional effort to injure them by subjecting them to criminal charges on the basis of disagreement with their political views. The facts pled, if proven, could amount to malice or gross negligence regarding Plaintiffs' rights under the Maryland Declaration of Rights. As a result, the Court will deny the Motion as to Counts VI, VII, and VIII.

### b. State Tort Claims (Counts IX – X)

In Maryland, the elements of false arrest and false imprisonment are the same: (1) "the deprivation of the liberty of another"; (2) "without consent"; and (3) "without legal justification." <u>Pegues v. Wal-Mart Stores, Inc.</u>, 63 F.Supp.3d 539, 542 (D.Md. 2014) (quoting <u>Heron v. Strader</u>, 761 A.2d 56, 59 (Md. 2000)). Legal justification, in this context, is "'judged by the principles applicable to the law of arrest.'" <u>Heron</u>, 761 A.2d at 59 (quoting <u>Montgomery Ward v. Wilson</u>, 664 A.2d 916, 926 (Md. 1995)). Therefore, "the liability of a police officer for false imprisonment will ordinarily depend upon whether or not the officer acted within his legal authority to arrest." <u>Id.</u> (quoting <u>Montgomery Ward</u>, 664 A.2d at 926).

Here, the Hulberts allege that Sgt. Pope arrested them as they were exercising their First Amendment rights and not violating any law—only Sgt. Pope's previous order, which was based on the alleged new policy devised by Col. Wilson. The MTCA does not immunize Sgt. Pope at this stage, because it is not clear whether the Hulberts' arrest was justified by a preceding lawful order such that Sgt. Pope acted within his legal authority and without malice or gross negligence.

The outcome of the MTCA analysis is different for Col. Wilson. Plaintiffs do not allege that Col. Wilson was personally involved in their arrests or detention, or that he ordered their arrests or detention. In other words, Plaintiffs do not allege that Col. Wilson acted in such a way that would strip him of the MTCA immunity that protects state personnel acting within the scope of their public duties "without malice or gross negligence." CJP § 5-522(b). As a result, with respect to Counts IX and X, the Court will grant the Motion as to Col. Wilson and otherwise deny it without prejudice.

## III.   CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part Defendants' Motion to Dismiss (ECF No. 11). The Court will grant the Motion to the extent the Complaint seeks monetary damages against the Defendants in their official capacities. The Court will grant the Motion as to Counts IV, V, IX, and X against Col. Wilson only. In all other respects, the Court will deny the Motion without prejudice. A separate Order follows. Entered this 28th day of March, 2019.

_____
/s/
George L. Russell III
United States District Judge
