**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| Jeff Hulbert, *et al*.<br><br>    *Plaintiffs*,<br><br>    v.<br><br>Sgt. Brian Pope, *et al*.<br><br>    *Defendants*. | Civil No.: 1:18-CV-00461-GLR |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION
TO QUASH SUBPOENA AND FOR PROTECTIVE ORDER**

Come now the Plaintiffs, by and through undersigned counsel, and submit the aforesaid Opposition, stating as follows:

**I.     INTRODUCTION**

Despite suggesting to the contrary in the present motion, the Office of the Attorney General is well aware of the relevance of the Lieutenant Governor's testimony in the present case. Plaintiffs Jeff and Kevin Hulbert were both unlawfully arrested by the Maryland Capital Police on February 5, 2018, while Jeff Hulbert was carrying a sign on a public sidewalk in Annapolis, Maryland and Kevin Hulbert was filming the arrest on his cellular telephone without a sign. *See* ECF 1, para. 20-71. The Hulberts were in the same location and engaged in the same protected First Amendment Activity they had engaged in for months prior. *Id.*

What made this day different was that the Capital Police received a call from the State Police executive protection detail in the Governor's Mansion. The call was recorded. When Defendant Brian T. Pope, the arresting officer, was confronted with this recording at deposition, the following transpired:

```
11    Q.  I'm going to play the -- just today
12    during the deposition about ten minutes ago,
```

13  somebody produced to me a copy of the recording
14  that came from the governor's mansion.
15  I'm going to play it for you, I want you to
16  listen to it, then I'm going to ask you some
17  questions.  Are you ready?

18     A.  Ready.

                   \*\*\*

18     Q.  Okay, all right.  So instead, what I
19  heard was that the governor's mansion called your
20  office and said that *the lieutenant governor* was
21  about to walk to the senate building or from the
1   senate building, and they didn't want the
2   protesters to interact with the *lieutenant*
3   *governor*; do you agree with me that that's a
4   synopsis of what we heard?

5        MR. FREDERICKSON:  Objection to the
6   form.

7        THE WITNESS:  **Yes.**

8        BY MR. HANSEL:
9     Q.  Having heard that, and with your
10  training as a 20-plus year police officer, and
11  given that you know people have a First Amendment
12  right to protest, **do you agree with me that**
13  **preventing people from interacting with the**
14  **lieutenant governor is an inappropriate reason to**
15  **ask somebody that is picketing to move?**

16       MR. FREDERICKSON:  Objection.

17       MR. McFARLAND:  Objection.  Go ahead.

18       THE WITNESS:  **I guess that would be.**

19       BY MR. HANSEL:

20     Q.  And do you agree with me that if this
21  call -- **if this is the reason why people were**
1   **asked to move, it's against their constitutional**
2   **rights?**

3        MR. FREDERICKSON:  Objection.

4      MR. McFARLAND:  Objection.  Go ahead.

5      THE WITNESS:  **It sounds like it.**

6      BY MR. HANSEL:

          \* \* \*

15  Q.  I want to make that clear for you on the
16  record.  And obviously based on your training,
17  **people have a right to be there even when the**
18  ***lieutenant governor* might walk by?**

19     MR. FREDERICKSON:  Objection.

20     THE WITNESS:  **Yes.**

          \* \* \*

1   **Q.  And you can imagine, can't you, how for**
2  **somebody who wanted to make their political point**
3  **known, it's probably especially important to be**
4  **there when somebody like the *lieutenant governor***
5  **walks by?**

6     MR. McFARLAND:  Objection.

7     MR. FREDERICKSON:  Objection.

8     BY MR. HANSEL:

9   Q.  Is that right?

10  **A.  Yes.**

11   **Q.  Had you known at the time that this was**
12  **the basis or the genesis of what happened, would**
13  **you have done something differently, would you**
14  **have not asked them to move had you known at the**
15  **time?**

16     MR. McFARLAND:  Objection.

17     MR. FREDERICKSON:  Objection.

18     THE WITNESS:  **Yes.**

19     BY MR. HANSEL:

> 20    Q. What would you have done differently?
>
> 21    A. Based on that, that's different than
> 1  what I was told.  I probably would have never
> 2  went out there at all.

