# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND

Jeff Hulbert, *et al.*

        *Plaintiffs*,

    v.                            Civil No.: 1:18-CV-00461-GLR

Sgt. Brian Pope, *et al.*

        *Defendants*.

## PLAINTIFFS' SUR-REPLY TO DEFENDANTS' MOTION TO QUASH SUBPOENA AND FOR PROTECTIVE ORDER

      Come now the Plaintiffs, by and through undersigned counsel, and submit the aforesaid Sur-reply, stating as follows:

## I.    The Movant's Affidavit is Insufficient.

      Movant's counsel represented, in a very broad fashion, in her original motion that the Lt. Governor "lacks any personal knowledge of the facts at issue in this case." *See* ECF 36 at 1. No affidavit or other record evidence was attached to support this extra-record contention in violation of Federal Rule 43(c) ("When a motion relies on facts outside the record, the court may hear the matter on affidavits or may hear it wholly or partly on oral testimony or on depositions.").

      In a Reply, for the first time, the Movant provided an affidavit, but it does *not* support his counsel's sweeping proclamation in her original motion. Indeed, the only relevant information in the affidavit are claims that the Movant allegedly: 1) "did not instruct, encourage or request anyone to call the Maryland Capital Police on February 5, 2018 concerning any protestors; 2) had no knowledge that such a call was made until well after the fact;" and 3) do[es] not

## Exhibit B

recognize the voice of the person who made the call…[and does] not know the identity." *See* ECF 38-1.

This affidavit does confirm that the Movant learned of the call at some point, but fails to disclose when.  Certainly, from whom the Movant learned of the call, when, why he was told and what he learned are critical issues to be discovered in this case.  After all, the purpose of the call (whether to quell protected First Amendment activity or to serve legitimate law enforcement ends) is the central issue in the case.  Since the call was made as a result of the fact that the Movant was going to walk from one building to another and did not want to interact with picketers, surely his conversations, upon learning of the call, would reveal much about what motivated it.

Further, before providing his affidavit in the Reply, the Movant had the fifteen-point list of matters on which the Plaintiffs sought his brief deposition (which list was contained in the Plaintiffs' Opposition).  Virtually none of those issues were addressed in the affidavit.

Information that the Lt. Governor is likely to have which is relevant to this case and which is not precluded by the affidavit includes, *but is not limited to*, the following:

1)      Whether the Lt. Governor directed that the Capital Police interact with the picketers;

**NOTE: While the affidavit states that the Movant did not direct that anyone "call the Maryland Capital police," the affidavit does not preclude, or even address, whether the Movant directed in some other fashion that the Capital Police interact with the picketers.  Without limitation, the Movant may have simply asked an associate to deal with the protestors because he did not like their message without specifically mentioning a call or the Capital Police.**

2)      If the Lt. Governor directed that the Capital Police interact with the picketers, why did he do so – *i.e.*, was it the result of some alleged legitimate government interest or, as the call from the Governor's Mansion suggests, simply to avoid having to interact with persons exercising their First Amendment rights;

*See* Note to Item 1, *supra*.

3)      Whether the Lt. Governor discussed the Hulberts or the picketers with anyone on the day in question and if so, with who, what was discussed, *etc*.;

        **NOTE: The affidavit does not discuss this point at all, and, indeed, suggests that at some point, the Movant did become aware of the call, and, thus, likely did discuss these events with someone, during which discussions information highly relevant to this case was likely revealed.**

4)      Whether the Lt. Governor was aware that the Capital Police would be made aware of the picketers and, if so, from whom did he learn this, when and for what purposes was the contact proposed;

        **NOTE: The affidavit does not discuss this point at all.  Its absence is particularly telling since the Movant had a list of relevant information sought prior to providing the affidavit.  The list included this item.  If, in fact, the Movant was not aware that the Capital Police would be made aware of the picketers on the day in question, including this point in his affidavit would have been an easy matter.  As a result, it would appear that the Movant likely has discoverable information on this critical point.**

5)      If the Lt. Governor did not direct that the Capital Police interact with the picketers, who did and why;

        **NOTE: Again, the affidavit is silent on this point, which suggests that the Movant has discoverable information critical to the Plaintiffs' case.**

6)      Who knew the Lt. Governor's plans (recited in the telephone call from the Governor's Mansion) to move from one building to another past the picketers;

        **NOTE: The affidavit is silent on this point, which suggests that the Movant has discoverable information critical to the Plaintiffs' case.**

7)      Who was on duty the day in question working in close proximity to the Lt. Governor such that he or she might have known the Lt. Governor's schedule sufficiently to have directed that the call be made from the Governor's Mansion;

        **NOTE: The affidavit is silent on this point, which suggests that the Movant has discoverable information critical to the Plaintiffs' case.**

8)      Which intermediaries ordinarily interact with the Governor's Mansion on the Lt. Governor's behalf and who did so on the day in question;

        **NOTE: The affidavit is silent on this point, which suggests that the Movant has discoverable information critical to the Plaintiffs' case.**

9)      Did the Lt. Governor have any legitimate concerns about the Hulberts, and, if so, what were they;

**NOTE: The affidavit is silent on this point, which suggests that the Movant has discoverable information critical to the Plaintiffs' case.**

10)     Did the Lt. Governor contact the Governor's Mansion, the State Police or anyone else on the day in question and, if so, were the picketers or the Hulberts discussed;

**NOTE: The affidavit is silent on this point, which suggests that the Movant has discoverable information critical to the Plaintiffs' case.**

11)     What does the Lt. Governor know about the involvement of any of his civilian or law enforcement staff in directing the Capital Police to interact with the Hulberts;

**NOTE: The affidavit is silent on this point, which suggests that the Movant has discoverable information critical to the Plaintiffs' case.**

12)     Have there been other incidents where the Lt. Governor and/or his staff have directed that people be moved out of the way and, if so, why;

**NOTE: The affidavit is silent on this point, which suggests that the Movant has discoverable information critical to the Plaintiffs' case.**

13)     If the Hulberts were the only ones ever directed to move so that the Lt. Governor might pass, was it based on their particular political message, and if not, what was the basis;

**NOTE: The affidavit is silent on this point, which suggests that the Movant has discoverable information critical to the Plaintiffs' case.**

14)      Where was the Lt. Governor on the date and time the caller from the Governor's Mansion said he was about to walk by the Hulberts, was he actually about to walk by the Hulberts, and, if so, how did the caller from the governor's Mansion learn this information; and

**NOTE: The affidavit is silent on this point, which suggests that the Movant has discoverable information critical to the Plaintiffs' case.**

15)     Are there any standing orders, directions, policies, procedure, patterns or practices followed by the Lt. Governor's staff, protection detail or others around him related to the Lt. Governor's movements in Annapolis and efforts to avoid

interactions with members of the public, picketers, protesters, the Hulberts or others?

