*Interrogatory #23*



## MARYLAND CAPITOL POLICE
## OPERATIONS DIRECTIVE

### Demonstrations

| Distribution: | All Employees | Index: | OPS 14.08 |
|---|---|---|---|
| Responsible Unit: | Headquarters | Rescinds: | 12-105, 13-103 |
| Issued: | June 15, 2018 | Revised: | December 19, 2018 |

### .01    Purpose

To establish policy for MCP personnel when responding to and managing public demonstrations.

### .02    Policy

The First Amendment to the U.S. Constitution says that "Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances." The Fourth Amendment provides "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." The 14th Amendment requires the states to provide due process and equal protection of the laws to all people within their jurisdiction.

As articulated in the United States Constitution, one of the freedoms guaranteed by the First Amendment is the right of persons and groups to assemble peacefully.  Whether demonstrating, counter-protesting, or showing support for a cause, individuals and groups have the right to peacefully gather.  Law enforcement, in turn, has the responsibility to ensure public safety while protecting the privacy and associated rights of individuals.

MCP personnel will protect the Constitutional Rights of all people regardless of their politics, beliefs, opinions or affiliations. Further, MCP personnel will enforce the laws of the State of Maryland as necessary to ensure the safety of the public and participants during public demonstrations.

### .03    Definitions

CIVIL DISTURBANCE - an unlawful assembly that constitutes a breach of the peace or any assembly of persons where there is imminent danger of collective violence, destruction of property or other unlawful acts.

 DEMONSTRATION (*synonyms: Protest, Rally*) -  a public meeting, march or assemblage of people expressing views on a political issue, policy, course of action, or showing support for a cause or person. Demonstration includes the following activities: parading, picketing, speech making, holding of vigils, sit-ins, or other activities conducted for the purpose of demonstrating approval or disapproval or governmental policies or practices (or the lack thereof) expressing a view on public issues, or bringing into public notice any issues or other matter.

### .04    Authority

U.S. Const. Amend. I, IV, and XIV;

MD State Fin & Pro Code § 4-204,  § 4-601, § 4-603,  § 4-604, § 4-606;

COMAR 04.05.02.02, 04.05.02.03, 04.05.02.04



OPS 14.08
**Demonstrations**

## .05   Background

Changes in mass demonstrations in recent years have prompted a reexamination of how police departments need to respond to and prepare for these events. Unlike past demonstrations, which often were planned by established civil rights groups or other organizations, today's demonstrations often emerge spontaneously and are organized informally via social media. As a result, the police might have a more difficult time identifying demonstration leaders, which could hinder the ability to establish communications with leaders, to discuss the police role in facilitating the exercise of First Amendment rights, to set ground rules, and to plan logistical issues.

Because police departments are responsible for managing and facilitating demonstrations, departments need to review existing strategies, and modify them if necessary, to meet the challenges these trends present. Police departments should start by ensuring all officers understand that their role is to facilitate demonstrators' First Amendment rights while protecting public safety.

The First Amendment guarantees free expression by protecting the right to freedom of speech, freedom of the press, and freedom of assembly and petition. Free expression encompasses all forms of speech, from spoken and written word, to signs, T-shirt slogans, armbands, and to organizational memberships. The courts, however, have consistently ruled that, while the government may not restrict the actual content of speech, it may restrict the time, place, and manner of speech.

Police departments need to find ways of communicating with demonstrators to discuss logistics, to develop a plan, and to establish expectations, all of which may be difficult when demonstrations occur spontaneously, with little or no established leadership structure.

## .06   Procedures

A. General Procedures

1. Most public gatherings will require that MCP supervision, within the area of jurisdiction, review at least a limited amount of information in order to make an assessment of the potential impact of the event on public safety. As part of this assessment, MCP supervision must consider the need to preserve the peace, the need to deploy officers for crowd and traffic control and other public safety purposes, and the need to protect persons' rights to assemble and express their opinions.

2. Public safety, primarily based on the amount of space available in the chosen area, will dictate the maximum number of participants allowed in the event. Groups of **fewer than fifteen (15) persons** do not require a permit, however, they should be encouraged to communicate with MCP in advance of the demonstration activity so that available space can be fairly and appropriately allocated. An approved permit will give the permitted group priority over a subsequent applications by another person or group, or a group demonstrating without a permit.

3. MCP personnel obtaining information regarding demonstrations will immediately notify the Detachment Commander of information received.

4. Upon determining that the demonstration will require law enforcement interaction, Commander's will implement the following procedures.

B. Application for Demonstrations

OPS 14.08
**Demonstrations**

1. Public Event Permit - When advance notice is received regarding a planned demonstration, and an identifiable organizer can be determined, they will be contacted by the Detachment Commander or designee and asked to complete an MCP Form 3 – Public Event Permit Application which can be obtained from the Maryland Capitol Police webpage, mcp.maryland.gov.

2. Once completed applications for organized activities may be submitted in the following manner.

   a. For events on the Maryland State Capitol Grounds, applications may be submitted by:

      1) Mailing the application to:

         Maryland Capitol Police
         Annapolis Detachment Commander
         29 St Johns Street
         Annapolis, MD 21401;

      2) Providing the application in person to the Maryland Capitol Police (MCP) Annapolis Detachment Commander, between 8:00 a.m. and 4:00 p.m., Monday through Friday;

      3) Emailing application to mcp.rallyrequest@maryland.gov; or

      4) Faxing to 410-974-2224.

   b. Applications for organized activities on other DGS owned properties may be submitted by:

      1) Mailing the application to:

         Maryland Capitol Police
         Headquarters
         301 W. Preston St. M-5
         Baltimore, MD 21201;

      2) Presenting the application in person to one of the Maryland Capitol Police installations, between 8:00 a.m. and 4:00 p.m., Monday through Friday;

      3) Emailing application to mcp.rallyrequest@maryland.gov; or

      4) Faxing to 410-333-7036.

3. Permits are issued at no cost to the applicant on a first-come, first-serve basis.

4. Applications will be accepted up to one (1) year in advance of the event.

C. Pre-Event Planning

1. Risk Assessment - Upon receipt of an application, the Commander or designee will assign a supervisor to complete a pre-event risk assessment in which limited information is collected that is relevant to the agency's decision as to the need to take action to facilitate event-related activities and provide a public safety response. The information sought should be clearly identified as needed solely to plan an adequate response to ensure public safety and health and to protect the public and those exercising their First Amendment rights. This should include:

OPS 14.08
**Demonstrations**

    a. Determining the purpose of the event.

    b. Determining the time, location, and type of activities planned.

    c. Estimating the number of persons expected to participate.

    d. Analyzing the expected means and routes of travel for participants and expected times of arrival and departure.

    e. Determining whether violence or other criminal conduct is anticipated or might reasonably occur at the event.

2. The use bicycle officers should be considered when available. They are able to maneuver in crowds more easily than officers in vehicles, and bicycle officers are often seen as more approachable. In addition, bike helmets provide officers with some head protection that is not perceived to be militaristic gear.

3. If possible, prepare for a demonstration by removing potential projectiles such as trash cans from areas where protesters will gather.

4. Prepare to separate protesters and counter-protesters to prevent violent conflict.

5. Prepare for the potential of multiple operational periods and plan for relief for both front-line resources and operational command.

6. Planning should include logistical considerations to include identifying:

    a. Personnel to be assigned to arrest teams with resources available for securing, transporting and efficiently processing prisoners;

    b. Staging areas for anticipated resources to include: Arrest Teams, Fire, EMS, and MFF; and

    c. Food, water and other personnel needs items for long duration events or adverse conditions.

D. Pre-event Walkthrough:

    a. A pre-event walkthrough will be required with MCP prior to receiving written approval, unless the Annapolis Detachment Commander waives this requirement.

    b. When possible, Commander's should make contact with organizers and attempt to develop a rapport ahead of time to facilitate cooperation. Attempts should be made to assure them that the goal of law enforcement is to assist them in exercising their Constitutional rights and ensuring participant and public safety.

    c. Organizers must provide a completed Form 3 prior to or at the walkthrough.

    d. An event coordinator must be designated who will be responsible for every aspect of the event.

    e. During the pre-event walkthrough with organizers, the Commander or designee should review the rules as outlined in the Public Event Permit Application, so that participants know what to

OPS 14.08
**Demonstrations**

expect from law enforcement the date of the event. The pre-event walkthrough will also establish specific needs and requests of the event coordinator.

