**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND**

Jeff Hulbert, *et al*.

   *Plaintiffs*,

  v.

Sgt. Brian Pope, *et al*.

   *Defendants*.

Civil No.: 1:18-CV-00461-SAG

**PLAINTIFFS' MOTION FOR RECONSIDERATION OF**
**LT. GOVERNOR RUTHERFORD'S MOTION TO QUASH**
**(Hearing Requested)**

   Plaintiffs, by and through undersigned counsel, pursuant to Fed. R. Civ. P. 60, hereby submits this Motion for Reconsideration.

## TABLE OF CONTENTS

I.  Factual Background ...................................................................................................2

II.  Procedural Background............................................................................................10

III.  Lt. Governor Rutherford Possesses Important, Discoverable Information Not Available Through Any Other Means ........................................................................................13

IV.  Permitting a Deposition of Lt. Governor Rutherford in This Case is Warranted and Appropriate .............................................................................................................19

V.  Conclusion ..............................................................................................................23

Certificate of Service .........................................................................................................24

## TABLE OF EXHIBITS

Exhibit A: Deposition of Cpl. Ryan Bitter..................................................3-5, 10-11, 13

Exhibit B: Deposition of Trooper Joseph Walder.................................5-6, 12, 14-15, 19

Exhibit C: Deposition of Sergeant Roby ........................................................5, 7, 12, 15

Exhibit D: November 8th through November 13th Emails .........................................10

Exhibit E: Notice of Deposition for Corporal Bitter .................................................................10

Exhibit F: January 3rd Emails ...................................................................................................11

Exhibit G: Notice of Deposition for Sgt. Shusko .......................................................................11

Exhibit H: Notice of Deposition for TFC Walder ......................................................................11

Exhibit I: Notice of Deposition for Sgt. DeCerbo .....................................................................11

Exhibit J: January 10th Emails ..................................................................................................11

Exhibit K: January 13th Emails .................................................................................................12

Exhibit L: Notice of Deposition for Sgt. Roby ..........................................................................12

Exhibit M: Lt. Gov. Rutherford's 2017 Public Schedule ...........................................................21

## I.     FACTUAL BACKGROUND

1.      This case arises out of the unlawful arrest of Plaintiffs Jeff and Kevin Hulbert, who were erroneously charged with misdemeanor criminal citations for lawfully exercising their First Amendment rights.

2.      On February 5, 2018, Plaintiffs were peacefully picketing in Maryland's capital as members of Patriot Picket, an informal group founded by Plaintiffs to oppose infringement of Second Amendment rights. The Plaintiffs were picketing on a public sidewalk, neither impeding nor interfering with the movement of pedestrians. Plaintiff Jeff Hulbert, along with a few other members of Patriot Picket, was holding a sign addressing Second Amendment rights. Plaintiff Kevin Hulbert was recording the demonstration on his cell phone.

3.      While the Plaintiffs and Patriot Picket had picketed in the same location without issue on several prior occasions, the demonstration on February 5, 2018, was different. Patriot Picket had attracted the attention of the Governor's Mansion. As the demonstration was underway,

the Maryland Capitol Police received a call from the State Police executive protection detail in the Governor's Mansion.

4.      The caller was Corporal Ryan Bitter, who was manning the "console," a desk at the Governor's Mansion which monitors the building's security camera feeds, radio, and telephone communications. Exhibit A (Deposition of Cpl. Ryan Bitter) at 24; 50. As the officer in charge of the console, Corporal Bitter was responsible for relaying any communication from the Lt. Governor's detail to the Maryland Capitol Police. *See id*. at 91-92. In the five years prior, Corporal Bitter had never called the Maryland Capitol Police about protestors or picketers; the typical issues he would call about were improperly parked vehicles blocking the vehicle lot or the Lt. Governor's parking space. *Id*. at 36.

5.      Corporal Bitter saw Patriot Picket from the window. *Id*. at 49-50. He did not see anyone besides Patriot Picket, and did not see any vehicles nearby. *Id*. at 51. He was unable to read any of the signs held by Patriot Picket and had no idea what Patriot Picket was protesting. *Id*. at 108. He had seen them the previous week, but did not see them do anything unlawful, did not call the Maryland Capitol Police, and had no interactions with them at all. *Id*. at 58-59.

6.      After he noticed Patriot Picket, Corporal Bitter received a call on the radio from the detail leader assigned to the Lt. Governor. *Id*. at 64. Corporal Bitter was unable to recall who was the detail leader on the night of February 5, 2018, but believed that either Sergeant Angelo Shusko or Trooper First Class Joseph Walder was the detail leader that night. *Id*. at 65-66. The detail leader relayed to Corporal Bitter that the Lt. Governor did not want to hear Patriot Picket's message or interact with them in any way—and Corporal Bitter faithfully relayed the message to the Maryland Capitol Police:

Q: In communicating this message to the Maryland Capitol Police, I heard you say that the concern was that they would give him a bunch of stuff for whatever reason. Did you hear that language?

