Case 1:18-cv-00461-SAG   Document 52-2   Filed 01/31/20   Page 1 of 21

Deposition of Corporal Ryan Bitter                    Jeff Hulbert, et al. v. Sgt. Brian T. Pope, et al.

1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF MARYLAND

3

4     JEFF HULBERT, et al.,            *

5            Plaintiffs              *

6       v.                           * Case No.:

7     SGT. BRIAN T. POPE, et al.,    * 1:18-CV-00461 SAG

8            Defendants               *

9

10            ----------------------------

11          Deposition of CORPORAL RYAN BITTER,

12    taken on Tuesday, December 10, 2019, at

13    10:18 a.m. at Hansel Law, PC, 2514 North Charles

14    Street, Baltimore, Maryland 21218, before Lindsy

15    Badawy, Notary Public.

16            ----------------------------

17

18

19

20

21    REPORTED BY:  Lindsy Badawy

**Exhibit A**

1    Q.  Very good.  What goes on there?  Does

2   somebody live there?  Are there offices?

3       **A.  It's where the governor and first lady**

4   **reside.**

5       Q.  You mentioned working the console there.

6   What's the console?

7       **A.  It's a desk, and it's where our cameras**

8   **are.**

9       Q.  I assume there's also communications

10  equipment at the console?

11      **A.  Yes.**

12      Q.  Does that include radio and telephone

13  communications?

14      **A.  Yes.**

15      Q.  You said that there are cameras there.

16  Where do the camera feeds come from?

17      **A.  An outside source, an outside security**

18  **company.**

19      Q.  No, I meant, where are the cameras

20  situated?

21      **A.  All around the property.**

1       **A.   Just if a vehicle was blocking the**

2  **vehicle gate and preventing us from entering or**

3  **exiting our vehicle lot on the Governor's**

4  **Mansion.  We have a triangle in front of our**

5  **front gate.  No one is supposed to occupy that.**

6  **If someone is parked there, we call them to have**

7  **it removed.  If there is a vehicle parked in the**

8  **lieutenant governor's spot around the State**

9  **House, we'll call them to have it removed.**

10      Q.   What other types of issues do you call

11  the Maryland Capitol Police about?

12      **A.   That's pretty much it.**

13      Q.   Did you ever have occasion during that

14  five years from '13 to '18 -- roughly five

15  years -- to call the Maryland Capitol Police

16  related to individuals that were either picketers

17  or protestors or anybody like that?

18      **A.   Yes.**

19      Q.   How many times, approximately, in that

20  five years?

21      **A.   I made a call once.**

1  **police to have a uniform come down and stand with**

2  **the picketers for the movement of the lieutenant**

3  **governor.**

4      Q.  Let's break that down a little bit.  How

5  did you first become aware of the picketers?

6      **A.  You could see them standing outside.**

7      Q.  Did you see them out the window or on

8  the screen or both?

9      **A.  Both.**

10      Q.  Describe to me where in the building the

11  console is.  Is it sort of on a corner?

12      **A.  Yes.  It's on the vehicle lot of the**

13  **Governor's Mansion.  The back of it faces Lawyers**

14  **Mall.**

15      Q.  How much of Lawyers Mall or the sidewalk

16  in front of Lawyers Mall can you see looking out

17  the window?

18      **A.  Not a lot.**

19      Q.  The people or person you saw we're going

20  to get into in more detail this day in February

21  of 2018.  How did you first see them?  Out the

1     window?  On the scene?

2          **A.   The window.**

3          Q.   Was that your first awareness that

4     anyone was out there, or had you received any

5     notice from elsewhere that somebody was out

6     there?

7          **A.   I believe that's the first time I saw**

8     **them.**

9          Q.   Was it the first time you were aware?

10         **A.   Yes.**

11         Q.   Sorry to be specific, but you understand

12    the difference?

13         **A.   Yes.**

14         Q.   What were you doing when you looked out

15    the window when you saw them?

16         **A.   Just the normal duties of the console.**

17         Q.   Were you seated in the chair at the

18    console?

19         **A.   Yes.**

20         Q.   What did you see when you looked out the

21    window?

