```
 1         IN THE UNITED STATES DISTRICT COURT

 2            FOR THE DISTRICT OF MARYLAND

 3

 4   JEFF HULBERT, et al.,        :

 5          Plaintiffs            :

 6      vs.                       :

 7   SGT. BRIAN T. POPE, et al., :   CASE NUMBER:

 8          Defendants            :   1:18-CV-02317 GLR

 9

10                 --------------------

11

12        Deposition of TROOPER JOSEPH WALDER, JR.,

13   taken on Monday, January 13, 2020, at 2:05 p.m.,

14   at Hansel Law, 2514 North Charles Street,

15   Baltimore, Maryland, before Linda A. Crockett,

16   Notary Public.

17                 --------------------

18

19

20   Reported by:

21   Linda A. Crockett
```

**Exhibit B**

Case 1:18-cv-00461-SAG   Document 52-3   Filed 01/31/20   Page 2 of 12

Deposition of Trooper Joseph Walder, Jr.                                        Jeff Hulbert, et al. v. Sgt. Brian T. Pope, et al.

1   **A. Yes.**

2   Q. Have you worked for any other governor

3   other than Governor Hogan in executive

4   protection?

5   **A. O'Malley.**

6   Q. When did you get assigned to the

7   lieutenant governor?

8   **A. When they were elected.**

9   Q. So somewhere around 2015; is that right?

10  **A. Yes.**

11  Q. And have you -- and recognizing you may

12  pick up an overtime shift or sub in for somebody,

13  but have you generally been assigned to executive

14  protection for the lieutenant governor since

15  2015?

16  **A. Yes.**

17  Q. And my understanding is that there's an

18  advance person and then a person who is

19  personally with the lieutenant governor that sort

20  of make up his immediate team; is that right?

21  **A. Yes.**

1  Q.  And the advance person I understand to

2 be the advance man or advance person, however you

3 say it, is that right, in terms of just what

4 they're referred to as?

5  **A.  Yes.**

6  Q.  And then the person who's actually with

7 the lieutenant governor, how do you call that

8 person or how do you refer to them?  I just want

9 to make sure we're on the same page.

10  **A.  Just protection.**

11  Q.  So there's the protection officer and

12 the advance officer; is that right?

13  **A.  Yes.**

14  Q.  And that's the lieutenant governor's

15 immediate team; is that fair?

16  **A.  Yes.**

17  Q.  Okay.  All right.  Tell me about the

18 role -- have you worked both roles for the

19 lieutenant governor?

20  **A.  Yes.**

21  Q.  And do you routinely kind of trade off

Case 1:18-cv-00461-SAG Document 52-3 Filed 01/31/20 Page 4 of 12

Deposition of Trooper Joseph Walder, Jr.     Jeff Hulbert, et al. v. Sgt. Brian T. Pope, et al.

1    Q. I mean, but you work closely together?

2    **A. Yes.**

3    Q. All right. Are the two of you also

4 friends?

5    **A. Friends as in -- I mean, we have a work**

6 **friendship.**

7    Q. Sure. But do you see each other outside

8 of work, maybe at a bar, a cookout, that sort of

9 thing?

10    **A. No.**

11    Q. Fair enough. But friendly certainly at

12 work?

13    **A. Sure, yes.**

14    Q. Okay. Now, describe the two roles for

15 me. What does the advance person do and what

16 does the protection person do, just from a

17 thousand feet in the air general question?

18    **A. So basically the advance guy will go**

19 **obviously in advance to wherever -- whatever that**

20 **event is or where we're going. He does basically**

21 **an overview of where we're going, checks things**

1  **out. The protection guy is basically, he'll**

2  **assume the duty of protecting the lieutenant**

3  **governor, anyone approaching him or whatever,**

4  **whoever is a threat.**

5       Q.   And so the protection person -- and

6  again, you have the knowledge and experience, not

7  me.  But I'm going to make some assumptions to

8  try to move the deposition along and ask you if

9  they're correct.  If they aren't, tell me.  But

10 the protection person it sounds like maintains a

11 relatively short distance between him and the

12 lieutenant governor, stays relatively physically

13 close in order to perform his role as protection.

14 Is that right?

15      **A.   For the most part, yes.**

16      Q.   And then the advance person is the

17 person who is more remote and goes and checks out

18 maybe the path of movement or a location where

19 they're going to go to; is that generally right?

20      **A.   Yes.**

21      Q.   Speaking of the advance person now, does

1  Q.  Okay.  What is it?

2  **A.  It's our schedule.**

3  Q.  It's been explained to me that there's a
4  schedule that's prepared in advance and then it
5  is corrected or changed if people are out sick or
6  got in a car wreck or whatever, couldn't make it
7  to work for whatever reason.  Do you know whether
8  this is the advance one, the final one?  Do you
9  have any idea one way or the other looking at it?

10  **A.  No.**

11  Q.  Have you ever seen this document before?

12  **A.  This particular one, no.**

13  Q.  But you've seen documents of this type?

14  **A.  Yes.**

15  Q.  All right.  Looking at Monday, February
16  5th, can you tell me who was working protection
17  for the lieutenant governor?

18  **A.  That was me, sir.**

19  Q.  Okay.

20  **A.  Well, I guess it would be me.  If you**
21  **were to draw a straight line, but --**

1  final version, is there any indication on here

2  that would help narrow it down as to who might

3  have subbed in for Shusko, assuming somebody did?

