Case 1:18-cv-00461-SAG  Document 52-4  Filed 01/31/20  Page 1 of 16

Deposition of Sgt. Kevin M. Roby  Jeff Hulbert, et al. v. SGT. Brian T. Pope, et al.

```
1           IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF MARYLAND

3

4   JEFF HULBERT, et al.

5           Plaintiffs

6   v.                              CASE NO.:

7   SGT. BRIAN T. POPE, et al.      1:18-CV-02317 GLR

8           Defendants

9   _____/

10

11

12          The deposition of SGT. KEVIN M. ROBY was

13  held on Tuesday, January 21, 2020, commencing at

14  10:00 a.m., at the Offices of Hansel Law, P.C., 2514

15  North Charles Street, Baltimore, Maryland 21218,

16  before Kaleigh Irish, RPR, Notary Public.

17

18

19

20

21  REPORTED BY:   Kaleigh Irish, RPR
```

**Exhibit C**

1  you're filling in for?  You follow what I'm asking?

2  **A     You mean like what -- if I'm filling in**

3  **for lieutenant governor, what am I doing?**

4     Q     Correct, yeah.

5  **A     So usually advance.**

6     Q     All right.  And just so we're on the same

7  page:

8           As I understand it, the lieutenant

9  governor, in terms of what I think of as direct

10 protection of people who are directly with him, has

11 an advance person and then a person -- they used to

12 call it a body man.  I think they like to call it

13 something else now, but a protection person who is

14 right with him.

15          Is that the team, an advance person and a

16 protection person?

17    **A     Yes.**

18    Q     And so -- and usually, you're advance

19 when you fill in for the lieutenant governor, is

20 that right?

21    **A     Correct.**

Case 1:18-cv-00461-SAG   Document 52-4   Filed 01/31/20   Page 3 of 16

Deposition of Sgt. Kevin M. Roby                                            Jeff Hulbert, et al. v. SGT. Brian T. Pope, et al.

1  governor intends to walk it, you walk it first.  Is

2  that fair?

3      **A    Correct.**

4      Q    And in my understanding, in Annapolis,

5  there is a lot of cameras available.  Are you able

6  to -- or, do you check out the route on cameras

7  first, or do you just go ahead and walk it?

8      **A    I just walk it.**

9      Q    And then in addition to the protection

10 person and the advance person, my understanding is

11 that executive protection has sort of a dispatch

12 that works out of the governor's mansion.  A couple

13 of different people have suggested that they refer

14 to that person as different things.

15         What do you call that person who is in the

16 governor's mansion relaying radio and telephone

17 traffic for executive protection, the state police

18 employee who is there?

19     **A    We just call them the desk or console.**

20     Q    And as the advance person, do you

21 communicate directly with the desk or console?

1   **A      Yeah. I mean, yes.**

2   Q      What kind of issues do you communicate

3   with the desk or console about as the advance

4   person?

5   **A      I mean, pretty much just let them know**

6   **if -- or, like when the lieutenant governor is en**

7   **route or when he gets there.**

8   Q      So the console is kept up-to-date about

9   the location and movements of your protectee, is

10  that fair?

11  **A      Yes.**

12  Q      When you're walking a route for a

13  protectee and you encounter picketers or folks with

14  signs, how are they treated? What's your approach

15  there?

16  **A      How are they treated?**

17  Q      Well, what's your approach? What do you

18  do? In other words, do you call in and check on

19  them, do you talk to them, do you just ignore them?

20  What's your -- what's your typical approach?

21  **A      I mean, if they're just holding signs,**

Case 1:18-cv-00461-SAG   Document 52-4   Filed 01/31/20   Page 5 of 16

Deposition of Sgt. Kevin M. Roby                                      Jeff Hulbert, et al. v. SGT. Brian T. Pope, et al.

1  **I'm not going to go up and talk to them.**

2       Q    Okay.

3       **A    Normally, we ignore them.  So if we're**

4  **just walking by, yeah, I'll keep an -- you know,**

5  **I'll see what the signs say and walk by.**

6       Q    In other words, you just walk by, read

7  whatever the signs are, and keep going.  Is that

8  fair?

9       **A    Correct.**

10      Q    In terms of -- I'm not quite sure how to

11 frame this question, so let me try to walk you

12 through it and then see if this makes sense.

13           I'm trying to understand who makes what

14 decisions between the protectee and the -- if it

15 matters, we're -- I'm talking about the lieutenant

16 governor.  And the -- and his executive protection

17 team.

18           So an example is:  If he is going to move

19 between two buildings, I assume the time he is going

20 to move, when he wants to go, scheduling is generally

21 up to him and, you know, absent obviously some

1   emergency.  But it's generally up to him when he is

2   going to move and where he is going to go.

3           Is that fair?  And then you guys have to

4   just basically make sure he is safe doing that.  Is

5   that accurate?

