**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| Jeff Hulbert, *et al*.<br><br>*Plaintiffs*,<br><br>v.<br><br>Sgt. Brian Pope, *et al*.<br><br>*Defendants*. | Civil No.: 1:18-CV-00461-SAG |

### PLAINTIFFS' REPLY TO LT. GOVERNOR RUTHEFORD'S OPPOSITION TO MOTION FOR RECONSIDERATION OF MOTION TO QUASH
**(Hearing Requested)**

Plaintiffs, by and through undersigned counsel, pursuant to Fed. R. Civ. P. 60, hereby submits this Reply, stating as follows:

1. Since this Court's original ruling on the Lt. Governor's Motion to Quash, Plaintiffs have discovered that on February 5, 2018, the Maryland Capitol Police were instructed to act after receiving a call from Corporal Bitter, a member of the State Police working at the Governor's Mansion.

2. Corporal Bitter placed the call after being instructed to do so by a member of the State Police working Executive Protection for the Lt. Governor.

3. Neither of the two executive protection officers protecting the Lt. Governor that night recalled placing the call and were unable to identify who, in turn, would have instructed that the call be placed.

4. However, both officers agreed that the decision would *not* have been made by an executive protection officer. Both officers also agreed that Plaintiffs would need to ask the Lt. Governor, as "[t]he ultimate authority [for that decision] is the lieutenant governor as the elected

official." ECF 52-4 at 23-25. Thus, "[y]ou would have to talk to the person you want to know the information, the lieutenant governor. I don't know how else to answer that." ECF 52-3 at 89.

5. Despite providing a new affidavit, the Lt. Governor has failed to address any of the points raised by Plaintiffs. The meager affidavit fails to account for (1) any discussions or instructions made prior to February 5th, (2) any other individual making the instruction in his presence, (3) his making the instruction on February 5th to someone other than a member of his staff or his own protection team, (4) his making a statement to his staff or protection team, either unprompted or in response to someone else notifying him of the issue, that his team interpreted to instruct them to move the protestors, but which was not an explicit "instruction" to "move" or "arrest" the Plaintiffs, (5) that he learned after the fact that the instruction was made by someone else, (6) that he has any knowledge of any of the other events occurring after the fact, such as the increase in Plaintiffs' charges on February 6th or the charges ultimately being dropped, or (7) other relevant information, such as if the Lt. Governor saw Plaintiffs or Patriot Picket, witnessed the arrest, or heard any officers discussing the events, given that the Lt. Governor planned to walk right by the demonstration and there is every reason to believe he was in the vicinity.

6. As the Lt. Governor has substantial relevant information, this Court should grant Plaintiff's Motion for Reconsideration and permit Plaintiff a four-hour deposition.

I. **THE LT. GOVERNOR'S OWN AFFIDAVITS DEMONSTRATE THAT THERE IS A SUBSTANTIAL LIKELIHOOD THE LT. GOVERNOR HAS INFORMATION RELEVANT TO THIS CASE.**

7. Although the Lt. Governor has now provided a second affidavit in an attempt to claim that he has no information relevant to this proceeding, the affidavit provided raises more questions than it answers and demonstrates that it is highly likely the Lt. Governor *does* have relevant information.

8. Boiled down, the Lt. Governor limits his affidavit to solely represent that he did not "instruct[] anyone to contact the Maryland Capitol Police about the protestors on February 5, 2018." ECF 54 at 5. However, the Lt. Governor fails to recognize multiple fatal issues with his representation, including, but not limited to: (1) that the Plaintiffs' interest is not limited to proving that the *Lt. Governor himself* made any instructions, but that the Lt. Governor may have *witnessed* someone else make the instruction, or *heard* about the series of events after the fact, and (2) that the newly discovered evidence outlined at length in Plaintiffs' Motion has proven that the communication went through the *State Police* and not directly to the *Maryland Capitol Police*.

