**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| JEFF HULBERT, *et al.* | * | |
| Plaintiffs | * | |
| v. | * | Case No. 1:18-CV-00461-SAG |
| SGT. BRIAN T. POPE, *et al.* | * | |
| Defendants | * | |

*   *   *   *   *   *   *   *   *   *   *   *   *

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

BRIAN E. FROSH
Attorney General of Maryland

JAMES N. LEWIS, Fed. Bar No. 30220
JOHN C. FREDRICKSON, Fed. Bar No. 02566
Assistant Attorneys General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
jlewis@oag.state.md.us
john.fredrickson@maryland.gov
(410) 576-7005 (telephone) – Lewis
(410) 576-6955 (facsimile) – Lewis
(410) 767-1825 (telephone) – Fredrickson
(410) 333-7654 (facsimile) – Fredrickson

December 16, 2020                    *Attorneys for Defendants*

**TABLE OF CONTENTS**

Page

INTRODUCTION ............................................................................................................1

STATEMENT OF UNDISPUTED FACTS ....................................................................3

During Maryland's Legislative Session, An Area Known as Lawyers' Mall
is the Center of First Amendment Activity................................................................3

Sgt. Pope Ordered an Unannounced Group Near Lawyers' Mall to Move Roughly
Fifteen Feet for Safety Reasons .................................................................................4

Sgt. Pope's First Order Was to Kevin Hulbert, Telling Him That the Group
Needs to Move to Lawyers' Mall ...............................................................................7

When Sgt. Pope Saw That the Group Was Ignoring His Order, He Returned to
Repeat His Prior Order to the Entire Group...............................................................8

Sgt. Pope Had the Hulbert Brothers Arrested ..........................................................10

Sgt. Donaldson's Role in Issuing the Order and
Subsequent Criminal Citations ................................................................................12

Sgt. Pope Only Gave the Hulbert Brothers One of the Charges That He
Wanted to Give Them at the Station Because He Could Not Locate the
Citation for the Other Charge ..................................................................................14

The Decision to Add Charges the Next Day.............................................................17

Sgt. Pope Completed His Report Summarizing the Arrests .....................................19

The Hulbert Brothers Immediately Tried This Case in the Media and Pursued Legal
Action.......................................................................................................................19

Col. Wilson Consulted with the State's Attorney About Dropping the Charges...............20

The Hulbert Brothers Have Articulated Speculative Damages .........................................20

The Hulberts' Theory of the Case Has Been Partially Driven by Conspiracy
Theories....................................................................................................................22

ARGUMENT ..............................................................................................................23

I.   LEGAL STANDARD. ..........................................................................................23

II.  SGT. POPE AND COL. WILSON ARE ENTITLED TO QUALIFIED IMMUNITY
     FROM THE § 1983 CLAIMS. .............................................................................24

     A.   Defendants Are Entitled to Qualified Immunity Because A
          Reasonable Time, Place, and Manner Restriction on Speech Does
          Not Violate the First Amendment. .........................................................25

          1.   Sgt. Pope's order to relocate was content neutral because it
               was not motivated by a disagreement with the message the
               Hulberts' demonstration conveyed. ...........................................27

          2.   Sgt. Pope's order served a significant governmental interest
               because it was intended to help maintain public safety. ............28

          3.   Sgt. Pope's order left ample alternative channels for
               communication open because the Hulberts were permitted to
               continue their demonstration in virtually the same location,
               in the exact same manner. ........................................................29

          4.   Sgt. Pope's order was narrowly tailored to meet the
               government's interest of maintaining public safety because
               the demonstrators were only asked to move roughly fifteen
               feet from where they stood. ......................................................30

     B.   The Undisputed Material Facts Show That Sgt. Pope Did Not Arrest
          Kevin Hulbert Because He Was Filming. ................................................33

     C.   The Alleged Constitutional Right to Record Police Is Not Clearly
          Established. ............................................................................................34

     D.   The Undisputed Material Facts Show That There is No Causal
          Connection for Plaintiffs' Retaliation Claim, And The Existence of
          Probable Cause Defeats the Claim. ........................................................35

          1.   February 5, 2018. .....................................................................36

          2.   February 6, 2018. .....................................................................37

     E.   Sgt. Pope Had Probable Cause to Arrest the Hulbert Brothers,
          Which Is Fatal to Their Unconstitutional Search and Seizure
          Claims.. ..................................................................................................37

F.   The Fourth Circuit Has Held That Tight Handcuffs Is Insufficient For An Excessive Force Claim As a Matter of Law. ..............................................40

III.   COL. WILSON IS ENTITLED TO SUMMARY JUDGMENT REGARDING THE REMAINING § 1983 CLAIMS ASSERTED AGAINST HIM BECAUSE THERE IS INSUFFICIENT EVIDENCE TO MEET THE HIGH STANDARD OF SUPERVISORY LIABILITY. ................................................43

IV.   SGT. POPE AND COL. WILSON ARE IMMUNE FROM SUIT ON THE STATE-LAW CLAIMS. ........................................................................................................45

V.   COUNTS SIX, SEVEN, AND EIGHT ARE READ IN PARI MATERIA WITH COUNTS ONE, TWO, THREE, FOUR, AND FIVE. ..............................................................46

VI.   THE FALSE ARREST AND FALSE IMPRISONMENT CLAIMS FAIL BECAUSE SGT. POPE HAD PROBABLE CAUSE TO ARREST THE HULBERT BROTHERS. ...............................49

VII.   JUDGMENT SHOULD BE ENTERED AGAINST MARYLAND SHALL ISSUE BECAUSE IT HAS NOTHING TO DO WITH THIS CASE. ..............................................................50

VIII.   IF ANY CAUSE OF ACTION SURVIVES, THEN THIS COURT SHOULD GRANT JUDGMENT IN FAVOR OF DEFENDANTS ON ANY CLAIM FOR PUNITIVE DAMAGES. ...........................................................................................................54

CONCLUSION .........................................................................................................55

## INTRODUCTION

A call originating from the governor's mansion in Annapolis to a dispatcher at the Maryland Capitol Police ("MCP") about an unscheduled group of demonstrators congregating on the sidewalk was the basis for Sergeant Brian Pope's first encounter with Kevin Hulbert.  The message from the governor's mansion was modified slightly when the dispatcher shared the information with Sgt. Pope.  That version of the message formed the basis for Sgt. Pope's decision to seek guidance from his superior officer, Sgt. Dennis Donaldson, about how to handle a situation. Sgt. Donaldson, in turn, informed the chief of MCP, Colonel Michael Wilson.  Col. Wilson and Sgt. Donaldson discussed safety issues in the area and, in light of those safety issues, Col. Wilson indicated that the demonstrators should be moved to the grassy area immediately adjacent to the sidewalk, which is known as Lawyers' Mall.  Sgt. Donaldson relayed the message back to Sgt. Pope.

In the moment, Sgt. Pope was reasonably under the impression that his superior officer wanted the demonstrators moved for safety reasons.  Despite not observing any immediate safety issues himself, he trusted the institutional knowledge of his superior officers at MCP, particularly because he was roughly one month into his first assignment in Annapolis during the legislative session.  Indeed, there is a history of safety issues in the area.

On February 5, 2018, Sgt. Pope ordered the group of demonstrators to move roughly fifteen feet from their existing location to enforce safety measures conveyed by Sgt. Pope's superior officer.  Sgt. Pope ordered the demonstrators to move at least three times and, after ignoring multiple orders, Sgt. Pope arrested two of the demonstrators, Jeff and Kevin Hulbert.[1]  The group

---

[1] Because the Plaintiffs are brothers and share the same last name, they may occasionally be referenced to as "Jeff" or "Kevin" in this memorandum of law.  It is not done so out of disrespect, but for ease of reference.

was ignoring the orders because Jeff Hulbert told the group not to ignore it.  Jeff and Kevin Hulbert are brothers who were leading the demonstration on February 5, 2018 on behalf of an informally created group known as Patriot Picket.

Even assuming that, in hindsight, it was a mistake to arrest the Hulbert brothers; with the facts that Sgt. Pope knew in the moment, his order to move into Lawyers' Mall for safety reasons—a very short distance of roughly fifteen feet—was lawful and a reasonable time, place, and manner restriction of speech under the circumstances.  The Hulbert brothers made an intentional decision to ignore Sgt. Pope's repeated orders and remained on the sidewalk.  When the Hulbert brothers committed a crime in Sgt. Pope's presence—namely, failure to obey his repeated lawful orders—he had probable cause to arrest them.  The arrests were lawful and it would be reasonable for any other officer to arrest the Hulbert brothers under the same circumstances.

On orders to issue criminal citations from Sgt. Donaldson—which are more akin to traffic tickets—Sgt. Pope transported the Hulbert brothers to the Annapolis Police Department where he could not find citations for all of the charges that he wanted to issue.  He gave the Hulbert brothers one charge that evening and released them after an hour because he did not want to waste their time while he looked for the other citation.  Col. Wilson, Sgt. Pope, and other officers at the MCP felt that the situation warranted additional citations based on longstanding guidance from the State's Attorney's Office ("SAO"), which Col. Wilson reinforced by email on the evening of February 5, 2018.

After consultation with an assistant state's attorney the next day, Sgt. Pope's superior officers ordered that he draft two new citations for the Hulbert brothers.  The additional charges were added and served on the Hulbert brothers the next day, February 6, 2018.  The additional charges and the method of amending charges were done on the advice of the SAO.  Service of the

amended charges was done out of convenience; the Hulbert brothers were physically near the MCP offices.  Four days after their arrests, and after further consultation with the SAO, the charges were dropped.  Nine days after their arrests, the Hulbert brothers sued Sgt. Pope and Col. Wilson for alleged constitutional and tortious violations.  Among other things, Sgt. Pope and Col. Wilson are entitled to qualified immunity and State personnel immunity, and judgment should be entered in their favor.

## STATEMENT OF UNDISPUTED FACTS

### During Maryland's Legislative Session, An Area Known as Lawyers' Mall is the Center of First Amendment Activity

The Maryland legislature begins its annual session in Annapolis on the second Wednesday of January, *see* Md. Const. art. III, § 14, and usually continues for ninety days, *see* Md. Const. art. III, § 15.  Throughout the year, but particularly when the General Assembly is in session, Annapolis receives a lot of groups trying to advance their legislative agenda or to simply make their voice heard, and a grassy square called Lawyers' Mall is often the spot for such activity. COMAR 04.05.02.02; *see also* Exhibit A: Demonstrations, Rallies and Press Conferences Directive 12-105.

The MCP is "a police and security force" established by the Secretary of General Services and is an agency of the Department of General Services.  Md. Code Ann., State Fin. & Proc. § 4-605(a)(1).  The MCP exists for the purpose of protecting "people and property on or about improvements, grounds, and multiservice centers under the jurisdiction of the Department."  *Id.* The physical jurisdiction extends 1,000 feet from the boundary of its defined jurisdiction.  Exhibit B: Deposition of Sergeant Brian T. Pope, 16:2-12, 17:13-16; State Fin. & Proc. § 4-601.

3

**Sgt. Pope Ordered an Unannounced Group Near Lawyers' Mall to Move Roughly Fifteen Feet for Safety Reasons**

On February 5, 2018, Sgt. Donaldson was contacted by the MCP's dispatcher, Lakeisha Wesby.  Exhibit C: Deposition of Dennis Clifton Donaldson, 47:2-21; Exhibit D: Deposition of Lakisha Urica Wesby, 11:5-9, 12:9-11.  Ms. Wesby told Sgt. Donaldson that she had received a call from the governor's mansion so he went to see her, asked her about the call, and looked at her screens. Ex. C: Donaldson, 48:1-10.[2]  Ms. Wesby alerted Sgt. Donaldson to an unscheduled group that had arrived near Lawyers' Mall.  Ex. B: Pope, 64:21 – 65:9.  Sgt. Donaldson recalls Ms. Wesby telling him that the call was about moving the lieutenant governor "across the street and they just want to know who the group was before they walked through the group.  And, of course, that's a safety issue."  Ex. C: Donaldson, 53:4-10.  Sgt. Donaldson told her to send a mobile patrol unit, but because the shift sergeant was playing that role on that particular night, which was Sgt. Pope, he told Ms. Wesby to send Sgt. Pope.  Ex. C: Donaldson, 48:11-20.

Sgt. Pope was working in his office when he was contacted by Ms. Wesby.  Ex. B: Pope, 66:1-11.  Ms. Wesby told Sgt. Pope that she had received a call from the governor's mansion indicating that there was a group setting up on the sidewalk in front of Lawyers' Mall.  Ex. B: Pope, 60:18 – 61:5, 64:12 – 65:9.[3]  Sgt. Pope walked down to Ms. Wesby's office to look at the monitor with her.  Ex. B: Pope, 66:4-18.  He saw one person on the sidewalk with a number of signs around him.  Ex. B: Pope, 66:19 – 67:11, 70:16 – 71:18.  Ms. Wesby said there had been more people, but that they left the area.  Ex. B: Pope, 66:19 – 67:4.

---

[2] The fact that a call came in from the governor's mansion is relevant because it initiated the events of this case, but the substance of the call is immaterial because none of the relevant persons in this case heard the substance of the call until after the events transpired.  Ex. B: Pope, 123:9-12, 127:11-14; Exhibit E: Deposition of Colonel Michael S. Wilson, 24:14 – 25:3.

[3] There is a computer aided dispatch ("CAD") report associated with this incident.  Ex. E: Wilson, 83:8-10. It shows that the call from the governor's mansion came in at 6:15 p.m.  See Exhibit F: CAD Report; Ex. D: Wesby 56:2-18.

Protests in Lawyers' Mall can be planned in advance by getting a permit and, because there were no permitted demonstrations scheduled for February 5, 2018, Ms. Wesby asked Sgt. Pope to "straighten that out." Ex. B: Pope, 64:21 – 65:9. It was unusual for Sgt. Pope to receive information originating from the governor's mansion,[4] so Sgt. Pope brought it to the attention of his immediate supervisor, Sgt. Dennis Donaldson, who was in charge that evening. Ex. B: Pope, 69:10 – 70:4; 77:15 – 80:13; Ex. C: Donaldson 22:8-14, 46:13 – 47:1. Sgt. Pope went to Sgt. Donaldson to get clarity on how to respond. Ex. B: Pope, 69:10 – 70:4.

