**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND**

Jeff Hulbert, *et al*.

    *Plaintiffs*,

  v.           Civil No.: 1:18-CV-00461-SAG

Sgt. Brian Pope, *et al*.

    *Defendants*.

## PLAINTIFFS' MOTION TO COMPEL
### (Hearing Requested)

   Plaintiffs, by and through undersigned counsel, pursuant to Fed. R. Civ. P. 37 and Local Rule 104, respectfully move this Honorable Court to compel unredacted responses to requests for production of documents.

   Pursuant to this Court's request that counsel compile all outstanding discovery issues into a single motion to compel, this Motion to Compel raises issues previously briefed by the parties in separate motions, compiled herein for the convenience of the Court.

## TABLE OF CONTENTS

I.  Factual Background ..................................................................................................3

II.  Procedural Background..........................................................................................11

III.  The Emails in Dispute..........................................................................................19

  A  The Question about Charges Emails and the Arrest Email....................................19

  B  The State's Justification for Redaction the Question about Charges Emails and the Arrest Email .........................................................................................................21

IV.  The Question about Charges Emails and Arrest Email are Improperly Redacted............22

  A.  The Executive Privilege Does Not Apply to the Emails........................................22

    i.  The Emails are not Predecisional................................................................24

      ii.     The Emails are not Deliberative ................................................................27

      iii.    Even If the Emails are Predecisional and Deliberative, Exceptions to the Privilege Apply ........................................................................................29

      iv.    Any Privilege Covering the Arrest Email Has Been Waived ...................31

V.    Conclusion ....................................................................................................33

Certificate of Service .................................................................................................34

Rule 104.7 and Rule 104.8 Certification of Counsel ....................................................34

## **TABLE OF EXHIBITS**

Exhibit A: Deposition of Cpl. Ryan Bitter ................................................... 4-7, 14,

Exhibit B: Deposition of Trooper Joseph Walder ...............................................7-8

Exhibit C: Deposition of Sergeant Roby ...........................................................7-8

Exhibit D: October 17th Emails ........................................................................11

Exhibit E: October 4th through October 16th Emails ..........................................12

Exhibit F: October 25th through October 28th Emails .........................................12

Exhibit G: October 25th Email ..........................................................................12

Exhibit H: October 28th Email ..........................................................................12

Exhibit I: October 28th Email ...........................................................................12

Exhibit J: November 4th Emails ........................................................................13

Exhibit K: November 4th through November 5th Emails ......................................13

Exhibit L: November 6th Email ..........................................................................13

Exhibit M: November 6th Emails .......................................................................13

Exhibit N: November 8th through November 13th Emails .............................. 13-14

Exhibit O: November 14th through November 15th Emails ..................................14

Exhibit P: December 4th through December 9th Emails ............................................................14

Exhibit Q: December 17th through December 23rd Emails ......................................................14

Exhibit R: December 17th through December 23rd Emails ......................................................15

Exhibit S: December 24th through January 2nd Emails ..........................................................15

Exhibit T: May Production Emails ........................................................................................16

Exhibit U: May 22 Production, STATE_000682-683 ....................................................16, 19, 28

Exhibit V: May 29 Email ....................................................................................................16

Exhibit W: May 29 Emails .......................................................................................... 16-17, 35

Exhibit X: Second Privilege Log ..........................................................................................17

Exhibit Y: June 3 Email ......................................................................................................17

Exhibit Z: July Emails .................................................................................................18, 36

Exhibit AA: August Emails ............................................................................................18, 36

Exhibit BB: September Emails .......................................................................................18, 36

Exhibit CC: December 23 Production, NC 057-059 ................................................................19

Exhibit DD: STATE_004190-004191 .............................................................................20, 27, 32

Exhibit EE: STATE_004217-004218 ..............................................................................20, 27, 33

Exhibit FF: STATE_004238-004239 ..............................................................................20, 27, 32

Exhibit GG: First Amended Privilege Log ......................................................................21, 25, 28

Exhibit HH: Second Amended Privilege Log....................................................................22, 26, 29

## I.      **FACTUAL BACKGROUND**

1.      This case arises out of the unlawful arrest of Plaintiffs Jeff and Kevin Hulbert, who were erroneously charged with misdemeanor criminal citations for lawfully exercising their First Amendment rights.

2.      On February 5, 2018, Plaintiffs were peacefully picketing in Maryland's capital as members of Patriot Picket, an informal group founded by Plaintiffs to oppose infringement of Second Amendment rights. The Plaintiffs were picketing on a public sidewalk, neither impeding nor interfering with the movement of pedestrians. Plaintiff Jeff Hulbert, along with a few other members of Patriot Picket, was holding a sign addressing Second Amendment rights. Plaintiff Kevin Hulbert was recording the demonstration on his cell phone.

3.      While the Plaintiffs and Patriot Picket had picketed in the same location without issue on several prior occasions, the demonstration on February 5, 2018, was different. Patriot Picket had attracted the attention of the Governor's Mansion. As the demonstration was underway, the Maryland Capitol Police received a call from the State Police executive protection detail in the Governor's Mansion.

4.      The caller was Corporal Ryan Bitter, who was manning the "console," a desk at the Governor's Mansion which monitors the building's security camera feeds, radio, and telephone communications. Exhibit A (Deposition of Cpl. Ryan Bitter) at 24; 50. As the officer in charge of the console, Corporal Bitter was responsible for relaying any communication from the Lt. Governor's detail to the Maryland Capitol Police. *See id*. at 91-92. In the five years prior, Corporal Bitter had never called the Maryland Capitol Police about protestors or picketers; the typical issues he would call about were improperly parked vehicles blocking the vehicle lot or the Lt. Governor's parking space. *Id*. at 36.

5.      Corporal Bitter saw Patriot Picket from the window. *Id*. at 49-50. He did not see anyone besides Patriot Picket, and did not see any vehicles nearby. *Id*. at 51. He was unable to read any of the signs held by Patriot Picket and had no idea what Patriot Picket was protesting. *Id*. at

108. He had seen them the previous week, but did not see them do anything unlawful, did not call the Maryland Capitol Police, and had no interactions with them at all. *Id*. at 58-59.

6.      After he noticed Patriot Picket, Corporal Bitter received a call on the radio from the detail leader assigned to the Lt. Governor. *Id*. at 64. Corporal Bitter was unable to recall who was the detail leader on the night of February 5, 2018, but believed that either Sergeant Angelo Shusko or Trooper First Class Joseph Walder was the detail leader that night. *Id*. at 65-66. The detail leader relayed to Corporal Bitter that the Lt. Governor did not want to hear Patriot Picket's message or interact with them in any way—and Corporal Bitter faithfully relayed the message to the Maryland Capitol Police:

Q: In communicating this message to the Maryland Capitol Police, I heard you say that the concern was that they would give him a bunch of stuff for whatever reason. Did you hear that language?

A: Yes.

Q: My understanding of what you're telling me is that you were communicating a message that ultimately came from somebody else. Sitting here today, do you know what you meant by or what they meant in asking you to communicate it, however the particular words were chosen, what was meant by, "give him a bunch of stuff for whatever reason"?

…

A: As far as approaching the lieutenant governor, whatever their message was they wanted to relay to him, being arrogant to him, using derogatory language towards him.