Exhibit A (Deposition of Sgt. Brian T. Pope) at 124 – 130.

Similarly, the Chief of the Maryland Capital Police, Michael Wilson, testified as follows regarding the call from the executive protection officers in the Governor's Mansion:

> 10    Q. This call wasn't just that there were
> 11  protesters out there and that somebody wanted to
> 12  know who they were and why they were there, but
> 13  it involved the fact that the ***lieutenant governor***
> 14  was going to have to walk by these people, right;
> 15  is that correct?
>
> 16       MR. FREDERICKSON:  Objection.  Go ahead.
>
> 17       THE WITNESS:  It appeared.
>
> 18       BY MR. HANSEL:
> 19    Q. Okay, all right.  And they might be
> 20  asking for stuff, they were going to be asking
> 21  for stuff is what's written in the notes here,
> 1  right?
>
> 2    A. That's what is written in, yes.
>
> 3    Q. So this wasn't merely an informational
> 4  question about who was going to be there or why,
> 5  disseminating information, this specifically was
> 6  directed toward ***a particular elected official*** who
> 7  was going to have to walk by people who might be
> 8  asking him for stuff.  **Is that kind of call
> 9  common?**
>
> 10       MR. FREDERICKSON:  Objection to the
> 11  form.  Go ahead.
>
> 12       THE WITNESS:  **Yes.**

*See* Exhibit B (Deposition of Michael Wilson) at 28-29.

Chief Wilson also admitted that it was the telephone call from the Governor's Mansion that "put the process in motion," resulting in the Hulberts' arrest.  *See* Exhibit B (Deposition of Michael Wilson) at 25.

There is no contention that the Hulberts were any sort of threat to the Lieutenant Governor or anyone else.  The Hulberts are twin brothers in their fifties with professional careers.  The Hulberts have been described by the Chief of the Capital Police as "very" respectful and reasonable to deal with as well as "polite and respectful."  *See* Exhibit B (Wilson Deposition) at 19 & 149.

In any event, all charges were later dropped and the arresting officer has admitted in deposition that *the Hulbert brothers were not engaged in any of the charged activity*.  Sgt. Pope cited the Hulberts for "acting in a manner disruptive of and disturbing to the conduct of normal business" and for "prevent[ing] or disturb[ing] the general public from obtaining services provided on the property or obstruct[ing] walks."  ECF 1, para. 38.  Yet, Sgt. Pope has since admitted under oath that the plaintiffs did ***not*** engage in the cited behavior:

```
16     Q. Did you ever observe either of the
17  Hulberts disturbing any normal business that was
18  going on there before the police arrived, before
19  the group of eight officers was there?

20      A. What do you mean, disturb normal
21  business?

 1     Q. Disturbing the conduct of any normal
 2  business.

 3     A. No.

 4     Q. Did you see the Hulberts disturbing the
 5  peace in any way before the eight officers were
 6  on the scene?

 7     A. No.
```

>   8   Q. Now after the eight officers arrived,
>   9   did you see the Hulberts disrupting normal
>  10   business or disturbing the peace?
>
>  11   A. No.

*See* Exhibit A (Deposition of Brian T. Pope) at 142-143.

In fact, prior to making the decision to arrest the Hulberts, Sgt. Pope testified that he had not even seen anyone else on the sidewalk other than the six other people with the Hulberts. *See id.* at 77; 81 ("Q. Nobody was walking down the sidewalk? A. I didn't pay attention to anybody walking down the sidewalk. Q. But you didn't see anyone that you recall? A. Not that I recall."); 83 ("Q. And you don't remember anybody else being there? A. Correct."); 90 ("Q. And when you were there within 20 feet of them, you don't recall seeing anybody else on the sidewalk other than the picketers; is that right? A. That's correct."); 93 ("Q. Now as you approached them, could you see anyone else on the sidewalk besides the people with pickets? A. I wasn't paying attention. Q. So not that you recall? A. Not that I recall."); *see also* 89.