> **NOTE: The affidavit is silent on this point, which suggests that the Movant has discoverable information critical to the Plaintiffs' case.**

The Movant had the advantage of the list above before providing his affidavit. Thus, it would have been a simple matter to have gone through the list and affirmed a total lack of any relevant knowledge on each point if such was the case. Instead, the Movant has hastily retreated from the original claim that he "lacks any personal knowledge of the facts at issue in this case," and has provided a carefully-worded affidavit. Indeed, the language of the affidavit is contrived to focus almost entirely on a single telephone call while ignoring that the issue in the case is not that telephone call, but why the Hulberts were arrested. On this latter point, as demonstrated in the notes following each numbered issue above, the affidavit provides no guidance as to the Movant's knowledge. As a result, it is insufficient to support the original claim that the Movant "lacks any personal knowledge of the facts at issue in this case." Thus, the motion based on this claim should be denied.

## II.     The Movant Failed to Address the Record Evidence Suggesting that He, or Someone Close to Him, was the Genesis of the Plaintiffs' False Arrests.

As noted in the Plaintiffs' Opposition, Defendant Brian T. Pope, the arresting officer, confirmed that the Capital Police interacted with the Hulberts on the day in question because the State Police working executive protection in the "governor's mansion" called the Capital Police and "said that ***the lieutenant governor*** was about to walk to the senate building or from the senate building, and they didn't want the protesters to interact with the ***lieutenant governor***. *See* ECF 37-1 (Deposition of Sgt. Brian T. Pope) at 124-130. The Chief of the Maryland Capital Police, Michael Wilson, testified similarly. *See* ECF 37-2 (Deposition of Michael Wilson) at 28-

29.  Chief Wilson also admitted that it was the telephone call from the Governor's Mansion that "put the process in motion," resulting in the Hulberts' arrest.  *See Id*. at 25.

In addition, Lakeshia Wesby, the civil communications officer employed by the Maryland Capital Police, who took the call from the Lt. Governor's team, testified that she received similar calls from elected officials on a regular basis, for the sole purpose of requesting police action to ensure the elected official would not need to interact with protestors:

> Q       Sure.  Now, how often have you had calls related to -- from aids or staff or secretaries from elected or appointed officials that are related to either a protest or picketers or people near Lawyers Mall walking around? Do you get those a lot?
>
> A       We do get some, but I can't tell you how many we get.

Exhibit B (Deposition of Lakeshia Wesby) at 24.

> Q       Sure.  In those cases where the call is from elected -- and so certainly you have received calls from the staff of elected or appointed officials to notify you that there are people in or near Lawyers Mall that look like they might want to interact with or talk to the elected or appointed officials?
>
> A       Yes.

*Id*. at 31.

> And you told me earlier, I think, that in your 19 years these types of groups of people in or around Lawyers Mall have always been peaceful in your experience.
>
> A       In my experience they have been peaceful. I've never seen an unpeaceful rally or protest.

*Id*. at 32.

> **Q       So just to be clear, there are certainly occasions in your experience where the staff of elected or appointed officials calls to say to you that there are people on or near Lawyers Mall that the elected or appointed official would not like to interact with and they want help avoiding that interaction and then you pass that on; is that right?**
>
> MR. FREDRICKSON:  Objection.
>
> MR. MCFARLAND:  Objection.

6

**Q      I'm sorry.  Is that right?**

**A      Yes.**

*Id*. at 34 (emphasis added); *see also* 33.

In this particular case, she admitted the call had been made about the Lt. Governor:

**Q      But when they call -- and we're now talking about this group of calls where elected or appointed officials call because they don't want to have to interact with people on or near Lawyers Mall, when you receive those calls from the governor's mansion, are those about the governor or lieutenant governor or both or other elected or appointed officials?**

MR. FREDRICKSON:  Objection.

MR. MCFARLAND:  Objection.

**A      It could be both.**

**Q      Okay.  And certainly during your career *you've gotten those calls about both; is that right*?**

**A      *Yes*.**

**Q      All right.  And I think one of those calls, to fast forward a little bit, was in the case we're here to talk about; is that fair?**

MR. FREDRICKSON:  Objection.

MR. MCFARLAND:  Objection.

**A      Yes.**

*Id*. at 37-38 (emphasis added).

Wesby testified that whenever she received a call regarding protestors, she would immediately forward the call to the sergeant *for the express purpose* of "moving or avoiding interaction" between the elected official and the protestors:

Now, when you get calls from the staff's, let's say, by or on behalf of elected and appointed officials -- that would include their staff, their aids, their secretaries, that kind of thing, **when you get calls by or on behalf of elected officials that**

they'd rather not interact with people on or near Lawyers Mall, is there a particular rank of person that you like to forward those to?

      MR. FREDRICKSON:  Objection.

      MR. MCFARLAND:  Objection.

**Q     Like the lieutenant, the sergeant, the major, the captain?  Is there a particular rank?**

**A     Usually the sergeant.  It goes to the sergeant.**

Q     And who is the -- at this point in time, so now we're -- I'm stepping back into asking you a little bit about the situation with my clients. In February of 2018, who was the sergeant that you would forward a call like that to?

A     It would have been Sergeant Pope.

Q     Okay.  So in the ordinary course -- we're going to get to what happened specifically in my client's situation.  But in the ordinary course, if you got a call like that, you would -- once you understood the nature of the call, you would say to the caller please hold, I'd like to forward it to a sergeant. Is that fair?

A     Yes.