E.  Use of Social Media

1.  Social media and other communications tools can be used to convey the message that the police understand that their role in managing demonstrations is to protect demonstrators' rights while also protecting public safety. When demonstrations seem to be leaderless, it is particularly important to communicate directly with all demonstrators and the general public. Messaging can be distributed utilizing:

    a.  The MCP Facebook and Twitter accounts, and

    b.  The MCP Nixle notification system.

2.  The Commander can request assistance with social media resources by contacting the Headquarters.

F.  Operational Plan

1.  Based on the findings of the Pre-Event Planning, the Commander should develop an Operational Plan for the event. The plan should articulate the agency's operational objectives during the event. Although there are certain objectives that will be consistent in all events, every event has unique characteristics that may require a unique response. As such, all objectives should be clearly stated. The operational objectives may include:

    a.  Engaging in crowd and traffic control;

    b.  Preventing criminal activity;

    c.  Providing dignitary protection;

    d.  Protecting persons and property;

    e.  Ensuring compliance with reasonable restrictions on the time, place, and manner for conducting the event as described in permits and Maryland regulations; and

    f.  Assessing the need for additional personnel or other response (i.e., Mobile Field Force (MFF) allied law enforcement, emergency medical services).

2.  The Operational Plan should include measures to efficiently increase the level of response if signs of impending violence are detected. A demonstration might begin calmly but then start to grow volatile. To protect the safety of protesters and officers, the Operational Plan should have measures for efficiently and quickly increasing response levels in proportion to what is happening.

3.  Gear and equipment approved for use should be proportional to the anticipated level of risk of violence or changes in the mood of the crowd during the event. Officer safety is critical and should be considered at all times. Part of that consideration is ensuring that we do not increase the tension during a demonstration unintentionally by outfitting responding officers in more gear and with more equipment than is necessary during their initial contact with the crowd. Begin with the lowest response level but be prepared to change if conditions change.

OPS 14.06
**Demonstrations**

4. Documenting Event:

a. Videotaping – Assign an officer to record video of major events, including your own officers. Having your own video recordings is critical to reviewing officers' actions. The news media and participants will be making their own recordings, but they may edit recordings to create false impressions or show incidents out of context. Police should have their own record of the event.

b. Reporting – An officer will be assigned the task of completing and submitting an incident report documenting the event. Any problems, special situations or other noteworthy details will be included in the report.

5. Communications:

a. A dedicated channel should be identified for the event which is separate from the routine communications for the Detachment.

b. Consideration should be given to assigning additional communications personnel dedicated to the event.

c. For large scale events, consideration should be given for assignment of a dedicated radio channel for logistics. This ensures that command staff can stay apprised of conditions on the ground when additional resources are needed and the needs of officers assigned to the event, such as food and water.

6. Incident Action Plan – Once the operational plan is finalized, the commander or designee will complete an MCP Incident Action Plan (IAP) which will be forwarded to Headquarters for review and final approval by the Chief of Police or his designee.

a. The IAP should clearly identify the Incident Commander which, unless extenuating circumstances exist, will be the Detachment Commander.

b. Key support positions should be identified as necessary (i.e. Operations Chief, Planning Chief, Logistics Chief, etc.)

c. The IAP will identify allied resources and points of contact.

d. If the event will occur across jurisdictional lines, a Unified Command Structure should be implemented and the IAP developed in conjunction with representatives from the affected agencies.

G. Implementing Operational Plan

1. The Incident Commander will ensure that the IAP is disseminated to all personnel and allied representatives.

2. Pre-Operational Period Briefing:

a. Providing clear instruct officers about the department's overall strategy, goals, and operational guidelines in responding to a demonstration is critical. This instruction ensures that responding officers understand that the department has an overarching response plan and that their roles and responsibilities are designed to support that strategy. Internal communication will also

OPS 14.08
Demonstrations

prevent situations in which officers feel they are receiving mixed messages during a demonstration: e.g., whether to make arrests or to engage in other responses.

b. Clearly communicate to officers the specific behaviors, tactics, and messaging that are expected of them during the demonstration. This communication will make them more confident in their decision making on the line and demonstrate to them that they are supported by the department in those actions.

c. Provide instruction to officers on the bar for making arrests and communicate it to all officers. Most departments do not make arrests for low-level civil disobedience during a protest, such as blocking traffic, particularly if traffic can be rerouted around a blocked intersection.

d. Remind officers that crowds are not usually homogenous. They might include protesters with constitutionally protected aims, as well as other individuals aiming to commit acts of violence or other serious criminal offenses.

e. Allied agencies providing support to the operation should be invited to the briefing and the share specifics of the IAP—including roles, assignments, and the location of the Unified Command Center and the mutual aid staging area.

3. The Incident Commander should attempt to meet again with the demonstration organizers to discuss regulations and rules of engagement. Explain the police role to the crowd and outline your expectations for their behavior. Most protesters are peaceful; don't allow a small group of instigators to provoke an aggressive response from officers. Engaging the crowd in a friendly, non-confrontational manner and befriending them can act as a force multiplier.

H. Civil Disturbances during Demonstrations

1. In demonstrations where agitators intend to provoke disruption or where criminal offenders hope to commit thefts or other crimes under the cover of confusion, crowded conditions, and heavy activity, understand that police agencies are in a contest with agitators for the loyalty of protesters. Police need to focus on building positive relationships with the crowd so violent agitators are unable to win the crowd's support or foster discord and potentially criminal behavior.

2. Incident Commanders should:

a. Assess the situation and determine the seriousness and the potential for escalation.

b. Make notification to:

1) Headquarters and request activation of MFF resources if needed;

2) Allied law enforcement and request assistance as deemed necessary; and

3) Local Emergency Services for fire or medical emergencies.

c. Identify staging areas for responding resources and assign an officer, preferably a Sergeant to coordinate resource deployment.

d. Ensure the response to the situation is proportional to magnitude of the unrest. Officer safety is critical and should be considered at all times. However, avoid unintentionally increasing tensions by responding more aggressively or with more equipment than is necessary.

    e. Respond to the disturbance with the goal of containment. Attempt to minimize the spread of unlawful behavior without cutting off escape routes for innocent bystanders and peaceful protestors not engages in unlawful conduct.

       1) Establish an outer perimeter sufficient to contain the disturbance and prohibit entrance into the affected area.

       2) Where possible evacuate innocent civilians from the immediate area of the disturbance.

    f. Be prepared to pull officers off the line if they appear to grow hostile toward protesters or are becoming over-stressed because protesters are focusing their antagonism on them.

3. Verbal Warnings – When appropriate verbal warnings should be given to those engaged in or inciting disorder or unlawful acts. Where possible, an MCP Form 21 will be utilized for this purpose.

    a. Verbal warnings should be given in a loud and clear manner. The use of a bullhorn or police PA may be necessary to ensure the warnings are heard.

    b. Where time permits, the warning should be repeated, with three warnings given prior to initiating arrests.

    c. The warnings should be videotaped.

I. Use of Force

1. Officers at civil disturbances are bound by the MCP Use of Force policy.

2. Unless exigent circumstances require immediate action, officers will not independently employ force without command authorization.

3. All allied law enforcement officers providing assistance to MCP will be briefed on use of force and protocols for crowd control prior to deployment.

4. All uses of force will be reported per MCP policy.

J. Making Arrests:

1. Ensure officers know they are not to act alone unless exigent circumstances exist and an arrest is necessary to prevent injury or serious property loss.

2. Avoid making mass arrests for minor infractions. Do not make arrests for low-level civil disobedience, such as blocking traffic, particularly if traffic can be rerouted around a blocked intersection.

3. Assess whether making arrests will exacerbate the situation and incite more disorder or criminal conduct. Are there alternatives to mass making mass arrests?

4. Ensure that there is probable cause to support the charges for each person arrested.

OPS 14.08
## Demonstrations

5. If arrests are needed, make sure you have prepared logistically for handling multiple arrests. Front-line officers should not be pulled to make arrests. Arrest teams should be designated from staged resources and plans made for transportation and processing.