A: Yes.

Q: My understanding of what you're telling me is that you were communicating a message that ultimately came from somebody else. Sitting here today, do you know what you meant by or what they meant in asking you to communicate it, however the particular words were chosen, what was meant by, "give him a bunch of stuff for whatever reason"?

…

A: As far as approaching the lieutenant governor, whatever their message was they wanted to relay to him, being arrogant to him, using derogatory language towards him.

Q: So it had to do in the first instance with avoiding the communicating of the message, and in the second instance, avoiding any unpleasant wording in the message; is that fair?

A: Correct.

Q: The goal in sending an officer out was to avoid those things; is that right?

A: Correct.

Q: That's how it was communicated to you by the people who were with the lieutenant governor; is that right?

…

A: Correct.

Q: As you've described it, you don't know what their message was because you couldn't see the signs; is that right?

A: Correct.

Q: Do you know how the people with the lieutenant governor determined that it might be a message he didn't want to hear or that they might be rude to him or however you would describe it?

A: No.

Q: But since you couldn't see the signs, obviously that was a determination that they made; is that right?

A: Yes.

Q: And then they communicated it to you, and then you communicated it to the Maryland Capitol Police; is that correct?

A: Correct.

…

Q: In communicating that, the intent was obviously that they would send a trooper out and do whatever could be done to try to avoid the interaction?

A: Correct.

…

Q: That's the message you got from the people with the lieutenant governor, and you relayed it to the people at the Maryland Capitol Police?

…

A: Correct.

*Id*. at 111-116.

7.    Corporal Bitter did not observe Patriot Picket break any laws at any point. *Id*. at 78.

8.    According to Corporal Bitter, the call originated from a member of the Lt. Governor's executive protection team. *Id*. at 64. The active detail team consists of "an advance person" and a "protection officer." The protection officer as the person personally with the lieutenant governor, while the advance person physically walks ahead of the lieutenant governor to check out locations where the lieutenant governor is expected to be. Exhibit B (Deposition of Trooper Joseph Walder) at 15-16; 19-20; *see also* Exhibit C (Deposition of Sergeant Roby) at 16.

9.    On February 5, 2018, Trooper Joseph Walder was assigned as Lt. Governor Rutherford's protection officer. Exhibit B (Deposition of Trooper Joseph Walder) at 39. As his

typical partner, Sergeant Shusko, was not working that day, another officer, Sergeant Roby, filled in as Lt. Governor Rutherford's advance person. *Id*. at 42.

10.      Trooper Walder could not confirm who placed the call to Corporal Bitter, or who gave the order for the call to be placed. As a protection officer, he would not have known what messages the Lt. Governor would find unpleasant or offensive, and could not make the decision himself to remove the picketers; the only person who could make that call would be the Lt. Governor:

> Q: … Would you ever, without consulting the lieutenant governor, call the mansion to tell them that particular picketers have a message he might find—
>
> A: That's where you lose me right there.
>
> Q: Go ahead.
>
> A: How do I know it's an unpleasant message. I never made a call. I never made that kind of a call. It goes case by case. Would I? I could not tell you.
>
> Q: And the only way you would know if he found it unpleasant or he didn't want to hear it would be if he told you?
>
> …
>
> A: As far as unpleasant message, I mean, I've never had that.
>
> Q: So you wouldn't know whether it was a message he didn't want to hear unless he told you; is that right?
>
> …
>
> A: A question that he would not want to hear. Yes, I mean, you would have to talk to him.
>
> Q: Who is him?
>
> A: You would have to talk to the person you want to know the information, the lieutenant governor. I don't know how else to answer that.

*Id*. at 87-89.

11.     Sergeant Roby was Lt. Governor Rutherford's advance person on the evening of February 5, 2018. Exhibit C (Deposition of Sergeant Roby) at 28-30. As the advance person, it was his responsibility to communicate directly with the desk at the Governor's Mansion. *Id*. at 20-21. If the advance person encountered picketers, the advance person would generally read the signs the picketers are carrying and sometimes share the message with their protectee. *Id*. at 22; 25.

12.     Regardless of his responsibility to communicate directly with the desk manned by Corporal Bitter, Sergeant Roby contends that he was never "part of communicating to anyone at the console that the lieutenant governor wanted to avoid a message that some picketers had on some signs or avoid any unpleasant wording in the message." *Id*. at 42-45; 48.