1      **A.   From what I recall, picketers standing**

2   **on the College Avenue side of Lawyers Mall.**

3      Q.   They are on the sidewalk there?

4      **A.   I believe so, yes.**

5      Q.   How many people did you see?

6      **A.   I don't recall.**

7      Q.   Did it seem to be a large group or a

8   small group?

9      **A.   I don't recall.**

10      Q.   Did you see anyone besides the picketers

11   that you recall?

12      **A.   No.**

13      Q.   What about vehicles?  Do you recall any

14   vehicles there?

15      **A.   No.**

16      Q.   You call them picketers.  Did they have

17   signs or anything?

18      **A.   I recall they had signs, yes.**

19      Q.   Had they started -- I don't know what

20   the term is -- picketing, moving with the signs?

21   What were they doing with the signs when you

1    any of those individuals previously, as far as

2    you know?

3         **A.  They were probably there the previous**

4    **week, but we had no dealings with them.**

5         Q.  Had you seen them there the previous

6    week?

7         **A.  Yes.**

8         Q.  Was that also on a Monday?  Do they have

9    a regular day of the week that they're there, if

10   you know?

11        **A.  I don't recall.**

12        Q.  In the previous week you said you had no

13   dealings with them; is that right?

14        **A.  Right.**

15        Q.  Obviously if you'd seen them violating

16   the law in any way, you would have had some

17   dealings with them one way or another; is that

18   right?

19        **A.  No.**

20        Q.  Well, you would have called somebody,

21   wouldn't you?

1      A.  Correct.

2      Q.  Did you call anybody about them the

3  previous week?

4      A.  No.

5      Q.  It's fair to say the previous time you

6  saw them they didn't do anything unlawful; is

7  that right?

8      A.  Correct.

9      Q.  As you sit here today, do you remember

10  ever seeing them previously, other than the

11  previous week?

12      A.  No.

13      Q.  In the period of time from this day

14  we're here to talk about, which I think was

15  February 5th of 2018, but this day that you're

16  remembering, whatever the date is, moving forward

17  in time, have you had any other observations of

18  this group or interactions with them at all?

19      A.  No.

20      Q.  What was your regular schedule in

21  February of 2018 as a duty officer?  Let me ask

1    Q.  Did anyone ever communicate to you that

2    the lieutenant governor did not want to interact

3    with these people in any way?

4    **A.  I don't recall.**

5    Q.  Who was the radio call from?

6    **A.  Whoever was working that day.  I don't**

7    **know.**

8    Q.  It would have been whoever was the --

9    what was the name of the position?  You told me

10   earlier.

11   **A.  Detail leader.**

12   Q.  Is that a position that rotated?

13   **A.  Yes.**

14   Q.  How big is the detail for the lieutenant

15   governor?  How many people?

16   **A.  On a daily basis, two.**

17   Q.  So one or the other was the detail

18   leader that night; is that right?

19   **A.  Correct.**

20   Q.  Certainly you worked closely with him;

21   is that right?

1    **A.  Yes.**

2    Q.  Who were the two people who were detail

3    leaders who may have been the detail leader in

4    February of 2018 when you received this radio

5    communication?

6    **A.  It could have been Sergeant Shusko or**

7    **TFC Walder.**

8    Q.  What's the sergeant's full name?

9    **A.  First name is Angelo.**

10   Q.  What is his last name?

11   **A.  Shusko, S-H-U-S-K-O.**

12   Q.  And the trooper first class, what is his

13   full name?

14   **A.  Joseph Walder, W-A-L-D-E-R.**

15   Q.  So either Sergeant Shusko or TFC Walder

16   radioed you about this movement; is that right?

17   **A.  Those two are who were assigned to the**

18   **group I work on.  They follow my group, so when**

19   **my group works, they work the lieutenant**

20   **governor.  If one of those two were off, a**

21   **fill-in could have been filled in for them.  It**

1   **not necessarily were those two that day.**

2       Q.  But assuming neither one of them had the

3   day off, it would have been one of those two?

4       **A.  Yes.**

5       Q.  Do you recall whether one of them had

6   the day off the day in question?

7       **A.  I don't recall.**

8       Q.  One way or the other, you don't recall?

9       **A.  I don't recall.**

10      Q.  Do you recall either one of them

11  specifically working that day?  For instance, you

12  might have had lunch with them.  You might have

13  chatted with them either earlier or at roll call

14  or something.  You might have seen them later.