4      **A.   According to this document, not by**

5  **memory --**

6      Q.   I hear you.

7      **A.   -- would be Roby and DeCerbo.**

8      Q.   All right.  In other words, the way this

9  is written, it suggests to you it was one of

10 those people who subbed in for Shusko; is that

11 what you're telling me?

12     **A.   Yes.**

13     Q.   All right.  And I'll tell you that's

14 what he told me too.  That's why I brought those

15 to your attention.

16     Looking at this document, is there

17 anybody else who you think might have subbed in

18 for him, if somebody did.  And I don't even know

19 if they did it, so I'm not suggesting it.

20     **A.   According to this document, no.**

21     Q.   Do you remember working this day,

1  lieutenant governor was that this particular

2  group might have an unpleasant message for him or

3  one he didn't want to hear; is that right.

4        He says, possible, yes.

5    **A.  Okay.**

6    Q.  Later in the same deposition he's asked,

7  that's what you were communicating when you said

8  that the executive protection people didn't want

9  the picketers to give them a bunch of stuff for

10 whatever reason.

11       Correct.

12       In communicating that, the intent was

13 obviously that they, they refers to the Maryland

14 capitol police, would send a trooper out and do

15 whatever could be done to try to avoid the

16 interaction.

17       Correct.

18       So would you ever, without at least

19 consulting with your protectee, direct that

20 officers be sent out to move people because they

21 might have a message that the protectee didn't

1  want to hear.

2  **A. No.**

3  MR. FREDRICKSON: Objection to the form

4  of the question. Objection to the improper

5  reading of the transcript. I don't know why we

6  have to keep inserting words into the transcript,

7  especially references to and explanations for

8  pronouns. It's a totally improper question.

9  Q. Your answer was no?

10  **A. No, I don't --**

11  MR. FREDRICKSON: Do you understand the

12  question?

13  MR. HANSEL: No, no, no. That's not how

14  this works.

15  MR. FREDRICKSON: It does work. Because

16  you don't want to have an improper incorrect

17  transcript. You said it at the beginning.

18  MR. HANSEL: He answered the question.

19  MR. FREDRICKSON: You asked him a

20  question that takes you a minute and a half and

21  you improperly read the deposition.

1    **A.   How would I know that?**

2         MR. FREDRICKSON:  Exactly.

3    Q.   Unless you what, consulted with the

4    lieutenant governor, right?

5         MR. FREDRICKSON:  Objection to the form

6    of the question, hypothetical.

7         MR. HANSEL:  Counsel, I'm going to ask

8    you that you stick to one word.  I understand

9    objection to incorporate all kinds of things.

10        MR. FREDRICKSON:  I can explain my

11   objection to the point I want to.

12        MR. HANSEL:  I disagree.

13   **A.   That's more an opinion than --**

14   Q.   That's fine.  I still need an answer.

15   Would you ever, without consulting the lieutenant

16   governor, call the mansion to tell them that

17   particular picketers have a message he might

18   find --

19   **A.   That's where you lose me right there.**

20   Q.   Go ahead.

21   **A.   How do I know it's an unpleasant**

Case 1:18-cv-00461-SAG   Document 52-3   Filed 01/31/20   Page 11 of 12

Deposition of Trooper Joseph Walder, Jr.                    Jeff Hulbert, et al. v. Sgt. Brian T. Pope, et al.

1  **message.  I never made a call.  I never made that**

2  **kind of a call.  It goes case by case.  Would I?**

3  **I could not tell you.**

4      Q.  And the only way you would know if he

5  found it unpleasant or he didn't want to hear it

6  would be if he told you?

7          MR. FREDRICKSON:  Objection.  Who is he?

8          MR. HANSEL:  The lieutenant governor.

9          MR. FREDRICKSON:  There's nothing in

10  that transcript that says lieutenant governor.

11         MR. HANSEL:  We're looking at it and it

12  does.

13     **A.  As far as unpleasant message, I mean,**

14  **I've never had that.**

15     Q.  So you wouldn't know whether it was a

16  message he didn't want to hear unless he told

17  you; is that right?

18         MR. FREDRICKSON:  Objection to the form

19  of the question.

20     **A.  A question that he would not want to**

21  **hear.  Yes, I mean, you would have to talk to**

Case 1:18-cv-00461-SAG   Document 52-3   Filed 01/31/20   Page 12 of 12

Deposition of Trooper Joseph Walder, Jr.                                    Jeff Hulbert, et al. v. Sgt. Brian T. Pope, et al.

1  **him.**

2  Q. Who is him?

3  **A. You would have to talk to the person you**
4  **want to know the information, the lieutenant**
5  **governor.  I don't know how else to answer that.**

6  Q. Me neither.

7  **A. That's an opinion.**

8  Q. Now, have you ever been party to asking
9  anybody in the mansion to send a trooper out to
10 try to avoid an interaction between a protectee
11 and members of the public?

12        MR. FREDRICKSON:  Objection.  Asked and
13 answered.  Go ahead.

14 **A. No, no.**

15 Q. To your knowledge, have you ever had any
16 internal affairs investigations opened against
17 you?

18 **A. No.**

19 Q. Is it fair to say that, in terms of the
20 decision-making between the protection team and
21 the protectee, what's the line between the two?