6       **A    I would say it's more on the staff to get**

7   **him from Point A to Point B.**

8       Q    When you say staff, not executive

9   protection, but his --

10      **A    Right, his staff.**

11      Q    Okay.  Good, understood, understood.  But

12  it's not generally a state police decision when the

13  lieutenant governor is going to move between two

14  buildings or which two building he's going to move

15  between, that kind of thing?

16      **A    No, we don't tell him when.  You know,**

17  **it's generally on his staff or him.  When he is**

18  **ready to go, we go.  We're not telling him when.**

19      Q    And what other types of decisions are his

20  versus the executive protection team?  If you can,

21  you know, describe to me.  What decisions does the

1   lieutenant governor and his staff make versus what

2   decisions do you guys make?

3       MR. FREDERICKSON:  Objection.  Go ahead.

4   **A   I can answer that?**

5       MR. FREDERICKSON:  Yes.

6   **A   Okay.**

7       MR. FREDERICKSON:  You can.  If you -- if

8   you have facts and you can respond.

9   **A   No, no.  I would say there is no decision**

10  **he tells us to make, you know.  That's about it on**

11  **that.**

12  Q   In other words, there is -- there is --

13  the ultimate authority is the lieutenant governor as

14  the elected official, is that right?

15      MR. FREDERICKSON:  Objection.  You can go

16  ahead.

17  **A   Can you repeat it?**

18  Q   Sure.  The ultimate authority is the

19  lieutenant governor as the elected official, is that

20  right?

21      MR. FREDERICKSON:  Objection.  Go ahead.

Case 1:18-cv-00461-SAG   Document 52-4   Filed 01/31/20   Page 8 of 16

Deposition of Sgt. Kevin M. Roby                                    Jeff Hulbert, et al. v. SGT. Brian T. Pope, et al.

1  **A     Yes.**

2  Q     Going back to my question about

3  picketers, you mentioned reading their signs.  Is

4  that information ever communicated anywhere by you?

5  In other words, what their message is, what they're

6  in favor of or against, what their position is, who

7  they are, that kind of information.

8  **A     I'm sorry, repeat that one.**

9  Q     Sure.  You mentioned reading the signs of

10 picketers --

11 **A     Right.**

12 Q     -- when you're doing your advance work.

13 Do you ever communicate any information about

14 picketers to anyone as you're doing your work?

15 **A     It depends on the situation, but possibly**

16 **to my protection guy.**

17 Q     And what kind information is sometimes

18 shared with the protection guy?

19 **A     Alternate routes we can take, depending**

20 **on the situation.**

21 Q     And what about picketers, just in

1   **A**   **Yes.**

2   Q   And that -- it's been explained to me --

3   Oh, and if you look down under lieutenant

4   governor, for Sgt. Shisko, you'll see it says SL,

5   which I've been told means sick leave.  It's been

6   explained to me, and I just -- to avoid 50 questions

7   and just make sure we're on the same page:

8   It's been explained to me that this LADV

9   means that you were doing the advance work for the

10  lieutenant governor on the -- in the second half of

11  the day, L being the late shift, for covering for

12  Sgt. Shisko, who was out on sick leave.

13  Does that look like an accurate

14  interpretation of the document?

15  **A**   **Yes.**

16  Q   But are you here to tell me -- and we're

17  going to talk about it a little more, so maybe we'll

18  jog your memory.  But at this point, do you remember

19  anything about Monday, February 5, 2018?

20  **A**   **No.**

21  Q   All right.  And looking at the document,

1  it looks like you would have been working with TFC

2  Water, is that right?

3       A    Yes.

4       Q    And I think we already said you'd be in

5  the later shift working advance, and Water then

6  would be the protection person.  Is that right?

7       A    Yes.

8       Q    Based on what we've already talked about,

9  all right.  And when did that later shift start?  Do

10 you -- do you -- generally, when does it start?

11      **A    Generally, it starts around 2:30.**

12      Q    P.m., is that right?

13      **A    Yes.**

14      Q    And how -- is it an eight-hour shift, in

15 general?

16      **A    Generally, yes.**

17      Q    And I understand the nature of your work

18 is that you may get held over, you may get called in

19 early, that kind of thing.

20      **A    Yes.**

21      Q    But generally, it starts at 2:30 and then

 1  would go 'til 10:30, approximately, is that right?

 2      **A      Yes, sir.**

 3      Q     All right.  Have you had a chance to

 4  review any documents prior to today in preparation

 5  for your testimony?

 6      **A      No.**

 7      Q     Have you reviewed any depositions?  You

 8  may be aware lots of people, you know, gave their

 9  deposition the way you're giving one.  Have you

10  reviewed any of those?

11      **A      No.**

12            (A discussion was held off the record.)

13      Q     Have you heard any recordings or seen any

14  video related to this case at all, as far as you

15  know?

16      **A      No.**

17      Q     Other than what I've told you today and

18  other than what your lawyer may have mentioned to

19  you, do you have any idea what it's about?