9. For example, the Lt. Governor asserts that he "did not instruct, direct or encourage anyone on my staff or my state police executive protection team to contact the Maryland Capitol Police to move or arrest any protestors in Annapolis on February 5, 2018," and he "did not instruct, direct or encourage anyone on my staff or my state police executive protection team to take any action to prevent me from interacting with protestors in Annapolis on February 5, 2018." ECF 54-1 at 1. But this statement leaves open numerous possibilities:

    a. That the Lt. Governor *did* instruct a member of his state or executive protection team to contact the **State Police**. **Plaintiffs do not assert that the Lt. Governor, or a member of his staff, contacted the Maryland Capitol Police**. Plaintiffs have already proven that Corporal Bitter contacted the Maryland Capitol Police. The question at this juncture is who instructed Corporal Bitter—a member of the State Police—to then subsequently call the Maryland Capitol Police.

    b. That the Lt. Governor provided a blanket instruction to his staff prior to February 5, 2018, with instructions on how to handle Plaintiffs and Patriot Picket if he were ever to need to travel past them during a demonstration. The statement is time-

3

limited solely to February 5th, and leaves open any instruction occurring prior to that date. Notably, ***nowhere in this affidavit or the prior affidavit did the Lt. Governor assert that he had no knowledge of Plaintiffs or their picketing prior to February 5, 2018***, leaving open the possibility that he had made prior instructions.

c. That the Lt. Governor made a statement that his team knew to be a request to move the Plaintiffs without instructing them on precisely *how* to accomplish that goal. His representation is solely limited to instructions to "move" or "arrest," failing to account for any *other* possible instruction that would result in the same outcome.

d. That his staff or other officers surrounding the Lt. Governor brought the presence of the Plaintiffs to his attention, and the Lt. Governor responded in a manner that his team interpreted to be a request to have them moved or arrested, but was not an explicit "instruction," "direction," or outright "encouragement."

e. That the Lt. Governor instructed, directed or encouraged *someone other than his staff or his own executive protection team* to make the call to Corporal Bitter. For example, the Lt. Governor's wife is also a protectee, and would have been accompanied by her protection team if she was with him at the time. The Lt. Governor could have instructed his wife or a member of his wife's team to take action. There are innumerous other people who could also have been surrounding the Lt. Governor at the time—although Plaintiffs have continuously attempted to answer the question of who was with him on that day and who knew his schedule, Plaintiffs have been unable to discover the information through any alternative means.

10. In the next part of his affidavit, the Lt. Governor makes an explicit deviation from his prior "did not instruct, direct or encourage" representations to limit his next assertion to solely "I did not direct that the Maryland Capitol Police interact with protestors in Annapolis on February 5, 2018." ECF 54-1 at 2. As stated earlier and expounded at length in Plaintiffs' Motion, *see* ECF 52 at 2-10, with the newly discovered evidence it is clear that the communication received by the Maryland Capitol Police *did not come directly from the Lt. Governor or a member of his staff*. The instruction came from the Lt. Governor, a member of his staff, or another individual surrounding him, to Corporal Bitter of the *State Police*, and then, through Corporal Bitter, to the Maryland Capitol Police. Thus, the Lt. Governor's statement is *meaningless*. The relevant information Plaintiffs seek is *who instructed the State Police* to contact the Maryland Capitol Police.

11. The Lt. Governor then asserts that he "ha[s] no recollection of discussing any protestors with anyone on February 5, 2018." ECF 54-1. Again, this statement leaves open numerous possibilities: (1) that the discussion occurred prior to February 5, 2018, as the Lt. Governor again fails to make any assertion that he was not aware of Plaintiffs' and Patriot Pickets' continual protests, (2) that other individuals around him were discussing Plaintiffs or Patriot Picket, and he did not participate in the discussion, and (3) that he, or another individual, made a statement or explicit direction that did not spark a "discussion," as a discussion necessarily requires at least two parties and does not cover unilateral statements.

12. The final two representations are again limited specifically to the Maryland Capitol Police, and are therefore meaningless as explained *supra*: while the Lt. Governor may not have been aware that Corporal Bitter notified the Maryland Capitol Police about the protestors and

5

instructed them to intervene, he *absolutely* could be aware of any instructions made to the State Police that led to Corporal Bitter's call. See ECF 54-1 at 2.

13.     Further, none of the representations account for any information that the Lt. Governor could have discovered after the fact. It is possible that he was informed the next day that a member of his staff instructed the State Police to ensure the protestors were moved. *The Lt. Governor appears to believe that he cannot have relevant information if he somehow can prove that he was not the "wrongdoer" here*—but he absolutely has relevant information if he knows who was, and there is every indication in his carefully crafted affidavit that he *does* know something.