Sgt. Donaldson told Sgt. Pope that he would get back to him. Ex. B: Pope, 70:5-15. Sgt. Donaldson called the chief of the MCP, Col. Michael Wilson. Ex. B: Pope, 70:5-15. During that conversation, Sgt. Donaldson told Col. Wilson that there was an unscheduled protest group in the in the area of Lawyers' Mall. Ex. E: Wilson, 20:15 – 21:9. Sgt. Donaldson told Col. Wilson that the group was "on the sidewalk in front of Lawyers' Mall and could cause a possible safety or hazardous issue." Ex. E: Wilson, 21:10-17. Col. Wilson told Sgt. Donaldson to let the group hold their demonstration in Lawyers' Mall even though they did not have a permit, *see* Ex. B: Pope, 70:5-15, 74:12-16, which would address the assessed safety concerns and allow the group to have its demonstration. The orders to have the demonstration moved into Lawyers' Mall, which was roughly fifteen feet[5] from where the demonstrators were positioned on the sidewalk, was for safety

---

[4] While this was unusual for Sgt. Pope, it was not unusual for the MCP. Ex. E: Wilson, 26:16 – 28:3, 45:2-7, 69:14 – 70:2; Ex. C: Donaldson, 23:12 – 26:4. This was only unusual for Sgt. Pope because it was his first time working in Annapolis during the legislative session, *see* Ex. B: Pope 62:3-18, and he responsibly sought guidance from his immediate supervisor about a new-to-him situation. Sgt. Pope had not heard the substance of the call from the governor's mansion, but rather he heard Ms. Wesby's recitation of what that call conveyed. Sgt. Pope first heard the substance of the call during his deposition. Ex. B: Pope, 123:9-12, 127:11-14.

[5] Google Maps has a function that measures distance. Although it is not as accurate as going to the physical location and measuring, it is a good estimate of the relevant distance. *See* Exhibit G: Google Maps Screenshots (depicting general area, including fixture in the middle of the sidewalk for plants that obstructs the sidewalk); Exhibit H: Google Maps Screenshot (showing rough distance of 15.50 feet from the street to Lawyers' Mall); Exhibit I: Google Maps Screenshot (showing rough distance of 5.46 feet from the street to the fixture in the sidewalk); Exhibit J: Google Maps Screenshot (showing rough distance of 5.56 feet from the fixture in the sidewalk to Lawyers' Mall); Exhibit K:

reasons.  Ex. B: Pope, 33:11-19 (on the night in question, "it was a safety violation that made this encounter."); 74:12-16 (it was reported to Sgt. Pope from Sgt. Donaldson that "Chief Wilson had said to allow the group to go to Lawyers' Mall" to continue demonstrating "for safety reasons."); 75:17 – 76:1 (Sgt. Donaldson told Sgt. Pope that "for safety reasons, we wanted to keep them away from the street.").  As Sgt. Donaldson has noted, pedestrians are common "because it's a busy area.  There's always people walking on the sidewalks and crossing the streets and things of that nature.  A lot of traffic in that area also."  Ex. C: Donaldson, 157:19 – 158:3.

Sgt. Pope did not think the safety issues were immediately present, but based on what he learned, they were anticipated to exist in the near future.  Ex. B: Pope 75:4 – 76:1; Exhibit L: Case Report (formal report related to these arrests).   The goal, as conveyed to Sgt. Pope by Sgt. Donaldson, was to keep them away from the street.  Ex. B: Pope, 75:17 – 76:1.  Col. Wilson confirmed that "[w]e made the arrest because of safety issues and concern for people in crosswalks and drivers, distracted drivers, that's why we affected the arrest."  Ex. E: Wilson, 44:13-16.  Even Jeff Hulbert testified that he wanted to be on the sidewalk "at a time *when there was also traffic*, people going home, people transitioning, going to dinner, that sort of thing.  So for us it was the most advantageous time to demonstrate, *the most amount of people*, most number of eyeballs we could get."  Ex. K: Jeff, 19:1-6 (emphasis added).[6]

---

Deposition of Jeff Hulbert ("Jeff"), 17:1-4 (confirming that the relevant sidewalk area it at the intersection of Bladen Avenue and College Avenue), 73:6-21 (describing the large planters in the relevant sidewalk area).

[6] Jeff and Kevin Hulbert deny that they used the crosswalks.  Ex. K: Jeff, 50:18 – 52:2 and Exhibit M: Deposition of Kevin Hulbert ("Kevin"), 37:8 – 41:21 (stating that they do not use crosswalks to avoid getting hit by cars, but they would if they had so many people that they were blocking the sidewalks and needed to thin out their large crowd).  Bryan Sears, a member of the media, was present.  He filmed the arrests, publicly posted it to Facebook that evening, and, in his video, you can see other demonstrators who were using the crosswalks.  Bryan P. Sears, *Breaking: Two members of the conservative Patriot Picket . . .*, FACEBOOK (Feb. 5, 2018) https://www.facebook.com/bpsears/posts/10155248494247286.  In this memorandum of law, the short-form citation to this video will be *Bryan Sears Video*.  The deposition testimony of the Hulbert brothers is contradicted by the video surveillance and publicly posted videos showing otherwise.  *Bryan Sears Video*, at 0:44-0:53 (the lengthier surveillance video depicts demonstrators regularly using the crosswalks, but the portion depicted in this citation shows a demonstrator continuing to demonstrate in the crosswalk); Ex. E: Wilson, 109:17 – 110:9.  Because Kevin Hulbert

### Sgt. Pope's First Order Was to Kevin Hulbert, Telling Him That the Group Needs to Move to Lawyers' Mall

In accordance with the orders he received from Sgt. Donaldson, Sgt. Pope went out to order the group to step back into Lawyers' Mall for safety reasons.  Ex. B: Pope, 80:20 – 82:12.  When Sgt. Pope arrived, there was still only one person on the sidewalk.  Ex. B: Pope, 80:20 – 82:12.  Sgt. Pope asked the individual—who was later identified as Kevin Hulbert—where the rest of the group was located.  Ex. B: Pope, 80:20 – 82:12, 96:7-10; Ex. M: Kevin, 20:2-19.  Kevin Hulbert told him that they went to get something to eat.  Ex. B: Pope, 80:20 – 82:12.  After some small talk, Sgt. Pope conveyed the order to him that, even though they do not have a permit, they would need to move the demonstration to Lawyers' Mall "for safety reasons."  Ex. B: Pope, 80:20 – 82:12, 83:7-16; Ex. M: Kevin, 21:10 – 23:9.  Sgt. Pope elaborated with Kevin Hulbert and told him that "even though they don't have a permit, we want you all to move your protesting to Lawyers' Mall."  Ex. B: Pope, 82: 5-12.  Kevin Hulbert did not object and, instead, he "simply accepted that.  I listened and I didn't have a response."  Ex. M: Kevin, 23:10-13.  According to Sgt. Pope, Kevin Hulbert indicated to him that "he would let the rest of the group know when they come."  Ex. B: Pope, 83:18 – 84:2.  After giving this order, Sgt. Pope and Mr. Hulbert reverted to some small talk and, after a few minutes, Sgt. Pope left to return to his other duties.  Ex. B: Pope, 83:18 – 84:7.

About an hour later, Sgt. Pope escorted a security officer from one building to another.  Ex. B: Pope, 85:3-18.  While escorting that officer, Sgt. Pope saw the group demonstrating on the sidewalk with signs.  Ex. B: Pope, 85:14 – 86:10.  Sgt. Pope decided to return to the group after completing the escort.  Ex. B: Pope, 88:1-16, 89:5-17, 91:8-18.

---

admitted that they only use crosswalks when they have an obstructive crowd, and because they used crosswalks on February 5, 2018, his deposition testimony implies that they were obstructing sidewalks that evening.

**When Sgt. Pope Saw That the Group Was Ignoring His Order, He Returned to Repeat His Prior Order to the Entire Group**

Sgt. Pope estimated that the group consisted of eight people.  Ex. B: Pope, 93:21 – 94:2.  Sgt. Pope addressed the group to inform them that he had previously ordered Kevin Hulbert to move the demonstration into Lawyers' Mall, and ordered—the first order to the entire group, but the second order of the day to Kevin Hulbert—that the group move roughly fifteen feet back into Lawyers' Mall.  Ex. B: Pope, 95:8 – 96:6; Ex. K: Jeff, 75:3-5 (stating that the first thing Sgt. Pope said was "we need you guys to move."), 76:1-7, 85:18 – 86:7; Ex. M: Kevin, 25:10 – 26:12 (indicating that Sgt. Pope was speaking loudly for the entire group and repeatedly ordered them to move to Lawyers' Mall); *see also* 2A_for_MD, *Patriot Picket Interview on WCBM*, YOUTUBE (Feb. 11, 2018), https://www.youtube.com/watch?v=gDH10F5uO7s&t, at 2:47-3:04.[7]  The group started moving to Lawyers' Mall when Jeff Hulbert stopped them and told Sgt. Pope that the group was not going to move.  Ex. B: Pope, 95:8 – 96:6, 99:12 – 100:10; *Patriot Picket Interview*, at 3:22-3:49 (stating in an interview four days after the arrest that Jeff Hulbert told the group not to move).[8]

The group listened to Jeff Hulbert, stopped moving to Lawyers' Mall, and turned around to remain on the sidewalk.  Ex. B: Pope, 96:2-6; 99:5-6.  Sgt. Pope gave a third order to move to Lawyers' Mall.  Ex. B: Pope, 96:14-20; Ex. M: Kevin 26:13-19.  Sgt. Pope explained that the chief

---

[7] Four days after the arrests, Jeff Hulbert did this interview with WCBM 680.  The short-form citation in this memorandum of law will be *Patriot Picket Interview*.  The interview was done by WCBM, which also published the interview to its Facebook page.  WCBM 680, *Jeff & Kevin Hulbert of Patriot Picket (2/9/18)*, FACEBOOK (Feb. 9, 2018) https://www.facebook.com/WCBM680/videos/2797144400324634.

[8] In the portion of the interview cited to here, Jeff Hulbert explains that he told the group to disobey the order.  Jeff further explained that if the officer returned to arrest anyone, then the group should step back and Jeff would step forward to "take the arrest to get us into court to get this issue settled."  He also states that his brother was filming and Sgt. Pope informed Kevin Hulbert that "'you're under arrest too because you're not moving either.'" *Patriot Picket Interview*, at 4:00-4:09.  According to Jeff Hulbert, his brother was arrested for not complying with the order to move and not because he was filming.

of police was not requiring that they have a permit to demonstrate in the area on this particular day.  Ex. B: Pope, 96:14-20.  Jeff Hulbert said they did not want to move into Lawyers' Mall.  Ex. B: Pope, 98:15-21.

Sgt. Pope informed the group that they were being ordered into Lawyers' Mall for safety reasons and, if they did not move the demonstration into Lawyers' Mall, then he was going to place them under arrest.  Ex. B: Pope, 99:1-9; Ex. K: Jeff, 76:15-16 (confirming that Sgt. Pope told the group that if they did not move, then they would be arrested), 78:6-8 (stating that Sgt. Pope gave him a second warning that if he did not move, then he would be arrested); Ex. M: Kevin, 31:1-19 (stating that Sgt. Pope ordered them to move to Lawyers' Mall and they would be arrested if they did not move); *see also* 2A_for_MD, *1st Amendment Under Attack*, YOUTUBE (Feb. 16, 2018), https://www.youtube.com/watch?v=oIu6SPpFG4A&t, at 0:20-0:52 (showing one of the final orders—after several repeated orders—to move into Lawyers' Mall before calling for backup to make the arrests).[9]

Sgt. Pope was the only officer present during this encounter and, because there were roughly eight demonstrators who were willfully ignoring his order, he called for backup to make the arrests.  Ex. B: Pope, 99:1-11; Ex. K: Jeff, 79:9-17; Ex. M: Kevin 27:5-7; *1st Amendment Video*, at 0:30-0:43.  Calling for additional officers is a standard safety measure to ensure officer safety during an arrest.  Ex. B: Pope, 99:1-11; Ex. C: Donaldson, 70:8-14.  Sgt. Pope knew that his fellow MCP officers were assigned to stationary posts, so he called Annapolis City Police Department for additional officers.  Ex. B: Pope, 99:1-11; *1st Amendment Video*, at 0:38-0:42.  Officers arrived one minute after the request for backup went out.  Ex. F; Ex. B: Pope, 206:8 – 207:15.

---

[9] The short-form citation for this video will be *1st Amendment Video*.

**Sgt. Pope Had the Hulbert Brothers Arrested**

After Sgt. Pope called for backup from the Annapolis City Police Department, some MCP officers heard the call and left their posts to assist Sgt. Pope. Ex. B: Pope, 100:17 – 101:9. The response from Annapolis City, and the unexpected response from the MCP, resulted in more officers than necessary arriving on scene. Ex. B: Pope, 100:17 – 101:9. Sgt. Pope told the arriving officers that he was going to place Jeff Hulbert under arrest for disobeying a lawful order. Ex. B: Pope, 101:2-6. Sgt. Pope originally intended to only arrest Jeff Hulbert because he was responsible for the other members of the group disobeying Sgt. Pope's order. Ex. B: Pope, 100:17 – 101:9.

Sgt. Pope was attempting to enforce a time, place, and manner restriction on the demonstration for safety reasons. Ex. B: Pope, 18:18 – 19:4, 27:8 – 28:8, 29:3-19, 31:1-15; Ex. A.[10] In reality, his order only slightly altered the "place." He had no concern about the time or manner of demonstration, and he had no concern about their message. Ex. B: Pope 177:13 – 178:3 (Sgt. Pope did not read their signs, but was told later that "their issue is guns, permission to carry guns, but I never paid attention to the signs."). For safety reasons, he simply wanted it moved roughly fifteen feet away to clear the sidewalk. Sgt. Pope was asked, "So you believed that by arresting Jeff Hulbert you could stop the picketing *on the sidewalk*; is that right?" Ex. B: Pope, 101:10-12 (emphasis added to show the interest in moving the activity off the sidewalk and not ending it altogether). Sgt. Pope answered "Yes" and that the rest of the group "went into Lawyers' Mall after we placed those two under arrest." Ex. B: Pope, 101:16-20. The demonstration continued and the people who complied with the order were able to continue demonstrating roughly fifteen feet from their original location. Ex. F (the group "can assume there [sic] positions

---

[10] *See also Ward v. Rock Against Racism*, 491 U.S. 781, 791-92 (1989); COMAR 04.05.01.02-03, 04.05.02.02-04.

in lawyer mall.  We will clear momentary"); Ex. C: Donaldson, 96:2-14 (explaining that the group moved back to Lawyers' Mall afterwards).