Q: So it had to do in the first instance with avoiding the communicating of the message, and in the second instance, avoiding any unpleasant wording in the message; is that fair?

A: Correct.

Q: The goal in sending an officer out was to avoid those things; is that right?

A: Correct.

Q: That's how it was communicated to you by the people who were with the lieutenant governor; is that right?

…

A: Correct.

Q: As you've described it, you don't know what their message was because you couldn't see the signs; is that right?

A: Correct.

Q: Do you know how the people with the lieutenant governor determined that it might be a message he didn't want to hear or that they might be rude to him or however you would describe it?

A: No.

Q: But since you couldn't see the signs, obviously that was a determination that they made; is that right?

A: Yes.

Q: And then they communicated it to you, and then you communicated it to the Maryland Capitol Police; is that correct?

A: Correct.

…

Q: In communicating that, the intent was obviously that they would send a trooper out and do whatever could be done to try to avoid the interaction?

A: Correct.

…

Q: That's the message you got from the people with the lieutenant governor, and you relayed it to the people at the Maryland Capitol Police?

…

A: Correct.

*Id*. at 111-116.

7.      Corporal Bitter did not observe Patriot Picket break any laws at any point. *Id*. at 78.

8.      According to Corporal Bitter, the call originated from a member of the Lt. Governor's executive protection team. *Id*. at 64. The active detail team consists of "an advance person" and a "protection officer." The protection officer as the person personally with the lieutenant governor, while the advance person physically walks ahead of the lieutenant governor to check out locations where the lieutenant governor is expected to be. Exhibit B (Deposition of Trooper Joseph Walder) at 15-16; 19-20; *see also* Exhibit C (Deposition of Sergeant Roby) at 16.

9.      On February 5, 2018, Trooper Joseph Walder was assigned as Lt. Governor Rutherford's protection officer. Exhibit B (Deposition of Trooper Joseph Walder) at 39. As his typical partner, Sergeant Shusko, was not working that day, another officer, Sergeant Roby, filled in as Lt. Governor Rutherford's advance person. *Id*. at 42.

10.     Trooper Walder could not confirm who placed the call to Corporal Bitter, or who gave the order for the call to be placed. As a protection officer, he would not have known what messages the Lt. Governor would find unpleasant or offensive, and could not make the decision himself to remove the picketers; the only person who could make that call would be the Lt. Governor:

Q: … Would you ever, without consulting the lieutenant governor, call the mansion to tell them that particular picketers have a message he might find—

A: That's where you lose me right there.

Q: Go ahead.

A: How do I know it's an unpleasant message. I never made a call. I never made that kind of a call. It goes case by case. Would I? I could not tell you.

Q: And the only way you would know if he found it unpleasant or he didn't want to hear it would be if he told you?

…

7

A: As far as unpleasant message, I mean, I've never had that.

Q: So you wouldn't know whether it was a message he didn't want to hear unless he told you; is that right?

…

A: A question that he would not want to hear. Yes, I mean, you would have to talk to him.

Q: Who is him?

A: You would have to talk to the person you want to know the information, the lieutenant governor. I don't know how else to answer that.

*Id*. at 87-89.

11.     Sergeant Roby was Lt. Governor Rutherford's advance person on the evening of February 5, 2018. Exhibit C (Deposition of Sergeant Roby) at 28-30. As the advance person, it was his responsibility to communicate directly with the desk at the Governor's Mansion. *Id*. at 20-21. If the advance person encountered picketers, the advance person would generally read the signs the picketers are carrying and sometimes share the message with their protectee. *Id*. at 22; 25.

12.     Regardless of his responsibility to communicate directly with the desk manned by Corporal Bitter, Sergeant Roby contends that he was never "part of communicating to anyone at the console that the lieutenant governor wanted to avoid a message that some picketers had on some signs or avoid any unpleasant wording in the message." *Id*. at 42-45; 48.

13.     The civil communications officer who took the call, Lakeshia Wesby, knew that this type of call from or on behalf of elected officials must be treated urgently "because of the importance of the people who [are] calling."  *See* ECF 40-2 (Deposition of Lakeshia Wesby) at 51.  She also knew the likely outcome of the call—she receives similar calls on a regular basis, approximately twice a month, and always forwards the calls to a sergeant for the express purpose

of helping the official to avoid interaction with demonstrators. *Id*. at 45-48. The usual response was "to have the officer in the field move people," a direction that she had received before. *Id*. at 52-54. Even though she knew what would likely happen, Lakeshia Wesby directed the call to Defendant Sgt. Brian T. Pope.

14.    Defendant Sgt. Brian T. Pope responded to the call by approaching Patriot Picket and asking them to relocate to Lawyer's Mall. He knew that asking them to move was inappropriate and unconstitutional, as asking individuals to move solely to "prevent[] people from interacting with the lieutenant governor" is "against their constitutional rights." *See* ECF 37-1 at 126-127. Pope even knew that "people have a right to be there even when the lieutenant governor might walk by." *Id*. at 128.

15.    Lawyer's Mall is an area of the capitol that is restricted to demonstrators holding the necessary permits to assemble in the area. Patriot Picket did not have the required permits to demonstrate in Lawyer's Mall. Still, some of the members did relocate after Defendant Pope's instruction. Plaintiffs, however, remained on the public sidewalk.

16.    Defendant Pope then returned and placed Plaintiff Jeff Hulbert in handcuffs. Plaintiff Kevin Hulbert recorded the arrest from a reasonable distance before also being placed under arrest. The Plaintiffs were then taken to the Annapolis City Police Precinct and locked to a bench inside. Eventually, Plaintiffs were released and issued a single citation for "acting in a manner disruptive of and disturbing to the conduct of normal business" and for "prevent[ing] or disturb[ing] the general public from obtaining services provided on the property or obstruct[ing] walks." ECF 1 at ¶38.

17.    Defendant Pope admitted under oath that he did not observe Plaintiffs engage in any of the cited behavior:

Q.  Did you ever observe either of the Hulberts disturbing any normal business that was going on there before the police arrived, before the group of eight officers was there?

A.  What do you mean, disturb normal business?

Q.  Disturbing the conduct of any normal business.

A.  No.

Q.  Did you see the Hulberts disturbing the peace in any way before the eight officers were on the scene?

A.  No.

Q.  Now after the eight officers arrived, did you see the Hulberts disrupting normal business or disturbing the peace?

A.  No.

*See* ECF 37-1 at 142-143.

18.     Rather than any valid law enforcement purpose, the motivation behind Defendant Pope's attempt to relocate Plaintiffs and the subsequent arrests was the call from the Governor's Mansion. Defendant Chief Michael Wilson admitted that the call "put the process in motion," resulting in the Hulberts' arrest. *See* ECF 40-3 at 25.

19.     On February 6, 2018, Plaintiffs met with members of the media for interviews on the sidewalk where they had been arrested. During the interviews, Defendant Wilson approached Plaintiffs and told Plaintiffs that the social media and news coverage of the incident portrayed Defendants in a negative light before citing each Plaintiff with two additional charges. The additional charges were separate and distinct misdemeanor charges from the citations issued to Plaintiffs the night before.