Sgt. Pope testified to the effect that had anyone else been there, they could have moved freely on the sidewalk without obstruction or hindrance, as he himself was able to do when approaching the group. *See id.*, pg. 93 ("Q. And you were able to approach them freely, you were able to move freely in the area? A. Yes."); 95 ("Q. And nothing that they were doing prevented you from getting where you needed to go or exercising your duties, did it? A. No."); 114-115 ("Q. And prior to the presence of police officers, you didn't see anybody stopped or filming or anything like that? A. No. Q. And prior to the presence of the eight police officers, people could freely come and go as far as you saw, you didn't see anybody stopped or couldn't get by; is that right? A. That's correct."); 117 ("Q. And prior to the arrival of the police cars that you've already described, people could come and go freely; is that right? A. Yes."); 130 ("Prior

to the officers' arrival, the way you described it to me, there was no disturbance or disruption of the normal business in the area by these people being there? A.  Not at that time, no. Q.  Prior to the officers being there? A.  Correct.").

Sgt. Pope also testified that cars could come and go unobstructed.  *See* Pope Deposition at 77 ("Q.  So traffic could get by? A.  Yes, it could get by."); 91 ("Q.  And there weren't any cars stopped or, the traffic was flowing freely on the road, correct? A.  I know there was nothing stopped so yes, they could go freely.").

With no one else on the sidewalk, and both foot and automobile traffic able to move freely, the Hulberts could not possibly have been "acting in a manner disruptive of and disturbing to the conduct of normal business" or "prevent[ing] or disturb[ing] the general public from obtaining services provided on the property or obstruct[ing] walks."  As a result, the charges against the Hulberts are entirely false.

This leads to a strong inference that the actual motivation for their arrest was the telephone call about the Lieutenant Governor's planned walk from one building to anther and his apparent desire not to interact with the peaceful, "reasonable" and "polite" picketers.

Crucial to the case are the questions of who gave the order to move the Hulberts and why.  These facts are critical to First Amendment claims this case, which turn on whether the Hulberts were ordered to move for any legitimate government purpose that might outweigh their First Amendment rights, or whether this was an unnecessary encroachment on protected activity.  To answer this question, who told directed that they be moved and why is critical.  As demonstrated below, the Lt. Governor's deposition is necessary in order to reach these issues.

**II.     Analysis**

    **A.     The Motion Should be Denied for Lack of a Supporting Affidavit.**

All of the facts outlined above were known to the Office of the Attorney General prior to filing the present motion because that Office represents the defendants in the present case, defended the depositions cited above and produced the telephone recording at issue.  Moreover, as she partially admits in her Certificate of Conference, the specific Assistant Attorney General who filed the present motion was referred to the depositions cited above as well as the telephone recording before her motion was filed.  *See* Exhibit C (e-mail exchange on which plaintiffs' counsel explains to the movant's counsel, "Answering the questions you are asking about our approach to the deposition would violate the attorney work product privilege.  However, I am sure that you will be able to satisfy yourself that your client has critical discoverable information by reviewing the discovery produced to date by your office as well as the depositions of the officers represented by your office.").

Despite the deposition testimony cited above, and after having been referred to said testimony, Movant's counsel represents that the Lt. Governor, "lacks any personal knowledge of the facts at issue in this case."  *See* Motion at 1.  No affidavit or other record evidence is attached to support this extra-record contention.

The sole basis for the present motion appears to be the carefully-worded allegation that the Lt. Governor lacks knowledge "of the events at issue" or, elsewhere, "of the facts at issue."[1]

---

[1] Of course, this type of assertion is immediately suspect due to the careful and very limited nature of its wording.  Whether someone has personal knowledge of the events or facts at issue depends on what one contends is at issue in the case.  The Movant makes no effort to further define his contention and it leaves enormous room for the Movant to have discoverable information (a much broader standard) along the lines of that discussed in more detail below.