              \* \* \*

Q     So we're talking about elected and appointed officials.  Again, as I understand what you're telling me -- because I'm just trying to make sure we're talking about the same calls.  **Going forward, we're talking about calls from elected and appointed officials or their staffs or people calling on their behalf who are aware there are people on or near Lawyers Mall, don't want to interact with them and want the police help in either avoiding them *or moving them*. Is that -- you've told me that happens, right?**

**A     Yes.**

**Q     All right.  I think you told me *about twice a month*; is that right?**

**A     Yes.**

**Q     All right.  So then when those calls come in, once you ascertain that's the nature of the call, you forward it to the sergeant; am I right?**

**A     Yes.**

**Q**      **And you've told me you never got a call like that from the public.  It's always by or on behalf elected or appointed officials?**

**A**      **Yes.**

*Id.* at 45-48 (emphasis added); *see also* 35.

**Q**      **And that's because these types of messages, when elected or appointed officials or people on their behalf call about moving or avoiding interaction with people on or near Lawyers Mall, those types of messages are treated somewhat urgently by your office; is that right?**

      MR. FREDRICKSON:  Objection to the form.

      MR. MCFARLAND:  Objection.

**Q**      **Is that right?**

**A**      **Yes.**

**Q**      **In other words, they're too urgent for email, you said.  You want to get to the sergeant right away?**

**A**      **Yes.**

**Q**      **And that's because of the importance of the people who's calling; is that right?**

**A**      **Yes.**

*Id.* at 51 (emphasis added).

Q      Now, the --okay.  When these types of calls come in, you said you then interact with the sergeant in the way you've described and I'll just adopt that, and then sometimes it's you and sometimes it's the sergeant who communicates direction to other officers. Do I have that correct?

A      Yes.

Q      And when it is you, I'm guessing, based on a lot of years of experience, that you just communicate whatever the sergeant tells you to do; is that fair?

A      Yes.

**Q      So the sergeant might say to you, for instance, you know, *have somebody go move those people to another area* and you just communicate that to the officer in the field; is that right?**

**A      *Yes.***

**Q      Okay.  And *that kind of direction certainly you've received before, right?***

**A      *Yes.***

Q      All right.  And you've received that after one of these types of calls we're talking about obviously, right?

        MR. FREDRICKSON:  Objection.

Q      Is that yes?

A      Yes.

Q      And so is that the usual approach?  Is that sort of -- you said you get these a couple times a month. ***Is that the usual response, to have the officer in the field move people?***

        MR. FREDRICKSON:  Objection.

        MR. MCFARLAND:  Objection.

**A      *Yes.***

Q      And then when -- and you've described sometimes you give that instruction yourself, but only with -- at the direction of the sworn officer; is that right?

A      Yes.

* * *

So when a call of the nature we're discussing comes in and you communicate it to the sergeant, we have described I think what happens if the sergeant tells you to communicate with somebody in the field and how that happens.  You mentioned to me earlier it can also happen that the sergeant communicates directly with somebody in the field. And so what I'm asking now is:  Have you observed that communication either by hearing it as you sit there, seeing it if it's verbal? Have you observed the sergeant communicating this information to people?

A       Yes.

Q       And so since you've observed it, then my next question is:  Is it the same type of direction that the sergeant sometimes asks you to give, in other words, let's move those people to another area, that type of thing?

A       Yes.

Q       Okay.  All right.

*Id*. at 52-54 (emphasis added).

Further, all charges were later dropped against the Plaintiffs and the arresting officer has admitted in deposition that *the Hulbert brothers were not engaged in any of the charged activity*. *Compare* ECF 1, para. 38 *with* ECF 37-1 at 142-143.  Thus, there is no valid law enforcement reason for the arrests of a man holding a political sign on a public sidewalk while another man filmed.

This leads to a strong inference that the actual motivation for their arrest was the telephone call about the Lt. Governor's planned walk from one building to another and his apparent desire not to interact with the peaceful picketers.  Yet, nothing in the affidavit provided rebuts this inference.

**III.    The Movant Failed to Address the Fact that the Information Sought <u>Has Not Been Made Available through Other means, Despite Request</u>.**

The Plaintiffs have sought the genesis of the telephone call directing the police to interact with the Hulberts on behalf the Lt. Governor throughout discovery, including in written discovery and depositions.  *See* ECF 37.  Despite these efforts, the relevant information has not been provided by the Office of the Attorney General (the same office now representing the Movant).  *Id*.  The Office of the Attorney General makes no contention to the contrary on behalf of the Movant.

It appears undisputed that the call was made at least *on behalf of* the Lt. Governor, but the Plaintiffs have been unable, despite significant efforts, to identify who directed that the call be made (or why) by working from the bottom up (*i.e.*, starting with the caller, whose identity is unknown).  Even Lakeshia Wesby, who took the call, was unable to identify the caller:

> Q      And could you—did you know who it was? Did you recognize the voice?
>
> A      No, I did not.
>
> Q      I know this may be not the easiest question in the world, but could you tell anything else about the person based on their voice?
>
> * * *
>
> A      I don't—I just knew it was a male. I couldn't tell the difference in the voice, no. I don't believe it had no accent or anything like that. No accent or anything.

Exhibit B (Deposition of Lakeshia Wesby) at 62. Plaintiffs have also attempted to discover the identity of the caller through a document request to the Defendants, which requested "[d]ocuments sufficient to identify the male, thought to be a Maryland State Police Officer, who called from the Governor's Mansion to the Maryland Capital [sic] Police on February 5, 2018 in connection with picketers later ascertained to be the Patriot Picket." *See* Exhibit C (Notice to Take Deposition Duces Tecum), at 6. The documents were originally due to be provided to Plaintiffs by 9:00 a.m. on October 7, 2019. *Id*. at 1. Defendants' counsel promised Plaintiffs' counsel to deliver all responsive documents no later than October 25, 2019. As of 4:30 p.m. on October 25, 2019, the Defendants have failed to produce *any* responsive documents identifying the caller.

All of the Plaintiffs' attempts to identify the caller and any persons who directed or requested the call be made from the bottom up have reached dead ends or been stonewalled. Therefore, the only avenue left to discover the identity of the person who made the decision

12

regarding the Hulberts (as well as why it was made), is to start with the Lt. Governor and work down the chain of command until the identity of the person who gave the directive is discovered (be it the Lt. Governor or someone on his staff).  None of this is disputed by the Movant.  As such, the brief deposition sought should be permitted.