6. Where possible, videotaping of arrests should be done so there is a record of the event.

K. Responding to Unscheduled Demonstrations

1. Upon arrival of the first officer at an unscheduled demonstration, he or she will:

   a. Observe the situation and evaluate it;

   b. Determine the nature of the incident;

   c. Determine the lawfulness of the demonstration;

   d. Notify the shift supervisor of the situation; and

   e. Request the supervisor respond to the scene and additional units, as necessary.

3. Upon arrival on the scene, the supervisor will:

   a. Assume the role of Incident Commander until relieved by higher authority;

   a. Implement the Incident Command System, as necessary;

   b. Identify a command post and staging area for responding resources;

   c. Attempt to establish contact with the group and identify the group leader;

   d. Identify the intent and likely duration of the incident;

   e. Determine the need for additional resources including:

      (1) Additional patrol units;

      (2) Allied Law Enforcement; and/or

      (3) Activation of the Mobile Field Force (MFF).

   f. Notify the Detachment Commander of the incident;

   g. Establish inner and outer perimeters as necessary; and

   i. Identify an officer to log details and events for completion of Incident Report.

Approved:

_MS Wilson_

Colonel Michael S. Wilson
Chief of Police      12/19/18

*Interrogatory #23*

| MARYLAND CAPITOL POLICE | | | |
|---|---|---|---|
| **OPERATIONS DIRECTIVE** | | | |
| **Events on Capitol Grounds** | | | |
| Distribution: | All Employees | Index: | OPS 14.09 |
| Responsible Unit: | Headquarters | Rescinds: | N/A |
| Issued: | December 19, 2018 | Revised: | N/A |

### .01   Purpose

The purpose of this policy is to ensure that events held inside the boundaries of the State Capitol Grounds are conducted in a manner that protects public health and safety, ensures the orderly business of State Government, and allows State Legislatures to fulfill their legislative responsibilities.

### .02   Policy

MCP personnel will protect the Constitutional Rights of all people regardless of their politics, beliefs, opinions or affiliations. Further, MCP personnel will enforce the laws of the State of Maryland as necessary to ensure the safety of the public and participants during public demonstrations.

### .03   Definitions

AMERICANS WITH DISABILITIES ACT (ADA) – The Annapolis Complex must be in compliance with the Americans with Disabilities Act as applied by the Congressional Accountability Act.  As such, any sponsoring person and/or organization that is granted a permit to engage in a demonstration or other organized activity on Maryland Capitol Grounds shall maintain and not block in any way all accessibly routes (pedestrian walkways).  Further, the sponsoring person and/or organization agrees to provide all people with disabilities equal access to the activity as required by the ADA.

### .04   Authority

U.S. Const. Amend. I, IV, and XIV;

MD State Fin & Pro Code § 4-204, § 4-601, § 4-603, § 4-604, § 4-606;

Md. CRIMINAL LAW Code Ann. § 4-101

MD Code Ann., Transportation Article 21-1122;

COMAR 04.05.02.02, 04.05.02.03, 04.05.02.04; 04.05.02.07

Americans with Disabilities Act (ADA)

### .05   Procedures

A.  Prohibited Areas:  Groups of any size are prohibited from demonstrating in the following areas:

   1.  Inside any State Buildings;
   2.  On the steps of the Maryland State Capitol;
   3.  On the steps of any building on the Capitol Grounds;
   4.  In any area otherwise closed or restricted for official use;
   5.  On roadways or any area routinely used for vehicular traffic;



OPS 14.09
**Events on Capitol Grounds**

6. Areas that are not deemed as a primary or secondary demonstration/rally areas as identified in the "Maryland Capitol Police Rally Areas Map" (see Appendix A).

Note:  *Notwithstanding the above, use of the State House, State House steps and grounds is not permitted for any types of demonstrations/rallies, as it is subject to the procedural rules of the Maryland Senate and House of Delegates.*

B. Designated Demonstration/Rally Areas

1. The primary demonstration/rally area on the Maryland State Capitol Grounds is located at Lawyers Mall.  This is the area located in front of the back steps, leading to the main entrance of the State House; between the Government House and the Legislative Services Building which is identified as the Primary Rally Area #1 on the Maryland Capitol Police Rally Areas Map (Appendix A).

2. The secondary demonstration/rally area on the Maryland State Capitol Grounds is located on the east side of the House of Delegates Building  (side door entrance), on College Avenue, close to St. Johns Street which is identified as the Secondary Rally Area #2 on the Maryland Capitol Police Rally Areas Map (Appendix A).

C. Approval Process

1. The rules and regulations governing press conferences, demonstrations and rallies occurring on Maryland State Capitol Grounds and other State Office Buildings and Grounds under the jurisdiction of the Department of General Services are enumerated in the Code of Maryland Regulations (COMAR) 04.05.02.

2. Applications for events on the Capitol Grounds must be submitted utilizing the Public Events Permit Application (MCP Form 3) and will be processed in accordance with the guidelines set forth in Directive OPS 14.08 Section 06.B.

3. Approved events may only occur in the area designated in the permit.  In the event to an emergency such as a major thunderstorm or extreme heat, access to suitable alternate area may be granted.

4. Demonstrations and rallies may be conducted in the walkways, streets, and other paved areas of the plaza known as Lawyer's Mall in front of the State House between the Legislative Services Building and Government House.  The areas in there posted as fire lanes may not be obstructed.

5. In the event of an official function of the Legislature is scheduled that conflicts with an already permitted activity, participants of the activity must clear the affected area prior to the start of the Legislative function, but may return in keeping with the permit guidelines, after the function has concluded or departed Capitol Grounds.

6. In case of preemption or conflicting scheduling of Lawyer's Mall, demonstrations may be conducted in other nearby outdoor areas if agreeable with the applicant for the demonstration permit and the Superintendent of Annapolis Public Buildings and Grounds.

7. Demonstrations or rallies outside State Property may require separate approval of the Mayor of Annapolis through the Annapolis Police Department.

OPS 14.09
**Events on Capitol Grounds**

D. Individuals or Groups (demonstrations or solicitation)

1. Groups of 15 or more persons wishing to hold demonstrations or rallies or engage in solicitation should apply in writing at least 2 days in advance to the MCP for a permit, unless extraordinary circumstances prevent the applications.

2. Groups of less than 15 persons may hold demonstrations or rallies or engage in solicitation without a permit, space permitting, subject to the same conditions in this regulation, but an individual or group holding a permit will have priority over an individual or group without a permit.

3. Permits shall be issued at no cost to the applicant on a first-come, first-served basis.  MCP may not refuse to issue a permit based on the:

   a. Subject matter of the demonstration;
   b. Applicant; or
   c. Lateness of the permit application.

4. Subject to paragraph 1, above, the following activities are not prohibited at Lawyer's Mall:

   a. Distribution of literature, materials, and merchandise for the exposition of ideas and opinions in the exercise of freedom of speech, association, assembly, and religion, but excluding purely commercial materials; and
   b. Solicitation of funds for lawful, non-commercial purposes or the collection of petitions signatures.

5. The applicant shall indicate whether solicitations for charitable contributions will occur and, if so, indicate whether the applicant is properly registered under the Maryland Solicitation Act, Business Regulation Article, Title 6, or exempt from registration.

6. The applicant or any participant engaging in solicitation or funds shall inform donors whether the contribution is tax deductible, a contribution under article 1101 (o) of the Election Law Article, or a gift.

D. Duration of Activity

1. Approved events cannot commence earlier that 9 a.m. nor be scheduled to start after 8 p.m.  All events must be concluded by 9 p.m., except sessions of the Senate or House of Delegates run beyond 9 p.m.

2. Permitted activity may not exceed two (2) consecutive hours, not to include time for set-up and clean-up.  When completing application, spokespersons should include set-up and clean-up time in the time requested.

E. Signs, Banners and Placards

1. Signs, banners, and placards are permitted as a part of a permitted activity.  All supports for these items must not exceed ¾ of an inch at their largest point, have dull ends and cannot in any way be construed as a weapon.  There can be no nails, screws, or bolt-type fasteners protruding from the supports.