13.     The civil communications officer who took the call, Lakeshia Wesby, knew that this type of call from or on behalf of elected officials must be treated urgently "because of the importance of the people who [are] calling." *See* ECF 40-2 (Deposition of Lakeshia Wesby) at 51.  She also knew the likely outcome of the call—she receives similar calls on a regular basis, approximately twice a month, and always forwards the calls to a sergeant for the express purpose of helping the official to avoid interaction with demonstrators.  *Id*. at 45-48.  The usual response was "to have the officer in the field move people," a direction that she had received before. *Id*. at 52-54. Even though she knew what would likely happen, Lakeshia Wesby directed the call to Defendant Sgt. Brian T. Pope.

14.     Defendant Sgt. Brian T. Pope responded to the call by approaching Patriot Picket and asking them to relocate to Lawyer's Mall. He knew that asking them to move was inappropriate and unconstitutional, as asking individuals to move solely to "prevent[] people from interacting with the lieutenant governor" is "against their constitutional rights." *See* ECF 37-1

(Deposition of Sgt. Brian T. Pope) at 126-127. Pope even knew that "people have a right to be there even when the lieutenant governor might walk by." *Id*. at 128.

15.     Lawyer's Mall is an area of the capitol that is restricted to demonstrators holding the necessary permits to assemble in the area. Patriot Picket did not have the required permits to demonstrate in Lawyer's Mall. Still, some of the members did relocate after Defendant Pope's instruction. Plaintiffs, however, remained on the public sidewalk.

16.     Defendant Pope then returned and placed Plaintiff Jeff Hulbert in handcuffs. Plaintiff Kevin Hulbert recorded the arrest from a reasonable distance before also being placed under arrest. The Plaintiffs were then taken to the Annapolis City Police Precinct and locked to a bench inside. Eventually, Plaintiffs were released and issued a single citation for "acting in a manner disruptive of and disturbing to the conduct of normal business" and for "prevent[ing] or disturb[ing] the general public from obtaining services provided on the property or obstruct[ing] walks."  ECF 1 at ¶38.

17.     Defendant Pope admitted under oath that he did not observe Plaintiffs engage in any of the cited behavior:

> Q.  Did you ever observe either of the Hulberts disturbing any normal business that was going on there before the police arrived, before the group of eight officers was there?
>
> A.  What do you mean, disturb normal business?
>
> Q.  Disturbing the conduct of any normal business.
>
> A.  No.
>
> Q.  Did you see the Hulberts disturbing the peace in any way before the eight officers were on the scene?
>
> A.  No.

Q.  Now after the eight officers arrived, did you see the Hulberts disrupting normal business or disturbing the peace?

A.  No.

*See* ECF 37-1 (Deposition of Sgt. Brian T. Pope) at 142-143.

18.     Rather than any valid law enforcement purpose, the motivation behind Defendant Pope's attempt to relocate Plaintiffs and the subsequent arrests was the call from the Governor's Mansion. Defendant Chief Michael Wilson admitted that the call "put the process in motion," resulting in the Hulberts' arrest. *See* ECF 40-3 (Deposition of Col. Michael Wilson) at 25.

19.     On February 6, 2018, Plaintiffs met with members of the media for interviews on the sidewalk where they had been arrested. During the interviews, Defendant Wilson approached Plaintiffs and told Plaintiffs that the social media and news coverage of the incident portrayed Defendants in a negative light before citing each Plaintiff with two additional charges. The additional charges were separate and distinct misdemeanor charges from the citations issued to Plaintiffs the night before.

20.     As stated more fully in the Complaint, Plaintiffs allege that Defendants unconstitutionally abridged their First Amendment right to freedom of speech with regard to their right to peacefully demonstrate (Count One), lawfully film a peaceful demonstration (Count Two), and engage in protected speech (Count Three). *See* ECF 1.

21.     Plaintiffs also allege that Defendants unconstitutionally violated Plaintiffs' Fourth Amendment rights by unreasonably searching, seizing, and arresting Plaintiffs without probable cause (Count Four) and utilizing unreasonable and unnecessary force (Count Five). *Id.*

22.     Plaintiffs further contend Defendants' conduct violated Plaintiffs' rights under the Maryland Declaration of Rights, including Plaintiffs' right to free speech (Count Six), freedom

from unlawful deprivation of property and liberty without due process (Count Seven), and right to be free from excessive force (Count Eight). *Id*.

23.    Finally, Plaintiffs allege that Defendants' conduct constituted false arrests (Count Nine) and false imprisonment (Count Ten). *Id*.

## II.    PROCEDURAL BACKGROUND

24.    On September 5, 2019, Plaintiffs served a Notice to Take Oral Deposition of Lt. Governor Boyd K. Rutherford, scheduling the deposition for 10:00 a.m. on October 16, 2019. *See* ECF 40-5.