15  Do you recall either one of them either working

16  or not working specifically that day?

17      **A.  No.**

18      Q.  Are there records that would reflect who

19  was assigned to the lieutenant governor that day,

20  which officers?

21      **A.  Yes.**

1   Walder, you don't know if it came from anybody

2   else above them?

3        A.  I don't.

4        Q.  For instance, you don't know if it came,

5   ultimately, from the lieutenant governor or not?

6        A.  I don't.

7        Q.  After the phone call, you said that

8   there were, for lack of a better word -- it

9   sounds to me like they were the only thing kind

10  of going on.  After the phone call, did you keep

11  an eye on the console on the cameras and out the

12  window at this little group?

13       A.  Yes.

14       Q.  Did you keep an eye on them until they

15  were gone?

16       A.  Yes.

17       Q.  Did you ever see them break any laws?

18       A.  Not from my vantage point, no.

19       Q.  What did you observe?  Well, let me ask

20  you this:  After you called the Maryland Capitol

21  Police, when did you next communicate with

1    communicate to the Maryland Capitol Police,

2    right?

3            MR. FREDRICKSON:  Objection to the form.

4        Q.  (BY MR. HANSEL)  Is that right?

5        **A.  Correct.**

6        Q.  That would be your goal.  It's pretty

7    obvious, but is that right?

8        **A.  Correct.**

9            MR. FREDRICKSON:  Objection to the form.

10       Q.  (BY MR. HANSEL)  Now, one thing that

11   strikes me about that approach, why would they

12   want you to do it instead of doing it themselves,

13   I guess, to put it most directly, if you know?

14   Is there a procedural reason, or maybe it's

15   because it has to be on the phone and they don't

16   have a phone with them?  Is there some --

17           MR. FREDRICKSON:  Objection.

18           Go ahead.

19       **A.  That's the responsibility of the duty**

20   **officer.**

21       Q.  (BY MR. HANSEL)  One of your

1   responsibilities is communication with the

2   Maryland Capitol Police; is that right?

3          **A.   Correct.**

4          Q.   So procedurally, that kind of

5   communication is supposed to go through you; is

6   that right?

7          **A.   Correct.**

8          Q.   Are those communications -- obviously

9   they're recorded; you and I have both heard an

10  audio recording of them -- but are they logged in

11  any other way or recorded in any other way than

12  that audio recording, in a log, in a notebook, in

13  a spreadsheet, on Excel, whatever it is?

14         **A.   I don't know.**

15         Q.   But not by you?

16         **A.   Correct.**

17         Q.   I've been told through other sources

18  that there are sometimes communications that fall

19  in this same category or description from members

20  of the legislature, the senate or the house of

21  delegates, to the Maryland Capitol Police.   Do

1  signs, and you believe them to be picketers or

2  protestors?

3      **A.  Correct.**

4      Q.  So you knew, when you made the call,

5  obviously, that they were there to get some kind

6  of message across, whatever it was, on the signs;

7  is that right?

8      **A.  Yes.**

9      Q.  Had you, at that point, read the signs?

10  Could you make out what they said from your

11  vantage point either on the video or out the

12  window?

13      **A.  No.**

14      Q.  So you didn't know the content of the

15  signs?

16      **A.  Correct.**

17      Q.  Had the content of the signs, as far as

18  you recall, been communicated to you by the folks

19  who called you in connection with the lieutenant

20  governor?

21      **A.  I don't recall.**

1      **A.  Correct.**

2      Q.  In communicating this message to the

3  Maryland Capitol Police, I heard you say that the

4  concern was that they would give him a bunch of

5  stuff for whatever reason.  Did you hear that

6  language?

7      **A.  Yes.**

8      Q.  My understanding of what you're telling

9  me is that you were communicating a message that

10 ultimately came from somebody else.  Sitting here

11 today, do you know what you meant by or what they

12 meant in asking you to communicate it, however

13 the particular words were chosen, what was meant

14 by, "give him a bunch of stuff for whatever

15 reason"?