20      **A      No.**

21      Q     Have you ever heard of a group called

1  Q   Have you ever heard of this practice
2  before, before reading it in Ms. Wesby's deposition?
3  **A   No.**
4  Q   Earlier, when we were talking about in
5  most instances there is more than one way to travel
6  between two -- more than one reasonable path --
7      Obviously, there is always more than one
8  way.  People could take a helicopter, and it would be
9  ridiculous.  But more than one, I think we're talking
10 about, reasonable paths between two places in
11 Annapolis.
12     What are the -- is there more than one
13 route between the Miller Building and the statehouse
14 that doesn't take somebody near Lawyers Mall or near
15 the sidewalk to Lawyers Mall?
16 **A   Yes.**
17 Q   And what's the other route that doesn't
18 take them near Lawyers Mall or near the sidewalk to
19 Lawyers Mall?
20 **A   College Avenue to Church Circle to School**
21 **Street to State Circle.**

Case 1:18-cv-00461-SAG   Document 52-4   Filed 01/31/20   Page 13 of 16

Deposition of Sgt. Kevin M. Roby                                    Jeff Hulbert, et al. v. SGT. Brian T. Pope, et al.

```
 1      Q      Is that a lot longer than going through

 2   Lawyers Mall or by Lawyers Mall?

 3      A      I wouldn't say it's that much longer, no.

 4      Q      But it's longer?

 5      A      I mean, maybe by a couple minutes.

 6      Q      And the -- can you see the sidewalk in

 7   front of Lawyers Mall when you travel that route,

 8   College to Church and so forth?

 9      A      Can I see the sidewalk of --

10      Q      Yeah, in front of -- in other words, if

11   there were people with large signs on the sidewalk

12   in front of Lawyers Mall and you took a protectee on

13   that alternative route, could they still see the

14   signs?

15      A      No.

16      Q      And when we took -- let's do it this way.

17   Let's go ahead and mark this.

18             (Roby Exhibit 1 was marked for purposes of

19   identification.)

20      Q      I'll show you what's been marked as Roby

21   Exhibit 1.  And this is the deposition of Cpl. Ryan
```

Case 1:18-cv-00461-SAG   Document 52-4   Filed 01/31/20   Page 14 of 16

Deposition of Sgt. Kevin M. Roby                                        Jeff Hulbert, et al. v. SGT. Brian T. Pope, et al.

1   Bitter, excerpts of it, not the whole thing.  You're

2   welcome to the whole thing if you like, but these

3   are excerpts of it.

4              You mentioned before you knew Cpl. Bitter

5   and had worked with him previously, is that right?

6       **A    Yes.**

7       Q    And on the day I'm interested in -- and I

8   can show you where in the depo, if it matters to

9   you.  But on the day I'm interested in, Cpl. Bitter

10  was working the console.  And if you look at Page

11  112.  Again, the page numbers are in the bottom

12  right.

13             I was asking him about a communication

14  that had come in from what we have determined either

15  would have been you or Water, based on that's who was

16  with the lieutenant governor.  But the question at

17  the top is:

18             "So it had to do in the first instance

19  with avoiding the communication of the message and in

20  the second instance avoiding any unpleasant wording

21  in the message, is that fair?"  He says, "Correct."

1                 And he had described earlier that he had

2     sent an -- had called capitol police to send an

3     officer out.  And I asked him, "But sending an

4     officer out was to avoid those things, is that

5     right?"  He says, "Correct."

6                 And then I asked him, "And that's how it

7     was communicated to you by the people who were with

8     the lieutenant governor, is that right?"  And he

9     says, "Correct."

10                Were you ever part of communicating to

11    anyone at the console that the lieutenant governor

12    wanted to avoid a message that some picketers had on

13    some signs or avoid any unpleasant wording in the

14    message?

15       **A       Not that I recall, no.**

16       Q       Were you ever part of telling Cpl. Bitter

17    that you wanted or somebody wanted an officer sent

18    out from the Maryland capitol police so that the

19    lieutenant governor could avoid interacting with

20    anyone?

21       **A       No.**

Case 1:18-cv-00461-SAG   Document 52-4   Filed 01/31/20   Page 16 of 16

Deposition of Sgt. Kevin M. Roby                                           Jeff Hulbert, et al. v. SGT. Brian T. Pope, et al.

1  Q    In situations where there is no threat, have you ever, for any reason, communicated to the Maryland Capitol Police or sent a communication that was intended for them through your chain to send an officer out to picketers, in situations where there was no threat?

7  **A    No.**

8  Q    And do you agree with me that where there isn't a threat, it would be inappropriate and heavy-handed to send a uniformed officer out?

11         MR. FREDERICKSON:  Objection.  Go ahead.

12  **A    Could you repeat it one more time?**

13  Q    Sure.  In a situation where there is no illegal activity and no threat, do you agree with me it's inappropriate to send a uniformed officer out for a small group of picketers?

17         MR. FREDERICKSON:  Objection.  You can go ahead.

19  **A    If it's just people -- I mean, picketers with signs, I would say we don't need a uniformed officer, no.**