14.     Thus, the meager affidavit provided by the Lt. Governor fails to account for (1) any discussions or instructions made prior to February 5th, (2) any other individual making the instruction in his presence, (3) his making the instruction on February 5th to someone other than a member of his staff or his own protection team, (4) his making a statement to his staff or protection team, either unprompted or in response to someone else notifying him of the issue, that his team interpreted to instruct them to move the protestors, but which was not an explicit "instruction" to "move" or "arrest" the Plaintiffs, (5) that he learned after the fact that the instruction was made by someone else, (6) that he has any knowledge of any of the other events occurring after the fact, such as the increase in Plaintiffs' charges on February 6th or the charges ultimately being dropped, or (7) other relevant information, such as if the Lt. Governor saw Plaintiffs or Patriot Picket, witnessed the arrest, or heard any officers discussing the events, given that the Lt. Governor planned to walk right by the demonstration and there is every reason to believe he was in the vicinity.

6

15.     For example, taking every statement in the Lt. Governor's affidavit as true, one version of events is as follows: the Lt. Governor and his staff are notified that Patriot Picket is demonstrating outside—or the Lt. Governor saw the picketers—near where the Lt. Governor was scheduled to walk. Knowing that the Lt. Governor dislikes Patriot Picket, their message, or just generally does not like to deal with protestors, a member of his staff immediately picks up their phone and calls the State Police. The staff member instructs, "the Lt. Governor does not want to deal with these protestors. Do something." In this scenario, the Lt. Governor has made no explicit instructions himself. He does not know how the State Police will handle the instruction, and thus does not know that the Maryland Capitol Police will be involved. But the Lt. Governor *absolutely* has vital information that is important to Plaintiffs' case—namely, *from whom* the instruction originated, and *why*.

16.     The Lt. Governor has had more than ample opportunity to provide Plaintiffs and this Court with an affidavit that covers every base and actually addresses each of Plaintiffs' contentions. Plaintiffs heavily challenged the Lt. Governor's original Motion to Quash and Reply on the bases that *first* the Lt. Governor failed to provide any affidavit at all and then *second* provided a significantly deficient one. *See* ECF 37, 39, 38-1. Now, months later, the Lt. Governor has *still* been unable to provide an affidavit fully addressing Plaintiffs' contentions. If the Lt. Governor truly had no knowledge of anything relevant to this proceeding, it would have been a simple matter for the Lt. Governor to provide an affidavit clearly stating that.

17.     Plaintiffs are not obligated to believe the assertions in the affidavit and ought to be able to explore the accuracy of the representations in a deposition, regardless of the Lt. Governor's representation of his affidavit as "undisputed" fact. *See* ECF 54 at 5. Here, it is clear that Plaintiffs have ample basis to question the affidavit's accuracy, given the significant disparity between the

carefully worded assertions and inferences from other witness testimony outlined at length above. Plaintiffs should be granted the opportunity to depose the Lt. Governor on the basis of this affidavit and each and every possibility that the affidavit leaves open.

18. Despite the Lt. Governor's attempt to dodge the issues Plaintiffs have raised by stating that "none of these state police witnesses testified that Lt. Governor Rutherford instructed them to call the Maryland Capitol Police," what was made clear by the two members of his personal protection team was that the only way for Plaintiffs to learn where the instruction originated from is to ask the Lt. Governor directly. ECF 54 at 4. As Trooper Walder stated, "[y]ou would have to talk to the person you want to know the information, the lieutenant governor. I don't know how else to answer that." ECF 52-3 at 89. Sergeant Roby agreed, stating that "[t]he ultimate authority is the lieutenant governor as the elected official." ECF 52-4 at 23-25. This is the sole avenue remaining for Plaintiffs to discover this information, as neither Trooper Walder nor Sergeant Roby was able to recall who instructed one of them to call Corporal Bitter. *See* ECF 52-4 at 42-45, 48; ECF 52-3 at 87-89.

II. **THE LT. GOVERNOR AGAIN RELIES ON THE *MORGAN* DOCTRINE WITHOUT ADDRESSING THE FACT THAT THE *MORGAN* DOCTRINE DOES NOT APPLY.**

19. The Lt. Governor again relies on the Morgan Doctrine, but does not even attempt to address how the *Morgan* Doctrine applies in this case. Plaintiffs explained in their Motion that the *Morgan* Doctrine is not applicable to this case. *See* ECF 52 at 19-20.

20. Nor does the Lt. Governor respond to Plaintiffs' explanation of how the concerns of the Morgan Doctrine—protecting government officials specifically because of the "greater duties and time constraints" imposed on them—do not apply to the Lt. Governor. *Lederman v. New York City Dep't of Parks & Recreation*, 731 F.3d 199, 203 (2d Cir. 2013) (quoting *In re*

*United States (Kessler)*, 985 F.2d 510, 512 (11th Cir. 1993)). It is telling that there was no response to the fact that the Lt. Governor has no expressly assigned duties and is not burdened by great duties or any considerable time constraints. See ECF 52 at 21.