Kevin Hulbert—the individual who was first ordered to move the demonstration into Lawyers' Mall—took out his cell phone camera, and began filming audio and video of the encounter.  Ex. B: Pope, 107:10 – 108:1; Ex. K: Jeff, 80:17 – 81:11.  According to Jeff Hulbert, no one else affiliated with Patriot Picket was filming.  *Compare* Ex. K: Jeff, 81:12-14 *with Bryan Sears Video*, *passim* (depicting several people filming, including people carrying signs).  Kevin was not the only person filming these discussions, however, and there were other passers-by who stopped to film as well.  Ex. B: Pope, 108:2-14.

Jeff Hulbert does not know whether Sgt. Pope is actually the officer who put handcuffs on him, but he does recall that another officer read him his Miranda rights.  Ex. K: Jeff, 84:4 – 85:8, 85:13-17.  Just before backup arrived, Sgt. Pope repeated the order to Jeff Hulbert.  *1st Amendment Video*, at 1:21-1:33.  After backup arrived, Kevin Hulbert began speaking to Sgt. Pope wherein Sgt. Pope repeated his order again and gave Kevin Hulbert another opportunity to comply with it.  *1st Amendment Video*, at 1:46-1:52 ("Sir, I gave you, sir, inside Lawyers' Mall or you're going to jail.").  Kevin Hulbert refused to comply with, perhaps, his fourth or fifth order of the day and was arrested.  *1st Amendment Video*, at 1:52-2:11.  During the handcuffing and reading of his Miranda rights, Kevin Hulbert did not audibly express any pain or discomfort.  After the reading of his Miranda rights, Kevin Hulbert acknowledged that he understood his rights by saying, "thank you, sir. Yes."  *1st Amendment Video*, at 1:52-2:11.

The other individuals who were there and filming did obey Sgt. Pope's orders to back up. Ex. B: Pope, 108:8-14, 113:16-21; *see also Bryan Sears Video*, at 4:45-5:00 (video depicting Sgt. Pope ordering a bystander and Bryan Sears to move, informing Mr. Sears that he can continue

filming from where he has been ordered to move, and both individuals complying with Sgt. Pope's order); Ex. C: Donaldson, 96:2-14, 130:17 – 131:3. It was Kevin Hulbert's failure to comply with repeated orders from Sgt. Pope to move into Lawyers' Mall that resulted in him being placed under arrest too. Ex. B: Pope, 100:17 – 101:9, 107:10-19; *see also Patriot Picket Interview*, at 3:49-4:13 (Sgt. Pope told Kevin Hulbert that "'you're under arrest too because you're not moving either.'"); *1st Amendment Video*, at 1:46-2:11; Ex. M: Kevin, 32:2-9 (admitting that he willfully disobeyed Sgt. Pope's order, which resulted in his arrest). Another MCP officer, Officer Stewart, assisted Sgt. Pope with the arrest of the Hulbert brothers. Ex. B: Pope, 105:3-14. Officer Stewart is the officer who "put the cuffs on and also said [the Miranda rights] as well." Ex. B: Pope, 132:21 – 133:10; *see also Bryan Sears Video*, *passim* (Sgt. Pope is seen at the beginning of the video moving signs while different officers search the Hulbert brothers. For reference, Sgt. Pope speaks to the person recording at 4:49.).

The Hulbert brothers were searched at Lawyers' Mall in connection with their arrests. Ex. B: Pope, 146:12-16. Sgt. Pope did not search them. *Bryan Sears Video*, *passim* (depicting searches conducted by different officers). The search was consistent with MCP policy in that they searched for weapons and contraband before putting the arrestees in the police cruiser. Ex. B: Pope, 147:3-5.

### Sgt. Donaldson's Role in Issuing the Order and Subsequent Criminal Citations

Sgt. Donaldson was the officer who sent Sgt. Pope to move the demonstrators for safety reasons, which was not an uncommon order from Sgt. Donaldson.[11] In fact, three days after the arrest in this case—and three days of constant scrutiny by the media, public, and members of the

---

[11] In fact, when he responded to Sgt. Pope's request for backup, he saw that the Patriot Picket group was moving around, which they had never done before, and they were on the sidewalk "trying to cut through." Ex. C: Donaldson, 85:13 – 86:8. In response, Sgt. Donaldson "for safety reasons" ordered them to go into Lawyers Mall." Ex. C: Donaldson, 86:2-8.

General Assembly—Sgt. Donaldson ordered that a different officer move a smaller group from the same sidewalk to Lawyers' Mall for safety reasons.  Exhibit N: Case Report (Cove Point); *see also* Bryan P. Sears, *Members of the "We are Cove Point" protest in Annapolis . . .* , FACEBOOK (Feb. 8, 2018) https://www.facebook.com/bpsears/posts/10155254631972286.[12]  Previously, Sgt. Donaldson had communicated to the MCP "sergeants in the past to make sure they're all clear that COMAR says that it's up to us, we can name the place and time of rallies and demonstrations and things of that nature," and that "[w]e only have one location that we use and that's Lawyers Mall, the pulpit area in the middle."  Ex. C: Donaldson, 89: 15 – 93:7.  Sgt. Donaldson specifically recalls speaking with Sgt. Pope about the fact that officers can select the time and place of events in Annapolis.  Ex. C: Donaldson, 92:3 – 94:1.

Sgt. Donaldson was among the officers who responded to Sgt. Pope's call for backup.  Ex. B: Pope, 117:16 – 118:3, 207:20 – 208:2; Ex: C: Donaldson, 71:9-11; Ex. F.  After the Hulbert brothers had been arrested and put in the car, Sgt. Pope spoke to Sgt. Donaldson—Sgt. Pope's supervisor and a superior officer—about the arrests.  Ex. B: Pope, 137:14 – 139:8.  Sgt. Pope told Sgt. Donaldson what happened.  Ex. C: Donaldson, 76:20 – 77:20, 132:4-14.  Sgt. Pope told Sgt. Donaldson about the statement of charges that he intended to file, but Sgt. Donaldson stopped Sgt. Pope and ordered him to draft criminal citations instead.  Ex. B: Pope, 117:16 – 118:3; 133:19 – 134:4; 137:14 – 139:8; Ex. C: Donaldson 78:3 – 79:2, 82:21 – 83:4, 132:4-16.  Sgt. Pope had never issued a criminal citation in his entire career as a law enforcement officer, but complied with his supervisor's order.  Ex: B: Pope, 120:1 – 121:14; Exhibit O: Deposition of Captain Rebecca Labs,[13] 69:3-11.  Sgt. Donaldson was on scene and present before the Hulbert brothers were

---

[12] The short-form citation for this link will be *We are Cove Point*.
[13] Rebecca Labs was a lieutenant with the MCP during the relevant time period.  She has since become a captain, *see* Ex. O: Labs 20:12 – 21:2, but will be referred to as lieutenant in this memorandum of law because it was her rank during the relevant period of time.

transported to the Annapolis Police Department.  He did not tell Sgt. Pope to uncuff them or release

them.  Instead, Sgt. Donaldson made the decision for Sgt. Pope to issue criminal citations after the

Hulbert brothers were in handcuffs.  Ex. B: Pope, 120:10 – 121:14.

After speaking with Sgt. Donaldson, Sgt. Pope had the Hulbert brothers transported to

Annapolis City Police Department at 7:45 p.m.  Ex. B: Pope, 133:11-14; Ex. F.  If someone is

arrested, then because MCP does not have a holding cell, it is MCP policy to process the arrestee

in the Annapolis police station, which is roughly one mile away from Lawyers' Mall.  Ex. B: Pope,

135:9-16; Ex. C: Donaldson 79:7-11.

### Sgt. Pope Only Gave the Hulbert Brothers One of the Charges That He Wanted to Give Them at the Station Because He Could Not Locate the Citation for the Other Charge

After arriving at the station, the Hulbert brothers were un-handcuffed, seated on a bench,

and then re-handcuffed to a handcuffing fixture near the bench, pursuant to Annapolis Police

Department procedure.  Ex. B: Pope, 143:21 – 144:13; Ex. K: Jeff, 92:10-14; Ex. M: Kevin, 50:3-

9.  Officer Stewart helped Sgt. Pope with the charges.  Ex. B: Pope, 140:6-20.  Jeff and Kevin

Hulbert were charged with disobeying a lawful order.  Ex. B: Pope, 140:21 – 141:13; 157:5-12;

Exhibit P: Copies of Charges (2/5/18).[14]  He had also arrested them for blocking a public sidewalk,

but could not find the citation for that charge while the Hulbert brothers were in the Annapolis

Police Department.  Ex. B: Pope, 140:21 – 141:13; 157:13 – 158:1; Ex. M: Kevin, 50:16 – 51:13.

Rather than make the Hulbert brothers sit there and wait for him to locate the charge, he

decided to release them since he had one charge to give them and he knew he could amend the

charge. Ex. B: Pope, 155:4-13. After the charges were written, the Hulbert brothers were uncuffed,

they signed the charges, and they were released.  Ex. B: Pope. 140:21 – 141:13.  The CAD Report

---

[14] The charge cites CJIS 2-0055, which is a reference to § 10-201 of the Criminal Law Article.  *See* COMAR 14.22.02.02.

shows that they were released at 8:50 p.m., which is one hour and five minutes after leaving the scene.  Ex. F.

After Jeff and Kevin Hulbert were released, Sgt. Pope talked about the arrests with Sgt. Donaldson again.  Ex. B: Pope, 154:12-14.  He told Sgt. Donaldson that he could not find the citations for all the charges and decided to only give each brother one charge before releasing them.  Ex. B: Pope, 154:15 – 156:3.  Sgt. Donaldson indicated that Sgt. Pope "needed to put those other charges on there."  Ex. B: Pope, 154:12-21.[15]  Sgt. Donaldson responded to Sgt. Pope by telling him that he wished Sgt. Pope had included the charge that he could not locate, that Sgt. Pope needed the charge, and that Sgt. Pope would need to speak with the state's attorney about how to amend the charges to include the missing charge.  Ex. B: Pope, 156:13 – 157:4.  It was important to Sgts. Donaldson and Pope that the charge for blocking a public sidewalk be added because they were, in part, arrested for that offense.  Ex. B: Pope, 157:13 – 158:1.

Sgt. Donaldson made a second call to Col. Wilson after the arrests were made.  Ex. E: Wilson, 65:17-20.  Sgt. Donaldson told Col. Wilson that Sgt. Pope had made an arrest, which was the first time Col. Wilson became aware that an arrest had happened.  Ex. E: Wilson, 65:21 – 66:7.  Specifically, Sgt. Donaldson told Col. Wilson that Sgt. Pope arrested the Hulbert brothers and "charged them with disorderly conduct, they failed to obey" because Sgt. Pope had ordered them three times to move off the sidewalk and out of the crosswalks, and onto Lawyers' Mall.  Ex. E: Wilson, 67:17 – 68:12; *see also Bryan Sears Video*, at 0:44-0:53.  Col. Wilson also recalled

---

[15] Sgt. Donaldson felt "there was another charge that would have been more suiting than the one he had utilized and I asked him to explain because he had written one criminal citation in lieu and then, on the back, in the narrative, he mentioned the other charge.  He thought that that would cover both charges" and Sgt. Donaldson advised him that each charge requires a separate citation.  Ex. C: Donaldson, 102:4-20; Ex. O: Labs, 62:15 – 63:6, 69:3-20 (asking that the charges be put on separate forms and that the most appropriate charges be added).

learning that the Hulbert brothers had received criminal citations, were taken to Annapolis City Police Department, and released.  Ex. E: Wilson, 69:7-13.

On the same day, February 5, 2018, Col. Wilson sent an email out at 9:59 p.m.  Exhibit Q: Feb. 5 Email from Col. Wilson (Labs Depo 4).  In the email, Col. Wilson cites to the charge that Sgt. Pope gave the Hulbert brothers—violation of § 10-201 of the Criminal Law Article—but he also cites to the charge that he thought was more appropriate based on longstanding advice from the State's Attorney's Office—violation of § 6-409(b) of the Criminal Law Article.  Ex. Q; Ex. E: Wilson, 132:7 – 133:9 (stating that "I've had several meetings throughout the years with the state's attorney's office on what they will prosecute and what they won't prosecute as it relates to demonstrators in Lawyers' Mall. . . . [T]hese are the charges they recommend that we charge with in the mall.); Ex. O: Labs, 70:7-13 ("normally when we charge somebody at our demonstrations, it's usually for trespassing after we've asked them to comply and they don't two or three times").  Col. Wilson was not present, but he did provide a summary of events resulting in the arrests, which included references to the safety issues that evening:

> The group was asked at least 2 times to leave the sidewalk and protest in the Lawyers Mall area.  They refused to leave and refused to move to a safe location (Lawyers Mall).
>
> It should be noted that session was going to convene at 2000 hours, it was dark, the intersection was lighted, several crosswalks are located in this vicinity, and there was a clear danger to the safety of pedestrians crossing at this location.  Several people cross at this location and vehicular traffic is steady at this intersection.
>
> After refusing to leave, and ignoring the order to leave this location, because of safety and security concerns, two of the protestors were arrested and charge[d] accordingly on a criminal citation.  The remainder of the group then proceeded to the Mall area to continue their protest.

Ex. Q.  Indeed, pedestrians have been struck by vehicles near the sidewalk in front of Lawyers' Mall.  Ex. E: Wilson, 105:14-18; Exhibit R: Email Discussing Pedestrians Struck by Vehicles.

Moreover, there have been prior complaints about pedestrians in the crosswalk, *see* Ex. E: Wilson 107:19 – 109:13, and members of the Patriot Picket demonstration were in the crosswalks, Ex. E: Wilson 109:17 – 110:19; *Bryan Sears Video*, at 0:44-0:53.  Visibility has also been an issue.  Ex. E: Wilson, 137:2-8.

### The Decision to Add Charges the Next Day

The next day, February 6, 2018, Col. Wilson came to the office, read Sgt. Pope's report and saw that it did not include all of the charges, and told Sgt. Donaldson that they needed to contact the state's attorney's office for guidance on adding the remaining charges, which he had mentioned in his email the evening before.  Ex. E: Wilson, 86:8 – 88:5.  Lt. Labs contacted Jason Miller, an assistant state's attorney, who informed them that "yes, we could do that, all you have to do it write two more criminal citations and loop the three together with the citation numbers and it would be fine.  He said we had time to do that."  Ex. E: Wilson, 90:2-17; Ex. O: Labs, 77:11 – 80:22; Ex. C: Donaldson, 111:5-13, 117:12 – 118:1 ("Somebody called the States Attorney to confirm is what we're doing correct, can we add these and reserve them today with the proper charges and they said yes.  And these are the charges we want to use, is that correct and they said yes.").  Col. Wilson told Sgt. Donaldson to "tell Pope when he came to work to write two more criminal citations for the more appropriate charges."  Ex. E: Wilson, 91:4-15.