20.     As stated more fully in the Complaint, Plaintiffs state that Defendants unconstitutionally abridged their First Amendment right to freedom of speech with regard to their

right to peacefully demonstrate (Count One), lawfully film a peaceful demonstration (Count Two), and engage in protected speech (Count Three). *See* ECF 1.

21.     Plaintiffs also state that Defendants unconstitutionally violated Plaintiffs' Fourth Amendment rights by unreasonably searching, seizing, and arresting Plaintiffs without probable cause (Count Four) and utilizing unreasonable and unnecessary force (Count Five). *Id.*

22.     Plaintiffs further state that Defendants' conduct violated Plaintiffs' rights under the Maryland Declaration of Rights, including Plaintiffs' right to free speech (Count Six), freedom from unlawful deprivation of property and liberty without due process (Count Seven), and right to be free from excessive force (Count Eight). *Id.*

23.     Finally, Plaintiffs state that Defendants' conduct constituted false arrests (Count Nine) and false imprisonment (Count Ten). *Id.*

## II.     PROCEDURAL BACKGROUND

24.     On September 5, 2019, Plaintiffs served a Notice to Take Deposition Duces Tecum on the State (the "**State Subpoena**") requiring the production of responsive documents to eight separate requests by October 7, 2019, at 9:00 a.m. *See* ECF 40-4.

25.     On October 17, 2019, in response to discussions with Plaintiffs' counsel regarding the breadth of the State Subpoena, State's counsel informed Plaintiffs' counsel that they would "conduct a reasonable search for additional responsive documents by making inquiry" to fifteen listed individuals who had received an email from Defendant Wilson. Exhibit D (October 17th Emails). Plaintiffs' counsel agreed that the search proposed by State's counsel would be "a necessary first step," provided that State's counsel added the Lt. Governor and Governor to the list of individuals, but clarified that "there may be additional steps required," dependent upon the response elicited. *Id.*

11

26.     State's counsel continually delayed providing discovery in response to the State Subpoena. Counsel initially agreed that the State would provide all responsive documents on October 25, 2019.  Exhibit E (October 4th through October 16th Emails). On October 25, 2019, Plaintiffs' counsel attempted multiple times to reach State's counsel by phone. Exhibit F (October 25th through October 28th Emails) at 1. State's counsel eventually responded to Plaintiffs' counsel by email that afternoon, indicating that the State had "received documents from at least two people from our list" that would be provided to Plaintiffs "as soon as [State's counsel] return[s] to the office." Exhibit G (October 25th Email). In response, Plaintiffs' counsel informed State's counsel that Plaintiffs would file a motion to compel and motion for extension of discovery, taking into account the State's lack of a timely response to the State Subpoena. Exhibit F (October 25th through October 28th Emails) at 1.

27.     The following Monday morning, State's counsel responded that the State was still "reviewing the documents [] received on Friday." *Id*. At 4:12 p.m. and 4:13 p.m. that afternoon, State's counsel provided the additional documents. Exhibit H (October 28th Email); Exhibit I (October 28th Email). While the total production was 231 pages, the majority of the documents were either copies of court filings in this case, blank pages, or duplicative documents. The remaining documents consisted primarily of emails and publicly available documents such as Google Alerts listing news articles published in February 2018 and Facebook ratings for the Maryland Capitol Police Facebook page, which barely scratched the surface of Plaintiffs' request for documents. Further, State's counsel "redacted [documents] to exclude some private identifier information and privileged communications" without providing a privilege log as required by Fed. R. Civ. P. 26. Exhibit F (October 25th through October 28th Emails) at 1.

12

28.     On October 28, 2019, Plaintiffs filed their first Motion to Compel Discovery, seeking production of documents in connection with the State Subpoena and the disclosure of the identity of the Executive Protection officer who called the Maryland Capitol Police. *See* ECF 40.

29.     A week later, on November 4, 2019, the State sent Plaintiffs a bate-stamped copy of the same production provided on October 28, 2019. Exhibit J (November 4th Emails). Plaintiffs immediately responded to request the additional responsive documents and identity of the individual who called the Maryland Capitol Police from the Governor's Mansion. *Id*. Later that evening, Plaintiffs' counsel called State's counsel to discuss Plaintiffs' discovery requests. *See* Exhibit K (November 4th through November 5th Emails). During the call, State's counsel represented that the State has additional documents responsive to the State Subpoena. *Id*. When Plaintiffs' counsel followed up by email to request full production of the additional documents, State's counsel stated that "[m]y client will continue to produce the documents that we agreed to produce." *Id*.

30.     This Court held a teleconference November 6, 2019. *See* ECF 42. During the teleconference, this Court denied Plaintiffs' Motion to Compel without prejudice. *See* ECF 43. At the November 6, 2019 teleconference, this Court ordered the State to provide discovery regarding the caller from the Governor's Mansion on or before November 13, 2019. ECF 44. Counsel agreed, in light of this Court's direction, that the State would provide Plaintiffs "with the name of the mansion caller within one week." Exhibit L (November 6th Email). Counsel also agreed to meet on Friday, November 8, 2019, at State's counsel's office to discuss outstanding discovery issues. Exhibit M (November 6th Emails).

31.     On November 8, 2019, counsel met in-person for an hour and a half to discuss discovery. Exhibit N (November 8th through November 13th Emails). During the meeting, the

State disclosed to Plaintiffs that the caller was Corporal Ryan Bitter. *Id*. State's counsel informed Plaintiffs' counsel that additional documents were being reviewed for privilege and would be produced by November 14, 2019. *Id*. State's counsel promised to follow up internally to ascertain if any further responsive documents exist. *Id*. Plaintiffs' counsel outlined a proposed search mechanism to ensure that State's counsel sufficiently respond to Plaintiffs' Requests. *Id*. Similarly to the prior proposed search mechanism, Plaintiffs clarified that the mechanism "would be a reasonable next step" subject to the "need to seek further responsive information" depending on the documents the search elicits. *Id*.

32.     On November 14, 2019, counsel further discussed the outstanding discovery issues by phone. Exhibit O (November 14th through November 15th Emails). State's counsel proposed extended deadlines for (1) responding to Plaintiffs' Requests for Admissions, (2) discovery, and (3) dispositive motions, and proposed two possible dates for a deposition of Corporal Bitter. *Id*.

33.     Plaintiffs deposed Corporal Bitter on December 10, 2019. *See* Exhibit O (November 14th through November 15th Emails). State's counsel did not produce any additional discovery at the deposition. *See* Exhibit A (Deposition of Cpl. Ryan Bitter) at 9-10.

34.     After the deposition, Plaintiffs' counsel met with State's counsel in-person to discuss outstanding discovery disputes. *See* Exhibit P (December 4th through December 9th Emails). At the meeting, State's counsel promised to produce the emails still outstanding from the State Subpoena. *See* Exhibit Q (December 17th through December 23rd Emails).

35.     After a week without response, Plaintiffs' counsel reached out to State's counsel to check on the status of the State's production. *Id*. State's counsel responded that all referenced discovery would be provided to Plaintiffs by December 24, 2019. *Id*.

36.     On December 23, 2019, State's counsel provided additional discovery, "produced as redacted." Exhibit R (December 17th through December 23rd Emails). The production was heavily redacted (the "**December 23 Redactions**").