*See* Motion at 1 & 2.  Despite being a matter beyond the pleadings, and having no other record support, no affidavit has been provided to the court in support of this claim.

Federal Rule of Civil Procedure 43(c) provides as follows:

Without a supporting affidavit, this Court cannot consider any fact outside the record relied upon by Defendants. New facts cannot be introduced, completely unsupported, by motion alone, but may be supported either by affidavit or by oral testimony:

(c) Evidence on a Motion. **When a motion relies on facts outside the record, the court may hear the matter on affidavits or may hear it wholly or partly on oral testimony or on depositions.**

Fed. R. Civ. P. 43(c).

The knowledge of the Lieutenant Governor is outside the record (with the exception of the depositions and other evidence cited above suggesting he *does* have knowledge relevant to this case).  Therefore, in order to make a claim that the Lt. Governor has no discoverable knowledge relevant in any way related to this case, the Movant was required to provide an affidavit to that effect.  *See* Fed. R. Civ. P. 43(c).  Given that the Movant failed to meet this requirement, the motion should be denied.

**B.    The Motion Should be Denied for Failure to Comply with Local Rule 104.7.**

Local Rule 104.7 provides that, "Counsel shall confer with one another concerning a discovery dispute and make sincere attempts to resolve the differences between them. The Court will not consider any discovery motion unless the moving party has filed a certificate reciting (a) the date, time, and place of the discovery conference, and the names of all persons participating therein, or (b) counsel's attempts to hold such a conference without success; and (c) an itemization of the issues requiring resolution by the Court."

The Movant has provided a Rule 1-4.7 Certificate of Conference which makes no mention of any effort to discuss this matter with *counsel for the defendants* in this matter.

9

Indeed, as of 11:30 a.m. on the day the parties response to the motion was due, defense counsel John Frederickson, Esquire, represented to the undersigned that the individual defendant officers had not yet decided whether to oppose the present motion.

It is very much in the interests of the defendant officers to depose the Lieutenant Governor because to whatever extent the Lieutenant Governor was involved, the individual officers may well be relieved of some responsibility for following orders in the eyes of a jury.

In any event, the failure to discuss this matter with counsel for the defendant officers and summarize said discussions in a Rule 104.7 Certificate violates the local rule and is grounds to deny the present motion.

### C. The Deposition Sought Will *Not* be Unduly Burdensome.

The Office of the Attorney General argues, *without affidavit or other support*, that the deposition sought would be "unduly burdensome." *See* Motion at 1. In doing so, the Movant fails to advise the Court that every effort has been made to accommodate the Movant's convenience. Indeed, undersigned counsel offered the following:

> I reiterate my offer to reschedule the deposition to any date and time of your client's choosing, including evenings, weekends and holidays. I expect the deposition to take 4 hours or less. I am willing to travel anywhere in the continental United States for the deposition, at your client's discretion.
>
> Please provide dates for the deposition, as your office previously promised.[2]

*See* Exhibit C (e-mail exchange between plaintiffs' counsel and the Movant's counsel). It cannot credibly be contended that a deposition of 4 hours or less is unduly burdensome if it is taken any

---

[2] Exhibit D, attached hereto, is an e-mail exchange with defense counsel when the deposition notice at issue here was initially served. In it, defense counsel makes no objection, but instead promises, "Received, thank you. John or I will get back to you soon to let you know if the any of the dates conflict with any of the deponents' schedules." Instead of providing dates, the Movant later objected and the present motion was filed.

date and time of the deponent's choosing, including evenings, weekends and holidays and anywhere in the continental United States, at the deponent's discretion.