## IV.   **The Movant Failed to show that the Deposition Sought Will be Unduly Burdensome.**

Plaintiffs' counsel has offered to limit the deposition to 4 hours or less and take it any date and time of the deponent's choosing, including evenings, weekends and holidays and anywhere in the continental United States, at the deponent's discretion.  *See* ECF 37-3 (e-mail exchange between Plaintiffs' counsel and the Movant's counsel).

Given the demonstrated relevance of the Lt. Governor's knowledge, the lack of any other avenue to obtain this critically relevant information, and the scheduling flexibility shown by Plaintiffs' counsel, as well as the fact that only a very brief deposition is sought, the Movant has failed to show that the deposition will be unduly burdensome.

In short, the Plaintiffs have demonstrated that the Movant has "unique first-hand knowledge related to the litigated claims or…the necessary information cannot be obtained through other, less burdensome or intrusive means."  *See* ECF 38 at 4-5 (*citing Lederman v. New York City Dep't of Parks & Rec.*, 731 F. 3d 199, 203 (2d Cir. 2013).  This is the standard for which the Movant contends and it is readily met here for reasons more fully described in the Opposition, most of which are uncontested in the Reply.  *See* ECF 37 and 38.

The rationale behind the Morgan doctrine cited by the Movant is that, "left unprotected, high-ranking government officials would be inundated with discovery obligations involving scores of cases ***where the public official would have little or no personal knowledge of material facts.***"  *United States v. Wal-Mart Stores, Inc.*, No. CIV.A. PJM-01-1521, 2002 WL 562301, at

*1 (D. Md. Mar. 29, 2002).  Indeed, "[o]ne of the driving principles of the *Morgan* decision is that the ***indiscriminate depositions*** of high-ranking government officials would be unduly burdensome upon said officials and likely discourage them from accepting positions as public servants."  *Id*. at *3.

The Plaintiffs do not seek an "indiscriminate" deposition "where the public official would have little or no personal knowledge of material facts."  *Id*.  Instead, the Plaintiffs have made a particularized showing of the information likely within the personal knowledge of the deponent and the other efforts to obtain the relevant information.

**V.**     **Service was Proper.**

All discovery in this case has been served by e-mail between the parties, by agreement of the office of the undersigned and the Office of the Attorney General.

Upon receipt of the subpoena for the Movant by e-mail form the undersigned, the Office of the Attorney General wrote Plaintiffs' counsel, stating, "Received, thank you. John or I will get back to you soon to let you know if the any of the dates conflict with any of the deponents' schedules."  *See* ECF 37-4.  Instead of providing dates, the Movant later objected and the present motion was filed.

Thereafter, the undersigned held a telephone conversation with Assistant Attorney General John Fredrickson, Esquire, to confirm that no contention was being made that service was improper given the history of accepting service by e-mail and given, further, that the Office of the Attorney General represents the Lt. Governor by law.  At no point did Mr. Fredrickson contend that service was improper, while obviously preserving the other arguments related to undue burden on a public official.

Indeed, the initial motion filed by the Lt. Governor contains no suggestion that service was improper.  As a result, any such contention – to the extent it existed at all after the assurances of the Office of the Attorney General – was waived.

Yet, in her Reply, the Assistant Attorney General representing the Movant states as an aside and without further argument or analysis, that "plaintiffs have not provided any evidence that [the subpoena] was properly served on the Lt. Governor."  *See* ECF 38 at 2.  Of course, such a statement falls well short of a claim that service was improper, or of a motion to quash the subpoena on these grounds.  Further, given that service was not contested in the initial motion, there was no prior need for counsel to lay out the fact that service had been accepted by the Office of the Attorney General.

In an overabundance of caution, the undersigned has ensured that the Lt. Governor was personally served.  On October 18, 2019, the undersigned's process server attempted to hand-deliver the subpoena to the Lt. Governor at his office at 100 State Circle, Annapolis, MD 21401.  However, the process server was turned away from the Lt. Governor's office and was instructed to serve the subpoena at the Office of the Attorney General.  The subpoena was subsequently hand-delivered to Assistant Attorney General Justin Fine at the Office of the Attorney General at 200 St. Paul Place, Baltimore, MD 21201—the same office previously served by email.  *See* Exhibit A (Proof of Service).

The Plaintiffs note that service has been accepted by the very office representing the Lt. Governor.  As such, the present motion does not turn on the question of service.

## IV.   CONCLUSION

For all the aforementioned reasons, Lt. Gov. Rutherford's Motion to Quash Subpoena and for Protective Order should be denied.

Respectfully submitted,

HANSEL LAW, PC

/s/ Cary J. Hansel
Cary J. Hansel (Bar No. 14722)
cary@hansellaw.com
2514 N. Charles Street
Baltimore, MD 21218
Phone: (301) 461-1040
Fax: (443) 451-8606
*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of October, 2019, I caused the foregoing to be filed via the Court's electronic filing system, which will make service on all parties entitled to service.

/s/ Cary J. Hansel
Cary J. Hansel

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.  1:18-cv-00461 GLR

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)*  Boyd Rutherford

on *(date)*  October 17, 2019

☑ I served the subpoena by delivering a copy to the named individual as follows:  Personal, hand delivery to
Justin Fine, Assistant Attorney General at the office of the Maryland Attorney General located at
200 St Paul Place, Baltimore, MD 21201.                              on *(date)*   October 18, 2019                  ; or

☐ I returned the subpoena unexecuted because:

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date:  10/21/19

_____
Server's signature

Jacques Collier, Affiant
*Printed name and title*

J & M Delivery, Inc. 301-530-5999

4306 Howard Ave, Kensington, MD 20895
*Server's address*

Additional information regarding attempted service, etc.:

Exhibit A

AO 88A (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Maryland

| | | |
|---|---|---|
| Jeff Hulbert, et al. | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.   1:18-cv-00461 GLR |
| Sgt. Brian Pope, et al. | ) | |
| | ) | |
| *Defendant* | ) | |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:                                   Boyd K. Rutherford

*(Name of person to whom this subpoena is directed)*

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:
Please see the attached notice of videotaped deposition for further instruction

| Place: Hansel Law, P.C.<br>2514 N Charles Street<br>Baltimore, MD 21218 | Date and Time:<br>10/28/2019 10:00 am |
|---|---|

The deposition will be recorded by this method:   Court reporter

☐ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:   10/17/2019

| | | |
|---|---|---|
| | *CLERK OF COURT* | |
| | | OR |
| | | /s/ Cary Hansel |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   Jeff Hulbert and
Kevin Hulbert                                                            , who issues or requests this subpoena, are:
Cary Hansel 2514 N Charles Street, Baltimore, MD 21218 cary@hansellaw.com 301-461-1040

**Notice to the person who issues or requests this subpoena**
If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF MARYLAND

3

4   JEFF HULBERT, et al.,

5             Plaintiffs

6        vs.                        Civil Action No.