   *Note:  Any display of signs, banners, placards, and related items is strictly prohibited inside all Maryland State Buildings on the Annapolis Complex.*

OPS 14.09
## Events on Capitol Grounds

F.  Props and Equipment

1.  Props, equipment and other movable facilities reasonably necessary for and integral to the activity shall be permitted. The event coordinator will include on the application; size, location, and structure for the items needed, so MCP can evaluate reasonable conditions, limitations, and restrictions provided for by the Department of General Services. These items include, but are not limited to:

   a.  Chairs;
   b.  Tables;
   c.  Stages, risers and platforms (maximum 2 feet in height);
   d.  Audio / visual equipment (maximum extension is 13.5 feet wide by 9 feet high);
   e.  Other props and equipment (maximum of fifteen (15) feet in height).

2.  Equipment for the event must be unloaded in the designated area. Designated unload areas will be identified during the walk-through process of the application. State Circle, public streets and designated emergency lanes shall not be obstructed.

3.  Use of State of Maryland electrical outlets or other power sources is *not permitted*, except by prior approval from the Annapolis Building Superintendent or their designee.

4.  Gasoline or propane powered generators are *not allowed* on State Property.

5.  Minimal battery operated sound amplification may be used, however, it may not conflict with local ordinance(s) which prohibit noise from exceeding a distance of fifty (50) feet from the source.

6.  Live bands or musicians are *not permitted.*

7.  Staging and use of canopies or tents are *not permitted.*

8.  The setting up, placement or storage of a shelter (of any kind) or storage or camping equipment, tents, sleeping bags, bedrolls, bedding is prohibited at all times.

9.  Temporary structures of any mind may not be erected on State Capitol Grounds. This includes tents, cabanas, canopies and all other types of covered or enclosed structures.

10. No objects shall be tied, fastened or suspended to any tree, pole, or other landscape or architectural feature on State Capitol Grounds. The only exception to this rule is if permission is given by the Secretary of the Department of General Services for special circumstances.

11. No climbing on, removing, or damaging any memorial, statue, architectural feature, tree, or landscaping.

12. The MCP reserves the right to limit the size, nature and scope of props and equipment for reasons of safety and security. At no time will props or equipment be left unattended.

OPS 14.09
**Events on Capitol Grounds**

G. Distribution of Literature

Literature may be distributed to interested persons, at no charge, as a part of a permitted activity. *Distribution of literature is prohibited inside of the Maryland State Capitol and all Legislative Office Buildings.*

H. Vehicles

1. No vehicles are allowed in the Lawyer's Mall area at any time before, during, or after the event.

2. Vehicles on the property will be operated in a careful and safe manner, complying with directions of police personnel and posted signs.

3. Vehicles are subject to removal by MCP that:

   a. Block entrances, driveways, walks, or loading platforms
   b. Park without authority in unauthorized locations or in locations restricted by signs.

4. Vehicles circling the vicinity of the approved event are subject to all applicable laws, including but not limited to, MD Code Ann., Transportation Article 21-1122 (Sound amplification system).

5. No drones are permitted for use during these events.

I. Solicitation and Debt Collection

1. The soliciting of alms, money, or contributions, commercial soliciting, the display or distribution of commercial advertising, political soliciting, or the collection of private debts, is prohibited on DGS property, except as specified below.

2. Permissible solicitations require the prior approval of the occupying agency head for scheduling, safety, security, and traffic purposes. Permissible solicitations are limited to:

   a. Solicitation by national or local campaigns for savings bonds, health, welfare, and charity;
   b. Solicitations by labor organizations for membership or dues as authorized by law;
   c. Recruitment campaigns for the Armed Forces, National Guard, and other federal or State agencies, as previously approved by the occupant agencies;
   d. Operation of vending facilities and concessions as part of the operation of the property for the benefit of employees and the public;
   e. Personal notices posted by employees on authorized bulletin boards; and
   f. Activities on portions of the property leased to other individuals or organizations.

3. These restrictions *do not apply* to Lawyers' Mall in Annapolis, which is regulated under COMAR Section 04.05.02.02.

J. Conditions of Grounds

1. Immediately upon the scheduled conclusion of a permitted activity, all props, equipment and facilities must be removed from Capitol Grounds. The event coordinator shall take such action as may be necessary so as to leave the space utilized by the activity in the same condition which existed immediately prior to the commencement of the activity.

OPS 14.09
**Events on Capitol Grounds**

2. It is prohibited at any time to climb, remove or in any way damage any statue, seat, wall, fountain, light poles, elevator towers, or other erection or architectural feature, or any tree, shrub or landscaping features within the Capitol Grounds. No person may stand or otherwise enter upon any of the fountains, planters, walls, surface level air grates and generators.

K. Marches

1. Marches are permitted to pass through State Capitol Grounds provided the march does not disrupt the orderly business of the Legislature or impede the equal access by others to the Maryland State Capitol and all Legislative Office Buildings.
2. When applying, applicants must identify the specific march route requested and also must provide a copy of a corresponding permit issued by either the City of Annapolis or the Annapolis City Police Department.

3. Marchers will be required to remain on sidewalks and obey all traffic signals and signs.

L. Parking

There is no parking available for private automobiles, buses, or other vehicles on State Capitol Grounds. Buses may utilize College Avenue, prior to the St Johns Street intersection, or the right side of St Johns Street, to drop of passengers. There are several private parking garages and some street parking in the city of Annapolis. On some occasions parking can also be utilized at the Naval Football Stadium.

M. Prohibited Items - The following items are prohibited at all times on State Capitol Grounds:

a. Firearms; replica guns, and ammunition;
b. Explosives, missiles, fireworks other incendiary devices;
c. Other handheld weapons;
d. Chemical or hazardous materials;
e. Mace, pepper spray and "stun guns";
f. Razors and box cutters;
g. Any knife or handheld weapon identified as a dangerous weapon under Md. CRIMINAL LAW Code Ann. § 4-101;
h. Controlled Dangerous Substances;
i. Alcoholic beverages; and
j. Open flame including, but not limited to, ignited candles, torches, lanterns, or lamps. Flashlights and other battery-operated lights are permitted.

Approved:

*M S Wilson*

Colonel Michael S. Wilson
Chief of Police    12/19/18

OPS 14.09
Events on Capitol Grounds

Appendix A:

Maryland Capitol Police – Rally Areas



DGS Authorized Rally Areas

7 of 7




# MARYLAND CAPITOL POLICE
## OPERATIONS DIRECTIVE

## Demonstrations

| Distribution: | All Employees | Index: | OPS 14.08 |
|---|---|---|---|
| Responsible Unit: | Headquarters | Rescinds: | 12-105, 13-103 |
| Issued: | June 15, 2018 | Revised: | N/A |

### .01   Purpose

To establish policy for MCP personnel when responding to and managing public demonstrations.

### .02   Policy

The First Amendment to the U.S. Constitution says that "Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances." The Fourth Amendment provides "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." The 14th Amendment requires the states to provide due process and equal protection of the laws to all people within their jurisdiction.

As articulated in the United States Constitution, one of the freedoms guaranteed by the First Amendment is the right of persons and groups to assemble peacefully. Whether demonstrating, counter-protesting, or showing support for a cause, individuals and groups have the right to peacefully gather. Law enforcement, in turn, has the responsibility to ensure public safety while protecting the privacy and associated rights of individuals.

MCP personnel will protect the Constitutional Rights of all people regardless of their politics, beliefs, opinions or affiliations. Further, MCP personnel will enforce the laws of the State of Maryland as necessary to ensure the safety of the public and participants during public demonstrations.

### .03   Definitions

CIVIL DISTURBANCE - an unlawful assembly that constitutes a breach of the peace or any assembly of persons where there is imminent danger of collective violence, destruction of property or other unlawful acts.

DEMONSTRATION (*synonyms: Protest, Rally*) - a public meeting, march or assemblage of people expressing views on a political issue, policy, course of action, or showing support for a cause or person.

### .04   Authority

U.S. Const. Amend. I, IV, and XIV;

MD State Fin & Pro Code § 4-204, § 4-601, § 4-603, § 4-604, § 4-606;

COMAR 04.05.02.02, 04.05.02.03, 04.05.02.04

### .05   Background

OPS 14.08
## Demonstrations

Changes in mass demonstrations in recent years have prompted a reexamination of how police departments need to respond to and prepare for these events. Unlike past demonstrations, which often were planned by established civil rights groups or other organizations, today's demonstrations often emerge spontaneously and are organized informally via social media. As a result, the police might have a more difficult time identifying demonstration leaders, which could hinder the ability to establish communications with leaders, to discuss the police role in facilitating the exercise of First Amendment rights, to set ground rules, and to plan logistical issues.