25.    On September 23, 2019, Lt. Governor Rutherford filed a Motion to Quash Subpoena and for Protective Order, which Plaintiffs opposed on October 7, 2019. *See* ECF 36; 37.

26.    During a teleconference with counsel, this Court granted without prejudice Lt. Governor Rutherford's Motion to Quash Subpoena and for Protective Order, but explicitly noted that this Court's ruling was subject "to Plaintiffs' right to re-subpoena him for deposition under appropriate circumstances that may arise later in the litigation." *See* ECF 43.

27.    At the same time, this Court required Defendants to "provide discovery regarding the possible caller from the Governor's Mansion." *See* ECF 44.

28.    On November 8, 2019, counsel met in-person for an hour and a half to discuss discovery. Exhibit D (November 8th through November 13th Emails) at 1. During the meeting, Defendants disclosed to Plaintiffs that the caller was Corporal Ryan Bitter. *Id*.

29.    Plaintiffs deposed Corporal Bitter on December 10, 2019. *See* Exhibit E (Notice of Deposition for Corporal Bitter). During the deposition, Corporal Bitter admitted that he had been manning the console at the Governor's Mansion on February 5, 2018, and had placed the call to the Maryland Capitol Police. Exhibit A (Deposition of Cpl. Ryan Bitter) at 24; 50; 111-116.

Corporal Bitter testified that he placed the call because he had been ordered to do so by the detail leader assigned to the Lt. Governor, which he believed was either Sergeant Shusko or Trooper Walder. *Id*. at 64-66; 111-116.

30.     As a result of Corporal Bitter's testimony, Plaintiffs sought to depose the protection officers identified by Corporal Bitter to identify which individual called to instruct Corporal Bitter to contact the Maryland Capitol Police.

31.     On January 3, 2020, Defendants' counsel proposed dates for Plaintiffs to depose the two officers. Exhibit F (January 3rd Emails) at 2. Defendants' counsel identified a third officer who was assigned to the Lt. Governor's protection detail for a few days in 2018. *Id*. at 1. Plaintiffs' counsel agreed to dispose all three officers on the dates provided by Defendants' counsel.

32.     Notices of Deposition were sent to Defendants' counsel by mail and email on January 3, 2020, for all three officers. The deposition for Sergeant Shusko was scheduled for January 13, 2020 at 11:00 a.m., the deposition for Trooper Walder was scheduled for January 13, 2020 at 1:00 p.m., and the deposition for Sergeant DeCerbo was scheduled for January 14, 2020 at 11:00 a.m. Exhibit G (Notice of Deposition for Sgt. Shusko); Exhibit H (Notice of Deposition for TFC Walder); Exhibit I (Notice of Deposition for Sgt. DeCerbo).

33.     On January 10, 2020, Defendants' counsel contacted Plaintiffs' counsel to advise that Defendants were able to locate a copy of the assignment schedule for February 5, 2018 indicating that Trooper Walder was the officer assigned to the Lt. Governor's detail that evening. Exhibit J (January 10th Emails) at 1. As Defendants' counsel failed to provide a copy of the referenced assignment schedule, Plaintiffs' counsel responded that all three depositions would proceed as scheduled unless the schedule was disclosed. *Id*.

11

34.     Three days later, on January 13, 2020, Defendants provided a heavily redacted version of the assignment schedule to Plaintiffs, asking that Plaintiffs excuse Sergeant Shusko from the deposition scheduled two hours later. Exhibit K (January 13th Emails). Plaintiffs promptly replied, pointing out several issues with Defendants' production and stating that the depositions would proceed as scheduled. *Id*.

35.     Plaintiffs deposed Sergeant Shusko and Trooper Walder on January 13, 2020, and Sergeant DeCerbo on January 14, 2020. During the depositions, the officers identified a fourth officer who had filled in for Sergeant Shusko as he was on sick leave.

36.     Plaintiffs deposed the fourth identified officer, Sergeant Roby, on January 21, 2020. Exhibit L (Notice of Deposition for Sgt. Roby).

37.     During the depositions, Plaintiffs confirmed that on the evening of February 5, 2018 Trooper Walder was assigned as Lt. Governor Rutherford's protection officer and Sergeant Roby was assigned as Lt. Governor Rutherford's advance person. Exhibit B (Deposition of Trooper Joseph Walder) at 39; 42; Exhibit C (Deposition of Sergeant Roby) at 28-30.

38.     Neither Trooper Walder nor Sergeant Roby were able to identify the person who ordered the detail team to instruct the Maryland Capitol Police to remove the Plaintiffs from Lawyers' Mall.