16         MR. FREDRICKSON:  Objection to the form.

17         Go ahead.

18     **A.  As far as approaching the lieutenant**

19 **governor, whatever their message was they wanted**

20 **to relay to him, being arrogant to him, using**

21 **derogatory language towards him.**

1    Q.  (BY MR. HANSEL)  So it had to do in the

2    first instance with avoiding the communicating of

3    the message, and in the second instance, avoiding

4    any unpleasant wording in the message; is that

5    fair?

6         A.  Correct.

7         Q.  The goal in sending an officer out was

8    to avoid those things; is that right?

9         A.  Correct.

10        Q.  That's how it was communicated to you by

11   the people who were with the lieutenant governor;

12   is that right?

13        MR. FREDRICKSON:  Objection to the form.

14        A.  Correct.

15        Q.  (BY MR. HANSEL)  As you've described it,

16   you didn't know what their message was because

17   you couldn't see the signs; is that right?

18        A.  Correct.

19        Q.  Do you know how the people with the

20   lieutenant governor determined that it might be a

21   message he didn't want to hear or that they might

1    be rude to him or however you would describe it?

2        **A.  No.**

3        Q.  But since you couldn't see the signs,

4    obviously that was a determination that they

5    made; is that right?

6        **A.  Yes.**

7        Q.  And then they communicated it to you,

8    and then you communicated it to the Maryland

9    Capitol Police; is that correct?

10       **A.  Correct.**

11       Q.  So the concern that was communicated to

12   you by the people in Executive Protection with

13   the lieutenant governor was that this particular

14   group might have an unpleasant message for him or

15   one he didn't want to hear; is that right?

16           MR. FREDRICKSON:  Objection.

17       **A.  Possibly, yes.**

18       Q.  (BY MR. HANSEL)  In other words, it

19   might possibly be one he doesn't want to hear; is

20   that right?

21           MR. FREDRICKSON:  Objection.

1      A.   Possibly, yes.

2      Q.   (BY MR. HANSEL)   And then you were

3  directed by those people who were with the

4  lieutenant governor to pass that on to the

5  Maryland Capitol Police; is that right?

6          MR. FREDRICKSON:   Objection.

7      A.   They necessarily didn't tell me to call

8  them.   What we assume happened was they called me

9  about the protestors, which then I, in turn,

10  called the capitol police.

11      Q.   (BY MR. HANSEL)   The goal of the call

12  was to avoid having the protestors give him a

13  bunch of stuff for whatever reason.   That's what

14  we're talking about now.   That piece of it

15  obviously came because you couldn't see what

16  their message was.   That piece of it obviously

17  came from the people with the lieutenant

18  governor, right?

19          MR. FREDRICKSON:   Objection.

20      A.   Correct, but our goal is the safety of

21  the lieutenant governor.

1    Q.  (BY MR. HANSEL)  You obviously didn't

2    have any reason to think -- because what you saw,

3    as we've pieced it together here, were a couple

4    people with signs that you couldn't read, right?

5        **A.  Correct.**

6        Q.  And you didn't see any illegal activity?

7        **A.  From my vantage point, no.**

8        Q.  You personally didn't have any reason to

9    think they were any kind of threat or anything,

10   obviously?

11       **A.  No.**

12       Q.  And because you didn't know their

13   message, you didn't know if it was one that was

14   rude or the lieutenant governor didn't want to

15   hear, right?

16       **A.  Correct.**

17       Q.  So that information came from the people

18   with the lieutenant governor; is that right?

19           MR. FREDRICKSON:  Objection.

20       **A.  Correct.**

21       Q.  (BY MR. HANSEL)  That's what you were

1   communicating when you said that the Executive

2   Protection people didn't want the picketers to

3   give them a bunch of stuff for whatever reason?

4        **A.  Correct.**

5        Q.  In communicating that, the intent was

6   obviously that they would send a trooper out and

7   do whatever could be done to try to avoid the

8   interaction?

9        **A.  Correct.**

10        MR. FREDRICKSON:  Objection to the form.

11        Q.  (BY MR. HANSEL)  Is that right?

12        **A.  Correct.**

13        Q.  That's the message you got from the

14   people with the lieutenant governor, and you

15   relayed it to the people at the Maryland Capitol

16   Police?

17        MR. FREDRICKSON:  Objection to the form.

18        **A.  Correct.**

19        Q.  (BY MR. HANSEL)  All right.  Thank you,

20   sir.  That's all I have today, unless these

21   gentlemen have any questions.