21. Even if the *Morgan* Doctrine does apply, Plaintiffs have demonstrated that there are "exceptional circumstances" in this case, given the Lt. Governor's "unique first-hand knowledge related to the litigated claims" described above. *Id*. The standard is not, as the Lt. Governor would like to claim, whether he is "a party" or "has … been accused of any wrongdoing." ECF 54 at 8. It is not relevant whether the Lt. Governor was a "wrongdoer" or not—Plaintiffs have clearly demonstrated that, at a minimum, he has knowledge of *who is*.

### III. PLAINTIFFS' MOTION IS TIMELY AND COMPLIES WITH FED. R. CIV. P. 30.

22. Lt. Governor Rutherford attempts to argue that Plaintiffs' Motion was (1) untimely, and (2) not compliant with Fed. R. Civ. P. 30, which requires that a party "obtain leave of court" to take a deposition that "would result in more than 10 depositions being taken."

23. His assertion that Plaintiffs' Motion was untimely is based solely on the time lapse between the denial of Plaintiffs' original Motion on November 6, 2019, ECF 43, and the fact that Plaintiffs filed the Motion on the final day of discovery.

24. However, Lt. Governor Rutherford fails to recognize that this Court's order on November 6, 2019 expressly permitted reconsideration of this Court's ruling "under appropriate circumstances that may arise later in the litigation" without attaching any time limitation to the subsequent request. ECF 43. Further, Plaintiffs filed their Motion pursuant to Fed. R. Civ. P. 60, which permits a motion for reconsideration based on "newly discovered evidence," to be filed any time within "a year after the entry of the judgment or order," and a motion based on "any other

reason that justifies relief" to be brought generally within "a reasonable time" without limitation. Fed. R. Civ. P. 60(b) and (c).

25. Plaintiffs' Motion is appropriate at this juncture due to newly discovered evidence brought to the attention of Plaintiffs during their depositions of Corporal Bitter, Trooper Joseph Walder, and Sergeant Roby, which were taken on December 10, 2019, January 13, 2020, and January 21, 2020 respectively. In light of that newly discovered evidence, Plaintiffs prepared and filed their Motion for Reconsideration within ten days—well within the "reasonable time" and one-year timeliness requirements pursuant to Fed. R. Civ. P. 60(c)(1).

26. Secondly, Lt. Governor Rutherford asserts without authority that Plaintiffs were required to file an *additional* motion to request leave of this Court to take additional depositions pursuant to Fed. R. Civ. P. 30. While the Rule does require a party to obtain leave of the court to take any deposition over ten total depositions, the Rule *does not* require the party to request leave in a separate, distinct motion. Plaintiffs have already sought the express leave of this Court to depose Lt. Governor Rutherford, which, if granted, would satisfy Plaintiffs' obligation to "obtain leave." Fed. R. Civ. P. 30(a)(2).

27. Further, this Court has already modified the requirements of Fed. R. Civ. P. 30 in this case by limiting depositions by *deposition hours* rather than *number of depositions*. In this Court's Amended Scheduling Order, this Court expressly stated that "[e]ach side shall be limited to 40 hours of depositions of fact witnesses (including parties)." ECF 31 at 3. To date, Plaintiffs have spent 26.25 total hours deposing 10 fact witnesses, rounding up to the nearest quarter hour and not including recesses. Plaintiffs have at least 13.75 hours remaining allocated to them pursuant to this Court's Order, well above the four hours requested for this deposition.

28. Thus, Plaintiffs' Motion is timely and fully compliant with all applicable Fed. R. Civ. P. and this Court's Orders.

## IV. PLAINTIFFS SHOULD BE PERMITTED THE FULL LENGTH OF THEIR REQUESTED DEPOSITION.

29. In the alternative, Lt. Governor Rutherford has requested that this Court limit the length of his deposition to one hour. ECF 54 at 8. As justification, Lt. Governor Rutherford cites to his "lack of relevant knowledge," and the fact that other depositions in this case have been shorter than four hours. *Id.*

30. As outlined above and at length in Plaintiffs' Motion, Lt. Governor Rutherford does have relevant knowledge, and Plaintiffs should not be so limited solely on his own word, substantiated only by a meager, two-page affidavit, that he does not know anything that Plaintiffs would find relevant.