Later in the day, Sgt. Pope came to the office and met with Sgt. Donaldson again about the arrests.  Ex. B: Pope, 158:2-17.  Sgt. Donaldson informed Sgt. Pope that they had contacted the state's attorney who advised that "all [Sgt. Pope] had to do was write out the other two charges and serve it on them."  Ex. B: Pope, 158:1-17.

 As a result of the directive from his supervisor, Sgt. Pope drafted the additional citations.  Ex. B: Pope, 158:1-17; Ex. C: Donaldson, 103:11 – 104:16, 111:14-18.  The charges were based

on the events from the evening before and did not include anything new that occurred after the Hulbert brothers were released.  Ex. B: Pope, 176:1-12; Exhibit S: Copies of Charges (2/6/18). Specifically, the charges were for violation of § 6-409(b) of the Criminal Law Article (under the trespass subtitle, this is a violation for refusal or failure to leave public building or grounds) and COMAR 04.05.01.03 (a regulation for the Department of General Services that prohibits certain conduct, including preventing or disturbing the general public from obtaining services provided on the property or obstructing walks).  The citations were reviewed by Sgt. Pope's superior officers before they were served on the Hulbert brothers.  Ex. C: Donaldson, 125:8-19; Ex. O: Labs, 74:18 – 75:5 (Lt. Labs reviewed and approved the new charges with the help of the state's attorney), 77:11 – 80:22 (the state's attorney agreed with the new charges), 81:17 – 82:12.

After the charges were drafted, the MCP was informed that the Hulbert brothers were at Lawyers' Mall.  Ex. B: Pope, 162:7-18; 169:10-19; 172:5 – 173:5; Ex. C: Donaldson, 106:18 – 107:7, 126:4 – 127:13; Ex. O: Labs 97:19 – 98:14.  The Hulberts went back to Lawyers' Mall "to meet with the news media, because [Jeff Hulbert] had been contacted by the media.  And [he] said yes to interviews."  Ex. K: Jeff, 101:4 – 103:9.

Lt. Labs told Col. Wilson that the Hulberts were in Lawyers' Mall, and Col. Wilson told her to grab the charges and notify Sgts. Donaldson and Pope.  Ex. O: Labs, 97:19 – 100:4.  Sgt. Pope went to Lawyers' Mall with Sgt. Donaldson and, when they arrived, Col. Wilson and Lt. Labs were already there and had approached the Hulberts.  Ex. B: Pope, 162:11-15; 163:3-9; Ex. K: Jeff, 112:18 – 113:1; Ex. M: Kevin, 69:14-18.  The Hulbert brothers signed the new citations and, after they were signed, they were given to Sgt. Pope before he and Sgt. Donaldson returned to the station.  Ex. B: Pope, 174:10-15; 175:14-21; 180:6-15; Ex. K: Jeff, 113:2 – 114:3; Ex. M: Kevin 78:11 – 79:4.  Col. Wilson went because he wanted to explain the additional charges to

make sure the Hulbert brothers understood why the additional charges were coming.   Ex. E: Wilson, 114:9 – 115:8; Ex. O: Labs, 101:16 – 102:4; Ex. C: Donaldson, 107:13-21; Ex K: Jeff, 116:9-16; Ex. M: Kevin, 70:1-74:3, 80:17 – 81:3.

**Sgt. Pope Completed His Report Summarizing the Arrests**

After any interaction with a scheduled or unscheduled rally, an officer has to write a report about it.  Ex. B: Pope, 58:12 – 59:19; Ex. C: Donaldson 26:12-19, 31:7-19.  The police information report is filed in the CAD system.  Ex. O: Labs, 37:17 – 38:1.  Sgt. Pope completed his report for this arrest on the evening of February 6, 2018.  Ex. L.  In his report, Sgt. Pope detailed the three "requests to move their location to allow for pedestrians to freely use the sidewalk, crosswalks and to reduce conditions for distracted vehicle operators approaching the intersection."  Ex. L.  He indicated that both Jeff and Kevin Hulbert were arrested for failing to obey his orders.  Ex. L.  Sgt. Pope detailed the safety issues that were concerning to the Department, which included the time and location of the demonstration, pedestrians being struck by vehicles at the location, limited visibility, pedestrian foot traffic in the area was expected to increase, and the signs that the group held limited pedestrian flow on the sidewalks, distracted drivers, and caused an unsafe environment.  Ex. L.  The report confirms that the "remainder of the group then proceeded to the Mall area to continue their protest."  Ex. L.  Finally, it confirms that the additional citations served on February 6, 2018 were done "at the suggestion of the state's attorney office."  Ex. L.

**The Hulbert Brothers Immediately Tried This Case in the Media and Pursued Legal Action**

As noted above, the media was immediately involved.  Members of media were present when the arrest occurred.  *Bryan Sears Video*, at 2:44-2:49 (in addition to the video being recorded by an employee of the Daily Record, at this citation, you can hear a question from a media member at Maryland Matters).  The Department of General Services immediately received inquiries from

the media.  Exhibit T: Examples of Media Inquiries.  As noted above, the Hulberts began doing interviews the next day in Lawyers' Mall and they did at least one radio interview.  They had an intertest in talking to the media about their arrests.  Ex. K: Jeff, 104:13-14.

In addition to the immediate contact with the media, the Hulbert brothers also did not delay in pursuing legal action.  The were arrested on the evening of February 5, 2018.  They filed this lawsuit nine days later on February 14, 2018.  ECF 1.

### Col. Wilson Consulted with the State's Attorney About Dropping the Charges

On February 8, 2018, three days after the arrests, Col. Wilson met with Wes Adams, then-State's Attorney for Anne Arundel County.  Ex. E: Wilson, 59:16 – 65:1, 123:7-17.  During the meeting, Wes Adams and Col. Wilson reviewed the video of the arrests.  Ex. E: Wilson 64:5-19, 142:1 – 144:4; Exhibit U: Email Transmitting Surveillance Video.  Wes Adams indicated to Col. Wilson that he was not inclined to prosecute.  Ex. E: Wilson, 63:8-12.  Knowing what Sgt. Pope had reported and after seeing the video, Col. Wilson believed the charges were appropriate and was disappointed in Mr. Adams's decision, but nevertheless agreed to recommend that they be dropped.  Ex. E: Wilson, 63:13 – 64:4.  The next day, February 9, 2018, Col. Wilson emailed a letter to Wes Adams and requested that the charges against the Hulbert brothers be dropped.  Ex. E: Wilson, 58:18 – 59:12; Exhibit V: Emails and Letters Requesting Charges be Dropped.

After notifying Wes Adams, Col. Wilson sent an email to Jeff Hulbert.  Exhibit W: Email to Jeff Hulbert.  In the email, Col. Wilson confirms that he met with Wes Adams, that the charges were being dropped, that the MCP was acting in good faith out of concern for safety, and that none of the paperwork or criminal citations were ever entered into the system.  Ex. W.

### The Hulbert Brothers Have Articulated Speculative Damages

Jeff Hulbert claims that he complained to Sgt. Pope about the handcuffs because they were "uncomfortable," and claims Sgt. Pope told him that he had to deal with it.  Ex. K: Jeff, 87:20 –

88:17.  Jeff Hulbert also claims to have asked a second officer for one of his coats to be removed or to be re-handcuffed, but that his request was denied.  Ex. K: Jeff, 95:20 – 97:21.  This is the basis for his claim that Sgt. Pope caused him damages because he claims to have "sustained wrist abrasions and muscle cramps."  Ex. K: Jeff, 94:13 – 95:4.  Jeff Hulbert did not seek any medical treatment for his alleged injuries and he has never discussed his alleged injuries with a health care provider.  Ex. K: Jeff, 95:5-10.  Jeff Hulbert claimed that his mental condition caused by the arrest was "shock," which he also did not seek treatment for and "decided to deal with it privately."  Ex. K: Jeff, 99:1 – 100:2.

Kevin Hulbert similarly claims that the handcuffs were tight, that his arms were "contorted" behind his back, and that Sgt. Pope had to lean on him in order to buckle him in the police car, which was painful.  Ex. M: Kevin, 45:6 – 46:6, 51:14 – 52:12.  He did not ask Sgt. Pope to adjust the seatbelt or handcuffs, and did not say anything to him about it during the drive to the Annapolis City Police Department.  Ex. M: Kevin, 46:7-13, 47:3-8.  Kevin Hulbert did not seek medical treatment.  Ex. M: Kevin, 52:13-17.

Kevin Hulbert claims that his injuries include anxiety and the feeling of being "terrified" during the arrest.  Ex. M: Kevin, 54:5 – 57:15.  Kevin Hulbert also has not sought medical treatment for the mental and emotional injuries that he claims in this case.  Ex. M: Kevin, 57:16 – 58:8.

The *Bryan Sears Video* is eight minutes and twenty-seven seconds long.  *Cf.* Ex. F (showing fourteen minutes passed between the time backup arrived and departure to the Annapolis City Police Department).  Two officers who are not party to this case are searching the Hulbert brothers in the video.  At no point do either Jeff or Kevin Hulbert display visible signs of discomfort, no audio can be heard of them complaining about discomfort or requesting that they

be re-handcuffed, and Jeff Hulbert calmly responds to questions from the media.  Jeff Hulbert does

voice his objection to the arrest, but does not appear to show signs of "shock" about his arrest.  In

fact, in his deposition and the *Patriot Picket Interview*, he says he was repeatedly told that he

would be arrested if he did not move, he made a decision not to move with knowledge that he

would be arrested, voiced that plan to the rest of his group, and then was, in fact, arrested.  During

one recording, he looks at the camera and says, "If it comes to taking arrest, I'm taking the arrest."

*1st Amendment Video*, at 1:06-1:11.  Yet, now he claims to have been "shocked" that he was

arrested.

**The Hulberts' Theory of the Case Has Been Partially Driven by Conspiracy
Theories**

During the arrest, Jeff Hulbert first posited a conspiracy theory, without evidence, that the

arrest was politically motivated.  *Bryan Sears Video*, at 6:56-7:07 (stating that "I suspect someone

in the corner office of the Senate office building who doesn't like the messages on our signs, and

they decided they want us to be out of view," which is his theory that then-Senate President Mike

Miller was behind the arrest).  The theory that democratic politicians were responsible for the

arrests came up again during Jeff Hulbert's interview four days later.  *Patriot Picket Interview*, at

4:19-5:21.  The conspiracy theories were pursued during depositions.  Ex. B: Pope, 131:9 – 132:17;

Ex. E: Wilson, 146:19 – 147:14.  During Jeff Hulbert's deposition, he said that he "considered [the

arrest] to possibly [be] politically motivated."  Ex. K: Jeff, 63:11-12, 65:8 – 66:9.

After revealing no evidence that the arrest was politically motivated by democratic

members of the General Assembly, the conspiracy evolved into a belief that the republican

lieutenant governor ordered the arrests.  The genesis of this belief is the audio recording from the

governor's mansion that neither Sgt. Pope, nor Col. Wilson heard until after the arrests.  Ex. B:

Pope, 123:9-12, 127:11-14; Ex. E: Wilson, 24:14 – 25:3.

Neither conspiracy is true.  The facts are much simpler.  The Patriot Picket group was ordered to move less than fifteen feet for safety reasons.  After at least three orders to move, two of the demonstrators were arrested for failing to obey the repeated orders.  They spent roughly one hour with Sgt. Pope while he drafted charges.  They signed for the charges and were released.  The charges were dropped a few days later.  Now they seek damages from two employees of the Maryland Capitol Police in their personal capacities.

## ARGUMENT

### I. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, a district court "shall grant summary judgment" if the record, including the pleadings, affidavits, and depositions, "shows that there is no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  Rule 56 mandates the entry of summary judgment where, after adequate time for discovery, the non-moving party fails to come forth with proof sufficient to establish an essential element of his claim upon which he will bear the burden of proof at trial.  *Feldman v. Law Enf't Assocs. Corp.*, 752 F.3d 339, 348 (4th Cir. 2014); *Cray Commc'ns v. Novatel*, 33 F.3d 290, 292 (4th Cir. 1994).

In order to survive a properly supported motion for summary judgment, the non-moving party must present evidence from which a reasonable fact finder could return a verdict in his favor. *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984).  The mere existence of some disputed fact does not require denial of the motion.  *Thompson Everett, Inc. v. Nat'l Cable*, 57 F.3d 1317, 1322 (4th Cir. 1995).  Rather, the disputed facts must be material to an issue necessary for resolution of the case and the quality and quantity of the evidence offered to create a question of

fact must be adequate to support a verdict. *Id.*; *FDIC v. Cashion*, 720 F.3d 169, 180 (4th Cir. 2013).

## II. SGT. POPE AND COL. WILSON ARE ENTITLED TO QUALIFIED IMMUNITY FROM THE § 1983 CLAIMS.

Qualified immunity protects Sgt. Pope and Col. Wilson from liability for the § 1983 claims. Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S.800, 818 (1982)). The qualified-immunity inquiry turns on the "'objective legal reasonableness of the [government official's] action, assessed in light of the legal rules that were clearly established at the time.'" *Pearson v. Callahan*, 555 U.S. 223, 243 (2009) (internal citation omitted).

"To overcome this shield, a plaintiff must demonstrate that: (1) the defendant violated the plaintiff's constitutional rights, and (2) the right in question was clearly established at the time of the alleged violation." *Adams v. Ferguson*, 884 F.3d 219, 226 (4th Cir. 2018). When analyzing the second prong of this test, the Court should "'not define clearly established law at a high level of generality.'" *Id.* at 227 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). Instead, a right is clearly established "'in light of the specific context of the case, not as a broad general proposition.'" *Id.* (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)). "To be clearly established, a right must be sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right." *Reichle v. Howards*, 556 U.S. 658, 664 (2012) (internal citations and quotations omitted). The court in its discretion may decide the two requirements in any order, based on the circumstances of the case. *Pearson*, 555 U.S. at 236.

**A.     Defendants Are Entitled to Qualified Immunity Because A Reasonable Time, Place, and Manner Restriction on Speech Does Not Violate the First Amendment.**

The Hulbert brothers claim that their First Amendment right to demonstrate was violated, however, the First Amendment "does not guarantee the right to communicate . . . at all times and places or in any manner that may be desired." *Heffron v. International Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981).