37.     On December 24, 2019, State's counsel provided a supplementation of Defendant Wilson's responses to the admissions, solely adding an additional basis for failing to respond. Exhibit S (December 24th through January 2nd Emails) at 2-3. In response, Plaintiffs' counsel requested another in-person meeting prior to filing a second discovery motion. *Id*. at 2.

38.     State's counsel failed to respond to Plaintiffs' counsel's request for an in-person meeting. On December 30, 2019, Plaintiffs' counsel again emailed State's counsel, stating that "this is at least my third request for a discovery meeting to address your continuing discovery failures. You provided no dates for a meeting in response to my other requests. Please respond with your availability this week and next." *Id*. at 1.

39.     Plaintiffs deposed Sergeant Shusko and Trooper Walder on January 13, 2020, and Sergeant DeCerbo on January 14, 2020. During the depositions, the officers identified a fourth officer who had filled in for Sergeant Shusko as he was on sick leave.

40.     Plaintiffs deposed the fourth identified officer, Sergeant Roby, on January 21, 2020.

41.     On January 30, 2020, Plaintiffs' counsel met in person with State's counsel at State's counsel's office. Counsel discussed outstanding discovery issues, including, but not limited to, the improper December 23 Redactions, and attempted to resolve this dispute. Counsel was unable to reach a resolution.

42.     In consideration of the considerable number of outstanding discovery issues left unresolved, Plaintiffs filed a Motion for Extension of Discovery on January 31, 2020 requesting

an extension of the discovery deadline until thirty-five days after the last to occur of (1) any production voluntarily produced or (2) any production produced as ordered by the Court. ECF 53.

43.     On March 9, 2020, this Court denied without prejudice Plaintiffs' Motion for Extension of Time and ordered the State to provide a status report on March 13, 2020 regarding the process and timing for acquisition of their requested e-discovery software. ECF 59.

44.     On March 13, 2020, the State filed a Status Report representing to the Court that their request for e-discovery software was informally approved, and anticipating that the State would have access to the e-discovery software by the end of the following week. ECF 60.

45.     Nearly two months later, the State began to provide partial rolling production to Plaintiffs of the emails responsive to the search terms agreed to by counsel on November 8, 2019. The State provided partial discovery on May 1, May 8, May 15, May 22, and May 29, 2020. *See* Exhibit T (May Production Emails).

46.     The documents produced by the State on May 22, 2020 included unexplained redactions on pages 682-683 (the "**May 22 Redactions**"). *See* Exhibit U (May 22 Production, STATE_000682-683). The State did not provide a Vaughn index and did not provide Plaintiffs with an explanation for the redactions.

47.     On May 29, 2020, counsel met via conference call to discuss outstanding discovery issues, including, but not limited to, the improper May 22 Redactions. *See* Exhibit V (May 29 Email). During the meeting, the State promised to provide an informal email explaining the redactions to Plaintiffs by the end of the day and a formal Vaughn index by June 1, 2020. *Id*.

48.     That evening, the State informed Plaintiffs that the "State exerted its executive/deliberative process privileges over these emails because they are deliberative

16

communications about a response to a press inquiry regarding the incident." *See* Exhibit W (May 29 Emails).

49.     Plaintiffs immediately responded to the State's email, requesting that the State "withdraw [its] objection and produce[] the un-redacted materials." *Id*. As counsel had met via conference call earlier that afternoon without succeeding at resolving the discovery dispute, Plaintiffs advised the State of their intention to "serve a motion to compel" on the basis that the redactions are improper.

50.     On June 1, 2020, the State provided a privilege log to Plaintiffs regarding the May 22 Redactions. In the privilege log, the State vaguely claimed that the redactions were made under the "executive/deliberative process privilege" because the emails included "[c]ommunication regarding a response to press inquiry regarding the incident." Exhibit X (Second Privilege Log) at 4.

51.     On June 3, 2020, counsel met for a second time via conference call to discuss the improperly redacted emails. Exhibit Y (June 3 Email).

52.     Shortly thereafter, the parties filed a Joint Status Report pursuant to this Court's order advising the Court of the status of all outstanding discovery issues. Plaintiffs noted that they had "indicated an intent to pursue a motion to compel related to the documents being produced in response to the subpoena," and the State advised that it "expects two more rolling productions to fully complete its production obligation to the plaintiffs." ECF 62 at 1.

53.     Plaintiffs served a Motion to Compel Unredacted Discovery on the State on June 19, 2020. The State responded by serving an opposition thereto on July 6, 2020. Plaintiffs served a reply in response to the State's opposition on July 20, 2020.

54.     As the parties were simultaneously briefing Plaintiffs' Motion to Compel Unredacted Discovery, the State produced the final rolling productions on June 19, 2020 and July 2, 2020.

55.     After receiving the final two rolling productions, Plaintiffs raised issues related to redactions made in the rolling production produced on July 2, 2020 (the "**July 2 Production**"). Plaintiffs' counsel advised the State of Plaintiffs' position regarding the redaction by email on July 16, 2020, and the parties met telephonically to discuss the issues raised on July 17, 2020. Exhibit Z (July Emails).

56.     As the parties were continuing attempts to resolve the outstanding issues, Plaintiffs' counsel requested an extension on Plaintiffs' motion to compel related to the July 2 Production. The State consented to extend the time for serving Plaintiffs' motion during the time the parties attempted to resolve the issues, and the parties met again telephonically on August 6, 2020. Exhibit AA (August Emails).

57.     As one of the outstanding universal issues Plaintiffs had raised relating to the December 23 Production, the May 22 Production, and the July 2 Production was the insufficiency of the State's privilege logs, the State proposed amending the privilege logs to provide greater detail and resolve that issue. On August 14, 2020, the State provided Plaintiffs with the first amended privilege log. After reviewing the amended log, Plaintiffs indicated on September 2, 2020 that they were satisfied with the amendments. Exhibit BB (September Emails).

58.     The State then proposed to similarly amend the privilege log related to the July 2 Production. Due to the length of the privilege log covering the July 2 Production, the State's amendment took longer to complete. On October 2, 2020, the parties filed another Joint Status Report to advise this Court of the status of the parties' ongoing discovery disputes. ECF 68. In the

Joint Status Report, the State promised to "make best efforts to produce the amended privilege log to plaintiffs' counsel on or before October 14, 2020." ECF 68 at 1.

59.     The parties agreed that Plaintiffs' time to serve a motion to compel related to the redactions covered by the second amended privilege log would be stayed pending the receipt of the amended log, agreeing to an extension of "all deadlines associated with the filing or updating of discovery motions by the plaintiffs until 3 weeks after the privilege log has been produced." ECF 68 at 2.

60.     As promised, the State provided an amended privilege log to Plaintiffs on October 14, 2020. Upon review, the Plaintiffs concluded that the amended log resolved all outstanding issues related to the sufficiency of the log and narrowed the focus of Plaintiffs' dispute to specific emails, but some discovery disputes remain outstanding.

61.     Plaintiffs served this Motion to Compel on the State on November 4, 2020, 3 weeks after Plaintiffs' receipt of the second amended privilege log.