**D.** **The Deponent is Likely to Have Discoverable Information.**

Discovery to date has established a defense claim that the genesis of the decision to arrest the Hulberts for lawfully engaging in protected First Amendment activity was a call from the executive protection detail at the Governor's Mansion citing a concern that the Lieutenant Governor wanted to move from one building to another without having to interact with the Hulberts.[3]

Given these facts, the Lieutenant Governor's deposition is vital to any reasonable effort to unravel the key elements of this case, namely: why were the Hulberts arrested and was it, as they contend, a violation of their First Amendment rights? Information that the Lt. Governor is likely to have in this regard includes, *but is not limited to*, the following:

1) Whether the Lt. Governor directed that the Capital Police interact with the picketers;

2) If the Lt. Governor directed that the Capital Police interact with the picketers, why did he do so – *i.e.*, was it the result of some alleged legitimate government interest or, as the call from the Governor's Mansion suggests, simply to avoid having to interact with persons exercising their First Amendment rights;

3) Whether the Lt. Governor discussed the Hulberts or the picketers with anyone on the day in question and if so, with who, what was discussed, *etc.*;

4) Whether the Lt. Governor was aware that the Capital Police would be made aware of the picketers and, if so, from whom did he learn this, when and for what purposes was the contact proposed;

5) If the Lt. Governor directed that the Capital Police interact with the picketers, who did and why;

---

[3] It bears repeating that there was no safety concern. The Hulberts are undisputedly "very" respectful and reasonable to deal with as well as "polite and respectful" at all times, but especially when engaged in the First Amendment activity at issue here. *See* Exhibit B (Wilson Deposition) at 19 & 149.

6) Who knew the Lt. Governor's plans (recited in the telephone call from the Governor's Mansion) to move from one building to another past the picketers;

7) Who was on duty the day in question working in close proximity to the Lt. Governor such that he or she might have known the Lt. Governor's schedule sufficiently to have directed that the call be made from the Governor's Mansion;

8) Which intermediaries ordinarily interact with the Governor's Mansion on the Lt. Governor's behalf and who did so on the day in question;

9) Did the Lt. Governor have any legitimate concerns about the Hulberts, and, if so, what were they;

10) Did the Lt. Governor contact the Governor's Mansion, the State Police or anyone else on the day in question and, if so, were the picketers or the Hulberts discussed;

11) What does the Lt. Governor know about the involvement of any of his civilian or law enforcement staff in directing the Capital Police to interact with the Hulberts;

12) Have there been other incidents where the Lt. Governor and/or his staff have directed that people be moved out of the way and, if so, why;

13) If the Hulberts were the only ones ever directed to move so that the Lt. Governor might pass, was it based on their particular political message, and if not, what was the basis;

14) Where was the Lt. Governor on the date and time the caller from the Governor's Mansion said he was about to walk by the Hulberts, was he actually about to walk by the Hulberts, and, if so, how did the caller from the governor's Mansion learn this information; and

15) Are there any standing orders, directions, policies, procedure, patterns or practices followed by the Lt. Governor's staff, protection detail or others around him related to the Lt. Governor's movements in Annapolis and efforts to avoid interactions with members of the public, picketers, protesters, the Hulberts or others?

The forgoing is, by no means, an exhaustive list, but provides a general synopsis of the type of information that the Lt. Governor can provide which would be highly relevant to this case.

### E. The Information Sought Has Not Been Made Available through Other means, Despite Request.

Before seeking the deposition at issue, plaintiffs attempted several other means to obtain the crucial information sought from the Movant. Yet, the defendants – represented by the same office representing the Movant – have failed to provide the information. For instance, the plaintiffs served interrogatories on each of the two defendants seeking identification of any individual that had personal knowledge of the incident:

> Identify all persons who are likely to have personal knowledge of any fact alleged in the Complaint or in your answer to the Complaint, or upon whom you intend to rely in defense of this matter, and state the subject matter of the personal knowledge possessed by each.

The responses *should have*, *but did not*, include the name of the individual who called from the Governor's Mansion, the name of the person who directed him to make the call, and so forth back to the person with whom the directive originated (presumably the Lt. Governor or someone close enough to him to know his movements that day). Unfortunately, neither defendant provided the name of the individual in the Governor's Mansion, let alone anyone above him in the chain of command who was involved.