7   SGT. BRIAN T. POPE, et al.,      1:18-CV-02317 GLR

8             Defendants

9   _____/

10

11          The deposition of LAKEISHA URICA WESBY was

12   held on Monday, October 21, 2019, commencing at 10:21

13   a.m., at the Law Offices of Hansel Law P.C., 2514 North

14   Charles Street, Baltimore, Maryland 21218,

15   before R. Dwayne Harrison, a Notary Public.

16

17

18

19

20                                        Exhibit B

21   REPORTED BY: R. Dwayne Harrison

1      **A       It could be -- a lot of times they have**

2   **committee meetings or, you know, they may call and say**

3   **it's cold or can you have someone to pull the trash.   I**

4   **don't know.   It could be something like that.**

5      Q       Okay.   So when you say it's cold, they're

6   not calling to tell you about the weather.   You they

7   mean they need the heat turned up?

8      **A       They need the heat turned up, yeah.**

9      Q       I understand.

10     **A       Or they need the air on or something of**

11   **that nature they call for.**

12     Q       Sure.   Now, how often have you had calls

13   related to -- from aids or staff or secretaries from

14   elected or appointed officials that are related to

15   either a protest or picketers or people near Lawyers

16   Mall walking around?

17          Do you get those a lot?

18     **A       We do get some, but I can't tell you how**

19   **many we get.**

20     Q       Is there a particular official who is known

21   for those types of calls that you get a lot from?

1       Q       Okay.

2       **A       -- you know.**

3       Q       Sure.  In those cases where the call is

4    from elected -- and so certainly you have received

5    calls from the staff of elected or appointed officials

6    to notify you that there are people in or near Lawyers

7    Mall that look like they might want to interact with or

8    talk to the elected or appointed officials?

9       **A       Yes.**

10          MR. FREDRICKSON:  Objection.

11      Q       And you told me earlier -- he may -- just

12   so you know the process -- I'm sure it's been explained

13   to you, but folks may object.  Unless somebody

14   instructs you not to answer, the process is for you go

15   ahead and answer.  But give him time to get his

16   objection out.

17          That's fine.  No, you're doing great.

18   You're doing great.  We got it.  He got it.

19   Everybody's got it.  You're doing great.  But I just

20   tell you that -- and we're all very good at letting you

21   know if there's something somebody thinks you shouldn't

1   answer.  Everybody in here has -- will use their

2   outside voice when they have to, but please don't worry

3   about that.

4           And you told me earlier, I think, that in

5   your 19 years these types of groups of people in or

6   around Lawyers Mall have always been peaceful in your

7   experience.

8   **A       In my experience they have been peaceful.**

9   **I've never seen an unpeaceful rally or protest.**

10  Q       Okay.  Wonderful.

11          And so what you've seen is just people --

12  **A       I mean, they have had them, but just not**

13  **when I'm on the clock.**

14  Q       All right.  Fair enough.

15          So when the staff of elected and appointed

16  officials are calling to point out that there are

17  people that may want to interact with the elected and

18  appointed officials, is part of the purpose of that

19  call or is a request that you sometimes receive that

20  that interaction be avoided somehow?

21          MR. FREDRICKSON:  Objection.

1       Q       Do you understand the question?

2               MR. FREDRICKSON:  Objection to the

3       question.  Go ahead.

4       **A       Can you state the question again?**

5       Q       Sure.  It was kind of rambling.

6               When the staff of elected or appointed

7       officials call you to point out that there are people

8       on or near Lawyers Mall that may want to interact with

9       the elected officials, is one of the requests that is

10      sometimes made that the elected official would like to

11      avoid that interaction somehow?

12              MR. FREDRICKSON:  Objection.

13              MR. MCFARLAND:  Objection.

14      Q       Is that sometimes explained to you during

15      those calls?

16      **A       Not to me because, if that happens, I**

17      **usually pass it to a supervisor.**

18      Q       Okay.  So -- but you have certainly -- but

19      in order to determine to pass it to a supervisor,

20      you've certainly heard those types of requests and then

21      you pass is on; is that right?

Deposition of Lakeisha Urica Wesby                    Jeff Hulbert, et al. v. Sgt. Brian T. Pope, et al.

1      **A**      **Yes.**

2      Q      So just to be clear, there are certainly

3    occasions in your experience where the staff of elected

4    or appointed officials calls to say to you that there

5    are people on or near Lawyers Mall that the elected or

6    appointed official would not like to interact with and

7    they want help avoiding that interaction and then you

8    pass that on; is that right?

9             MR. FREDRICKSON:  Objection.

10            MR. MCFARLAND:  Objection.

11     Q      I'm sorry.  Is that right?

12     **A**      **Yes.**

13     Q      Okay.  And are those calls -- just now

14   talking about during session, most of those are during

15   session, I'm guessing?

16            Are those -- how often are they, once a

17   day, once a week?  What would you estimate?

18     **A**      **I can't really answer because they would be**

19   **random.**

20     Q      Yeah, sure.

21     **A**      **I don't -- I can't say once a week or...**

1      Q      Can you give me an at least -- like you get

2   one of those at least every two weeks?

3      **A      I can't say.**

4      Q      And, obviously, I'm asking for an estimate,

5   you know.  And so I'm not asking you to tell me -- to

6   sit here and remember for 19 years every call you ever

7   got, right?

8           But based on your experience and really

9   knowing your job like you do, can you tell me you get

10  one of those calls at least every two weeks, at least

11  every three weeks?

12           MR. FREDRICKSON:  Objection.

13           MR. MCFARLAND:  Objection.

14           MR. FREDRICKSON:  Go ahead.

15      **A      Maybe -- out of a month maybe twice,**

16  **something like that.**

17     Q      All right.  So two a month is a fair

18  estimate; is that right?

19     **A      Something like that.**

20     Q      All right.  Fair enough.  That's all I'm

21  asking for.  I appreciate that.