Because police departments are responsible for managing and facilitating demonstrations, departments need to review existing strategies, and modify them if necessary, to meet the challenges these trends present. Police departments should start by ensuring all officers understand that their role is to facilitate demonstrators' First Amendment rights while protecting public safety.

The First Amendment guarantees free expression by protecting the right to freedom of speech, freedom of the press, and freedom of assembly and petition. Free expression encompasses all forms of speech, from spoken and written word, to signs, T-shirt slogans, armbands, and to organizational memberships. The courts, however, have consistently ruled that, while the government may not restrict the actual content of speech, it may restrict the time, place, and manner of speech.

Police departments need to find ways of communicating with demonstrators to discuss logistics, to develop a plan, and to establish expectations, all of which may be difficult when demonstrations occur spontaneously, with little or no established leadership structure.

### .06    Procedures

A. General Procedures

1. Most public gatherings will require that MCP supervision, within the area of jurisdiction, review at least a limited amount of information in order to make an assessment of the potential impact of the event on public safety.  As part of this assessment, MCP supervision must consider the need to preserve the peace, the need to deploy officers for crowd and traffic control and other public safety purposes, and the need to protect persons' rights to assemble and express their opinions.

2. MCP personnel obtaining information regarding demonstrations will immediately notify the Detachment Commander of information received.

3. Upon determining that the demonstration will require law enforcement interaction, Commander's will implement the following procedures.

B. Pre-Event Planning

1. Pubic Event Permit - When advance notice is received regarding a planned demonstration, and an identifiable organizer can be determined, they will be contacted by the Detachment Commander or designee and asked to complete an MCP Form 3 – Public Event Permit Application which can be obtained from the Maryland Capitol Police webpage, mcp.maryland.gov and return the form to mcp.rallyrequest@maryland.gov.

2. Risk Assessment - Upon receipt of an application, the Commander or designee will assign a supervisor to complete a pre-event risk assessment in which limited information is collected that is relevant to the agency's decision as to the need to take action to facilitate event-related activities and provide a public safety response. The information sought should be clearly identified as needed

solely to plan an adequate response to ensure public safety and health and to protect the public and those exercising their First Amendment rights. This should include:

  a. Determining the purpose of the event.

  b. Determining the time, location, and type of activities planned.

  c. Estimating the number of persons expected to participate.

  d. Analyzing the expected means and routes of travel for participants and expected times of arrival and departure.

  e. Determining whether violence or other criminal conduct is anticipated or might reasonably occur at the event.

3. The use bicycle officers should be considered when available. They are able to maneuver in crowds more easily than officers in vehicles, and bicycle officers are often seen as more approachable. In addition, bike helmets provide officers with some head protection that is not perceived to be militaristic gear.

4. If possible, prepare for a demonstration by removing potential projectiles such as trash cans from areas where protesters will gather.

5. Prepare to separate protesters and counter-protesters to prevent violent conflict.

6. Prepare for the potential of multiple operational periods and plan for relief for both front-line resources and operational command.

7. Planning should include logistical considerations to include identifying:

  a. Personnel to be assigned to arrest teams with resources available for securing, transporting and efficiently processing prisoners;

  b. Staging areas for anticipated resources to include: Arrest Teams, Fire, EMS, and MFF; and

  c. Food, water and other personnel needs items for long duration events or adverse conditions.

C. Pre-event Walkthrough:

  a. When possible, Commander's should make contact with organizers and attempt to develop a rapport ahead of time to facilitate cooperation. Attempts should be made to assure them that the goal of law enforcement is to assist them in exercising their Constitutional rights and ensuring participant and public safety.

  b. During the pre-event walkthrough with organizers, the Commander or designee should review the rules as outlined in the Public Event Permit Application, so that protestors know what to expect from law enforcement the date of the event.

D. Use of Social Media

1. Social media and other communications tools can be used to convey the message that the police understand that their role in managing demonstrations is to protect demonstrators' rights while also

protecting public safety. When demonstrations seem to be leaderless, it is particularly important to communicate directly with all demonstrators and the general public. Messaging can be distributed utilizing:

  a.  The MCP Facebook and Twitter accounts, and

  b.  The MCP Nixle notification system.

2.  The Commander can request assistance with social media resources by contacting the Headquarters.

E.  Operational Plan

  1.  Based on the findings of the Pre-Event Planning, the Commander should develop an Operational Plan for the event. The plan should articulate the agency's operational objectives during the event. Although there are certain objectives that will be consistent in all events, every event has unique characteristics that may require a unique response.  As such, all objectives should be clearly stated. The operational objectives may include:

    a.  Engaging in crowd and traffic control;

    b.  Preventing criminal activity;

    c.  Providing dignitary protection;

    d.  Protecting persons and property;

    e.  Ensuring compliance with reasonable restrictions on the time, place, and manner for conducting the event as described in permits and Maryland regulations; and

    f.  Assessing the need for additional personnel or other response (i.e., Mobile Field Force (MFF) allied law enforcement, emergency medical services).

  2.  The Operational Plan should include measures to efficiently increase the level of response if signs of impending violence are detected. A demonstration might begin calmly but then start to grow volatile. To protect the safety of protesters and officers, the Operational Plan should have a measures for efficiently and quickly increasing response levels in proportion to what is happening.

  3.  Gear and equipment approved for use should be proportional to the anticipated level of risk of violence or changes in the mood of the crowd during the event. Officer safety is critical and should be considered at all times. Part of that consideration is ensuring that we do not increase the tension during a demonstration unintentionally by outfitting responding officers in more gear and with more equipment than is necessary during their initial contact with the crowd. Begin with the lowest response level but be prepared to change if conditions change.

  4.  Documenting Event:

    a.  Videotaping – Assign an officer to record video of major events, including your own officers. Having your own video recordings is critical to reviewing officers' actions. The news media and participants will be making their own recordings, but they may edit recordings to create false impressions or show incidents out of context. Police should have their own record of the event.

    b.  Reporting – An officer will be assigned the task of completing and submitting an incident report documenting the event. Any problems, special situations or other noteworthy details will be included in the report.

5.  Communications:

    a.  A dedicated channel should be identified for the event which is separate from the routine communications for the Detachment.

    b.  Consideration should be given to assigning additional communications personnel dedicated to the event.

    b.  For large scale events, consideration should be given for assignment of a dedicated radio channel for logistics. This ensures that command staff can stay apprised of conditions on the ground when additional resources are needed and the needs of officers assigned to the event, such as food and water.

6.  Incident Action Plan – Once the operational plan is finalized, the commander or designee will complete an MCP Incident Action Plan (IAP) which will be forwarded to Headquarters for review and final approval by the Chief of Police or his designee.

    a.  The IAP should clearly identify the Incident Commander which, unless extenuating circumstances exist, will be the Detachment Commander.

    b.  Key support positions should be identified as necessary (i.e. Operations Chief, Planning Chief, Logistics Chief, etc.)

    b.  The IAP will identify allied resources and points of contact.

    c.  If the event will occur across jurisdictional lines, a Unified Command Structure should be implemented and the IAP developed in conjunction with representatives from the affected agencies.

F.  Implementing Operational Plan

1.  The Incident Commander will ensure that the IAP is disseminated to all personnel and allied representatives.

2.  Pre-Operational Period Briefing:

    a.  Providing clear instruct officers about the department's overall strategy, goals, and operational guidelines in responding to a demonstration is critical. This instruction ensures that responding officers understand that the department has an overarching response plan and that their roles and responsibilities are designed to support that strategy. Internal communication will also prevent situations in which officers feel they are receiving mixed messages during a demonstration: e.g., whether to make arrests or to engage in other responses.

    b.  Clearly communicate to officers the specific behaviors, tactics, and messaging that are expected of them during the demonstration. This communication will make them more confident in their decision making on the line and demonstrate to them that they are supported by the department in those actions.

c. Provide instruction to officers on the bar for making arrests and communicate it to all officers. Most departments do not make arrests for low-level civil disobedience during a protest, such as blocking traffic, particularly if traffic can be rerouted around a blocked intersection.

d. Remind officers that crowds are not usually homogenous. They might include protesters with constitutionally protected aims, as well as other individuals aiming to commit acts of violence or other serious criminal offenses.

e. Allied agencies providing support to the operation should be invited to the briefing and the share specifics of the IAP—including roles, assignments, and the location of the Unified Command Center and the mutual aid staging area.