39.     Plaintiffs' counsel met with Defendants' counsel in an attempt to resolve this dispute, but counsel was unable to reach a resolution.[1]

---

[1] On January 30, 2020, counsel met in-person to attempt to resolve this discovery dispute. The meeting occurred at 2:00 p.m., lasted until approximately 3:45 p.m., and took place at the offices of Defendant Col. Michael Wilson's counsel. The meeting was attended by Defendant Col. Michael Wilson's counsel, Defendant Sgt. Brian Pope's counsel, and Plaintiffs' counsel.

### III.     LT. GOVERNOR RUTHERFORD POSSESSES IMPORTANT, DISCOVERABLE INFORMATION NOT AVAILABLE THROUGH ANY OTHER MEANS.

Plaintiffs originally sought the deposition of the Lt. Governor to answer the question of who ordered that Plaintiffs be moved from their lawful, peaceful protest despite the fact that there was no contention the Plaintiffs were of any threat to the Lt. Governor or anyone else and despite the fact that no one witnessed the Plaintiffs doing anything illegal or engaging in the activities they were ultimately charged with. While this Court initially granted Lt. Governor Rutherford's request for a Protective Order, this Court permitted Plaintiffs to pursue this line of inquiry from the bottom, requiring Defendants to identify the individual who called the Maryland Capitol Police from the Governor's Mansion. *See* ECF 44. This Court reserved the possibility of requiring a deposition of Lt. Governor Rutherford later in the litigation, if the appropriate circumstances arose. *See* ECF 43.

The appropriate circumstances have now arisen to require the deposition of Lt. Governor Rutherford. Plaintiffs have laid the necessary foundation to demonstrate that the Lt. Governor possesses important, discoverable information that is not available through any other means.

Despite significant efforts, Plaintiffs have been unable to identify who directed that the call be made to order the Maryland Capitol Police to move the Plaintiffs. Plaintiffs have discovered, however, that the direction was passed through a member of the Lt. Governor's executive protection team to Corporal Bitter, who passed along the directive directly to Lakeshia Wesby and the Maryland Capitol Police. Exhibit A (Deposition of Cpl. Ryan Bitter) at 111-116. Both Corporal Bitter and Lakeshia Wesby understood the directive as an order to ensure that the Lt. Governor would not have any contact with the picketers. *Id*.; ECF 40-2 (Deposition of Lakeshia Wesby) at 45-48, 52-54.

Working up the chain, Plaintiffs then deposed each and every executive protection officer identified as working as part of Lt. Governor Rutherford's protection detail in February 2018,

seeking to identify which officer gave the directive to Corporal Bitter. After conducting four more depositions, Plaintiffs were able to identify the two officers that could have placed that call: Trooper Walder, as the protection officer standing directly next to the Lt. Governor, and Sergeant Roby, the Lt. Governor's advance person. Exhibit B (Deposition of Trooper Joseph Walder) at 39; 42.

Neither Sergeant Roby nor Trooper Walder were able to identify who ordered one of them to give the directive to Corporal Bitter to call the Maryland Capitol Police. Neither even recall making the call to Corporal Bitter, leaving unresolved the question of who instructed Corporal Bitter to make the call to the Maryland Capitol Police. Notably, however, ***the officers indicated that it was not within their purview to determine whether a particular political message would upset their protectee and independently take action as a result***.

The only person identified during either Sergeant Roby's deposition or Trooper Walder's deposition who could know why the directive was made on the evening of February 5, 2018 is Lt. Governor Rutherford himself. Trooper Walder even outright stated that the only person who would know if picketers should be moved on the basis of a particular political message—as Plaintiffs were in this case—was the Lt. Governor:

> Q: So would you ever, without at least consulting with your protectee, direct that officers be sent out to move people because they might have a message that the protectee didn't want to hear.
>
> A: No.
>
> …
>
> Q: So you wouldn't know whether it was a message he didn't want to hear unless he told you; is that right?
>
> …

A: A question that he would not want to hear. Yes, I mean, you would have to talk to him.

Q: Who is him?

A: ***You would have to talk to the person you want to know the information, the lieutenant governor. I don't know how else to answer that***.

Exhibit B (Deposition of Trooper Joseph Walder) at 83-84; 88-89 (emphasis added). According to Sergeant Roby, "***[t]he ultimate authority is the lieutenant governor as the elected official***." Exhibit C (Deposition of Sergeant Roby) at 23-25.

It is clear at this point Plaintiffs have exhausted any other possibilities for discovering who gave the order. Working up the chain, Plaintiffs have deposed each person who might have the information Plaintiffs seek, up to and including the protection officer that was standing directly beside the Lt. Governor at the time. None of the officers deposed could identify where the directive came from—but were able to confirm that ***they must have been ordered to do by another person*** and did not simply decide to give the directive on their own. The single remaining person who could have given the directive himself—or have knowledge of who did and why—is the Lt. Governor.