31. Once the deposition is underway, it is within Plaintiffs' discretion to focus on certain topics or redirect to others based on *Plaintiffs'* evaluation of their theory of the case and the relevant information needed to build their case. It is certainly possible that Plaintiffs may determine that they can inquire as to all relevant topics within a shorter time frame, but such determination can only be made *once Plaintiffs have had the opportunity to inquire further into the scope of Lt. Governor Rutherford's knowledge*. Substantially limiting the time permitted will effectively bar Plaintiffs from being able to inquire into areas of knowledge that Plaintiffs may not know about in advance and will only learn on the day of deposition sitting across the table from the Lt. Governor.

32. If this Court substantially limits the permissible deposition time, it is highly likely that Plaintiffs will find themselves discovering new information they did not previously discover during the course of Lt. Governor Rutherford's deposition, but without the time to inquire into

those areas. Then Plaintiffs would be forced to come back before this Court to request additional deposition time at a later date—pushing discovery even longer, and placing a burden on Lt. Governor Rutherford to show up to a deposition not once, but twice. Certainly, the best way to ensure that the "undue burden" Lt. Governor Rutherford claims is kept to a minimum is for Plaintiffs to have the opportunity to fully depose the Lt. Governor *once*.

33. The Lt. Governor's reliance on the length of other depositions in this case is misplaced, and does not support his ultimate conclusion that "there is no justification for a four-hour deposition … when plaintiffs spent significantly less time deposing the police officers who were involved." ECF 54 at 8. The Lt. Governor fails to acknowledge that (1) the length of other depositions is irrelevant to determine how long the deposition of another person may take, given that all witnesses have different scopes and breadths of knowledge and degrees of forthrightness, (2) four hours is a reasonable deposition length for this case, as the Defendants in this case have deposed three witnesses, two lasting over three hours,[1] (3) the requested four hour time limit is a maximum and not a minimum time limit, and Plaintiffs have no intention of unnecessarily extending the deposition for the sole purpose of taking the entirety of the allotted time, and (4) the Lt. Governor is not uniquely situated in having other commitments that a deposition may "tak[e] time away from"—Plaintiffs also have other commitments. *Id*. Plaintiffs certainly will not benefit from unnecessarily extending the deposition and fully intend to limit the deposition to the length of time necessary to fully inquire into all of the relevant information discovered during the deposition and no longer.

---

[1] The deposition of Jeff Hulbert lasted three hours and ten minutes. The deposition of Mark Pennak lasted three hours and five minutes.

34. Plaintiffs have attempted to resolve this dispute without requesting the intervention of this Court. On February 5, 2020, Plaintiffs' counsel reached out to the Lt. Governor's counsel, requesting confirmation of the Lt. Governor's position and offering for a second time to meet in person and discuss Plaintiffs' request. *See* Exhibit A at 2 (stating, "[a]s I have explained under separate cover, I am also happy to meet on this topic, but I would hope that you would provide your promised input by e-mail as well."). The next day, the Lt. Governor's counsel clarified that he is "not authorized to agree to such a deposition," without agreeing to an in-person meeting to discuss further. *Id.* at 1. The Lt. Governor's counsel advised that he would "let [Plaintiffs] know if anything changes our position on that issue," and has not indicated that his position has changed since. *Id.* As the Lt. Governor's counsel *does not even have the authority* to resolve the dispute with Plaintiffs and has not responded to Plaintiffs' request for an in-person meeting, this dispute is ripe for this Court to resolve.

**V.      CONCLUSION.**

WHEREFORE, Plaintiffs respectfully request that this Honorable Court grant their Motion, deny Lt. Governor Rutherford's Motion to Quash Subpoena, order that Defendants make Lt. Governor Rutherford available for deposition on or before seven days after the entry of the Order at 4:30 p.m., and such further relief as the Court may grant in the interest of justice.

>
> Respectfully submitted,
>
> HANSEL LAW, PC
>
> _____/s/ Cary J. Hansel_____
> Cary J. Hansel (Bar No. 14722)
> cary@hansellaw.com
> 2514 N. Charles Street
> Baltimore, MD 21218
> Phone: (301) 461-1040
> Fax: (443) 451-8606
> *Counsel for Plaintiffs*

## **CERTIFICATE OF SERVICE**

      I hereby certify that on this 28th day of February, 2020, I caused the foregoing to be filed via the Court's electronic filing system, which will make service on all parties entitled to service.

                                                  /s/ Cary J. Hansel
                                              Cary J. Hansel