Two cases, which will be discussed below, are instructive and clarify why defendants are entitled to qualified immunity for plaintiffs' First Amendment challenges. The first is *Ross v. Early*, 746 F.3d 546 (4th Cir. 2014) ("*Ross*").[16] In *Ross*, the City of Baltimore implemented a policy to move protestors to a designated area outside the First Mariner Arena. *Id.* at 549. The plaintiff, Aaron Ross, was leafleting in the fifteen feet of sidewalk closest to the Arena, outside the [] designated area." *Ross (D. Md.)*, 899 F. Supp. 2d at 419. Mr. Ross was "repeatedly warned" by an officer "to move to the designated area and, when he refused, arrested [] for failing to obey a lawful order" pursuant to § 10-201(c)(3) of the Criminal Law Article, *Ross* at 550-51, which is the same charge that Sgt. Pope gave the Hulbert brothers on February 5, 2018, *see* Ex. P. Mr. Ross sued the officer for, among other things, violating his First and Fourth Amendment rights. *Id.* at 551.

The second case is *Kass v. City of New York*, 864 F.3d 200 (2nd 2017), which arises out of the Second Circuit.[17] In *Kass*, the New York Police Department was monitoring a protest taking place in a park. *Id.* at 204. At 4:40 p.m., one pedestrian, Stephen Kass, stopped on the sidewalk

---

[16] The procedural history in *Ross* is complicated. There are two District Court opinions that will also be referenced: *Ross v. Early*, 899 F. Supp. 2d 415 (D. Md. 2012) ("*Ross (D. Md.)*") and *Ross v. Early*, 758 F. Supp. 2d 313 (D. Md. 2010) ("*Ross II (D.Md.)*").

[17] This Court is not bound to holdings from the Second Circuit, but this case illustrates certain areas of law where the Second and Fourth Circuit agree.

adjacent to the park so he could speak with protestors.  *Id.*  He was standing on the sidewalk, engaged in non-confrontational conversation, and was not impeding pedestrian or vehicular traffic. *Id.*  An officer approached him after a minute or two, and told him to "keep walking."  *Id.*  Mr. Kass "replied that he wanted to hear the protestors' views, he was not blocking pedestrian traffic, and he had a right to remain on the sidewalk."  *Id.*  The officer repeated her order, Mr. Kass continued to refuse to comply, the officer called for assistance, and one of the protestors began recording the interaction.  *Id.*

After several orders to move and several refusals from Mr. Kass, one of the responding officers placed his hand on Mr. Kass's elbow and attempted to guide him away, but Mr. Kass objected to being touched and insisted that he wanted to continue talking with protestors.  *Id.*  The officer then suggested that he "go inside the park to continue his conversation with the protestors." *Id.*  After further objection, Mr. Kass was grabbed, handcuffed, and brought to the precinct where he was issued a summons for disorderly conduct under New York law.  *Id.*  Similar to the State's Attorney's decision in the instant case, "[t]he charge was ultimately dismissed for failure to prosecute."  *Id.*  Mr. Kass's subsequent lawsuit was principally for federal false arrest and false imprisonment claims, but also included a First Amendment challenge.  *Id.* at 204, 207-08.

Like Mr. Ross and Mr. Kass, the Hulbert brothers' First Amendment challenge fails because the government may impose reasonable restrictions on the time, place, or manner of protected speech, so long as the restrictions (1) are content neutral, (2) serve a significant government interest, (3) leave open ample alternative channels for communication of the information, and (4) are narrowly tailored to the government's interest.  *Ross II (D.Md.)*, 758 F. Supp. 2d at 320 (citing *Ward*, 491 U.S. at 791).

Sgt. Pope was working in Annapolis for the first time during the legislative session, which began on Wednesday, January 5, 2018.  Md. Const. art. III, § 14; Ex. B: Pope, 62:3-18.  Less than one month later, a group showed up unannounced to occupy the sidewalk at a busy intersection when the designated demonstration area—which was immediately adjacent to it—was available. Sgt. Pope sought guidance from his superior officers who shared their deeper understanding of the area and potential safety risks.  With that frame of mind, Sgt. Pope gave repeated orders to move roughly fifteen feet away for safety reasons.  As such, Sgt. Pope's time, place, and manner restriction of speech satisfies each component of this four-part test.

### 1. Sgt. Pope's order to relocate was content neutral because it was not motivated by a disagreement with the message the Hulberts' demonstration conveyed.

Sgt. Pope's order was content neutral because it was motivated by a concern for public safety, rather than a disagreement with the demonstration's message.  The government's purpose is the "threshold consideration" in determining whether a restriction is content neutral or content based.  *Ross II (D. Md.)*, 758 F. Supp. 2d at 321 (quoting *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 763 (1994)).  The key inquiry is whether or not the regulation's purpose is to suppress content, as opposed to combating the undesirable secondary effects of the speech.  *Id*.

Here, the evidence shows that the purpose of Sgt. Pope's order was to address the secondary effects of the Patriot Picket demonstration; namely, the creation of a safety hazard. There is no evidence to suggest that Sgt. Pope ordered the group to move off the public sidewalk and onto Lawyers' Mall because of the message of the Patriot Picket's demonstration that evening. In fact, there is no evidence that he was even aware of their message.  Ex. B: Pope 177:13 – 178:3. Instead, there is overwhelming, repeated evidence that the basis for ordering the group to move less than fifteen feet was for safety reasons.  Ex. A; Ex. B: Pope, 18:18 – 19:4, 27:8 – 28:8, 29:3-

19, 31:1-15, 33:11-19; 74:12-16; 75:4 – 76:1, 80:20 – 82:12, 83:7-16, 99:1-9; Ex. C: Donaldson,

53:4-10; 157:19 – 158:3; Ex. E: Wilson, 21:10-17; 44:13-16; Ex. L; Ex. Q; Ex. W.  Just three

days after these arrests, Sgt. Donaldson had another officer order a different group, with a smaller

turnout and a different message, to move into Lawyers' Mall for safety reasons.  Ex. N; *see also*

*We are Cove Point*.  The evidence shows that Sgt. Pope issued the order for safety reasons and not

because of their message.  Sgt. Pope's repeated orders satisfy the requirement of content neutrality.

> ## 2. Sgt. Pope's order served a significant governmental interest because it was intended to help maintain public safety.

"[Fourth Circuit] jurisprudence *makes clear* that a city's interest in maintaining the safety,

order, and accessibility of its streets and sidewalks is sufficient to justify a time, place, and manner

regulation."  *Ross*, 746 F.3d at 555 (internal citation and quotation omitted) (emphasis added); *see*

*also Kass*, 864 F.3d at 208.  Relying "[o]n this strength of authority, [the Fourth Circuit has] little

trouble concluding the City's asserted interest in maintaining the flow of pedestrian traffic and

ensuring public safety qualifies as 'substantial.'"  *Ross*, 746 F.3d at 555 (internal citations and

quotations omitted).

The evidence in *Ross* was sufficient to convince the Fourth Circuit that Baltimore City "has

adequately demonstrated that the presence of protestors on the relevant sidewalks presents a

plausible threat to the orderly flow of pedestrian traffic and, concomitantly, public safety."  *Ross*

at 556.  The government is "entitled to advance its interests by arguments based on appeals to

common sense of logic . . . particularly where, as here, the burden on speech is relatively small."

*Id.* (internal citations and quotations omitted).  The evidence in *Ross* was that the sidewalks around

the Arena can get congested and that "at least once—in the year preceding the issuance of the

Policy—the presence of protestors caused a significant safety hazard."  *Ross* at 556; *compare* Ex.

R (showing two pedestrians were struck by vehicles at the intersection within the prior year).

Here, the undisputed material facts show that Sgt. Pope ordered the Patriot Picket group to relocate their demonstration for safety reasons, and his orders serve an undeniably significant governmental interest.  In fact, the request to move to Lawyers' Mall materially advances the government's substantial interest "by redressing past harms or preventing future ones." Pedestrians had been hit by cars at this intersection within the prior year, *see* Ex. R, safety issues were reasonably anticipated in the area, *see* Ex. L and Ex. Q, and the burden on speech was relatively small because the group was ordered to move roughly fifteen feet away into the area that serves as the central point for demonstrations in Annapolis.  Ex. G; Ex. H; Ex. I; Ex. J.

> ### 3. Sgt. Pope's order left ample alternative channels for communication open because the Hulberts were permitted to continue their demonstration in virtually the same location, in the exact same manner.

The requirement that regulation of speech "leave[s] open ample channels for communication of information" does not mean that the available alternative "be the speaker's first or best choice or provide [] the same audience or impact for the speech."  *Ross*, 746 F.3d at 559 (internal citations and quotations omitted).  Instead, "the relevant inquiry is simply whether the challenged regulation 'provides avenues for the more general dissemination of a message.'"  *Id.* (internal citations and quotations omitted).

In *Ross*, the protestors were asked "to stand in designated areas mere feet from their intended audience, within full view and earshot of both passerby and [event] attendees, and [the move to the new location] imposes no restriction on the channels of expression employed therein." *Id.*  The Court "readily conclude[d] this narrow degree of geographical separation does not hinder the protestors' ability to disseminate their message."  *Id.*; *see also Marcavage v. City of Chicago*, 659 F.3d 626, 630-31 (7th Cir. 2011) (finding that orders to move off of a sidewalk and onto an adjacent gravel area or across the street were ample alternatives, and that "plaintiffs were only

limited by their own stubborn refusal to move there."). The inquiry "does not rise or fall on the efficacy of a single medium of expression. The First Amendment affords no special protection to a speaker's 'favored or most cost-effective mode of communication.'" *Ross*, 746 F.3d at 559. Similarly, in *Kass*, the officers' orders to Mr. Kass that he step into the park to continue his conversation "did not foreclose ample, alternative channels of communication. Such channels need not 'be perfect substitutes for those . . . denied to [the plaintiff] by the regulation at hand.'" *Kass*, 864 F.3d at 209.

Here, as in *Ross*, while the Hulbert brothers may have preferred to remain on the public sidewalk instead of backing up a few feet onto Lawyers' Mall, the First Amendment does not grant them unrestricted access to any area of public sidewalk on which they choose to demonstrate. The Hulberts were not barred from the general dissemination of their message and were only ordered to move a matter of feet. Under Sgt. Pope's orders, the Hulberts could have continued to display their signs, film their demonstration, and convey their views in exactly the same manner, just steps away from where they were standing. Therefore, Sgt. Pope's orders left ample alternative channels of communication open to the Hulberts.

> **4.** **Sgt. Pope's order was narrowly tailored to meet the government's interest of maintaining public safety because the demonstrators were only asked to move roughly fifteen feet from where they stood.**

Whether substantially more speech than necessary was burdened to further the government's legitimate interests does not require the government use "the least restrictive or least intrusive means available to achieve its goals." *Ross*, 746 F.3d at 557 (internal citations and quotations omitted); *see also Kass*, 864 F.3d at 208. In other words, "[s]o long as the means chosen are not substantially broader than necessary to achieve the government's interest . . . the regulation will not be invalid simply because a court concludes that the government's interest could be

adequately served by some less-speech-restrictive alternative." *Ross*, 746 F.3d at 557 (internal citations and quotations omitted).

In *Ross*, the Fourth Circuit held that the policy might have had plausible, debatable alternatives, but even if that is the case, it does not change the ultimate holding that the policy "does not burden *substantially* more speech than necessary." *Id.* at 557 (emphasis in original). As such, it was narrowly tailored to address the threats to sidewalk congestion and public safety. *Id.* at 558. Likewise, the Second Circuit also held that the orders to Mr. Kass "were narrowly tailored to achieve" the same undeniably significant government interest. *Kass*, 864 F.3d at 208. The orders to Mr. Kass were targeted to achieve the government's interest, in part, because Mr. Kass "might cause congestion or a security issue by interacting with protestors on the sidewalk outside of the protest area." *Id.* at 209. The orders from the officers were justified despite Mr. Kass being the only person on the sidewalk, and even though he was not impeding pedestrian or vehicular traffic. *Id.* Importantly, the Second Circuit held that the officers were not required to wait for Mr. Kass to actually impede pedestrian traffic or cause a security issue before intervening. *Id.* As a result, the orders given to Mr. Kass were narrowly tailored to achieve the government's substantial interest. *Id.*

While it is true that Sgt. Pope did not observe the presence of any immediate safety hazards during the Patriot Picket's demonstration on February 5, 2018, it is well established that the government has a legitimate interest in maintaining freedom of movement on public sidewalks, and Sgt. Pope is not required to wait for an accident to occur in order to exercise his duty to maintain public safety. *Ross* at 558; *Kass* at 209. The overwhelming evidence shows that Sgt. Pope's superior officers conveyed that it was a safety issue. Ex. A; Ex. B: Pope, 18:18 – 19:4, 27:8 – 28:8, 29:3-19, 31:1-15, 33:11-19; 74:12-16; 75:4 – 76:1, 80:20 – 82:12, 83:7-16, 99:1-9;

Ex. C: Donaldson, 53:4-10; 157:19 – 158:3; Ex. E: Wilson, 21:10-17; 44:13-16; Ex. L; Ex. Q; Ex. W.  The intersection where the Hulberts stood had in fact been the site of previous accidents in which pedestrians were struck by vehicles, including two in the past year alone.

It was reasonable for Sgt. Pope to determine that the Patriot Picket demonstration could pose a risk to public safety, and his order that they move roughly fifteen feet from where they stood to alleviate that risk did not substantially burden their speech.  It is clear that Sgt. Pope's order promoted the government's substantial interest in maintaining public safety, and that the order did not burden more of the Hulberts' speech than was necessary to further that interest.  Therefore, the order was sufficiently narrowly tailored to meet the government's substantial interest.

Sgt. Pope's orders to relocate were content neutral, left ample channels of communication open to the Hulberts, served a significant government interest, and were narrowly tailored to serve that interest.  Sgt. Pope's repeated orders were a reasonable time, place, and manner restriction on the Hulberts' speech, and their arrest for failure to obey those orders did not violate their rights under the First Amendment.  Because it was a reasonable time, place, and manner restriction, and the Hulbert brothers willfully ignored repeated orders, it gave Sgt. Pope probable cause to arrest them, which is fatal to their other claims, as discussed below.  A reasonable time, place, and manner restriction on speech does not violate the First Amendment (or its Article 40 counterpart, discussed below), and defendants are entitled to qualified immunity.[18]

---

[18] Moreover, Col. Wilson did not know the arrests occurred until after-the-fact.  Ex. E: Wilson, 65:21 – 66:7. The Complaint alleges that Count I is related to the February 5, 2018 arrests and not the additional charges on February 6, 2018.  There is no evidence to pursue a claim against Col. Wilson.  Even if plaintiffs were challenging the February 6, 2018 citations in Count I, all of the evidence shows that Sgt. Pope could not find the citations on February 5, 2018, several persons wanted to add the citations on February 5, 2018, and Col. Wilson sent an email out on February 5, 2018, which included the additional charge.  Ex. Q.  Therefore, the February 6, 2018 citations were not a result of any subsequent speech by the Hulbert brothers, but rather a charging decision that pre-dates the claimed speech.