## III.     THE EMAILS IN DISPUTE

### A.     The Question about Charges Emails and the Arrest Email.

Plaintiffs request that this Court resolve the discovery dispute arising pursuant to specific inappropriate redactions made in the December 23 Production, the May 22 Production, and the July 2 Production. The specific emails at issue are as follows:

1.  An email chain with the subject line "question about 2/5 charges" produced fully redacted in the December 23 Redactions. *See* Exhibit CC (December 23 Production, NC 057-059).

2.  The same email chain with the subject line "question about 2/5 charges" produced fully redacted in the May 22 Redactions. *See* Exhibit U (May 22 Production, STATE_000682-683).

19

3.  An email chain with the subject "Arrest at Lawyers Mall," which includes a fully redacted email sent by Defendant Michael Wilson to various employees of the Department of General Services and the Maryland State Police, produced in the July 2 Redactions. *See* Exhibit DD (STATE_004190-004191).

4.  Another email chain with the subject "Arrest at Lawyers Mall," forwarding the same fully redacted email written by Defendant Michael Wilson to other individuals employed by the Maryland State Police, produced in the July 2 Redactions. *See* Exhibit EE (STATE_004217-004218).

5.  A third email chain with the subject "Arrest at Lawyers Mall," forwarding the same fully redacted email written by Defendant Michael Wilson to another individual employed by the Maryland State Police, produced in the July 2 Redactions. *See* Exhibit FF (STATE_004238-004239).

6.  The original email with the subject "Arrest at Lawyers Mall," which was deleted in its entirety from the State's response in the July 2 Redactions but assigned bates numbers STATE_003736-003738.[1]

As the same two emails appear multiple times throughout the December 23 Redactions, the May 22 Redactions, and the July 2 Redactions, the Plaintiffs shall refer to the email chain "question about 2/5 charges" as "**Question about Charges Emails**" and the email titled "Arrest at Lawyers Mall" as "**Arrest Email**."

---

[1] This same email is reproduced, fully redacted, more than the four times cited in this motion throughout the July 2 Redactions. Plaintiffs have cited these four specific examples to support Plaintiffs' contentions raised in this motion, and incorporate every other instance the same email is reproduced throughout the State's production herein by reference.

### B. The State's Justification for Redacting the Question about Charges Emails and the Arrest Email.

The State provided the following justification for the redactions of the Question about

Charges Emails in its amended privilege log:

> Communication regarding a response to a press inquiry regarding the incident. The only email here is from Rebecca Labs to Terry Custer with a carbon copy to Michael Wilson, Nick Cavey, and Todd May. Each email in the chain has separately been produced.

> It begins with an email from Bryna Zumer to Terry Custer, Todd May, and Rebecca Labs (produced at STATE_000665). It has no redactions.

> The next email in the chain is from Terry Custer to Nick Cavey and Michael Wilson with a carbon copy to Todd May and Rebecca Labs (produced at STATE_004683). Mr. Custer is consulting with a high-level employee of the Maryland Capitol Police and the Director of Communications for the Department of General Services about the media inquiry from Bryna Zumer. He carbon copies each high-level employee of the Maryland Capitol Police who also received the email from Ms. Zumer. Mr. Custer discusses the media inquiry and response.

> The next email in the chain is from Michael Wilson to Terry Custer with carbon copies to Nick Cavey, Todd May, and Rebecca Labs (produced at STATE_004719). Chief Wilson recommends a response to the media inquiry.

> The next email in the chain is the final email before the one produced at this bates number. It is from Terry Custer to Michael Wilson with carbon copies to Nick Cavey, Todd May, and Rebecca Labs (produced at STATE_004562). Mr. Custer provides his input on the response and recommends how a final response should be approved for this media inquiry.

> The email being produced here is the next email in the chain (produced at STATE_000682). It is from Rebecca Labs to Terry Custer with carbon copies to Michael Wilson, Nick Cavey, and Todd May. Ms. Labs provides agreement with Mr. Custer's recommendation.

Exhibit GG (Amended Privilege Log) at 4.

The State provides the following justification for the complete redaction of the Arrest

Email in its second amended privilege log, referring back to this justification for each entry relating

to any subsequent email forwarding the original Arrest Email:

Communication to leadership regarding arrest by Sergeant Pope so they can respond to inquiries about the arrest. It discusses the nature of the incident, the date and time of the incident, the relevant [charges], and a description of the incident that would be helpful in formulating a response.

Exhibit HH (Second Amended Privilege Log) at 1, 8, 9, 11. The State cites to the executive/deliberative process privilege as the basis for both sets of redactions.

## IV.    THE QUESTION ABOUT CHARGES EMAILS AND ARREST EMAIL ARE IMPROPERLY REDACTED

The State's redactions of the Question about Charges Emails and the Arrest Email are inappropriate because the deliberative process privilege does not apply, and, even if the privilege did apply, the contents of both sets of emails falls within exceptions to the privilege.

### A.    The Executive Privilege Does Not Apply to the Produced Emails.

The State redacted the Question about Charges Emails and the Arrest Email pursuant to the "Executive/Deliberative Process" privilege, under the presumption that communications generally regarding responses to press inquiries qualifies under the privilege. However, this Court should not permit the State to take shelter behind the deliberative process privilege to hide from discovery *all* communications regarding a typical day-to-day operation, especially where it is not clear that any executive decisionmaker is engaged in discussion regarding the formulation of agency policies.

The purpose of the executive, or "deliberative process," privilege, is to protect predecisional communications to "encourage[] free-ranging discussion of alternatives; prevent[] public confusion that might result from the premature release of such nonbinding deliberations; and insulate[] against the chilling effect likely were officials to be judged not on the basis of their final decisions but for matters they considered before making up their minds." *Nat'l Ass'n for Advancement of Colored People v. Bureau of Census*, 401 F. Supp. 3d 608, 611 (D. Md. 2019)

(quoting *City of Virginia Beach, Va. v. U.S. Dept. of Commerce*, 995 F.2d 1247 (4th Cir. 1993)).

The privilege exists to "ensure that a decisionmaker receives 'the unimpeded *advice* of his

associates.'" *Id.* (quoting *Florida House of Representatives v. U.S. Dep't of Commerce*, 961 F.2d

941, 947 (11th Cir. 1992)) (emphasis in original). To invoke the privilege, the communication in

question "must be both 'predecisional' and 'deliberative.'" *Id.* (citing *Petroleum Info. Corp. v.*

*United States Dep't of Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992)).

> A document is predecisional if it was prepared in order to assist an agency
> decisionmaker in arriving at his decision, rather than to support a decision already
> made. A document is deliberative if it reflects the give-and-take of the consultative
> process by revealing the manner in which the agency evaluates possible alternative
> policies or outcomes.

*Id.* (internal citations and quotations omitted). The "deliberative" prong can only be met where the

communication "bear[s] on the formulation or exercise of agency policy-oriented *judgment*." *Id.*

(quoting *Ethyl Corp v. U.S. E.P.A.*, 25 F.3d 1241, 1248 (4th Cir. 1994)) (emphasis in original).

Even if the communication is "predecisional" and "deliberative," it does not necessarily

fall within the scope of the privilege. The privilege does not extend to purely factual information:

> [C]ourts have typically required disclosure of purely factual material, presumably
> because the prospect of disclosure is less likely to make an advisor omit or fudge
> raw facts, while it is quite likely to have such an effect on materials reflecting
> deliberative or policy-making processes.