Whether this is because the information is unknown to all but the Lt. Governor or was purposefully withheld is of no moment.[4] The point is that the plaintiffs made these requests, and the information was not forthcoming.

In addition, plaintiffs deposed both defendants, inquiring about the crucial telephone call at length. Both Defendants admitted that the telephone call originated from the Governor's Mansion and informed the Maryland Capitol Police about plaintiffs' presence on the sidewalk:

---

[4] The Plaintiffs assume that the defendant officers have acted in good faith, and simply do not know the relevant information. Thus, it is unavailable to them or the plaintiff except through the deposition of the Lt. Governor.

> Q. Now on the night in question, how did you first become aware of the group you later identified as Patriot Picket, did you see them out there, did you get a phone call or radio communication; how did you first become aware of them that night?
>
> A. I got a call from Dispatcher Wesby. She received a call from the governor's mansion that there was a group setting up, and I knew that there was no group scheduled.

Exhibit A (Deposition of Brian T. Pope) at 60-61.

> Q. At 6:15 it says the mansion called, advised that there are people setting up signs in College Avenue and Lawyer Mall. The lieutenant governor is in Miller's Senate and he has to walk back that way. They're going to be asking for stuff. Do you see that?
>
> A. Uh-huh.
>
> Q. Is that yes?
>
> A. Yes.

Exhibit B (Deposition of Michael S. Wilson) at 23-24.

> Both defendants denied knowing the caller's identity:
>
> Q. And to your knowledge, the person at the governor's mansion making that call, do you know who that person is, do you recognize the speaker at the governor's mansion? We can play it again if you'd like.
>
> A. No, I don't recognize the voice.
>
> Q. I think they said the name. Let's just pick up, because in fairness to both of us, this was just given to me before the deposition, I never got it before.
> (Recording being played.)
>
> A. He never said the name.
>
> Q. That's okay, so all I hear the person saying who introduced himself on the recording, said this is the mansion. Who lives at the mansion?
>
> A. The governor.
>
> Q. And do you know who it was that said this is the mansion?
>
> A. No, sir.

14

Exhibit A (Deposition of Brian T. Pope) at 179.

> Q. Now when I hear the call, the caller says this is the mansion?
>
> A. Uh-huh.
>
> Q. Is that a yes?
>
> A. Yes.
>
> Q. And I don't hear the caller identify him or herself, it sounds like a male to me.
>
> A. Correct.
>
> Q. Were you able to determine who that person was, who they worked for or was it a sworn officer, that kind of thing?
>
> A. No.

Exhibit B (Deposition of Michael S. Wilson) at 34-35.  Defendant Chief Wilson stated that the caller was a member of the Lieutenant Governor's executive protection detail:

> Q. Is it your belief that the person whose voice we hear is in executive protection at the governor's mansion?
>
> A. Yes.

Exhibit B (Deposition of Michael S. Wilson) at 35-36.

Beyond this information, and that the caller had a deep voice, defendants were not able to provide any further information that could identify the caller.  The only other information provided by Defendants is that (1) the call originated from the governor's mansion, and (2) the call was placed due to the lieutenant governor's impending walk from an adjacent building.

Without any further information, the only remaining avenue for plaintiffs is to directly depose the Lieutenant Governor. No other individual has been identified that may be able to identify the caller or the individual that ordered the call to be placed.  Even if the Lieutenant Governor does not have direct personal knowledge of the phone call itself, he should have

pertinent information that could assist plaintiffs in identifying the caller; for example, the identities of his executive protection detail and each individual with prior knowledge of the Lieutenant Governor's schedule on February 5, 2018.

In short, the plaintiff has information that the call was made on behalf of the Lt. Governor, but has been unable, despite significant efforts, to identify who directed that the call be made working from the bottom up (*i.e.*, starting with the caller, whose identify is unknown). Therefore, the only avenue left to discover the identity of the person who made the decision regarding the Hulberts (as well as why it was made), is to start with the Lt. Governor and work down the chain of command until the identity of the person who gave the directive is discovered (be it the Lt. Governor or someone on his staff).