1      **A        Yes.**

2      Q        Okay.  And those calls from the governor's

3   mansion, who are they on behalf of?  Governor's

4   mansion -- the governor is writing the name, so I don't

5   know, but who are they on behalf of?

6            MR. FREDRICKSON:  Objection.  Go ahead.

7      **A        They're usually from -- they're usually on**

8   **behalf of his staff or it could be the mansion, the**

9   **governor's mansion.**

10     Q        But when they call -- and we're now talking

11  about this group of calls where elected or appointed

12  officials call because they don't want to have to

13  interact with people on or near Lawyers Mall, when you

14  receive those calls from the governor's mansion, are

15  those about the governor or lieutenant governor or both

16  or other elected or appointed officials?

17            MR. FREDRICKSON:  Objection.

18            MR. MCFARLAND:  Objection.

19     **A        It could be both.**

20     Q        Okay.  And certainly during your career

21  you've gotten those calls about both; is that right?

1      **A      Yes.**

2      Q      All right.  And I think one of those calls,

3   to fast forward a little bit, was in the case we're

4   here to talk about; is that fair?

5           MR. FREDRICKSON:  Objection.

6           MR. MCFARLAND:  Objection.

7      **A      Yes.**

8      Q      Now, the -- moving forward a little bit,

9   let me understand a little bit more about your job.

10  You did a great job of explaining it.  I didn't do a

11  good job of asking you all the questions I wanted to

12  ask.

13           You mentioned to me that you sometimes get

14  calls and then you have the ability to forward those

15  along; is that right?

16     **A      Yes.**

17     Q      All right.  So you have a -- in addition to

18  those screens you're looking at to see what's going on

19  out in the world, you have a phone system and can

20  forward calls and I'm not -- you know, like the way

21  somebody might think of a receptionist's desk, you have

1   your detachment in Annapolis.

2          Am I right about that?

3       **A        No, because the major that's in Baltimore**

4   **is the major over the whole entire detachment.**

5       Q       Got it.  I think I understand.

6          Now, when you get calls from the staff's,

7   let's say, by or on behalf of elected and appointed

8   officials -- that would include their staff, their

9   aids, their secretaries, that kind of thing, when you

10  get calls by or on behalf of elected officials that

11  they'd rather not interact with people on or near

12  Lawyers Mall, is there a particular rank of person that

13  you like to forward those to?

14         MR. FREDRICKSON:  Objection.

15         MR. MCFARLAND:  Objection.

16      Q       Like the lieutenant, the sergeant, the

17  major, the captain?  Is there a particular rank?

18      **A        Usually the sergeant.  It goes to the**

19  **sergeant.**

20      Q       And who is the -- at this point in time, so

21  now we're -- I'm stepping back into asking you a little

1    bit about the situation with my clients.

2              In February of 2018, who was the sergeant

3    that you would forward a call like that to?

4        A    It would have been Sergeant Pope.

5        Q    Okay.  So in the ordinary course -- we're

6    going to get to what happened specifically in my

7    client's situation.  But in the ordinary course, if you

8    got a call like that, you would -- once you understood

9    the nature of the call, you would say to the caller

10   please hold, I'd like to forward it to a sergeant.

11             Is that fair?

12       A    Yes.

13       Q    And I take it one of the reasons -- let's

14   talk about -- again, I may ask you some questions that

15   are obvious in your field and I apologize, but we're

16   trying to make sure everybody understands.

17             In a situation where a member of the public

18   calls and let's suppose the member of the public said

19   there are people in Lawyers Mall -- on or around

20   Lawyers Mall that I'd rather not interact with and I'd

21   like somebody to do something about it, I'm guessing

1    that call from a member of public would not get

2    forwarded to the sergeant.

3            Am I right about that?

4    **A      It would go to the sergeant.**

5    Q      Oh, even that?

6    **A      Yes.**

7    Q      Have you ever had one from a member of the

8    public?

9    **A      No.**

10   Q      So we're talking about elected and

11   appointed officials.  Again, as I understand what

12   you're telling me -- because I'm just trying to make

13   sure we're talking about the same calls.  Going

14   forward, we're talking about calls from elected and

15   appointed officials or their staffs or people calling

16   on their behalf who are aware there are people on or

17   near Lawyers Mall, don't want to interact with them and

18   want the police help in either avoiding them or moving

19   them.

20           Is that -- you've told me that happens,

21   right?

 1        **A**      **Yes.**

 2        Q      All right.  I think you told me about twice

 3   a month; is that right?

 4        **A**      **Yes.**

 5        Q      All right.  So then when those calls come

 6   in, once you ascertain that's the nature of the call,

 7   you forward it to the sergeant; am I right?

 8        **A**      **Yes.**

 9        Q      And you've told me you never got a call

10   like that from the public.  It's always by or on behalf

11   elected or appointed officials?

12        **A**      **Yes.**

13        Q      And when those calls come in and you

14   forward them then to the sergeant, but do you have any

15   more to do with them after that?

16        **A**      **No.  Usually the sergeant can come up and**

17   **he may say send whoever, whoever our mobile unit is.**

18        Q      And then is it your responsibility to

19   communicate with the mobile unit or does the sergeant

20   do that directly or does it sometimes happen that it's

21   both?

1    definitely wouldn't want to email.

2          Q      Sure.

3          A      So we would tell him over the radio or over

4    the phone or if they are in the office.

5          Q      And that's because these types of messages,

6    when elected or appointed officials or people on their

7    behalf call about moving or avoiding interaction with

8    people on or near Lawyers Mall, those types of messages

9    are treated somewhat urgently by your office; is that

10   right?

11               MR. FREDRICKSON:  Objection to the form.

12               MR. MCFARLAND:  Objection.

13         Q      Is that right?

14         A      Yes.

15         Q      In other words, they're too urgent for

16   email, you said.  You want to get to the sergeant right

17   away?

18         A      Yes.

19         Q      And that's because of the importance of the

20   people who's calling; is that right?

21         A      Yes.

Deposition of Lakeisha Urica Wesby                    Jeff Hulbert, et al. v. Sgt. Brian T. Pope, et al.

1        Q        Now, the --okay.  When these types of calls

2    come in, you said you then interact with the sergeant

3    in the way you've described and I'll just adopt that,

4    and then sometimes it's you and sometimes it's the

5    sergeant who communicates direction to other officers.