3. The Incident Commander should attempt to meet again with the demonstration organizers to discuss regulations and rules of engagement. Explain the police role to the crowd and outline your expectations for their behavior. Most protesters are peaceful; don't allow a small group of instigators to provoke an aggressive response from officers. Engaging the crowd in a friendly, non-confrontational manner and befriending them can act as a force multiplier.

G. Civil Disturbances during Demonstrations

1. In demonstrations where agitators intend to provoke disruption or where criminal offenders hope to commit thefts or other crimes under the cover of confusion, crowded conditions, and heavy activity, understand that police agencies are in a contest with agitators for the loyalty of protesters. Police need to focus on building positive relationships with the crowd so violent agitators are unable to win the crowd's support or foster discord and potentially criminal behavior.

2. Incident Commanders should:

a. Assess the situation and determine the seriousness and the potential for escalation.

b. Make notification to:

1) Headquarters and request activation of MFF resources if needed;

2) Allied law enforcement and request assistance as deemed necessary; and

3) Local Emergency Services for fire or medical emergencies.

c. Identify staging areas for responding resources and assign an officer, preferably a Sergeant to coordinate resource deployment.

d. Ensure the response to the situation is proportional to magnitude of the unrest. Officer safety is critical and should be considered at all times. However, avoid unintentionally increasing tensions by responding more aggressively or with more equipment than is necessary.

e. Respond to the disturbance with the goal of containment. Attempt to minimize the spread of unlawful behavior without cutting off escape routes for innocent bystanders and peaceful protestors not engages in unlawful conduct.

1) Establish an outer perimeter sufficient to contain the disturbance and prohibit entrance into the affected area.

OPS 14.08
## Demonstrations

    2)  Where possible evacuate innocent civilians from the immediate area of the disturbance.

  e.  Be prepared to pull officers off the line if they appear to grow hostile toward protesters or are becoming over-stressed because protesters are focusing their antagonism on them.

  3.  Verbal Warnings – When appropriate verbal warnings should be given to those engaged in or inciting disorder or unlawful acts. Where possible, an MCP Form 21 will be utilized for this purpose.

    a.  Verbal warnings should be given in a loud and clear manner. The use of a bullhorn or police PA may be necessary to ensure the warnings are heard.

    b.  Where time permits, the warning should be repeated, with three warnings given prior to initiating arrests.

    c.  The warnings should be videotaped.

H.  Use of Force

  1.  Officers at civil disturbances are bound by the MCP Use of Force policy.

  2.  Unless exigent circumstances require immediate action, officers will not independently employ force without command authorization.

  3.  All allied law enforcement officers providing assistance to MCP will be briefed on use of force and protocols for crowd control prior to deployment.

  4.  All uses of force will be reported per MCP policy.

I.  Making Arrests:

  1.  Ensure officers know they are not to act alone unless exigent circumstances exist and an arrest is necessary to prevent injury or serious property loss.

  2.  Avoid making mass arrests for minor infractions. Do not make arrests for low-level civil disobedience, such as blocking traffic, particularly if traffic can be rerouted around a blocked intersection.

  3.  Assess whether making arrests will exacerbate the situation and incite more disorder or criminal conduct. Are there alternatives to mass making mass arrests?

  4.  Ensure that there is probable cause to support the charges for each person arrested.

  5.  If arrests are needed, make sure you have prepared logistically for handling multiple arrests. Front-line officers should not be pulled to make arrests. Arrest teams should be designated from staged resources and plans made for transportation and processing.

  6.  Where possible, videotaping of arrests should be done so there is a record of the event.

J.  Responding to Unscheduled Demonstrations

  1.  Upon arrival of the first officer at an unscheduled demonstration, he or she will:

OPS 14.08
**Demonstrations**

   a. Observe the situation and evaluate it;

   b. Determine the nature of the incident;

   c. Determine the lawfulness of the demonstration;

   d. Notify the shift supervisor of the situation; and

   e. Request the supervisor respond to the scene and additional units, as necessary.

3. Upon arrival on the scene, the supervisor will:

   a. Assume the role of Incident Commander until relieved by higher authority;

   a. Implement the Incident Command System, as necessary;

   b. Identify a command post and staging area for responding resources;

   c. Attempt to establish contact with the group and identify the group leader;

   d. Identify the intent and likely duration of the incident;

   e. Determine the need for additional resources including:

      (1) Additional patrol units;

      (2) Allied Law Enforcement; and/or

      (3) Activation of the Mobile Field Force (MFF).

   f. Notify the Detachment Commander of the incident;

   g. Establish inner and outer perimeters as necessary.

Approved:

_MS Wilson_

Colonel Michael S. Wilson
Chief of Police      06/15/18



# CIVIL DISTURBANCE

## Directive: 13 – 103

## Date of Issue: July 2013    Amends/Cancels: G.O. 12-07

## I. PURPOSE

The purpose of this Directive is to establish policy and procedure in the event of civil disorder in and around Department of General Services owned, managed, or leased property.

## II. POLICY

All members of DGS-MCP will strictly adhere to the procedures set forth in this Directive.

## III. INTRODUCTION

During civil disorder, the mission of DGS-MCP will be the protection of life and property and the restoration of law and order. This mission may be accomplished by dispersing unauthorized assemblies and by increased patrolling within the disturbance area. To prevent commission of lawless acts, DGS-MCP may deploy an increased presence, establish road or area blockades, disperse crowds and start such actions necessary to apprehend offenders. The Chief of Police or his/her designee shall coordinate the DGS-MCP response to civil disorder.

Impartiality of DGS-MCP in Civil Disorders -Care must be exercised to refrain from taking, or giving an appearance of taking sides in any civil disturbance.

Enforcement of Laws at Civil Disorders -Officers may be required to arrest violators and to impose restrictions which are mandated.

Deployment at Civil Disorders -The most appropriate course of action to restore law and order will be pursued within DGS-MCP guidelines. The measures used shall be only those measures reasonably necessary to achieve the objective.

Personnel will be briefed on the existing situation, mission, course of action, and control measures to be employed.

DGS-MCP will coordinate efforts with all applicable allied agencies. All industry standard incident command protocol will be followed.

## IV. DEFINITION

CIVIL DISTURBANCE: An unlawful assembly that constitutes a breach of the peace or any assembly of persons where there is imminent danger of collective violence, destruction of property or other unlawful acts.

## V.  PROCEDURES

A.  The first officer to arrive on the scene of a civil disturbance should do the following:

    1.  Observe the situation from a safe distance to determine if the gathering is currently or potentially violent.

    2.  Notify the communications center of the nature and seriousness of the disturbance.  Advise the number of participants and the observation of weapons.  Request the assistance of a supervisor, any necessary backup and advise as to the present course of action.

    3.  If approaching the crowd would not present unnecessary risk, instruct the gathering to disperse.

    4.  Attempt to identify crowd leaders and any individual personally engaged in criminal acts.

B.  The ranking officer at the scene shall be the officer in charge (OIC).  The OIC or other higher ranking officer assuming command at the scene should take the following steps:

    1.  Assess the immediate situation for seriousness and its potential for escalation.  If the disturbance is minor in nature and adequate resources are available, efforts should be made to disperse the crowd.

    2.  Establish the number of personnel and equipment necessary to contain and disperse the disturbance and relay this information to the communications center.

    3.  Where necessary, ensure that appropriate notification is made to allied agencies to include the fire department, rescue squads, state and local law enforcement agencies, agency officials, public information officer, the agencies' legal advisor and the local detention center.

    4.  Establish a temporary command post based on proximity to the scene, availability of communications, available space and security from crowd participants.