In his original Motion to Quash, Lt. Governor Rutherford broadly and vaguely represented that he "lacks any personal knowledge of the facts at issue in this case." *See* ECF 36 at 1. In his Reply, he provided an affidavit—in violation of the Federal Rules of Civil Procedure—which did *not* support his sweeping proclamation in the original motion. Indeed, the only relevant information in the affidavit are claims that Lt. Governor Rutherford allegedly: 1) "did not instruct, encourage or request anyone to call the Maryland Capital Police on February 5, 2018 concerning any protestors; 2) had no knowledge that such a call was made until well after the fact;" and 3)

do[es] not recognize the voice of the person who made the call…[and does] not know the identity." *See* ECF 38-1.

This affidavit does confirm that Lt. Governor Rutherford learned of the call at some point, but fails to disclose when.  Certainly, from whom Lt. Governor Rutherford learned of the call, when, why he was told and what he learned are critical issues to be discovered in this case.  After all, the purpose of the call (whether to quell protected First Amendment activity or to serve legitimate law enforcement ends) is the central issue in the case.  Since the call was made as a result of the fact that Lt. Governor Rutherford was going to walk from one building to another and did not want to interact with picketers, surely his conversations, upon learning of the call, would reveal much about what motivated it.

Prior to the filing of the affidavit, Plaintiffs had provided a list of matters on which Plaintiffs sought Lt. Governor Rutherford's deposition. Virtually none of those issues were addressed in the affidavit, and the majority of those identified issues are still open issues on which Lt. Governor Rutherford has personal knowledge. Those issues, which remain open and relevant to this case and which are not precluded by the affidavit include, *but are not limited to*, the following:

1)      Whether the Lt. Governor directed that the Capital Police interact with the picketers;

**NOTE: While the affidavit states that the Lt. Governor did not direct that anyone "call the Maryland Capital police," the affidavit does not preclude, or even address, whether the Lt. Governor directed in some other fashion that the Capital Police interact with the picketers.  Without limitation, the Lt. Governor may have simply asked an associate to deal with the protestors because he did not like their message without specifically mentioning a call or the Capital Police.**

2)      If the Lt. Governor directed that the Capital Police interact with the picketers, why did he do so – *i.e.*, was it the result of some alleged legitimate

government interest or, as the call from the Governor's Mansion suggests, simply to avoid having to interact with persons exercising their First Amendment rights;

*See* **Note to Item 1,** *supra***.**

3)      Whether the Lt. Governor discussed the Hulberts or the picketers with anyone on the day in question and if so, with who, what was discussed, *etc*.;

**NOTE: The affidavit does not discuss this point at all, and, indeed, suggests that at some point, the Lt. Governor did become aware of the call, and, thus, likely did discuss these events with someone, during which discussions information highly relevant to this case was likely revealed.**

4)      Whether the Lt. Governor was aware that the Capital Police would be made aware of the picketers and, if so, from whom did he learn this, when and for what purposes was the contact proposed;

**NOTE: The affidavit does not discuss this point at all.  Its absence is particularly telling since the Lt. Governor had a list of relevant information sought prior to providing the affidavit.  The list included this item.  If, in fact, the Lt. Governor was not aware that the Capital Police would be made aware of the picketers on the day in question, including this point in his affidavit would have been an easy matter.  As a result, it would appear that the Lt. Governor likely has discoverable information on this critical point.**

5)      If the Lt. Governor did not direct that the Capital Police interact with the picketers, who did and why;

**NOTE: Again, the affidavit is silent on this point, which suggests that the Lt. Governor has discoverable information critical to the Plaintiffs' case.**

6)      Who knew the Lt. Governor's plans (recited in the telephone call from the Governor's Mansion) to move from one building to another past the picketers;

**NOTE: The affidavit is silent on this point, which suggests that the Lt. Governor has discoverable information critical to the Plaintiffs' case.**

7)      Who was on duty the day in question working in close proximity to the Lt. Governor other than his executive protection detail such that he or she might have known the Lt. Governor's schedule sufficiently to have directed that the call be made from the Governor's Mansion;

**NOTE: The affidavit is silent on this point, which suggests that the Lt. Governor has discoverable information critical to the Plaintiffs' case.**

8)      Which intermediaries ordinarily interact with the Governor's Mansion on the Lt. Governor's behalf and who did so on the day in question;

**NOTE: The affidavit is silent on this point, which suggests that the Lt. Governor has discoverable information critical to the Plaintiffs' case.**

9)      Did the Lt. Governor have any legitimate concerns about the Hulberts, and, if so, what were they;