**B.    The Undisputed Material Facts Show That Sgt. Pope Did Not Arrest Kevin Hulbert Because He Was Filming.**

Sgt. Pope did not violate Kevin Hulbert's constitutional rights and, even if he did, those rights were not clearly established at the time of the arrest.[19]   Kevin Hulbert's claim that he was arrested for filming law enforcement is unsupported by the evidence.   Kevin Hulbert's arrest did not have anything to do with his decision to take out his cell phone and begin filming.

Kevin Hulbert was placed under arrest for failure to obey a lawful order.   The record is wholly devoid of evidence that Kevin Hulbert was arrested for filming.   Rather, the evidence shows that Sgt. Pope arrested him for failing to obey his order to move off the sidewalk.   Ex. B; Pope, 100:17 – 101:9, 107:10-19; Ex. M: Kevin, 32:2-9; *1st Amendment Video*, at 1:46-2:11; *Patriot Picket Interview*, at 3:49-4:13.   Citizens are not permitted to ignore lawful orders so long as they happen to be filming the situation.   Such a finding would produce an absurd result and diminish police officers' ability to execute their duties.

As Kevin Hulbert tells it, Sgt. Pope warned the group of demonstrators that, if they did not move, then they would be placed under arrest.   Ex. M: Kevin 31:1 – 32:1.   After this warning, Kevin told Sgt. Pope that the group had "a right to be on the sidewalk."   Ex. M: Kevin, 32:2-5. Sgt. Pope gave Kevin Hulbert several orders and several opportunities to comply with it.   *1st Amendment Video*, at 1:46-1:52 ("Sir, I gave you, sir, inside Lawyers' Mall or you're going to jail.").   Kevin Hulbert refused to comply with, perhaps, his fourth or fifth order of the day and was arrested.   Ex. M: Kevin, 32:6-9, 33:11 – 34:3 (stating that the order to move "seemed to include me"); *1st Amendment Video*, at 1:46-2:11.

---

[19] The only plaintiff who could potentially assert this claim is Kevin Hulbert, and any claim that Jeff Hulbert or MSI might try to assert should be dismissed because Kevin Hulbert is the only plaintiff who was filming.

This evidence demonstrates that Kevin Hulbert was not arrested for filming an officer, but for failing to obey Sgt. Pope's order to move into Lawyers' Mall. There is no evidence to demonstrate that Kevin Hulbert would have been arrested simply for filming the incident that evening had he complied with Sgt. Pope's order.  As discussed more thoroughly above, several other people were filming, obeyed the orders, and were not arrested.

There is no dispute of material fact that Kevin Hulbert's act of filming had nothing to do with his arrest.  As a result, this Court should find that Defendants are entitled to qualified immunity and grant judgment in their favor.

**C.    The Alleged Constitutional Right to Record Police Is Not Clearly Established.**

Even if Kevin Hulbert's arrest had something to do with filming, Sgt. Pope and Col. Wilson are still entitled to qualified immunity because recording police is not a clearly established right under the First Amendment.  By unreported opinion, the Fourth Circuit agreed that an "asserted First Amendment right to record police activities on public property was not clearly established in this circuit at the time of the alleged conduct."  *Szymecki v. Houck*, 353 Fed. Appx. 852, 853 (4th Cir. 2009).  To wit, the Fourth Circuit has not yet weighed in this subject in a reported opinion, which could be complicated by the fact that Maryland's wiretap laws expressly prohibit someone from recording audio of another person without their consent.  Md. Code Ann., Cts. & Jud. Proc. § 10-401 – 10-414 (LexisNexis 2020).

This Court is required to look to the Supreme Court, Fourth Circuit, and the Maryland Court of Appeals for precedent existing at the time of the alleged violation to determine whether the conduct violated a clearly established right.  *Edwards v. City of Goldsboro*, 178 F.3d 231, 251 (4th Cir. 1999).  Even if a right is recognized in another circuit court, if it has not been recognized by the Fourth Circuit, then the "official will ordinarily retain the immunity defense."  *Id.* (internal

citation and quotation omitted). Indeed, this Court recently recognized that "[n]o such legal trail exists in Supreme Court or Fourth Circuit precedent" and that, as of November 2015, police officers have not been "provided with fair warning that it is unconstitutional to stop someone from video recording the police in the routine public performance of their duties. Nor has the Maryland Court of Appeals weighed in on the issue." *Garcia v. Montgomery County*, 145 F. Supp. 3d 492, 508-09 (D. Md. 2015); *see Sharpe v. Winterville Police Department*, -- F. Supp. 3d --, 2020 WL 4912297, at *5-*6 (E.D.N.C. Aug. 20, 2020); *see J.A. v. Miranda*, 2017 WL 3840026, at *5-*6. As a result, this Court found that the officers in *Garcia* were "entitled to qualified immunity from a suit for damages." *Id.* at 509.

The fact that there still is not a relevant opinion on this issue as we approach the year 2021 highlights that this remains an emerging area of law. Because it had not been recognized as a clearly established right prior to February 5, 2018, defendants are entitled to qualified immunity.

**D. The Undisputed Material Facts Show That There is No Causal Connection for Plaintiffs' Retaliation Claim, And The Existence of Probable Cause Defeats the Claim.**

To establish a First Amendment retaliation claim, plaintiffs are required to show that (1) their "speech was protected," (2) "defendant's alleged retaliatory action adversely affected the [] constitutionally protected speech," and (3) that there is "a causal relationship" between the protected speech and the alleged retaliatory action. *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685-86 (4th Cir. 2000) (internal citations and quotations omitted). Plaintiffs claim two adverse actions occurred; namely, they allege the arrests on February 5, 2018 and the citations issued on February 6, 2018 were adverse actions that are causally related to their speech. Plaintiffs' claims fail as a matter of law and defendants are entitled to qualified immunity.

35

### 1.     February 5, 2018

As argued above, the Hulbert brothers did not have their First Amendment rights violated. Sgt. Pope ordered a reasonable time, place, and manner regulation on speech.  Such a regulation is not an infringement on the First Amendment or Article 40.  Regardless, the Hulbert brothers repeatedly and willfully ignored his orders.  It was their refusal to comply with his orders—not their speech—that resulted in their arrests.

Indeed, the other demonstrators with Patriot Picket continued the demonstration—with the same signs and message—in Lawyers' Mall after the arrests.  Ex. B: Pope, 101:16-20; Ex. C: Donaldson, 96:2-14; Ex. F.  There is simply no evidence that the speech of the Hulberts was causally connected to their arrests.

When a plaintiff pursues a retaliatory arrest claim, they "must plead and prove the absence of probable cause for the arrest."  *Nieves v. Bartlett*, 139 S. Ct. 1715, 1724 (2019).  When the Hulbert brothers disobeyed Sgt. Pope's orders, it gave Sgt. Pope arguable "probable cause to believe that a suspect has or is committing a crime," which means that he "may arrest the suspect without a warrant" even if "the person 'has committed even a very minor criminal offense,' such as a traffic violation."  *Conboy v. State*, 155 Md. App. 353, 354 (2004) (internal citation omitted).  As discussed more fully below, Sgt. Pope had probable cause to arrest the Hulbert brothers, which defeats their First Amendment retaliation claim as a matter of law.

Even if this Court finds that that probable cause did not exist, then the Hulbert brothers still "must show that the retaliation was a substantial or motivating factor behind the [arrest], and, if that showing is made, the defendant can prevail only by showing that the [arrest] would have been initiated without respect to retaliation."  *Nieves* at 1725 (quoting *Lozman v. City of Riviera Beach*, 138 S. Ct. 1945, 1952 (2018)).  In other words, the retaliatory motive must be a "but-for" cause,

"meaning the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Nieves* at 1722 (internal citations and quotations omitted). There simply is no evidence that the arrests were motivated by their message. The undisputed material facts all show that the arrests occurred because the Hulbert brothers did not obey Sgt. Pope's orders.

### 2.     February 6, 2018

"In order to establish [a] causal connection, a plaintiff in a retaliation case must show, at the very least, that the defendant was aware" that they engaged in protected activity. *Constantine v. Rectors and Visitors of George Mason Univ.*, 441 F.3d 575, 501 (4th Cir. 2005). The citations that were served on February 6, 2018 were generated before the Hulbert brothers spoke to the media in Lawyers' Mall. As noted above, Sgt. Pope wanted to bring these charges even though he could not locate the citation, Sgt. Donaldson and Col. Wilson agreed that they needed to be added, and Col. Wilson emailed about the charges on the evening of February 5, 2018. Moreover, the MCP consulted with the State's Attorney's Office about the charges prior to serving them. Ex. B: Pope, 154:12 – 158:17, 176:1-12; Ex. C: Donaldson, 102:4-20, 103:11 – 104:16, 111:5-18, 117:12 – 118:1; Ex. E: Wilson, 86:8 – 88:5, 90:2-17, 91:4-15, 132:7 – 133:9; Ex. O: Labs, 62:15 – 63:6, 69:3-20, 70:7-13, 77:11 – 80:22; Ex. Q; Ex. S. There is simply no evidence that the February 6, 2018 charges were causally connected to the Hulberts' speech.

### E.     Sgt. Pope Had Probable Cause to Arrest the Hulbert Brothers, Which Is Fatal to Their Unconstitutional Search and Seizure Claims.

To establish an unreasonable seizure under the Fourth Amendment, plaintiffs must show that they were arrested without probable cause. *Brown v. Gilmore*, 278 F.3d 362, 367 (4th Cir. 2002). "Probable cause is determined from the *totality of the circumstances known to the officer at the time* of the arrest." *Id.* (internal citation omitted) (emphasis added). "For probable cause to exist, there need only be enough evidence to warrant the belief of a reasonable officer that an

offense has been or is being committed." *Id*. (internal citation omitted).  "Two factors govern the determination of probable cause in any situation: 'the suspect's conduct as known to the officer, and the contours of the offense thought to be committed by that conduct.'" *Id*. (internal citation and quotation omitted).[20]

"The test for assessing probable cause is an objective one.  An officer can arrest a person subjectively believing that the individual had committed one offense when the individual had committed a completely different offense.  In other words, an officer's 'subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause.'" *McCormick v. State*, 211 Md. App. 261, 270 (2013) (quoting *Devenpeck v. Alford*, 543 U.S. 146 (2004)).

"Probable cause to arrest 'exists where *the facts and circumstances within the knowledge of the officer at the time of the arrest, or of which the officer has reasonably trustworthy information*, are sufficient to warrant a prudent person in believing that the suspect had committed or was committing a criminal offense.'" *Williams v. State*, 246 Md. App. 308, 335 (2020) (internal citation and quotation omitted) (emphasis added).  When an officer has arguable "probable cause to believe that a suspect has or is committing a crime," then the officer "may arrest the suspect without a warrant," which is even "true in cases where the person 'has committed even a very minor criminal offense,' such as a traffic violation." *Conboy v. State*, 155 Md. App. 353, 354 (2004) (internal citation omitted).  After the suspect has been arrested, "police may search 'the

---

[20] With one exception, the contours of these offenses have very little appellate case law to develop precedent. Sgt. Pope arrested them, in part, for blocking a public sidewalk, *see* Ex. B: Pope, 157:13 – 158:1, which is one of the charges that was given on February 6, 2018.  Ex. S (COMAR 04.05.01.03).  A Westlaw search reveals that there are no cases interpreting this regulation, other than Judge Russell's citation to it in his opinion on the motion to dismiss in this case.  A Westlaw search for the charge recommended by the SAO (Crim Law. § 6-409) has twelve reported cases that predate the arrest here.  Only three of them discuss relevant elements, but only in passing, and the opinions are all from the 1970s.  Only the charge given on February 5, 2018 has more substantial case law, and it is identical to the charge given in *Ross v. Early*, 746 F.3d 546 (4th Cir. 2014); a factually similar case to this one.

person of the arrestee' as well as 'the area within the control of the arrestee' to remove any weapons or evidence that could be concealed or destroyed." *Id.* (internal citation and quotation omitted).

The undisputed facts of this case demonstrate that Sgt. Pope repeatedly ordered the Patriot Picket demonstration to relocate from the sidewalk to Lawyers' Mall. The Hulbert brothers deliberately and intentionally disobeyed Sgt. Pope's orders, even after he informed them that they would be arrested if they did not comply. The facts show that Sgt. Pope placed handcuffs on Kevin Hulbert, *see* Ex. M: Kevin, 32:6-9, *1st Amendment Video*, at 1:46-2:11, but are unclear about which officer put handcuffs on Jeff Hulbert, *see* Ex. K: Jeff, 84:11-13, Ex. B: Pope, 132:21 – 133:10. Sgt. Pope did not search Jeff or Kevin Hulbert. *Bryan Sears Video*, *passim*. As a result, neither of the Plaintiffs can pursue claims against Sgt. Pope for an unconstitutional search, and there is insufficient evidence for Jeff Hulbert to pursue an excessive force claim against Sgt. Pope. Regardless, Sgt. Pope had probable cause to arrest both of them and he is entitled to qualified immunity.

It is a misdemeanor for a person to "willfully fail to obey a reasonable and lawful order that a law enforcement officer makes to prevent a disturbance to the public peace." Crim. Law § 10-201(c)(3). The orders given by Sgt. Pope were a reasonable time, place, and manner restriction of speech under the circumstances and given Sgt. Pope's knowledge at the time. *Williams*, 246 Md. App. at 335 ("Probable cause to arrest 'exists where the facts and circumstances within the knowledge of the officer at the time of the arrest, or of which the officer has reasonably trustworthy information, are sufficient to warrant a prudent person in believing that the suspect had committed or was committing a criminal offense.'"). Any reasonable officer with the same information as Sgt. Pope could have given the same order. No reasonable person could find that the Hulberts complied with Sgt. Pope's repeated orders. Sgt. Pope gave a lawful order, the Hulbert brothers

39

willfully ignored it, and Sgt. Pope had probable cause to conclude that the Hulberts were failing to obey it.  As a result, Plaintiffs' claim that their constitutional rights to freedom from unreasonable searches and seizures were violated fails as a matter of law.