*Id.* at 612 (quoting *Quarles v. Dep't of Navy*, 893 F.2d 390, 392 (D.C. Cir. 1990)); *see also Stone*

*v. Trump*, 356 F. Supp. 3d 505, 514 (D. Md. 2018), *amended on reconsideration*, 402 F. Supp. 3d

153 (D. Md. 2019) ("Deliberative process privilege does not protect purely factual information,

unless it is inextricably intertwined with deliberative material."). The privilege also does not

extend to communications advising policies that are subsequently adopted:

> But if the suggestion contained in a document "is adopted, formally or informally,
> as the agency position on an issue," or if it is "used by the agency in its dealings
> with the public," the document may lose its privileged status.

*NAACP*, 401 F. Supp. 3d at 612 (quoting *Quarles*, 893 F.2d at 392). Further, the court may require disclosure of otherwise privileged communications to balance the "public interest in nondisclosure with the need for the information as evidence," considering:

> (1) the relevance of the evidence to the lawsuit; (2) the availability of alternative evidence on the same matters; (3) the government's role (if any) in the litigation, and (4) the extent to which disclosure would hinder frank and independent discussion regarding contemplated policies and decisions.

*Stone v. Trump*, 402 F. Supp. 3d 153, 157 (D. Md. 2019) (quoting *Karnoski v. Trump*, 926 F.3d 1180, 1206 (9th Cir. 2019)).

### i.      The Emails Are Not Predecisional.

*First*, the redacted emails do not fall within the deliberative process privilege since standard, day-to-day emails regarding the drafting of a response to a press inquiry are neither predecisional nor deliberative. As defined in *NAACP*, a "predecisional" document is created to assist an *agency decisionmaker* in arriving at a decision. Although the *NAACP* court did not define "agency decisionmaker," it would defy reason to presume that *every* individual employed in a state agency who makes *any* decision qualifies. It would be equally as preposterous to argue that a privilege rooted in the fear that excessive public scrutiny would chill vital agency decision making would apply to an email conversation between Secretary Ellington Churchill and his administrative staff advising which brand of paper to buy for the office printer or a conversation between an office manager and their staff putting together a staffing schedule for the next week. Secretary Churchill may ultimately decide the type of paper to order with the advice of his office staff and the office manager may formulate the schedule with the input of his employees, but neither type of communication qualifies as communication "bear[ing] on the formulation or exercise of agency

policy-oriented *judgment*." *NAACP*, 401 F. Supp. 3d at 611(quoting *Ethyl Corp*, 25 F.3d at 1248) (emphasis in original). **It is not simply *who* is deciding—but *what* is being decided**.

Here, the *what* that the State seeks to broadly apply the privilege to are responses to press inquiries. Such responses are not individual exercises of agency judgment, but are standard day-to-day tasks that come hand-in-hand with the operation of a government agency.[2] Truly, the evidence of the day-to-day nature of such responses is that it is not apparent there even is a single individual responsible for making a final decision on these matters. No ***policy judgment*** is being exercised.

With regard to the Question about Charges emails, it is far from clear that any final policy judgment was even made, much less which individual in the chain was the one with the final decision-making authority. The State indicates that Terry Custer is "consulting with a high-level employee of the Maryland Capitol Police and the Director of Communications for the Department of General Services" about the media inquiry, but rather than obtaining a response from the Director of Communications—who would be the obvious choice of a final decisionmaker for an issue regarding the press—Terry Custer instead receives a "recommend[ation]" from Defendant Michael Wilson. Exhibit GG (Amended Privilege Log) at 4. Terry Custer then "provides his input on the response and recommends how a final response should be approved," which is then agreed to by Rebecca Labs. *Id*.

There are two glaring issues with this email chain, that strongly indicate the Question about Charges emails are not predecisional within the context of the deliberative process privilege: first,

---

[2] If, for instance, these conversations dealt with the formulation of press policy—for example, if Secretary Churchill, with the advice of his staff, decided that the Department of General Services would no longer respond to press inquiries—then the question is different. But the type of responses in this case are individual responses to specific reporters.

that no final judgment was made, as Terry Custer recommended an approval of a final response, with no indication that the proposal was ever approved, and second, that the individuals who would appear to be the final decision makers, the "a high-level employee of the Maryland Capitol Police and the Director of Communications for the Department of General Services" referred to by the State, never even participated in this discussion. Without a final judgment—and without a final decision maker—it is simply not possible for the Question about Charges Emails to be predecisional.

The Arrest Email—and all the reiterations of the Arrest Email subsequently forwarded to numerous individuals—is also not predecisional. The Arrest Email is written by Defendant Michael Wilson, and although the State attempts to justify the purely fact-driven nature of the email as being "helpful in formulating a [press] response," an email that solely relates facts is not an email that exercises any particular agency judgment subject to protection under the deliberative process privilege. Exhibit HH (Second Amended Privilege Log) at 1. As with the Question about Charges Emails, the Arrest Email does not appear to include any response from any agency decision maker.

It is clear that the redacted emails simply constitute the day-to-day work of managing a governmental organization, which includes regular communication with journalists and factual statements relating job-related incidents. There is nothing to indicate that any of these emails stemmed from the exercise of *policy judgment* by a *specific agency decisionmaker*; thus, the emails cannot be considered predecisional.

As the Question about Charges Emails and the Arrest Email are not predecisional, this Court should order the State to produce the emails unredacted. In the alternative, this Court should order an attorneys' eyes only review to permit Plaintiffs to effectively evaluate which portions of

the email chains are not predecisional and must be unredacted, with further briefing to be conducted under seal, or conduct an *in camera* review of the allegedly privileged material.

**ii.** **The Emails are not Deliberative.**

The Question about Charges Emails and the Arrest Email are also not deliberative. "A document is deliberative if it reflects the give-and-take of the consultative process by revealing the manner in which the agency evaluates possible alternative policies or outcomes," and thus requires an email-by-email analysis. *NAACP*, 401 F. Supp. 3d 608 at 611. Not all emails in an email chain necessarily add to the give-and-take consultative process.

The Arrest Email is clearly not deliberative, as it is a single email that does not appear to be connected to any of the back-and-forth communication necessary to constitute a consultative process. The Arrest Email stands alone; even if the instances where the Arrest Email was forwarded to numerous other individuals, on each occasion the Arrest Email was forwarded either without any additional language at all, or a single word or line that could not constitute more than a "see attached." *See* Exhibit DD (STATE_004190-004191); Exhibit EE (STATE_004217-004218); Exhibit FF (STATE_004238-004239).

Further, even if the subsequent email forwarding the Arrest Email did constitute sufficient substance to be considered "consultative," it could not be interpreted as being part of a "back-and-forth" where the original author of the Arrest Email—Defendant Michael Wilson—is not included on any of the forwarded emails. It is impossible for a "give-and-take" to occur where there is only a single participant. It would be ridiculous to assert that the privilege was intended to shelter advice one gives to oneself—the privilege is described as sheltering "'the unimpeded *advice* of [the decisionmaker's] associates.'" *NAACP*, 401 F. Supp. 3d 608 at 611. (quoting *Florida House of Representatives*, 961 F.2d at 947) (emphasis in original).