Knowing who directed that the Hulberts be moved from the sidewalk is crucial to knowing why the direction was given. This information is vital, in turn, to a determination of whether there was a legitimate government purpose or it whether the Hulberts were being ordered away in violation of their constitutional rights as they have alleged. Thus, the Movant's deposition is vital and necessary to the case.

> **F.   The Cases Cited by the Movant Do Not Support the Relief Sought Given the Facts of this Case.**

The movant cites an unreported trial court decision in *United States v. Wal-Mart Stores, Inc.*, No. CIV.A. PJM-01-1521, 2002 WL 562301, at *3 (D. Md. Mar. 29, 2002) for the proposition that there is an "exception" to the general rules of discovery as it relates to high ranking officials holding public office."[5]

---

[5] While the plaintiffs address this case above under the presumption that the so-called "Morgan Doctrine" applies here, the plaintiffs also assert that the "Morgan Doctrine," and any concept that government officials should be treated any differently than anyone else under the law is a violation of the plaintiffs' rights to due process and equal protection, as well as a principle

The Federal Rules of Civil Procedure hold that "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b). As a result, "Courts are extremely hesitant to prohibit the taking of a discovery deposition and most **requests of this nature are denied**." *UAI Tech., Inc. v. Valutech, Inc.*, 122 F.R.D. 188, 191 (M.D.N.C. 1988) (emphasis added); *see also Baron Fin. Corp. v. Natanzon*, 240 F.R.D. 200, 202 (D. Md. 2006) ("An order to vacate a notice of taking a deposition is generally regarded by the courts as both unusual and unfavored" (internal quotations and citations omitted).

Federal Courts have held that where "relevant evidence" may be discovered, "depositions are necessary in order to give the plaintiff the opportunity" to do so. *Culp v. Devlin*, 78 F.R.D. 136, 140 (E.D. Pa. 1978). Further, in determining whether information is relevant, the Court should not "disregard[] the theories underlying the plaintiff's case." *Id.*, pg. 141.

In the instant action, the Hulberts have complained that they were arrested in violation of their constitutional rights and that the citations issued against them contained false charges. In light of the discovery that has already occurred, Lt. Gov. Rutherford's testimony is not only relevant, it is central to the Hulberts' claim of a constitutional violation. Thus, when:

> Defendants hold important public offices, when they come into federal court they must be treated like all other parties. **Justice in the judicial system requires equality of treatment and equal application of the discovery rules**. If any other individual would be required to attend a deposition under these circumstances, so must these defendants be made to appear for oral examination unless compelling circumstances direct otherwise.

---

without support in the Constitution or in any statute, and, finally, that it is anathema to our representative democracy. The plaintiff hereby moves that the court so find, but offers the analysis above in the alternative.

*Culp*, 78 F.R.D. at 141 (emphasis added).  While the above refers to parties to a lawsuit, the reasoning nonetheless applies to non-parties since:

> It is clear that the standards set forth in the [Federal] Rules [of Civil Procedure], and particularly the Rule 26(b)(1) limitation of discovery to information relevant to the claim or defense of any party, **apply equally with respect to depositions of parties and non-parties**.

*Bell ex rel. Estate of Bell v. Bd. of Educ. of County of Fayette*, 225 F.R.D. 186, 193 (S.D.W. Va. 2004) (emphasis added).

Lt. Gov. Rutherford cites an unreported case for the proposition that a high-ranking official may only allegedly be deposed under exceptional circumstances *or* when "the official is personally involved in a material way."  ECF 36, para. 7; citing *United States v. Wal-Mart Stores, Inc.*, CIV.A. PJM-01-1521, 2002 WL 562301, at *3 (D. Md. Mar. 29, 2002).  First, it should be noted that the rationale in *Wal-Mart Stores, Inc.*, leans heavily on the Supreme Court's decision in *United States v. Morgan*, 313 U.S. 409 (1941), which the *Wal-Mart Stores, Inc.* Court itself interprets as only applying in the context of deposing public officials related to their *official conduct related to the mental processed of administrative agency decision-makers*:

> The *Morgan* doctrine protects **the mental processes of administrative agency decision-makers**.  It stems from the proposition that high-ranking government officials should not, in the absence of extraordinary circumstances, be called upon to testify regarding their reasons for **official conduct**.