6             Do I have that correct?

7        A        Yes.

8        Q        And when it is you, I'm guessing, based on

9    a lot of years of experience, that you just communicate

10   whatever the sergeant tells you to do; is that fair?

11       A        Yes.

12       Q        So the sergeant might say to you, for

13   instance, you know, have somebody go move those people

14   to another area and you just communicate that to the

15   officer in the field; is that right?

16       A        Yes.

17       Q        Okay.  And that kind of direction certainly

18   you've received before, right?

19       A        Yes.

20       Q        All right.  And you've received that after

21   one of these types of calls we're talking about

 1    obviously, right?

 2                 MR. FREDRICKSON:  Objection.

 3         Q      Is that yes?

 4         **A      Yes.**

 5         Q      And so is that the usual approach?  Is that

 6    sort of -- you said you get these a couple times a

 7    month.

 8                 Is that the usual response, to have the

 9    officer in the field move people?

10                 MR. FREDRICKSON:  Objection.

11                 MR. MCFARLAND:  Objection.

12         **A      Yes.**

13         Q      And then when -- and you've described

14    sometimes you give that instruction yourself, but only

15    with -- at the direction of the sworn officer; is that

16    right?

17         **A      Yes.**

18         Q      Fair enough.  And then other times that

19    sworn officer gives the direction and you've either

20    heard or observed that happen; is that right?

21         **A      The other sworn officer?**

Deposition of Lakeisha Urica Wesby                           Jeff Hulbert, et al. v. Sgt. Brian T. Pope, et al.

1        Q       I'm sorry.  Let me slow down.  Sure.

2                So when a call of the nature we're

3    discussing comes in and you communicate it to the

4    sergeant, we have described I think what happens if the

5    sergeant tells you to communicate with somebody in the

6    field and how that happens.  You mentioned to me

7    earlier it can also happen that the sergeant

8    communicates directly with somebody in the field.

9                And so what I'm asking now is:  Have you

10   observed that communication either by hearing it as you

11   sit there, seeing it if it's verbal?

12               Have you observed the sergeant

13   communicating this information to people?

14       **A       Yes.**

15       Q       And so since you've observed it, then my

16   next question is:  Is it the same type of direction

17   that the sergeant sometimes asks you to give, in other

18   words, let's move those people to another area, that

19   type of thing?

20       **A       Yes.**

21       Q       Okay.  All right.

Deposition of Lakeisha Urica Wesby                    Jeff Hulbert, et al. v. Sgt. Brian T. Pope, et al.

1        Q       And could you -- did you know who it was?

2   Did you recognize the voice?

3        **A       No, I did not.**

4        Q       I know this may be not the easiest question

5   in the world, but could you tell anything else about

6   the person based on their voice?

7                I grew up in West Virginia and I try really

8   hard, but sometimes folks tell me I have an accent.

9   Sometimes somebody has a high-pitched voice, a

10  low-pitched voice.  They may sound like they're from a

11  particular region of the world or a particular region

12  of the country.

13               Was there anything other than male that you

14  could make out about that voice that you recall today?

15       **A       I don't -- I just knew it was a male.  I**

16  **couldn't tell the difference in the voice, no.  I don't**

17  **believe it had no accent or anything like that.  No**

18  **accent or anything.**

19       Q       All right.  Fair enough.

20               And when you get a call like this, is it --

21  do you do anything to identify the person?  You said

---

CRC Salomon, Inc.                    www.crcsalomon.com - info@crcsalomon.com                    Page: 62
Office (410) 821-4888                2201 Old Court Road, Baltimore, MD 21208                    Facsimile (410) 821-4889

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**JEFF HULBERT,** *et al.*

*Plaintiffs,*

v.                                                                    **Case No. 1:18-cv-00461 GLR**

**SGT. BRIAN POPE,** *et al.*

*Defendants*

## NOTICE TO TAKE DEPOSITION DUCES TECUM
### (Records Only)

Under the terms and provisions of Fed. R. Civ. P. 30 and 34, and in accordance with the

Maryland Local Rules, counsel for Plaintiffs Jeff Hulbert and Kevin Hulbert will take the records

deposition of the following named person who is requested to produce the records at the time and

place designated below:

| | |
|---|---|
| **NAME:** | **Designee of the State of Maryland** |
| | **ATTN: John C. Fredrickson, Esq.** |
| | **ATTN: Robert A. McFarland, Esq.** |
| | **300 W Preston Street, Room 608** |
| | **Baltimore, MD 21201** |
| **DATE & TIME:** | **October 7, 2019 at 9:00am** |
| **PLACE:** | **Hansel Law, P.C.** |
| | **2514 North Charles Street** |
| | **Baltimore, MD 21218** |

The records deposition will be taken before a Notary Public of the State of Maryland, or

other duly qualified officer authorized by law to administer oaths at the location set forth above.



At the above date, time and place, you are also requested to produce for inspection and copying **the documents listed in the provided attachment.**

Please certify that the requested records and documents provided by you are true and accurate copies of records maintained by your facility, and should be certified as correct by the custodian of records or another person authorized to make that certification.

NOTE:  **PERSONAL APPEARANCE OF THE CUSTODIAN OF RECORDS IS NOT NECESSARY IF THE REQUESTED CERTIFIED RECORDS ARE DELIVERED TO HANSEL LAW, P.C. PRIOR TO THE DATE AND TIME OF THE DEPOSITION NOTED ABOVE.**

Respectfully submitted,

HANSEL LAW, PC

Cary J. Hansel
Hansel Law, P.C.
2514 North Charles Street
Baltimore, MD 21218
Tel: (301) 461-1040
Fax: (443) 451-8606
cary@hansellaw.com
*Counsel for Plaintiff*

2

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 5th day of September, 2019, a copy of the foregoing

was Notice of Deposition *Duces Tecum* was mailed, postage pre-paid to:


John C. Fredrickson, Esq.
Robert A. McFarland, Esq.
Assistant Attorney General
300 W Preston Street, Room 608
Baltimore, MD 21201

Cary Hansel

## DOCUMENTS REQUESTED

**REQUEST NO. 1:** All current and former policies and procedures related to picketing, filming, congregating or walking on the public sidewalk adjacent to "Lawyer's Mall" in Annapolis, Maryland, which were in place at any time from 2015 until the present.