    5.  Establish an outer perimeter sufficient to contain the disturbance and prohibit entrance into the affected area.

    6.  Ensure that, to the degree possible, innocent civilians are evacuated from the immediate area of the disturbance.

    7.  Ensure that surveillance points are established to identify agitators, leaders and individuals committing crimes, and to document and report on events as they happen.  **Photographic and videotape evidence of criminal acts and perpetrators shall be generated whenever possible.**

C.  **Incident Command**-When adequate personnel and resources are in place; the OIC shall establish communications with leaders of the disturbance and discuss actions necessary to disperse the crowd.  Should the crowd fail to disperse in the prescribed manner, the OIC should be prepared to implement one of the following options:

1. **Containment and dialogue.** The objective of containment and dialogue measures is merely to disperse the crowd. In so doing, the OIC should:

    (a) Establish contact with crowd leaders to assess their intentions, motivation and develop a trust relationship; and

    (b) Communicate to the participants that their assembly is in violation of the law and will not be tolerated. Notify individuals involved that DGS-MCP wish to resolve the incident peacefully and that acts of violence will be dealt with swiftly and decisively.

2. **Verbal Warnings.** When appropriate, the OIC will give three verbal warnings to disperse using the warning format attached hereto as **Attachment 1.** Verbal warnings should be given to crowd leaders, agitators and others engaged in unlawful conduct.

    Note: Verbal warnings will be recorded. Video cameras will be assigned to Detachment Commanders and be readily available when needed.

    If the verbal orders to disperse are ignored, the OIC will:

    (a) Ensure the appropriate use of tactical formations and availability of protective equipment for officers engaged in arrest procedures;

    (b) Ensure the availability of transportation for arrestees, if needed; and

    (c) Ensure that a back up team of officers is readily available, should assistance be required.

3. **Physical Arrest/Use of Non-Lethal Force.**

    (a) When crowd leaders, agitators and other individuals involved ignore verbal orders and fail to disperse or engage in unlawful conduct, the OIC may order the lawful arrest of crowd leasers, agitators and other violators. While officers are authorized to use force, officers are cautioned to use only that degree of force as is necessary and reasonable to repel an attack or terminate unlawful resistance. The use of force continuum should be used progressively when force is used. Personnel should be familiar with the department's use of force policy as outlined in the DGS-MCP General Order No. 12-02. The use of force policy is to be applied uniformly and consistently, regardless of the nature of the assignment or deployment. In the event that force is applied to an individual(s), the involved officer shall affect an arrest and provide decontamination and/or render first aid, as appropriate. Required documentation regarding use of force and injured prisoners (detailed report/use of force report) shall be submitted prior to the end of the event to the OIC. Should force be applied to an arrestee, the arresting officer will process charging documents and MCP documentation procedures will apply.

    (b) The OIC may use non-lethal force when physical arrest of identified leaders and agitators fail to disperse the crowd. In using non-lethal force, the OIC shall ensure that:

1. A clear path of escape is available for those who wish to flee the area.

2. The use of chemical agents such as Oleoresin Capsicum (OC Spray) should be coordinated and controlled.

3. In the event OC Spray is deployed a predetermined decontamination area should be established.

4. Medical attention for those affected will be immediate.

4. **Use of deadly force.** The use of deadly force in the control and dispersion of civil disturbances as in other circumstances is governed by DGS-MCP use of force policy General Order No.12 -02. Specifically:

   (a) Law enforcement officers are permitted to use deadly force to protect themselves or others from what is reasonably believed to be an immediate threat of death or serious bodily injury.

   (b) Particular caution should be taken when using firearms during civil disturbances. The use of firearms in a civil disturbance presents several challenging factors. If there is substantial risk of injury to innocent people from an officer's use of deadly force, **the officer may not use his firearm to employ deadly force, unless no other reasonable alternative is available. The arbitrary use of return fire in crowds is prohibited.**

D. **Mass Arrest** -During the course of civil disturbances, it may be necessary to make arrests of numerous individuals over a relatively short period of time. In order for this process to be handled efficiently, safely and legally, the OIC should consider the following:

1. What actions, by the persons to be arrested, require the proposed mass arrest?

2. Has anyone been injured? Who? What was the cause of the injury?

3. Has property been damaged? What? What was the cause of the damage?

4. Will an effort to arrest likely cause more injuries than alternative police action?

5. Will an effort to arrest likely cause more property damage than alternative police action?

6. Will an effort to arrest likely cause greater disruption of traffic flow (or potentially block evacuation routes) than alternative police action? What are the offenses committed/to be charged?

7. What evidence provides probable cause for the arrest upon those charges as to each person? **You must have adequate probable cause to make any arrest.**

8. The warning format (see Attachment A) is to be used when preparing to make arrest in mass demonstration situations. The information contained in any

Page 4 of 5

warnings that are given in mass arrest incidents must be documented and retained for reporting requirements and notifications.

9. The OIC should ensure that:

    (a) An arrest team is designated to process all prisoners for purposes of transportation.

    (b) An adequate number of vehicles is made available to remove the prisoners to the detention center.

    (c) An adequate secure area is designated in the field for holding prisoners after initial booking and while awaiting transportation.

    (d) All arrested individuals are searched, photographed and properly identified prior to transportation to the detention center for formal booking.

    (e) All injured prisoners are provided medical attention prior to being booked.

    (f) All arrested juveniles are handled in accordance with the DGS-MCP procedures for the arrest, transportation and detention of juveniles.

    (g) All evidence and weapons taken from arrestees are processed in accordance with the agency's policy on the preservation and custody of evidence.

E. **After Actions** -When the disturbance has been brought under control, the OIC shall ensure that the following measures are taken:

1. All law enforcement officers engaged in the incident shall be accounted for and an assessment made of personal injuries.

2. All necessary personnel shall be debriefed as required.

3. Witnesses, suspects and others shall be interviewed or interrogated.

4. All written reports shall be completed as soon as possible following the incident to include a comprehensive documentation of the event.

**WARNING**

I am _____ of the DGS-Maryland Capitol
Police Department.  You are in violation of (state criminal offense)

_____

_____

_____

_____.

**If you do not cease your unlawful behavior and disperse peaceably you
will be arrested.**

**DAY:** _____ **DATE:** _____

LOCATION OF ARRESTS

_____

**\*\*\*Record the time that all warnings have been voiced to the violators.**

**1st Warning** _____ **(Wait 5 minutes before reading 2nd warning)**

**2nd Warning** _____ **(Wait 2 minutes before reading 3rd warning)**

**3rd Warning** _____ **(Commence making arrests)**

**Warnings should be given with either a bullhorn or a police vehicle PA
system, and they must be given in a loud and clear manner. If possible,
DGS-MCP will videotape the reading and arrests procedures.**



# DEMONSTRATIONS, RALLIES AND PRESS CONFERENCES

Directive: 12 – 105

Date of Issue: July 2013   Amends/Cancels: Chapter XIII Sec 3

## I. PURPOSE

The purpose of this Directive is to establish policies and procedures in regards to demonstrations, rallies, and press conferences held within the Department of General Services Maryland Capitol Police (DGS-MCP) jurisdiction.

## II. POLICY

The Department of General Services Maryland Capitol Police will take all reasonable and appropriate steps to insure that demonstrations, rallies and press conferences held within our jurisdiction will be conducted in a lawful manner and in conformity with all rules and regulations. DGS-MCP will also coordinate with allied agencies and other components of state government to achieve this objective. The Detachment Commander will be responsible for the planning, coordinating and execution of law enforcement operations with respect to these events.

## III. DEFINITIONS

A. **Demonstration** – Activities such as parading, picketing, speech making, holding of vigils, sit-ins, or other expressive conduct that conveys a message supporting or opposing a point of view, or has the intent, effect or propensity to attract a crowd or onlookers, but does not include merely wearing tee shirts, buttons, or other similar articles of apparel that convey a message.

B. **Rally** – A gathering of persons intending to incite or inspire enthusiasm for a cause.

C. **Press conference** – A small group of people gathered with the press to give a short statement to the press and not involving any of the activities defined under the term demonstration.

D. **Special events** – Other gatherings that may occur from time to time that have been approved by the appropriate authority.

## IV. PROCEDURES

A. Approval Process:

1. Press Conferences, demonstrations and rallies on State property require prior written approval (Permit) from the Department of General Services Maryland Capitol Police Chief (DGS-MCP) or his designee.

Page 1 of 6

2. Individuals or groups wishing to hold press conferences, demonstrations or rallies must apply in writing at least two days in advance for the permit unless extraordinary circumstances prevent the applications.

3. A pre-rally walk through will be required with the Chief of Police or his designee prior to receiving written approval. Applicants may be asked to provide an event agenda prior to or at the walk through. An event coordinator must be designated who will be responsible for every aspect of the event. The event coordinator must also identify all individuals assisting with the event.