**NOTE: The affidavit is silent on this point, which suggests that the Lt. Governor has discoverable information critical to the Plaintiffs' case.**

10)      Did the Lt. Governor contact the Governor's Mansion, the State Police or anyone else on the day in question and, if so, were the picketers or the Hulberts discussed;

**NOTE: The affidavit is silent on this point, which suggests that the Lt. Governor has discoverable information critical to the Plaintiffs' case.**

11)      What does the Lt. Governor know about the involvement of any of his civilian or law enforcement staff in directing the Capital Police to interact with the Hulberts;

**NOTE: The affidavit is silent on this point, which suggests that the Lt. Governor has discoverable information critical to the Plaintiffs' case.**

12)      Have there been other incidents where the Lt. Governor and/or his staff have directed that people be moved out of the way and, if so, why;

**NOTE: The affidavit is silent on this point, which suggests that the Lt. Governor has discoverable information critical to the Plaintiffs' case.**

13)      If the Hulberts were the only ones ever directed to move so that the Lt. Governor might pass, was it based on their particular political message, and if not, what was the basis;

**NOTE: The affidavit is silent on this point, which suggests that the Lt. Governor has discoverable information critical to the Plaintiffs' case.**

14)      Are there any standing orders, directions, policies, procedure, patterns or practices followed by the Lt. Governor's staff, protection detail or others around him related to the Lt. Governor's movements in Annapolis and efforts to avoid interactions with members of the public, picketers, protesters, the Hulberts or others?

**NOTE: The affidavit is silent on this point, which suggests that the Lt. Governor has discoverable information critical to the Plaintiffs' case.**

Lt. Governor Rutherford had the advantage of the list above before providing his affidavit. Thus, it would have been a simple matter to have gone through the list and affirmed a total lack of any relevant knowledge on each point if such was the case. Instead, Lt. Governor Rutherford has hastily retreated from the original claim that he "lacks any personal knowledge of the facts at issue in this case," and has provided a carefully-worded affidavit that does not address the majority of the issues raised by Plaintiffs.

Combined with new evidence and all of the deposition testimony taken since the original Motion to Quash, it is now evident that Lt. Governor Rutherford does have personal knowledge on several issues vital to this litigation. Plaintiffs have exhausted all other avenues possible to obtain this information, leaving a single open avenue remaining: in the words of Trooper Walder, Plaintiffs simply "have to talk to the person you want to know the information, the lieutenant governor." Exhibit B (Deposition of Trooper Joseph Walder) at 89.

## IV. PERMITTING A DEPOSITION OF LT. GOVERNOR RUTHERFORD IN THIS CASE IS WARRANTED AND APPROPRIATE.

While Lt. Governor Rutherford attempted to claim in his Motion to Quash that a high-ranking official may only allegedly be deposed under exceptional circumstances *or* when "the official is personally involved in a material way," the *Morgan* doctrine does not apply in this case. ECF 36, para. 7 (citing *United States v. Wal-Mart Stores, Inc.*, CIV.A. PJM-01-1521, 2002 WL 562301, at *3 (D. Md. Mar. 29, 2002)). The *Morgan* doctrine, as interpreted by the *Wal-Mart Stores* court, was applied in the context of deposing public officials related to their *official conduct related to the mental processed of administrative agency decision-makers*:

> The *Morgan* doctrine protects **the mental processes of administrative agency decision-makers**. It stems from the proposition that high-ranking government

officials should not, in the absence of extraordinary circumstances, be called upon to testify regarding their reasons for **official conduct**.

*Wal-Mart Stores, Inc.*, CIV.A. PJM-01-1521, 2002 WL 562301, at *4 (D. Md. Mar. 29, 2002) (emphasis added). As this case has nothing to do with any lawful "official action," and even less with "administrative agency decision-makers," the *Wal-Mart Stores* interpretation of the *Morgan* doctrine is not applicable.

Even if the *Morgan* doctrine was applicable in this case, the doctrine only applies to bar "indiscriminate" depositions "where the public official would have little or no personal knowledge of material facts":

> The *Morgan* doctrine recognizes that, left unprotected, high-ranking government officials would be inundated with discovery obligations involving scores of cases ***where the public official would have little or no personal knowledge of material facts.***
>
> * * *
>
> One of the driving principles of the *Morgan* decision is that the ***indiscriminate depositions*** of high-ranking government officials would be unduly burdensome upon said officials and likely discourage them from accepting positions as public servants.

*United States v. Wal-Mart Stores, Inc.*, No. CIV.A. PJM-01-1521, 2002 WL 562301, at *1–3 (D. Md. Mar. 29, 2002). This simply is not such a case. Above, the plaintiff makes a particularized showing, not only of what information is likely within the personal knowledge of the deponent, but also of other efforts to obtain the relevant information. This is a far cry from an indiscriminate deposition sought from someone with little or no knowledge.