Sgt. Pope and the responding officers had probable cause to arrest the Hulbert brothers and search them incident to arrest.  As a result, Sgt. Pope did not violate their Fourth Amendment rights (or the Articles 25 and 26 counterparts, discussed below), and Sgt. Pope is entitled to qualified immunity.[21]

### F.   The Fourth Circuit Has Held That Tight Handcuffs Is Insufficient For An Excessive Force Claim As a Matter of Law.

Claims for a Fourth Amendment violation that a law enforcement officer used excessive force in the course of an arrest is analyzed to determine whether the amount of force was "reasonable" under the circumstances.  *Graham v. Connor*, 490 U.S. 386, 395 (1989). "Determining whether the force used to effect a particular seizure is reasonable requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  *Id.* at 396 (internal citations and quotations omitted).  "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (internal citations and quotations omitted).  This requires careful attention to the totality of the facts and circumstances of each particular case.  *Id.*  (internal citation and quotation omitted).

The right to make an arrest or investigatory stop "necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."  *Id.*; *see also Martin v. Gentile*, 849 F.2d 863, 869 (4th Cir. 1988) (holding that "an arrest carries with it the right to use the amount of

---

[21] Counts IV and V were previously dismissed as to Col. Wilson.  ECF 17, 18.

force that a reasonable officer would think necessary to take the person being arrested into custody.").

The Fourth Circuit has considered the specific harm that the plaintiffs complain of in this case and rejected it as a matter of law. It held that claims about handcuffs being too tight are insufficient to state a claim for excessive force. *Carter v. Morris*, 164 F.3d 215, 219 n.3 (4th Cir. 1999). Specifically, it held that plaintiff's "basis for her excessive force claim—that her handcuffs were too tight and that an officer pushed her legs as she got into the police car—is so insubstantial that is cannot *as a matter of law* support her claim under either the Fourth Amendment." *Id.* (emphasis added); *White v. Maryland Transp. Auth.*, 151 F. Supp. 2d 651, 657 (D. Md. 2001) (citing to *Carter* to hold that a claim that handcuffs were too tight, without more, is not actionable under the Fourth Amendment, and concluding that tight handcuffs and use of a leather strap around the plaintiff's torso to bind his arms to his side was not actionable when the plaintiff could not even show de minimus injury); *McGainey v. Prince George's County*, 2013 WL 6062007, at *2 (D. Md. 2013) (recognizing that "the right to make an arrest carries with it the right to use some degree of physical coercion, and that the 'minimal level of force' applied was justified by the fact that the arrest occurred during a street scene and that the arrestee had already refused to obey one lawful police order. The court also noted that 'in all events, a standard procedure such as handcuffing would rarely constitute excessive force where the officers were justified, as here, in effecting the underlying arrest.'").

There is no evidence that Sgt. Pope handcuffed Jeff Hulbert and his claim against Sgt. Pope fails as a matter of law. *Brown*, 278 F.3d at 369 ("Since there is no allegation that [the officer] ever touched [the plaintiff], there can be no excessive force claim made against him."). Regardless of whether Sgt. Pope handcuffed him or not, he is entitled to qualified immunity. Like in *Carter*,

both Hulbert brothers claim to have been handcuffed too tightly. Kevin Hulbert also claims to have felt some pain when Sgt. Pope leaned over him to buckle his seatbelt, which is closely analogous to the plaintiff in *Carter* complaining that the officer pushed her legs as she got in the car.

In *Brown v. Gilmore*, the Fourth Circuit held that police officers did not violate an arrestee's Fourth Amendment rights by handcuffing her and escorting her to a police vehicle. *Brown*, 278 F.3d at 369. The plaintiff, who was arrested for disorderly conduct after refusing to move her vehicle from the roadway following an accident, claimed the handcuffing was painful and caused her wrists to swell. *Id.* The Court noted that it was reasonable for officers to believe that a suspect who disobeyed direct orders would balk at being arrested, and consequently, that handcuffing was reasonable under the circumstances. *Id.*

Here, as in *Brown*, the circumstances justified the minimal use of force applied by Sgt. Pope and his fellow officers to effectuate the arrest. Like the plaintiff in *Brown*, the Hulberts repeatedly disobeyed Sgt. Pope's orders, which presents a reasonable inference that they would not cooperate. Further, as described in more detail at pp. 21-22 above, the Hulberts' alleged injuries are speculative, at best. They claim to have felt discomfort immediately after the handcuffs were put on despite the video of the scene depicting two arrestees who were not visibly in pain, nor were they voicing it. Kevin Hulbert also claims to have felt some pain while Sgt. Pope buckled him into the vehicle, which is the kind of de minimums impact required to effectuate the arrest and safely transport him roughly one mile away. Kevin Hulbert also failed to verbalize the alleged injuries he described at his deposition to Sgt. Pope. Ex. M: Kevin, 46:7-13, 47:3-8. Moreover, neither plaintiff sought medical attention, which highlights the de minimus nature of any injury they allegedly sustained. This Court should follow the Fourth Circuit's holding in *Carter* and find,

42

as a matter of law, that handcuffs being too tight is not actionable. Therefore, Sgt. Pope did not

violate their Fourth Amendment rights (or the Articles 25 and 26 counterparts, discussed below),

and Sgt. Pope is entitled to qualified immunity.

### III. COL. WILSON IS ENTITLED TO SUMMARY JUDGMENT REGARDING THE REMAINING § 1983 CLAIMS ASSERTED AGAINST HIM BECAUSE THERE IS INSUFFICIENT EVIDENCE TO MEET THE HIGH STANDARD OF SUPERVISORY LIABILITY.

Plaintiffs do not contend that Col. Wilson personally participated in their arrest on February

5, 2018.  Indeed, he learned about the arrests after-the-fact.  Ex. E: Wilson, 65:21 – 66:7.  Col.

Wilson's involvement with this case stems from his role in having the additional citations served

on February 6, 2018.  At the outset, as discussed above, Sgt. Pope had probable cause to arrest the

Hulbert brothers on February 5, 2018, which entitles him to qualified immunity and should end

the inquiry into whether Col. Wilson also has qualified immunity.  For the sake of argument,

however, in order to maintain a § 1983 claim against Col. Wilson, plaintiffs must establish

"supervisory liability," which has three elements:

> (1) "that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed 'a pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff';
>
> (2) "that the supervisor's response to that knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices'"; and
>
> (3) "that there was an 'affirmative causal link' between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff."

*Randall v. Prince George's County*, 302 F.3d 188, 206 (4th Cir. 2002) (quoting *Shaw v. Stroud*,

13 F.3d 791, 799 (4th Cir. 1994)).  Plaintiffs have failed to adduce adequate evidence to satisfy

these three elements and survive summary judgment.

The first and second elements of supervisory liability, knowledge and deliberate

indifference, are closely related and completely absent in this case.  Col. Wilson had no knowledge

43

of the arrests until after they occurred and, therefore, could not be deliberately indifferent to a situation for which he was unaware.  Ex. E: Wilson, 65:21 – 66:7.  Prior to the arrests, he had communicated with Sgt. Donaldson about a concern for safety in the area, which later caused Sgt. Pope to issue a narrowly tailored time, place, and manner restriction.  Col. Wilson could not have known that the Hulbert brothers would repeatedly ignore a lawful order that would result in their arrests.

The overwhelming evidence shows that the decision to add more charges was made on the evening of February 5, 2018.  As argued more fully above, Col. Wilson included the additional charge that they had used on the advice of the SAO in an email that same day.  The charging decision had been made long before the Hulbert brothers returned to Lawyers' Mall on February 6, 2018.  Col. Wilson—and Sgt. Pope, for that matter—could not have had knowledge of future speech by the Hulbert brothers, nor could they have been deliberately indifferent to it.

Further, plaintiffs cannot save their § 1983 claims from summary judgment by merely showing that Col. Wilson "should have been aware" of the risk of harm or "should have" taken additional action. *Williams v. Branker*, 462 F. App'x 348, 354-55 (4th Cir. 2012); *Brown v. Harris*, 240 F.3d 383, 390 (4th Cir. 2001).  This is because deliberate indifference is a "very high" bar, a subjective standard, "a showing of mere negligence will not meet" the requirements for deliberate indifference.  *Parrish ex rel Lee v. Cleveland*, 372 F.3d 294, 301 (4th Cir. 2004).

There is no admissible evidence that Col. Wilson knew that the Hulbert brothers would be arrested before it happened.  There is no admissible evidence that there was any widespread or retaliatory arrests of demonstrators, let alone any admissible evidence that Col. Wilson would have known about something like this.  There is no admissible evidence that Col. Wilson was deliberately indifferent to the plaintiffs.  The undisputed, material evidence shows that Col. Wilson

44

acted reasonably in response to what he actually knew about the arrests.  In short, no claim against Col. Wilson can survive as a matter of law.

## IV.  SGT. POPE AND COL. WILSON ARE IMMUNE FROM SUIT ON THE STATE-LAW CLAIMS.

Sgt. Pope and Col. Wilson are also entitled to judgment as a matter of law on plaintiffs' state-law claims in Counts Six, Seven, Eight, Nine, and Ten[22] of the complaint, because they are immune from suit under the Maryland Tort Claims Act ("MTCA"), Md. Code Ann., State Gov't §§ 12-104 – 12-106 (LexisNexis 2014 & Supp. 2019).  There is no evidence in the record to show that Sgt. Pope or Col. Wilson acted with malice or gross negligence.  This means they are immune from plaintiffs' state-law claims as a matter of law.  Md. Code Ann., Cts. & Jud. Proc. § 5-522(b) (LexisNexis Supp. 2019) (providing that State personnel are "immune from . . . liability in tort for a tortious act or omission that is within the scope of the public duties of the State personnel and is made without malice or gross negligence.").  This immunity applies to alleged tortious acts and omissions involving State constitutional violations (Counts Six, Seven, and Eight) and non-malicious intentional misconduct (Counts Nine and Ten).  *Lee v. Cline*, 384 Md. 245, 266 (2004).

The MTCA's immunity for State personnel applies equally to state claims brought in federal court.  *E.W. v. Dolgos*, 884 F.3d 172, 187 (4th Cir. 2018) (applying MTCA personnel immunity to state claims advanced in federal court against an employee); *Oliver v. Department of Pub. Safety & Corr. Servs.*, 350 F. Supp. 3d 340, 353 (D. Md. 2018).  To overcome this immunity, a plaintiff must allege and prove conduct that is grossly negligent, malicious, or outside the scope of employment.  *Lee*, 384 Md. at 256.

---

[22] Counts Nine and Ten were previously dismissed as to Col. Wilson only.  ECF 17, 18.

To avoid the limits of the MTCA under a theory of malice, plaintiffs must demonstrate that defendants acted with "'evil or wrongful motive, intent to injure, knowing and deliberate wrongdoing, ill-will or fraud.'" *Barbre v. Pope*, 402 Md. 157, 182 (2007) (quoting *Lee*, 384 Md. at 268). To avoid the limits of the MTCA under a theory of gross negligence, plaintiffs must demonstrate that defendants "inflict[ed] injury intentionally or [was] so utterly indifferent to the rights of [plaintiffs] that [they] act[ed] as if such rights did not exist." *Id.*

The undisputed material facts show that there is no evidence supporting such a determination under either theory. Instead, the facts show that Sgt. Pope gave repeated orders to move roughly fifteen feet for safety reasons and he gave the Hulbert brothers advance notice that failure to comply would result in their arrests. The additional charges—one of which has never been the subject of an appellate decision and the other has not been the subject of an appellate decision since the 1970s—were related to the conduct on February 5, 2018. They decided on the charges on the evening of February 5, 2018, and they were only written and served after consultation with the SAO. Ex. B: Pope, 154:12 – 158:17, 176:1-12; Ex. C: Donaldson, 102:4-20, 103:11 – 104:16, 111:5-18, 117:12 – 118:1; Ex. E: Wilson, 86:8 – 88:5, 90:2-17, 91:4-15, 132:7 – 133:9; Ex. O: Labs, 62:15 – 63:6, 69:3-20, 70:7-13, 77:11 – 80:22; Ex. Q; Ex. S. The actions of Sgt. Pope and Col. Wilson fall far short of malicious or grossly negligent as a matter of law, and no reasonable juror could find otherwise. This is particularly true where, as here, Sgt. Pope had probable cause to arrest the Hulbert brothers for failure to obey his repeated lawful orders. As a result, they are entitled to immunity under the MTCA.

## V. COUNTS SIX, SEVEN, AND EIGHT ARE READ IN PARI MATERIA WITH COUNTS ONE, TWO, THREE, FOUR, AND FIVE.

Counts Six, Seven, and Eight are read in pari materia with their federal counterparts. Specifically, Count Six for alleged violation of Article 40 is read in pari materia with the First

Amendment.  *Kensington Volunteer Fire Dep't, Inc. v. Montgomery County*, 684 F.3d 462, 468 n.3 (4th Cir. 2012).  Counts Seven and Eight for alleged violation of Articles 24 and 26 "are construed in pari materia with the Fourth and Fourteenth Amendments of the U.S. Constitution." *Littleton v. Swonger*, 502 Fed. App'x. 271, 274 (4th Cir. 2012).

The challenge in Count Six mirrors plaintiffs' First Amendment challenges.  The challenges in Counts Seven and Eight mirror plaintiffs' Fourth Amendment challenges.  Due process rights available in the Fourth Amendment are also available in the Fourteenth Amendment because "[t]he Fourth Amendment was tailored explicitly for the criminal justice system, and its balance between individual and public interest always has been thought to define the 'process that is due' for seizures of person or property in criminal cases, including the detention of suspects pending trial." *Gerstein v. Pugh*, 420 U.S. 103, 125 n.27 (1964).

As argued more fully above, Sgt. Pope—with the information available to him—ordered a group to move roughly fifteen feet away for safety reasons.  It was a reasonable time, place, and manner restriction of speech and, therefore, not a violation of the First Amendment or Article 40.  There is no evidence that Kevin Hulbert was arrested for filming, nor is that a clearly established right.  It, therefore, was not a violation of the First Amendment or Article 40.  The Hulbert brothers repeatedly ignored Sgt. Pope's orders, giving him probable cause to arrest them for ignoring his lawful orders.  "[A]n officer has legal justification to arrest an individual if he witnesses that individual commit a crime in his presence." *Ross (D. Md.)*, 899 F. Supp. 2d. at 431.  It was, therefore, not a violation of the Fourth Amendment, Article 24, or Article 26.  Moreover, they were arrested for ignoring his orders and there is no evidence that they were arrested because of their speech.  As a result, it was not a violation of the First Amendment or Article 40.  The Hulbert brothers were searched incident to arrest by persons other than the Defendants in this case and,

thus, not a violation of the Fourth Amendment, Article 24, or Article 26.  At the direction of Sgt. Donaldson, his superior officer, Sgt. Pope issued criminal citations to them and released them.