27

The Question about Charges Emails are similarly not deliberative. Despite the State's careful wording in their summary of the emails in the Second Amended Privilege Log, which does appear to imply some form of consultative process occurred, it is evident from the emails themselves that no meaningful discussion could have transpired. The key "consultative" emails in this chain are the final three, which the State claims involves Defendant Michael Wilson "recommend[ing] a response to the media inquiry," Terry Custer "provid[ing] his input on the response and recommend[ing] how a final response should be approved for this media inquiry, and Rebecca Labs "provid[ing] agreement with Mr. Custer's recommendation." Exhibit GG (Amended Privilege Log) at 4.

Looking at the redacted emails, it is a mystery how this "consultation" could have possibly occurred. Defendant Michael Wilson's email constituted a third of a line, probably spanning approximately four or five words. Exhibit U (May 22 Production, STATE_000682-683) at STATE_000682. Terry Custer's response constituted one word and a second line spanning approximately six or seven words. *Id*. Rebecca Labs' unbelievably short first line could only constitute a response such as "ok" or "yes," with a second line spanning two or three words. *Id*. The State's description of the substance of these emails used more words to describe the emails than actually appear in the emails themselves—making it difficult to believe that these short emails could possibly involve any meaningful consultation or "evaluat[ion of] possible alternative policies or outcomes." *NAACP*, 401 F. Supp. 3d 608 at 611.

As the emails are not deliberative, this Court should order the State to produce the emails unredacted. In the alternative, this Court should order an attorneys' eyes only review to permit Plaintiffs to effectively evaluate which portions of the emails are not deliberative and must be

produced unredacted, with further briefing to be conducted under seal, or conduct an *in camera* review of the allegedly privileged material.

### iii.    Even If the Emails are Predecisional and Deliberative, Exceptions to the Privilege Apply.

As required pursuant to Local Guideline 10(d)(iii), unprivileged portions of otherwise privileged documents must be produced: "[w]here only part of a document or communication is privileged/protected, the unprivileged/unprotected portion should be disclosed if otherwise discoverable and within the scope of the discovery request." There are two bases on which some of the emails may be unprotected under the claimed privilege: *first*, if part or all of the email contains solely purely factual information, or *second*, if this Court finds that an otherwise privileged email should nonetheless be disclosed.

Both the Question about Charges Emails and the Arrest Email are clearly factual. The State's own description of the Arrest Email emphasizes that the email includes only a factual recitation of the events surrounding the arrest of Plaintiffs; the implication the State includes that the factual recitation is for the purpose of other individuals "respond[ing] to inquiries about the arrest" does not permit the State to shield this purely factual email. Exhibit HH (Second Amended Privilege Log) at 1. The subsequent usage of unprivileged information does not suddenly transform unprivileged information into privileged information. An email that simply states "the nature of the incident, the date and time of the incident, the relevant [charges], and a description of the incident" falls squarely within the factual information exception to the deliberative process privilege.

The Question about Charges Emails are similarly factual, either all or in part. As discussed above, the redacted emails are too short to constitute the policy consultation that the State implies; which means that the emails either consist of factual observations, such as "we received a press

inquiry," or, possibly, benign statements such as "ok," or "see attached." This language would fall under the factual information exception to the privilege, as short statements that involve no policy discussion do not qualify as protected under the privilege. Even if the Questions about Charges Emails partially includes both policy discussion *and* factual statements, the State has the obligation to unredact the portions of the emails falling within that exception.

On the second basis, this Court has the authority to bypass the deliberative process privilege and order otherwise privileged material to be disclosed where there is "public interest in nondisclosure with the need for the information as evidence," considering:

> (1) the relevance of the evidence to the lawsuit; (2) the availability of alternative evidence on the same matters; (3) the government's role (if any) in the litigation, and (4) the extent to which disclosure would hinder frank and independent discussion regarding contemplated policies and decisions.

*Stone v. Trump*, 402 F. Supp. 3d 153, 157 (D. Md. 2019) (quoting *Karnoski v. Trump*, 926 F.3d 1180, 1206 (9th Cir. 2019)). Here, all four elements favor disclosure, and, to the extent this Court finds any of the emails privileged, this Court should nonetheless require full, unredacted disclosure.

*First*, the emails are highly relevant to this lawsuit. Plaintiffs' suit raises constitutional concerns, questioning whether there was a legitimate government interest in moving Plaintiffs and disrupting their legal protest, or whether Plaintiffs were ordered away and eventually arrested in violation of their constitutional rights. These emails are vital to establishing Plaintiffs' case.

*Second*, there is no availability of alternative evidence on the same matters. The State has not indicated that any other documents exist as alternative sources of information. These emails are likely the sole documents in existence that Plaintiffs can review to determine how the State handled the incident after it occurred, what each actor knew during the time of its occurrence, and, crucially, *why* this incident occurred.

*Third*, the State plays a key role in this litigation. Although the State has not been directly named as a defendant in this case, Defendant Pope and Defendant Wilson are both members of the Maryland Capitol Police, and are being represented by the Office of the Attorney General. Many of the redacted emails were sent or received by Defendant Wilson or other members of the Maryland Capitol Police, and thus are central to this case.

*Fourth*, requiring disclosure in this case would not hinder frank and independent discussion. Media responses must be formulated on a case-by-case basis—what is relevant or advisable in one circumstance is not necessarily applicable in another. Thus, the decision process surrounding the formulation of media responses in this case would be so unique to this case in particular that the production of those discussions could not impact future discussions on completely unrelated cases.

As the emails are factual, or should otherwise be disclosed pursuant to the public interest, this Court should order the State to produce the emails unredacted. In the alternative, this Court should order an attorneys' eyes only review to permit Plaintiffs to effectively evaluate which specific portions of the emails are purely factual and must be unredacted, with further briefing to be conducted under seal, or conduct an *in camera* review of the allegedly privileged material.

### iv. <u>Any Privilege Covering the Arrest Email Has Been Waived</u>.

Even if the deliberative process privilege applied, any privilege covering the Arrest Email has been waived, as the email was shared outside the sphere of the privilege to other agencies beyond the Department of General Services.

It is axiomatic that privileges are waived where the allegedly privileged material is disseminated outside of the sphere of the privilege. The bounds of the privilege are clearly outlined in its purpose: for the deliberative process privilege, the purpose of the privilege is to encourage

discussion *between an agency decisionmaker and his or her associates*, and thus does not extend beyond that sphere. "Deliberative process privilege is designed to enhance the quality of agency decisions by promoting candid communication among policymakers without the fear that their remarks will be subject to discovery." *Stone v. Trump*, 356 F. Supp. 3d 505, 514 (D. Md. 2018), *amended on reconsideration*, 402 F. Supp. 3d 153 (D. Md. 2019); *see also Nat'l Ass'n for Advancement of Colored People v. Bureau of Census*, 401 F. Supp. 3d 608, 611 (D. Md. 2019).