*Wal-Mart Stores, Inc.*, CIV.A. PJM-01-1521, 2002 WL 562301, at *4 (D. Md. Mar. 29, 2002) (emphasis added).

The evidence that has come to light through discovery in this matter suggests either that Lt. Gov. Rutherford personally ordered the removal of the Hulberts and Patriot Picket from a public sidewalk where they were lawfully gathered and engaging in constitutionally protected speech or that those close to him did so.  This has nothing to do with any lawful "official action,"

and even less with "administrative agency decision-makers." Thus, *Wal-Mart Stores, Inc.,* is not applicable to the facts at issue.

Of course, even if it were, *Wal-Mart Stores, Inc.,* clearly stands for the proposition that Lt. Gov. Rutherford should be deposed, since the evidence adduced to date strongly suggests that he had material personal involvement in the removal of the Hulberts. In considering this point, it is important to examine the rationale behind the Morgan Doctrine:

> The *Morgan* doctrine recognizes that, left unprotected, high-ranking government officials would be inundated with discovery obligations involving scores of cases ***where the public official would have little or no personal knowledge of material facts***.
>
> * * *
>
> One of the driving principles of the *Morgan* decision is that the ***indiscriminate depositions*** of high-ranking government officials would be unduly burdensome upon said officials and likely discourage them from accepting positions as public servants.

*United States v. Wal-Mart Stores, Inc.*, No. CIV.A. PJM-01-1521, 2002 WL 562301, at *1–3 (D. Md. Mar. 29, 2002).

The Morgan Doctrine is meant to preclude "indiscriminate" depositions in situations "where the public official would have little or no personal knowledge of material facts." *Id*. This simply is not such a case. Above, the plaintiff makes a particularized showing, not only of what information is likely within the personal knowledge of the deponent, but also of other efforts to obtain the relevant information. This is a far cry from an indiscriminate deposition sought from someone with little or no knowledge.

Lt. Gov. Rutherford also cites *Lederman v. New York City Dep't of Parks & Recreation*, 731 F.3d 199, for the proposition that an "exceptional circumstance" permitting the deposition includes any "unique first-hand knowledge related to the litigated claims." ECF 36, para. 7; citing *Lederman*, 731 F.3d at 203. This case also supports allowing the deposition because the

Lt. governor has unique, first-hand knowledge related to all of the issues identified above on which he should be deposed, not the least of which being *who directed that the Hulberts be ordered off of the sidewalk so the Lt. Governor could pass and why*.

As noted above, the defendants (who, like the Movant, are represented by the Office of the Attorney General) have thus far refused (despite request) to provide any information as to the genesis of the direction to the executive protection team in the Governor's Mansion to make the call expressing the Lt. Governor's concerns. Thus, the Lt. Governor is the only deponent known to the plaintiffs competent to provide the information outlined above which is critical to their case.

### IV.   CONCLUSION

For all the aforementioned reasons, Lt. Gov. Rutherford's Motion to Quash Subpoena and for Protective Order should be denied.

Respectfully submitted,

HANSEL LAW, PC

       /s/ Cary J. Hansel       
Cary J. Hansel (Bar No. 14722)
cary@hansellaw.com
2514 N. Charles Street
Baltimore, MD 21218
Phone: (301) 461-1040
Fax: (443) 451-8606
*Counsel for Plaintiffs*

### CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of October, 2019, I caused the foregoing to be filed via the Court's electronic filing system, which will make service on all parties entitled to service.

       /s/ Cary J. Hansel       
Cary J. Hansel