**REQUEST NO. 2:** The recordings (audio and/or visual) and documents (including, but not limited to, police reports, police files, correspondence, notes, e-mail, memoranda, and journal entries) which relate to, describe, summarize, or memorialize any communication by or between any Maryland state employee(s) or official(s) (whether appointed or elected), or anyone known or believed to have been acting under the authority of any Maryland state employee(s) and/or official(s), concerning the Patriot Picket's activities in Annapolis, Jeff or Kevin Hulbert, the Hulberts' activities on February 5, 2018, the Hulberts' February 5, 2018 arrest, the Hulberts' charging on February 5 and/or 6, 2018, or the decision to drop charges.

**REQUEST NO. 3:** Please produce all e-mail communication related in any way to the Hulberts, or any of the matters identified in Request No. 2 above, by or between Col. Michael Wilson, Chief of the Maryland Capital Police, and:

a) the office of the Anne Arundel County State's Attorney (*see* Wilson Deposition at 55);
b) Chief Wilson's lieutenants (*see* Wilson Deposition at 55);
c) Chief Wilson's commanders (*see* Wilson Deposition at 55);
d) Chief Wilson's Detachment Commander (*see* Wilson Deposition at 55);
e) the media (*see* Wilson Deposition at 57);
f) Ellington Churchill, Jr., Secretary, Maryland Department of General Services; and
g) Nick Cavey, Director Of Communications at Maryland Department of General Services (*see* Wilson Deposition at 58).

This request includes, but is not limited to, any e-mails from any person listed in Request 3(a) to and including 3(g) above to anyone else regarding the Hulberts, as well as the responses and any related e-mails any recipient(s) sent or received.

**REQUEST NO. 4:**   Please produce all recordings (audio and/or visual) and documents (including, but not limited to, police reports, police files, correspondence, notes, e-mail, memoranda, and journal entries) related in any way to the Hulberts, or any of the matters identified in Request No. 2 above, created, sent, received, stored or reviewed by Maryland Governor Larry Hogan, The Office of the Governor, Maryland Lieutenant Governor Boyd Rutherford, The Office of the Lieutenant Governor, Secretary of the Department of General Services Ellington Churchill, Jr., The Department of General Services, The Maryland State Police, Col. Michael Wilson (Chief of the Maryland Capital Police), The Maryland Capital Police, or any of their protection details, offices, agents, apparent agents, assigns, staff or employees.

**REQUEST NO. 5:**   Please produce all recordings (audio and/or visual) and documents (including, but not limited to, police reports, police files, correspondence, notes, e-mail, memoranda, and journal entries) relating to or reflecting requests by any appointed or elected official, their protection details, offices, agents, apparent agents, assigns, staff or employees, to law enforcement to move, relocate, investigate, contact, examine, speak with, direct, order, interfere with, or otherwise interact in any way with picketers, protesters, speakers, demonstrators, and/or others engaging in or attempting to engage in First Amendment activity during a legislative session in Annapolis, Maryland.

**REQUEST NO. 6:**   Please produce all recordings (audio and/or visual) and documents (including, but not limited to, police reports, police files, correspondence, notes, e-mail, memoranda, and journal entries) relating to or reflecting requests by Lieutenant Governor Boyd Rutherford, The Office of the Lieutenant Governor, the Lt. Governor's protection details, offices, agents, apparent agents, assigns, staff or employees, to law enforcement to move, relocate,

5

investigate, contact, examine, speak with, direct, order, interfere with, or otherwise interact in any way with picketers, protesters, speakers, demonstrators, and/or others engaging in or attempting to engage in First Amendment activity during a legislative session in Annapolis, Maryland.

**REQUEST NO. 7:**   Please produce all recordings (audio and/or visual) and documents (including, but not limited to, police reports, police files, correspondence, notes, e-mail, memoranda, and journal entries) relating to or reflecting requests by Governor Larry Hogan, The Office of the Governor, the Governor's protection details, offices, agents, apparent agents, assigns, staff or employees, to law enforcement to move, relocate, investigate, contact, examine, speak with, direct, order, interfere with, or otherwise interact in any way with picketers, protesters, speakers, demonstrators, and/or others engaging in or attempting to engage in First Amendment activity during a legislative session in Annapolis, Maryland.

**REQUEST NO. 8:**   Documents sufficient to identify the male, thought to be a Maryland State Police Officer, who called from the Governor's Mansion to the Maryland Capital Police on February 5, 2018 in connection with picketers later ascertained to be the Patriot Picket.

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the
District of Maryland

| | |
|---|---|
| Jeff Hulbert, et al. | ) |
| *Plaintiff* | ) |
| v. | )    Civil Action No.   1:18-cv-00461 GLR |
| Sgt. Brian Pope, et al. | ) |
| | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:                    State of Maryland

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: Please see attached Notice of Deposition Duces Tecum

| Place: Hansel Law, P.C.<br>2514 North Charles Street<br>Baltimore, MD 21218 | Date and Time:<br>10/07/2019 9:00 am |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:    09/05/2019

          *CLERK OF COURT*

                               OR

                                                  /s/ Cary Hansel

          *Signature of Clerk or Deputy Clerk*                         *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*    Jeff Hulbert and Kevin Hulbert                                    , who issues or requests this subpoena, are:

Cary Hansel 2514 N Charles Street, Baltimore, MD 21218 cary@hansellaw.com (301) 461-1040

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 1:18-cv-00461 GLR

**PROOF OF SERVICE**

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❐ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❐ I returned the subpoena unexecuted because: _____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

(1) *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
(i) is a party or a party's officer; or
(ii) is commanded to attend a trial and would not incur substantial expense.

(2) *For Other Discovery.* A subpoena may command:
(A) production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
(B) inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

(1) *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

(2) *Command to Produce Materials or Permit Inspection.*
(A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
(B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

(3) *Quashing or Modifying a Subpoena.*
(A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
(i) fails to allow a reasonable time to comply;
(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
(iv) subjects a person to undue burden.
(B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
(i) disclosing a trade secret or other confidential research, development, or commercial information; or

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
(C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

(1) *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
(A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
(B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
(C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
(D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) *Claiming Privilege or Protection.*
(A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
(i) expressly make the claim; and
(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
(B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).