4. Approved events may only occur in the area designated in the Permit. In the event of an emergency such as a major thunderstorm or extreme heat, access to suitable alternate area may be granted. Notwithstanding the above, use of the State House, State House steps and grounds is not permitted as it is subject to the procedural rules of the Senate and House of Delegates.

B. General Rules:

1. Events can commence no earlier than 9 a.m. or be scheduled to start after 8 p.m. All events must be concluded by 9 p.m. except when sessions of the Senate or House of Delegates run beyond 9 p.m.

2. Events are limited to two hours. This includes on-site preparation time for the event.

3. The event coordinator(s) must wear or other identifying insignia and identify themselves to DGS-MCP prior to the start of the event.

4. The event coordinator is responsible for advising the demonstrators on compliance with all applicable laws and regulations and ensuring the designated area is left in a clean and orderly state.

5. Detachment Commanders or his designee will coordinate event activities with applicant.

6. Equipment for the event must be unloaded in the designated area. Designated emergency lanes shall not be obstructed.

7. Use of State of Maryland electrical outlets and other power sources is not permitted.

8. Gasoline generators are not allowed on State property.

9. Battery powered public address systems are authorized.

10. Minimal sound amplification may be used during the press conference/demonstration/rally. However, sound amplification may not conflict with local ordinance(s) which prohibit noise from exceeding a distance of fifty (50) feet from the source.

11. Live bands or musicians are not permitted.

12. Staging and use of canopies/tents are not permitted.

13. The event coordinator is responsible for ensuring the area is left in a clean and orderly state upon completion of the event.

14. No vehicles are allowed in the Lawyer's Mall area at any time before, during or after the event.

C. Regulations

1. "Signs and placards are permitted, but signs and placards mounted on sticks and poles are not permitted." COMAR 04.05.02.02 (I).

2. "An individual may not have a firearm in the individual's possession within 1,000 feet of a demonstration on the property." COMAR 04.05.02.02 (J).

3. "An individual or group may not willfully disrupt or interfere with, or attempt to disrupt or interfere with:

    a) A session of the General Assembly;
    b) The Senate or the House of Delegates;
    c) Any of the Senate's or House of Delegates' committees;
    d) An officer, employee, or staff member of the General Assembly; or
    e) A member of the Senate or House of Delegates in the member's performance of any official function."    COMAR 04.05.02.03(A)

4. "An individual may not willfully picket in a building where:

    a) The Senate or House of Delegates has a chamber;
    b) A member of the General Assembly has an office;
    c) A committee of the General Assembly or the House of Delegates has an office." COMAR 04.05.02.03(B)

5. No regulations prohibit "citizens and small groups of citizens from communicating with the General Assembly in a reasonable and orderly manner, including delivery of handbills, pamphlets, letters, and small symbolic objects to members or members' offices." COMAR 04.05.02.04

6. Vehicles circling the vicinity of the approved event are subject to all applicable laws, including but not limited to, Md. Code Ann., Transportation Article, §21-1122.

D. Detachment Commander Responsibilities

1. Detachment Commanders will prepare a special order for each event and ensure that it is distributed to all affected DGS personnel.

2. Detachment commanders will adjust their schedules to make sure that they are present and on the scene of any demonstration, rally, or other special event that is controversial or expected to generate strong emotions.

3. Before the event begins, one police officer will be assigned and notified of the task of completing and submitting an incident report documenting the event. Any problems, special situations or other noteworthy details will be included in the report.

E. Demonstrating on Public Property

1. The First Amendment protects free speech from infringement by the government. Assembly is generally permissible in most public areas, such as public parks, public streets and sidewalks, and outside public buildings. These locations are commonly known as public forums, which are generally defined as areas that can be used for the communication of any and all views on political and social issues.

2. There are three basic types of public forums:

    (a) A traditional public forum is any area historically dedicated to public assembly and protest, such as public streets, public parks and public sidewalks.

    (b) A limited public forum is public property that, while not typically dedicated to public assembly, has been open to expressive activity by particular categories of people or on particular subjects. Examples of limited public forums would be university meeting rooms open for use by student groups or a city auditorium open for theatrical performances.

    (c) A non-public forum is public property that is not a traditional public expression. Examples of non-public forums include prisons and military bases (more information below). The government can severely restrict public expression in a non-public forum.

3. The First Amendment does not regulate the activities of private individuals, business or organizations. Citizens do not have a constitutional right to speech, assembly or protest while on private property.

4. Restrictions on the use of public forum.

    (a) Depending on the specific public location and the government's interest in ensuring safety and order, restrictions governing the use of public property for assembly and protest may apply. The following are some locations-specific regulations to consider when planning protest activities.

        1. Public sidewalks: Demonstrating groups should leave room for passer-by and should not block the flow of pedestrian traffic. If leafleting, demonstrators should not force passer-by to accept leaflets or harass individuals who refuse leaflets.

        2. Public Streets: Any march on the public street is typically considered a parade; therefore the location, time and duration of the march are subject to regulation by the city officials to prevent traffic problems. Marchers may be expected to obey traffic laws (such as red light) during the march.

3. <u>Lobbies of public buildings:</u> It is more difficult to obtain access to the inside of a public building than it is to obtain access to a street or sidewalk outside. However, if some non-government-sponsored expressive activities are permitted in the lobby, then similar activities by others may not be prohibited based on the content of the expression. But if no activities are permitted, then it is unlikely that a rally or demonstration would be allowed inside.

4. <u>Other types of public property:</u> Some types of public property are non-traditional public forums and therefore have special restrictions on free speech. For example, protests are prohibited on <u>military bases</u>, even if those protesting are in the armed services. Similarly, protests on <u>jail or prison property</u> can be restricted for safety and security reasons. <u>Post offices</u> do not allow flyers to be posted inside the building and do not allow partisan political activity inside the building. However, leafleting and other protest activities are permitted on the public street or sidewalk outside. Demonstrations may be prohibited in the immediate vicinity of <u>courthouses.</u>

F. The Right to Free Expression

1. The First Amendment guarantees free expression by protecting the right to freedom of speech, freedom of the press, and freedom of assembly and petition. The courts also have ruled that the First Amendment protects the freedom of association, which is implied by the other freedom listed above.

2. Free expression encompasses all forms of speech, from spoken and written word, to T-shirt slogans and black armbands. To rallies and protest signs, to organizational memberships. The First Amendment protects free expression from infringement by federal, state and local governments.

3. Restrictions on free expression.

(a) The courts have consistently ruled that while the government may not restrict the actual *<u>content</u>* of speech, it may restrict the *<u>time, place, and manner</u>* of speech. For example, a municipality cannot permit members of only one political party to hold rallies on the public streets. This would be restricting speech based on content. But the government may prohibit political rallies from taking place at unusual hours or from blocking pedestrian or vehicle traffic. This would be restricting only the time, place and manner of speech.

(b) The courts have generally found time, place and manner restrictions to be permissible because such regulations serve to ensure the safety and order of the community at large. However, it is important to note that in order to be constitutional, time, place and manner restrictions must be content-neutral, meaning they must apply to everyone regardless of the opinion being expressed.

4. Expression not protected by the First Amendment.

    (a) The courts have recognized several types of speech that do not fall within First Amendment guarantees:

        1. In 1919, Supreme Court ruled in Schenck v. U.S. (249 U.S. 47) that the First Amendment does not protect the speech that creates a "clear and present danger" (such as "shouting fire in a theatre").

        2. In its 1942 decision in Chaplinsky v. New Hampshire (315 U.S. 568), the Supreme Court ruled that speech that incites violence or directly encourages others to commit a crime ("fighting words") is a threat to the public safety and is therefore not protected by the First Amendment.

        3. In 1973, the Supreme Court found in Miller v. California (413 U.S. 568) that the First Amendment does not protect "obscene" material. The courts established the "SLAPS" test for determining obscenity: speech is obscene if "the work, taken as a whole, lacks serious literary, artistic, political, or scientific value." However, obscenity remains difficult to define – as Supreme Court Justice Potter Stewart once said: "I know it when I see it."

        4. The courts have ruled that defamation – a known false statement about a person or an organization intended to harm the reputation of that person or organization – is not protected by the First Amendment. Defamation in writing is libel, and defamation through the spoken word is slander.