Lt. Gov. Rutherford also cites *Lederman v. New York City Dep't of Parks & Recreation*, 731 F.3d 199 (2d Cir. 2013), for the proposition that an "exceptional circumstance" permitting the deposition includes any "unique first-hand knowledge related to the litigated claims." ECF 36, para. 7; citing *Lederman*, 731 F.3d at 203. This case also supports allowing the deposition because

the Lt. governor has unique, first-hand knowledge of **who directed that the Plaintiffs be ordered off of the sidewalk so the Lt. Governor could pass and why**.

The concern of courts considering the Morgan doctrine centers around the *nature* of the duties of high-level officials. As the Second Circuit noted, "[h]igh-ranking government officials are generally shielded from depositions because they have *'greater duties and time constraints than other witnesses.'" Id.* (quoting *In re United States (Kessler)*, 985 F.2d 510, 512 (11th Cir. 1993)) (emphasis added).

However, it is evident that these same concerns should not be applied to Lt. Governor Rutherford. The office of the Lieutenant Governor of Maryland has no expressly assigned duties: the Maryland Constitution assigns the office solely "the duties delegated to him by the Governor." Md. Const. art. II, § 1A. Plaintiffs were unable to locate a public schedule for Lt. Governor Rutherford for 2019, but Plaintiffs were able to find twenty-five days' worth of Lt. Governor Rutherford's public schedule for 2017. *See* Exhibit M (Lt. Gov. Rutherford's 2017 Public Schedule). His days in 2017 were spent distributing gifts at holiday parties, giving presentations and "remarks," and receiving honorary degrees. *Id.* The only event scheduled that involved any sort of governance duty was the single day he was scheduled to chair a Board of Public Works meeting. *Id.* at 18. There is no evidence that Plaintiffs could locate indicating Lt. Governor Rutherford has any "greater duties" warranting a special shield—particularly in a case involving serious allegations of constitutional violations.

There can be no credible contention that the deposition would be unduly burdensome as Plaintiffs' counsel has repeatedly offered to take the deposition, capped at four hours, at any date and time of the deponent's choosing, including evenings, weekends and holidays and anywhere in Maryland, at the deponent's discretion.

It is clear that where "relevant evidence" may be discovered, "depositions are necessary in order to give the plaintiff the opportunity" to do so. *Culp v. Devlin*, 78 F.R.D. 136, 140 (E.D. Pa. 1978). Thus, when:

> Defendants hold important public offices, when they come into federal court they must be treated like all other parties. **Justice in the judicial system requires equality of treatment and equal application of the discovery rules**. If any other individual would be required to attend a deposition under these circumstances, so must these defendants be made to appear for oral examination unless compelling circumstances direct otherwise.

*Id.* at 141 (emphasis added). While the above refers to parties to a lawsuit, the reasoning nonetheless applies to non-parties since:

> It is clear that the standards set forth in the [Federal] Rules [of Civil Procedure], and particularly the Rule 26(b)(1) limitation of discovery to information relevant to the claim or defense of any party, **apply equally with respect to depositions of parties and non-parties**.

*Bell ex rel. Estate of Bell v. Bd. of Educ. of County of Fayette*, 225 F.R.D. 186, 193 (S.D.W. Va. 2004) (emphasis added).

Knowing who directed that the Plaintiffs be moved from the sidewalk is crucial to knowing why the direction was given. This information is vital, in turn, to a determination of whether there was a legitimate government purpose or it whether the Plaintiffs were being ordered away in violation of their constitutional rights as they have alleged. Thus, the Lt. Governor's deposition is vital and necessary to the case—and the only method of finally answering the question of where the directive originated from.

## V.      <u>CONCLUSION</u>

WHEREFORE, Plaintiffs respectfully request that this Honorable Court grant their

Motion, deny Lt. Governor Rutherford's Motion to Quash Subpoena, order that Defendants make

Lt. Governor Rutherford available for deposition on or before seven days after the entry of this

Order at 4:30 p.m., and for such further relief as the Court may grant in the interest of justice.


Respectfully submitted,

HANSEL LAW, PC

_____/s/ Cary J. Hansel_____
Cary J. Hansel (Bar No. 14722)
cary@hansellaw.com
2514 N. Charles Street
Baltimore, MD 21218
Phone: (301) 461-1040
Fax: (443) 451-8606
*Counsel for Plaintiffs*


## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 31st day of January, 2020, I caused the foregoing to be filed

via the Court's electronic filing system, which will make service on all parties entitled to service.


_____/s/ Cary J. Hansel_____
Cary J. Hansel