Additional charges premised on the February 5, 2018 conduct were decided on that evening based on longstanding advice from the SAO.  The charges and process for adding criminal citations was discussed and confirmed the next day with an assistant state's attorney.  When the Hulbert brothers were in the area, the charges that had been previously decided upon and reviewed with the SAO were served.  There was no violation of the First Amendment or Article 40 because the decision had been made the day before and confirmed on February 6, 2018 with a prosecutor before the Hulbert brothers engaged in more speech.  There was no violation of the Fourth Amendment, Article 24, or Article 26 because the additional citations were decided on the day before based upon longstanding advice from the SAO, reviewed and confirmed with a prosecutor prior to serving them, and not based on any other conduct.  Regardless, the charges were dropped a few days later.

These facts are sufficient as a matter of law to show that no constitutional violations occurred and entitle defendants to qualified immunity, but as argued above, these undisputed facts also show why defendants are entitled to State personnel immunity under the MTCA.  None of their conduct is remotely close to meeting the definition of malice or gross negligence.  This Court noted in its opinion on the motion to dismiss that "Plaintiffs plead that Defendants' conduct amounted to an intentional effort to injure them by subjecting them to criminal charges on the basis of disagreement with their political views.  The facts pled, if proven, could amount to malice or gross negligence."  ECF 17.  As exhaustively discussed above, there is simply no evidence that this was based on their political message, but rather their refusal to obey a lawful order.

48

**VI.   THE FALSE ARREST AND FALSE IMPRISONMENT CLAIMS FAIL BECAUSE SGT. POPE HAD PROBABLE CAUSE TO ARREST THE HULBERT BROTHERS.**

"The elements of false arrest and false imprisonment are identical." *Heron v. Strader*, 361 Md. 258, 264 (2000).  The plaintiffs must show "(1) the deprivation of the liberty of another; (2) without consent; and (3) without legal justification." *Pegues v. Wal-Mart Stores, Inc.*, 63 F. Supp. 3d 539, 542 (D. Md. 2014) (internal citation omitted).  Whether a police officer can be liable for false arrest depends upon whether the "officer acted within his legal authority to arrest." *Heron v. Strader*, 361 Md. 258, 264-65 (2000) (internal citation and quotation omitted).

Like in *Ross (D. Md.)*, 899 F. Supp. 2d at 430-31, a factually similar case to this one, this Court held that "[a] reasonable fact-finder could not find or infer that Ross obeyed Officer Early's order.  The evidence clearly establishes that on both occasions Ross did not heed Officer Early's repeated requests to move his leafleting activity." *Id.*  As a result of Mr. Ross's repeated failures to obey the officer's orders, "Officer Early warned of impending arrest and gave Ross one last opportunity to follow the order before he was ultimately arrested for failure to obey Early's order." *Id.*  "[A]n officer has legal justification to arrest an individual if he witnesses that individual commit a crime in his presence.  Thus, Ross's false arrest claim fails." *Id.* at 431.

In a nearly identical fact pattern, the Hulbert brothers ignored repeated orders to move a short distance and a reasonable fact-finder could not conclude that the Hulbert brothers obeyed Sgt. Pope's orders.  Sgt. Pope gave them several warnings that they would be arrested if they continued ignoring his order. Ex. B: Pope, 99:1-9; Ex. K: Jeff, 76:15-16, 78:6-8; Ex. M: Kevin, 31:1-19; *1st Amendment Video*, at 0:20-0:52.  The Hulbert brothers continued ignoring the orders and were arrested.  Sgt. Pope witnessed them commit a crime in his presence and, as discussed more fully above, it gave him probable cause to arrest them.  The temporary detention that followed

was done incident to a lawful arrest.  It lasted for an hour and five minutes, which included the time to transport them, bring them inside, draft charges, and have them sign the charges.

Sgt. Pope had probable cause to arrest them and, as a result, their claims for false arrest and false imprisonment fail.  Moreover, there are no facts to show that Sgt. Pope acted with malice or gross negligence.  He acted reasonably under the circumstances and gave the Hulbert brothers several opportunities to comply with his orders before arresting them.  Like in *Ross (D. Md.)*, he also gave them fair warning of the consequences before he arrested them.  As a result, he is entitled to State personnel immunity.

## VII.    JUDGMENT SHOULD BE ENTERED AGAINST MARYLAND SHALL ISSUE BECAUSE IT HAS NOTHING TO DO WITH THIS CASE.

Maryland Shall Issue, Inc. ("MSI") has nothing to do with this case and judgment should be entered against it on all counts.  In the Complaint, MSI claims to bring this action on behalf of itself and its members.  ECF 1 at 6, ¶ 13.  MSI, however, does not have standing on its own, nor does it have associational standing on behalf of its members.

MSI is a registered nonprofit that "advocates for firearm rights in Maryland."  Ex. K: Jeff, 118:11-14; *see also* Exhibit X: Deposition of Corporate Designee, Mark W. Pennak, 18:18 – 19:20. The only overlap between MSI and Patriot Picket is the groups have some of the same members. Ex. K: Jeff, 119:4-8.  Patriot Picket is totally separate from MSI and there is no relationship between the two organizations.  Ex. X: Pennak, 93:9-20, 95:16-21; Ex. K: Jeff, 123:13-18; Ex. M: Kevin 86:2-5.  MSI did not participate in the demonstration on February 5, 2018.  Ex. K: Jeff, 123:19-21.  MSI does not contribute any money to support Patriot Picket demonstrations.  Ex. M: Kevin, 85:20 – 86:1.

Mark Pennak, MSI's corporate designee, was deposed in this case.  Ex. X: Pennak, 6:16-21.  Mr. Pennak "helped draft the complaint in [this case] and contacted counsel and retained

counsel on behalf of MSI in [this case]." Ex. X: Pennak, 9:12-17, 10:6-15.  Mr. Pennak was not present on February 5 or 6, 2018 for any of the events, but rather he saw videos online.  Ex. X: Pennak, 10:19 – 11:21.

When asked about damages sustained by MSI, Mr. Pennak said it would require an expert witness, but that it would include "monetary damages associated with the litigation, itself; clearly, of course, my time, and the fair market value of my time as an attorney;[23] the time associated with counsel's time, of course, and his compensation; and the incalculable cost in terms of money that shows, in effect, the illegal actions that your clients inflicted upon my members.  And how that is calculated is very difficult."  Ex. X: Pennak, 58:18 – 59:13.

Mr. Pennak believes that membership in MSI alone is sufficient for its members to be subject to retaliation, so MSI keeps its membership database secret.  Ex. X: Pennak, 33:8 – 34:4, 35:4-16.  But, Mr. Pennak also believes that the arrests of the Hulbert brothers has had a chilling effect on its members who "are more afraid of being arrested or otherwise being retaliated against to the extent that they express support for the Second Amendment in this State."  Ex. X: Pennak, 66:8-19.  Mr. Pennak does not explain how MSI's members are both required to remain secret in order to be free from inherent retaliation, but also chilled from being vocal about their beliefs.  Mr. Pennak regularly claims that these arrests have required MSI to divert its resources, *see* Ex. X: Pennak 66:12-15, 66:21 – 67:1, but also admits that MSI has not paid any amount as of Mr. Pennak's deposition.  Ex. X: Pennak, 64:4 – 65:4.  Mr. Pennak claims that MSI lost membership, *see* Ex. X: Pennak 66:20, but he also thinks it is impossible to quantify how many members it has

---

[23] Mr. Pennak was admitted to the Maryland bar on May 19, 2019.  Ex. X: Pennak, 14, 19-21.  According to the bar member search for this Court, Mr. Pennak was admitted on August 9, 2019.  This lawsuit was filed in February 2018.  As of his deposition on October 22, 2019, Mr. Pennak claimed that the only legal expenses incurred by MSI for this lawsuit was for Mr. Pennak's time.  Ex. X: Pennak, 60:9-17.  Despite not being admitted to practice law in this Court at the time, even if his time was a "damage" for MSI, he does not keep track on his time for this case.  Ex. X: Pennak, 62:3-6.

allegedly lost and it has no record of members that it has lost as a result of the arrest of the Hulbert brothers, *see* Ex. X: Pennak, 68:7 – 69:8.

For MSI to have individual standing, it must demonstrate that it "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (internal citation omitted). For MSI to have suffered an injury in fact, it must have "suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual and imminent, not conjectural or hypothetical.'" *Id.* at 1548 (internal citation and quotation omitted). The injury must be "particularized" in that it "'must affect the plaintiff in a personal an individual way.'" *Id.* The injury must also be "concrete," which means that it must actually exist. *Id.*

Here, MSI fails to show any injury by its own admission. It was not present at the demonstration on February 5, 2018. No one was there on behalf of MSI. MSI cannot articulate any particularized injury it sustained as a result of Jeff and Kevin Hulbert's arrests, nor can it articulate any other concrete injury it has sustained. No one representing MSI was present on February 5, 2018 when a concern for safety caused Sgt. Pope for order members of Patriot Picket to move roughly fifteen feet into Lawyers' Mall. MSI is unable to calculate its alleged financial harm or quantify any change in membership. Even if MSI could identify a way in which it was harmed, it certainly could not trace it to an arrest at a demonstration that it did not participate in.

The third prong requires that the injury "must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal citations omitted). As argued above, MSI simply has not been injured, but even if it had, it has only been able to articulate speculative injuries, at best. It certainly could not have its alleged injuries redressed by a favorable decision. This Court

cannot order an unknown quantity of lost members to rejoin.  This Court cannot compensate it for the arbitrary "cost in terms of money" that Mr. Pennak posits without further explanation.  Nor can this Court compensate MSI for Mr. Pennak's time—both because he was not admitted to practice law in the relevant Court and he does not keep track of his time.  MSI does not have individual standing and judgment should be entered against MSI on all counts.

For MSI to have associational standing, it must show: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested required the participation of individual members in the lawsuit." *Lane v. Holder*, 7083 F.3d 668, 674 n.6 (4th Cir. 2012) (internal citation omitted).

None of MSI's members would have standing to sue in their own right because no one representing MSI was present on February 5, 2018 when a concern for safety caused Sgt. Pope to order members of Patriot Picket to move roughly fifteen feet into Lawyers' Mall.  No one representing MSI disobeyed Sgt. Pope's order and no one representing MSI was arrested.  While it is coincidental that Jeff and Kevin Hulbert are both members of MSI, they both clearly articulated that Patriot Picket is totally separate from MSI and there is no relationship between the two organizations.  Ex. X: Pennak, 93:9-20, 95:16-21; Ex. K: Jeff, 123:13-18; Ex. M: Kevin 86:2-5.  MSI did not participate in the demonstration on February 5, 2018.  Ex. K: Jeff, 123:19-21.

Patriot Picket is a loose confederation that started in 2016.  Ex. K: Jeff, 33:3-13, 53:11-13.  There is no membership list.  Ex. K: Jeff, 34:8-21; Ex. M: Kevin, 9:4-7.  Its purpose is to demonstrate.  Ex. K: Jeff, 33:21-7.  Jeff Hulbert is the leader of Patriot Picket and Kevin Hulbert is a co-leader.  Ex. K: Jeff, 43:1 – 44:5; Ex. M: Kevin 15:13-15.  On the day of the arrests, Patriot Picket conducted a demonstration in Annapolis.  Ex. K: Jeff, 35:19 – 36:3.  Jeff Hulbert led the

demonstration, and told the group where to go and where to picket.  Ex. K: Jeff, 52:3-13; Ex. M: Kevin 17:10-18.  Patriot Picket and MSI are completely separate, and no member of MSI would have standing in their own right.

The interests that MSI seeks to protect are inconsistent with this case.  It is true that Patriot Picket and MSI share a passion for the Second Amendment, but the Second Amendment has nothing to do with this case.  The message by the Patriot Picket demonstrators had nothing to do with the arrests on February 5, 2018 or the additional citations on February 6, 2018.  It was Jeff and Kevin Hulbert's repeated failures to obey Sgt. Pope's lawful order that led to their arrests.  The remaining members of Patriot Picket remained and continued their demonstration.  MSI does not have associational standing and judgment should be entered against MSI on all counts.

## VIII.   IF ANY CAUSE OF ACTION SURVIVES, THEN THIS COURT SHOULD GRANT JUDGMENT IN FAVOR OF DEFENDANTS ON ANY CLAIM FOR PUNITIVE DAMAGES.

If this Court permits any causes of action to proceed, then it should grant judgment in favor of Defendants on any claim for punitive damages.  Punitive damages are only permitted in § 1983 claims "for conduct that involves 'reckless or callous indifference to the federally protected rights of others,' as well as for conduct motivated by evil intent."  *Cooper v. Dyke*, 814 F.2d 941, 948 (4th Cir. 1987).

For the same reasons that defendants are entitled to qualified immunity and State personnel immunity, the undisputed material facts show that Sgt. Pope reasonably tried to enforce a time, place, and manner restriction of speech.  Two members of the group ignored repeated orders to move and warnings that they would be arrested if they continue ignoring the orders.  They were arrested, issued criminal citations, and released.    The rest of the group continued the demonstration.  The charges were dropped a few days later.  No reasonable jury could conclude that the conduct of Sgt. Pope and Col. Wilson was reckless, based in callous indifference, or

54

motivated by evil intent.  As such, judgment should be entered in favor of defendants for any potentially-surviving cause of action that seeks punitive damages.

## CONCLUSION

For the foregoing reasons, the Court should enter summary judgment in favor of defendants Sergeant Brian T. Pope and Colonel Michael Wilson.

Respectfully submitted,

BRIAN E. FROSH
Attorney General of Maryland

/s/ James N. Lewis

---

James N. Lewis
Fed. Bar No. 30220

/s/ John C. Fredrickson

---

John C. Fredrickson
Fed. Bar No. 02566
Assistant Attorneys General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
jlewis@oag.state.md.us
john.fredrickson@maryland.gov
(410) 576-7005 (telephone) – Lewis
(410) 576-6955 (facsimile) – Lewis
(410) 767-1825 (telephone) – Fredrickson
(410) 333-7654 (facsimile) – Fredrickson

December 16, 2020                                    *Attorneys for Defendants*