Thus, the deliberative process privilege protects discussions between subordinates and superiors, but must be considered waived where a person breaks that sphere of privilege and shares that discussion with other individuals. "One of the main policy justifications for the privilege is to protect open and frank discussions between subordinates and superiors," but that justification would completely disappear if those discussions could be shared with third parties—for example, a member of the general public—and still be considered protected. *Jones v. Murphy*, 256 F.R.D. 510, 518 (D. Md. 2008), *aff'd*, No. CIV. CCB-05-1287, 2009 WL 604937 (D. Md. Feb. 23, 2009).

This waiver is clear in looking at all of the individuals copied by Defendant Michael Wilson in the original Arrest Email, and in examining how widespread the email was disseminated by others forwarding the email afterwards. The original email was sent primarily to individuals within the Department of General Services, but also included individuals employed by the Maryland State Police—a completely separate agency from the Maryland Capitol Police. At least two Maryland State Police employees were recipients of the original Arrest Email: George White and Jeffrey Ferreira. Exhibit DD (STATE_004190-004191). The Arrest Email was then disseminated to *at least* four other Maryland State Police employees. Jeffrey Ferreira forwarded the email to Jeremy Shannon, and then separately to David Lewis. *Id.*; Exhibit FF (STATE_004238-004239). George

White forwarded the email to Sonya Clark, and blind carbon copied Robert Parham. Exhibit EE (STATE_004217-004218).

George White, Jeffrey Ferreira, Jeremy Shannon, David Lewis, Sonya Clark, and Robert Parham, all Maryland State Police employees, are not covered by the sphere of privilege covering the operations of the Maryland Capitol Police within the Department of General Services. These Maryland State Police employees are not policymakers involved with the Department of General Services' operations, and it is clearly apparent that these individuals—even if they were tangentially related—were not at all involved with any Department of General Services agency decision, as these forwarded emails went one way, and it does not appear that any of these individuals joined in any Department of General Services agency discussion stemming from Defendant Michael Wilson's email.

Clearly, this dissemination means that any privilege that could have applied to the Arrest Email has been waived, both by virtue of the original author of the email including individuals outside his agency and outside his deliberative sphere on the original correspondence, and also because of all the individuals that subsequently received the email outside that sphere by having the email forwarded to them. Thus, this Court should order the State to produce the Arrest Email unredacted, or, in the alternative, order an attorneys' eyes only review to permit Plaintiffs to effectively evaluate the Arrest Email and conduct further briefing under seal.

## V.   <u>CONCLUSION</u>

Plaintiffs respectfully request that this Honorable Court grant their Motion and order the State to provide unredacted discovery to Plaintiffs on or before seven days after the entry of the order at 4:30 p.m., and for such further relief as the Court may grant in the interest of justice.

Respectfully submitted,

HANSEL LAW, PC

_____/s/ Cary J. Hansel_____

Cary J. Hansel (Bar No. 14722)
cary@hansellaw.com
2514 N. Charles Street
Baltimore, MD 21218
Phone: (301) 461-1040
Fax: (443) 451-8606
*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of November, 2020, I caused the foregoing to be served to the State via electronic mail.

_____/s/ Cary J. Hansel_____

Cary J. Hansel

## RULE 104.7 AND RULE 104.8 CERTIFICATION OF COUNSEL

The undersigned certifies, pursuant to Local Rules 104.7 and 104.8, that the undersigned attempted in good faith to resolve this discovery dispute.

On January 30, 2020, counsel met in-person to attempt to resolve several discovery disputes. The meeting occurred at 2:00 p.m., lasted until approximately 3:45 p.m., and took place at the offices of Defendant Wilson's counsel, John Frederickson. The meeting was attended by Defendant Wilson's counsel, John Frederickson, Defendant Pope's counsel, Jim Lewis, and Plaintiffs' counsel, Ashton Zylstra. Counsel attempted, but failed, to resolve several issues,

including, but not limited to, the redactions applied to the emails produced by the State on December 23, 2019.

On May 29, 2020, counsel met via conference call to further discuss outstanding discovery issues. The call occurred at 2:00 p.m., lasted until approximately 2:25 p.m., and was attended by Defendant Wilson's counsel, John Frederickson, Defendant Pope's counsel, Jim Lewis, and Plaintiffs' counsel, Ashton Zylstra. Counsel addressed several outstanding discovery issues, including, but not limited to, the redactions applied to emails produced by the State on May 22, 2020, and the absence of a Vaughn index related to those redactions.

In addition, counsel attempted to resolve outstanding discovery issues on multiple occasions via electronic mail. For example, counsel exchanged numerous emails on May 29, 2020 regarding the redactions of the May 22, 2020 production, including an email from Plaintiffs' counsel which requested that the State "withdraw [its] objection and produce[] the un-redacted materials." Exhibit W (May 29 Emails).

On June 3, 2020, counsel met for a second time via conference call to specifically discuss the improper redactions and deficient privilege logs. The call occurred at 2:00 p.m., and was attended by Defendant Wilson's counsel, John Frederickson, Defendant Pope's counsel, Jim Lewis, and Plaintiffs' counsel, Ashton Zylstra. Counsel were unable to resolve the issues discussed on the conference call and raised herein.

Plaintiffs served a Motion to Compel Unredacted Discovery on Defendant Wilson's counsel, John Frederickson, and Defendant Pope's counsel, Jim Lewis, via electronic mail on June 19, 2020. The State served its opposition on July 6, 2020. Plaintiffs served their reply on July 20, 2020.

As the parties were briefing Plaintiffs' Motion to Compel Unredacted Discovery, the State produced the final rolling productions on June 19, 2020 and July 2, 2020. After receiving the final two rolling productions, Plaintiffs raised issues related to redactions made in the rolling production produced on July 2, 2020. Plaintiffs' counsel advised the State of Plaintiffs' position regarding the redaction by email on July 16, 2020, and the parties met telephonically to discuss the issues raised on July 17, 2020. Exhibit Z (July Emails). The call occurred at 10:00 a.m., and was attended by Defendant Wilson's counsel, John Frederickson, Defendant Pope's counsel, Jim Lewis, and Plaintiffs' counsel, Ashton Zylstra. Counsel were unable to resolve the issues discussed on the conference call and raised herein.

The parties met again telephonically on August 6, 2020. Exhibit AA (August Emails). The call occurred at 2:00 p.m., and was attended by Defendant Wilson's counsel, John Frederickson, Defendant Pope's counsel, Jim Lewis, and Plaintiffs' counsel, Ashton Zylstra. During the call, the State proposed amending the privilege logs to provide greater detail and resolve Plaintiffs' concerns relating to the sufficiency of the privilege logs produced to date. Plaintiffs agreed. Counsel were unable to resolve any other outstanding discovery issues discussed on the August 6, 2020 conference call.

The State provided Plaintiffs with the first amended privilege log on August 14, 2020. After reviewing the amended log, Plaintiffs indicated on September 2, 2020 that they were satisfied with the amendments. Exhibit BB (September Emails). The State then provided Plaintiffs with the second amended privilege log on October 14, 2020. Upon review, Plaintiffs were satisfied that both amended privilege logs resolved any outstanding issues relating to the privilege logs.

As all other discovery issues remained outstanding and were unable to be resolved between counsel, Plaintiffs served this Motion to Compel on the State on November 4, 2020, which includes all remaining outstanding discovery disputes as instructed by this Court.


                                                   /s/ Cary J. Hansel
                                            Cary J. Hansel