## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND

Jeff Hulbert, *et al*.

         *Plaintiffs*,

    v.

Sgt. Brian Pope, *et al*.

         *Defendants*.

Civil No.: 1:18-CV-00461-SAG

## PLAINTIFFS' OPPOSITION TO DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

COME NOW the Plaintiffs, by and through undersigned counsel, and respectfully file this Opposition to Defendants' Motion for Summary Judgment, stating as follows:

## TABLE OF CONTENTS

Introduction ................................................................................................................... 1

Factual Background......................................................................................................... 3

    The Plaintiffs' Legal and Peaceful Protest on February 5, 2018 ........................... 3

    The False Arrest of the Hulberts ........................................................................... 3

    The False Original Charges for Disorderly Conduct ............................................ 4

    The Addition of Two Additional Citations the Following Day ........................... 10

    The False Criminal Citation for Obstructing a Public Sidewalk......................... 13

    The False Criminal Citation for Trespass on Public Grounds............................. 14

    The Phone Call from The Governor's Mansion .................................................. 17

Procedural History......................................................................................................... 20

Analysis ......................................................................................................................... 21

    I.    The Defendants are Not Entitled to Qualified Immunity in this Case, as Both Defendants Violated Plaintiffs' Clearly Established Constitutional Rights to Freedom of Speech and Freedom from False Arrest................................................ 21

A.  The Applicable First Amendment Standard ................................................. 21

B.  The Defendants' Actions Fail the "Time, Place and Manner" Test ............. 23

C.  A Reasonable Juror Could Conclude that Defendant Pope Arrested Kevin Hulbert for Filming the Arrest of Jeff Hulbert, as Kevin Hulbert Was Not Doing Anything Else, and the Right to Record Police is Clearly Established Law ............................................................................................................. 27

D.  There is Considerable Evidence to Demonstrate that the Defendants' Addition of New Charges on February 6, 2018 was in Retaliation for Plaintiffs Exercising their Right to Free Speech ......................................................... 30

    i.   The Defendants were Alerted to Plaintiffs' Presence on February 5, 2018 by the Governor's Mansion, and a Reasonable Juror Could Conclude that the Defendants then Arrested Plaintiffs Specifically to Preclude them from Lawfully Demonstrating ........................................................................ 30

    ii.  Defendants Retaliated Against the Hulberts for Speaking About Their Arrests By Charging the Hulberts With Additional Crimes on February 6, 2018 ....................................................................................................... 32

    iii. The Doctrine of Qualified Immunity is Unconstitutional ..................... 33

E.  Defendant Pope Did Not Have Probable Cause to Arrest the Hulbert Brothers on February 5, 2018 for Disorderly Conduct ................................................ 34

F.  All Force is Excessive Force When the Defendants Have No Right to Arrest ................................................................................................................... 36

II.   Defendant Wilson is Directly Liable for the Counts Pled Against Him, And Also Subject to Supervisory Liability for the Acts of His Employees ............................ 38

III.  Summary Judgment is Not Appropriate for Plaintiffs' State Law Claims as Malice and Gross Negligence Are Issues for the Jury to Decide ................................................. 42

IV.   Defendant Pope Did Not Have Probable Cause to Arrest the Plaintiffs ................... 45

V.    MSI Has Both Organizational and Representational Standing ................................ 48

A.  MSI Has Representational Standing ............................................................. 50

B.  MSI Has Organizational Standing ................................................................ 52

VI.   Punitive Damages are an Issue That Should Be Reserved for the Jury ................... 54

Conclusion ..................................................................................................................... 54

Certificate of Service ........................................................................................................ 55

## TABLE OF EXHIBITS

Exhibit A: Jeff Hulbert Deposition ............................................................................... passim

Exhibit B: Kevin Hulbert Deposition............................................................................ passim

Exhibit C: Pope Deposition .......................................................................................... passim

Exhibit D: Citations................................................................................................... 4, 12

Exhibit E: Wilson Deposition ....................................................................................... passim

Exhibit F: Arrest Report ......................................................................................... 12, 14, 17

Exhibit G: Bitter Deposition ................................................................................... 17-19, 30

Exhibit H: Walder Deposition...................................................................................... 19

Exhibit I: Roby Deposition ..................................................................................... 19-20

Exhibit J: Wesby Deposition................................................................................ 20, 30, 44, 51

Exhibit K: Pennak Deposition .......................................................................... 49-50, 53-54

## <u>INTRODUCTION</u>

While there are important First Amendment rights at stake, the facts supporting the Fourth Amendment, false arrest and false imprisonment claims are the most straightforward: two brothers were charged with multiple crimes the arresting officer has admitted under oath that they did not commit.

When asked specifically in deposition about each element of every charge, the arresting officer has testified that none of the elements existed.  The arresting office also denied observing any of the alleged "safety concerns" on which the defense motion turns.  Finally, the day after the initial charges, additional charges were brought for which the arresting officer has also admitted there was no probable cause to believe the underlying crimes had been committed.

Even absent any concerns about freedom of speech, therefore, summary judgment should be denied.

Layered over the other claims are serious First Amendment violations, however.  First, the evidence shows that someone on the executive security team of the Lt. Governor directed that picketers be unlawfully moved from a public sidewalk because the officer did not want the Lt. Governor to hear from the picketers.  The order had nothing to do with safety concerns and was conceived and executed in a manner to frustrate the exercise of the rights to free speech, assembly and to petition one's government.

The directive from the Lt. Governor's team directly resulted in Jeff Hulbert being ordered by Defendant Pope to move from a public sidewalk while he was lawfully present picketing.  As a further consequence of the unlawful directive, Defendant Pope charged Jeff Hulbert with crimes he had not committed and arrested them.

Kevin Hulbert, who was not picketing, but merely exercising his right to film events from a safe distance of 20 feet, was also falsely arrested and charged by Pope in violation of the First Amendment.

Even the arresting officer has admitted that arresting the Hulberts solely as a result of the directive he received from the "Governor's Mansion" was a violation of the Hulberts' rights to freedom of speech and expression.

When the brothers complained to the media about the false charges against them, the police Chief responded by personally directing that the severity of the charges be increased.  The Chief was so upset that he made a public display of assisting in the service of the new charges, something testimony shows he had never done as Chief.

At its core, this case involves two sets of false charges devoid of probable cause, supporting the Fourth Amendment, false arrest and false imprisonment claims.  But there are also unlawful orders to leave a public place, the unconstitutional denial of the right to film police in public, and false charges based on the security team of a public official deciding that the official should not have to walk by picketers and a retaliatory increase in those charges.  The latter all support the First Amendment claims.

The best way to understand and approach the case is that the First Amendment claims require an examination of the motivations behind the unconstitutional false arrest and imprisonment of the Hulberts, while motivation is irrelevant to these other claims.  The utter lack of probable cause to believe a crime had been committed is all that is necessary to establish the Fourth Amendment, false arrest and false imprisonment claims in the context of this case and the defense motion.

As demonstrated below, summary judgment should be denied as to all counts and this case should proceed to trial.

## FACTUAL BACKGROUND

### The Plaintiffs' Legal and Peaceful Protest on February 5, 2018

On February 5, 2018, Plaintiffs Jeff Hulbert and Kevin Hulbert (the "**Hulberts**") were peacefully picketing in Maryland's capital as members of Patriot Picket, an informal group founded by Plaintiffs to oppose infringement of Second Amendment rights.  Exhibit A (Jeff Hulbert Deposition) at 33-34.

The Hulberts and Patriot Picket were picketing on a public sidewalk, and were not impeding or interfering with the movement of pedestrians or vehicle traffic.  Exhibit A (Jeff Hulbert Deposition) at 36-38. The intent of the picket was to bring attention to constitutional issues through picket signs and answering questions from the public and passing legislators.  Exhibit A (Jeff Hulbert Deposition) 37-42.

As the Hulberts and Patriot Picket were preparing for the demonstration, Kevin Hulbert was approached by Defendant Sergeant Brian T. Pope ("**Defendant Pope**"), who asked Kevin Hulbert to move the demonstration to Lawyer's Mall.  Exhibit B (Kevin Hulbert Deposition) at 20-22. About 45 minutes later, Defendant Pope approached the Hulberts and the rest of Patriot Picket again, telling them that they should be demonstrating at Lawyer's Mall.  Exhibit B (Kevin Hulbert Deposition) at 24-26. Defendant Pope returned a third time that night, telling the group again that they should be demonstrating in Lawyer's Mall.  Exhibit B (Kevin Hulbert Deposition) at 26-27.

### The False Arrest of the Hulberts

Defendant Pope had seen the Patriot Picket demonstrations before, and was familiar with

their Monday night protests in the same location and in the same manner as the day of their arrests. Exhibit C (Pope Deposition) at 50-51. When Defendant Pope saw the group on the night of February 5, 2018, the members of Patriot Picket were walking around a public sidewalk with picket signs, in the same manner as Defendant Pope had observed many times before. Exhibit C (Pope Deposition) at 51-53. Defendant Pope had never issued any citations or arrested any individual connected with Patriot Picket despite observing the same picketing on numerous prior occasions. Exhibit C (Pope Deposition) at 53.

Defendant Pope initially became aware that Patriot Picket was demonstrating again on February 5, 2018 when he received a call from dispatch, who in turn had received a call about the demonstration from the Governor's Mansion. Exhibit C (Pope Deposition) at 60-61. This was the first and only time that Defendant Pope had acted to stop a demonstration because of a complaint lodged by someone at the Governor's Mansion. Exhibit C (Pope Deposition) at 63-64. Responding to the complaint from the Governor's Mansion, Defendant Pope ultimately arrested the Hulberts and stopped the legal demonstration that Patriot Picket was conducting on a public sidewalk, issuing criminal citations for disobeying an order from law enforcement and for blocking a public sidewalk. Exhibit C (Pope Deposition) at 141-142.

### The False Original Charges for Disorderly Conduct

On the night of February 5, 2018, when Defendant Pope arrested the Hulberts, Defendant Pope issued a single criminal citation to each Hulbert brother. In the citation, both Hulberts were charged with "willfully fail[ing] to obey a reasonable and lawful order of a law enforcement officer to whit made to prevent a disturbance to the public peace." Exhibit D (Citations) at 3-4. On the citation, Defendant Pope specifically noted that the penalty for each citation was a $500.00 fine and 60 days' incarceration. Exhibit D (Citations) at 3-4.

Under Md. Code, Crim. Law § 10-201(c)(3), "A person may not willfully fail to obey a reasonable and lawful order that a law enforcement officer makes to prevent a disturbance to the public peace." The elements of the crime charged *require* that the law enforcement order be made to prevent a breach of the peace:

> [I]t has been held that failure to obey a policeman's command to move on when not to do so may endanger the public peace, amounts to disorderly conduct.... [R]efusal to obey an order of a police officer, not exceeding his authority, to move on "even though conscientious ... may interfere with the public order and lead to a breach of the peace," and that such a refusal "can be justified only where the circumstances show conclusively that the police officer's direction was purely arbitrary and was not calculated in any way to promote the public order."

*Spry v. State*, 396 Md. 682, 692–93 (2007) (quoting *Drews v. State*, 224 Md. 186, 192 (1961)). In other words, to issue a valid criminal citation for disorderly conduct due to a failure to obey an order of law enforcement, an officer would need to demonstrate: (1) that the individual's conduct was interfering with the public order or leading to a breach of the peace, (2) that the officer directed the individual to move on in order to prevent a breach of the peace, and (3) that the individual failed to follow the police officer's direction. An individual who chooses not to follow the direction of a law enforcement officer that was made arbitrarily, or for any other reason than to "promote the public order," has not engaged in disorderly conduct.

When Defendant Pope first arrived at the scene, Defendant Pope did not even see anyone walking down the sidewalk in the area, much less anyone that the Hulberts were obstructing:

> Q. When you could first see the scene of this area with your own eyes in front of Lawyers' Mall, tell me what you saw.
> A. I saw the one guy there with all the signs on the ground.
> Q. As you approached did that scene change, or was it still one guy and signs when you first got there?
> A. It was the same when I got there.
> Q. And in your description of the scene, you didn't mention any other people. You didn't see anybody else as you an approached?
> A. No.
> Q. Nobody was walking down the sidewalk?

A. I didn't pay attention to anybody walking down the sidewalk.
Q. But you didn't see anyone that you recall?
A. Not that I recall.
Q. So when you got there, the only two people you recall on the sidewalk were yourself and Mr. Hulbert?
A. Right.

Exhibit C (Pope Deposition) at 80-81. Despite what Defendant Pope claimed in the arrest report, he was not concerned with the safety of anyone in the area, and did not see any condition that looked unsafe:

Q. Now when you said that, did you feel safe at the moment?
A. Yes I did. Safe from like danger?
Q. Safe from anything, yeah. You felt safe, didn't you, comfortable?
A. Yes.
Q. And did Mr. Hulbert look safe when you said that?
A. He looked safe.
Q. And you don't remember anybody else being there?
A. Correct.
**Q. Did any condition that you could see at that time look unsafe?**
**A. Not that I could see.**

Exhibit C (Pope Deposition) at 82-83. The second time that Defendant Pope saw the Hulberts and Patriot Picket that night, he similarly did not see anyone else on the sidewalk or in the area, and the demonstration did not obstruct Defendant Pope's ability to transverse the sidewalk or obstruct any vehicular traffic:

Q. And when you were there within 20 feet of them, you don't recall seeing anybody else on the sidewalk other than the picketers; is that right?
A. That's correct.
Q. And were you able to freely go across or was anything they were doing affecting your ability to walk across at that point?
A. They couldn't affect my ability from where they were standing and where I was crossing. They were up further.
Q. And there weren't any cars stopped or, the traffic was flowing freely on the road, correct?
A. I know there was nothing stopped so yes, they could go freely.

Exhibit C (Pope Deposition) at 90-91. Defendant Pope then approached Patriot Picket and the Hulberts for the second time to ask them to move to Lawyer's Mall, at which point Defendant

6

Pope *still* did not see anyone on the sidewalk and was *still* able to traverse the sidewalk freely and

without obstruction:

> Q. Now as you approached them, could you see anyone else on the sidewalk besides the people with pickets?
> A. I wasn't paying attention.
> Q. So not that you recall?
> A. Not that I recall.
> Q. And you were able to approach them freely, you were able to move freely in the area?
> A. Yes.
> Q. And traffic was flowing freely?
> A. I didn't come that way. The way I was  coming  from  I  was  coming  from Lawyers' Mall, so there was no traffic.
> Q. But you didn't see any traffic being impeded in any way, did you?
> A. No, not at that time.
> …
> Q. And nothing that they were doing prevented you from getting where you needed to go or exercising your duties, did it?
> A.  No.

Exhibit C (Pope Deposition) at 93-95. Although people began to congregate and film the police

officers *after* Defendant Pope initiated the arrests and called for backup, at no point prior to the

arrets were either pedestrian or vehicular travel obstructed:

> Q. So when there were eight police officers responding in front of Lawyers' Mall, the police presence caused some people to stop and pull out their cameras?
> A. Probably.
> Q. And that's what it [looked] liked to you?
> A. Yes.
> Q. And prior to the presence of a police officers, you didn't see anybody stopped or filming or anything like that?
> A. No.
> Q. And prior to the presence of the eight police officers, people could freely come and go as far as you saw, you didn't see anybody stopped or couldn't get by; is that right?
> A. That's correct.
> Q. And prior to the police officers being there, you didn't observe anybody in any unsafe condition or behavior, did you?
> A. No.
> …
> Q. So the officers were impeding driving traffic with their lights on with their cars stopped in the intersection when they arrived; is that right?

7

A. I don't know if you would call it impeding, but they couldn't park on the sidewalk.
Q. And prior to the arrival of the police cars that you've already described, people could come and go freely; is that right?
A. Yes.

Exhibit C (Pope Deposition) at 114-117.

Q. Now the way you've described it to me prior to these arrests -- let me put it this way. Prior to the officers' arrival, the way you described it to me, there was no disturbance or disruption of the normal business in the area by these people being there?
A. Not at that time, no.
Q. Prior to the officers being there?
A. Correct.

Exhibit C (Pope Deposition) at 129-130.

Given the forgoing, the elements of disorderly conduct were not satisfied as to either Kevin Hulbert or Jeff Hulbert. Defendant Pope had no possible justification to order the Hulberts and Patriot Picket to move on from the area, as a police officer is only permitted to do when the individuals are a danger to public peace. As Defendant Pope admits that there was no obstruction of travel, no unsafe conditions, and no fear for anyone's safety, Defendant Pope did not issue the order to promote public safety.

Rather, Defendant Pope arrested Jeff Hulbert and criminally charged him without probable cause in an effort to procure compliance by the group with the unlawful order to move:

**Q. So you believed that by arresting Jeff Hulbert you could stop the picketing on the sidewalk; is that right?**
MR. FREDERICKSON: Objection to the form.
BY MR. HANSEL:
Q. Is that right?
**A. Yes.**
**Q. And that was your goal?**
**A. Right. And they went into Lawyers' Mall after we placed those two under arrest.**

Exhibit C (Pope Deposition) at 100-101.

Defendant Pope made the decision to arrest Kevin Hulbert and charge him with disorderly conduct while Kevin Hulbert was filming the arrest of Jeff Hulbert, despite the fact that Hulbert was aware of the right to film police:

> Q. **And in fact, other than not leaving the sidewalk, we'll talk about that, other than that, did the Hulberts do anything to interfere or frustrate with your police authority other than not leaving the sidewalk?**
> A. **No**. The second Hulbert was up on me filming when I asked him to back up. He goes well, and I wasn't sure what he was going to do. He refused to back up, and I placed him under arrest as well.
> * * *
> **Q. You agree with me the public has a First Amendment right to film police officers in the conduct of their duties, their official duties in public?**
> **A. Yes.** He wasn't the only one filming. There were others filming.
> **Q. And you agree with me that the activity insofar as the filming that they engaged in, the filming was perfectly lawful?**
> **A. Yes**. I want to state that there were two other guys filming that weren't picketers, they were like passers by, and I told them to back up and they backed up, but Kevin didn't.

Exhibit C (Pope Deposition) 107-108.

Contrary to Pope's version of events, Kevin Hulbert testified that he was 20 feet away while filming and Pope approached him.  Exhibit B (Kevin Hulbert Deposition) at 29-31.  This factual dispute precludes reliance on any alleged interference by Kevin with the officer's duties. It also demonstrates that any order to "back up" was unlawful as Kevin was 20 feet away until the officer left what he was doing and approached Kevin.

Defendant Pope did not witness any conduct from either Kevin or Jeff Hulbert that could possibly constitute disorderly conduct pursuant to Md. Code, Crim. Law § 10-201(c)(3). Thus, the original criminal citations issued against the Hulberts on the evening of February 5, 2018 were unsupported by probable cause and unconstitutional.

The order to move and these citations also violated the Hulberts' First Amendment rights. Absent a lawful reason to order the Hulberts to move or to charge them, Defendant Pope's actions

9

denied the Hulberts their right to continue their peaceful First Amendment activity.

**The Addition of Two Additional Citations the Following Day**

The next morning, on February 6, 2018, the Chief of the Maryland Capitol Police, Defendant Col. Michael Wilson ("**Defendant Wilson**"), made the choice to upcharge the Hulberts and issue two additional criminal citations against each brother.

Defendant Wilson was familiar with the Hulberts and Patriot Picket, and knew of them and the regular demonstrations that they would organize in the capitol. Exhibit E (Wilson Deposition) at 16-18. Defendant Wilson had conversations with the Hulberts previously at Patriot Picket demonstrations, and was familiar enough with Patriot Picket to know that they picket on Second Amendment issues. Exhibit E (Wilson Deposition) at 16-18. Defendant Wilson was also familiar with the Hulberts and Patriot Picket's tradition of demonstrating on a public sidewalk, and admitted under oath that it was legal for them to demonstrate there without a permit. Exhibit E (Wilson Deposition) at 16-18.

Defendant Wilson was notified during the night of of February 5, 2018 that arrests had been made. Exhibit E (Wilson Deposition) at 74-75. The next morning, Defendant Wilson began to read media reports related to the arrests. The reports were generally critical of the arrests and critical of the Maryland Capitol Police's handling of the incident:

> Q. All right. You mentioned earlier how this started to feel like you were being thrown under the bus at some point. When you were reading the media reports, obviously the Hulberts in the media reports were unhappy with their arrest, were critical of their arrest?
> A. Yes, sir.
> Q. And ultimately in being critical of their arrest, were being critical of your department; is that fair?
> A. Yes.

Exhibit E (Wilson Deposition) at 79. The Hulberts exercised their right to free speech by giving interviews the day after the arrests, resulting in considerable negative press surrounding the actions

of the Maryland Capitol Police. Defendant Wilson was upset about being "thrown under the bus" in the media:

> A. I don't recall. I recall the following day there were questions coming from the governor's office about who involved them in this arrest case because by then this information was out there about the Hulbert brothers, it was TV and social media and there were interviews. They had had a big interview in Annapolis and I think part of the allegations were that, that there was a political entity involved. So --
> MR. FREDERICKSON: Mr. Hansel has a plan in mind, so you have to wait for his question.
> BY MR. HANSEL:
> Q. So what happened next?
> A. That's your plan? Are you kidding me? Yeah, so I'm trying to recall as best I can, because it's been a while ago. **But we were being blamed, we were being questioned. I was personally being asked from up, up somewhere in the staff who made, or was there a call made**. That's when I found out about this. I    was like I have no idea what you're talking about but I can find out, because this stuff is recorded, so if the governor's mansion did call the control center, we'll have it recorded. And I believe somebody, I don't know who, somebody was talking to the governor's office, executive protection. When I say governor's office, I'm talking about the state police executive protection guys referenced this, and they were like we never made that call. We never made the call. **So we, meaning me, I was being kind of thrown under the bus at this point.** So I did start going and searching, let's go back and look at the file and we'll settle it real fast, which is when I found out about this.

Exhibit E (Wilson Deposition) at 32-34.  Without having any more information than what was reported by Defendant Pope and in the news media, Defendant Wilson decided to add additional charges.  Exhibit E (Wilson Deposition) at 88-89 (Wilson was the one who decided to add the charges); Exhibit E (Wilson Deposition) at 64 & 148 (Wilson did not observe any unlawful behavior and based the charging decisions only on what Pope saw); *see also* Exhibit C (Pope Deposition) at 223.

Defendant Wilson instructed Sergeant Donaldson to order Defendant Pope to write additional criminal citations once he arrived on duty. *See* Exhibit E (Wilson Deposition) at 91. Defendant Wilson then directed that corresponding changes be made to the arrest report by Defendant Pope, to support the new criminal citations that Defendant Wilson chose to issue.

Exhibit E (Wilson Deposition) at 93-95.

Later that afternoon, on February 6, 2018, Defendant Wilson learned that the Hulberts were near Lawyer's Mall again, and Defendant Wilson personally went to serve that additional criminal citations on the Hulberts. At the time, the Hulberts were being interviewed about their arrests. Exhibit E (Wilson Deposition) at 118. As Defendant Pope noted, it was unusual for the Chief to "go out in the field and serve citations" and that Pope had never seen the Chief serve citations before.  Exhibit C (Pope Deposition) at 164-165.

The final arrest report alleged that Defendant Pope requested that the group move "[o]ut of concern for public safety."  Exhibit F (Arrest Report) at 4-5. The Hulberts were charged with "Obstructing public walks" under COMAR 04.05.01.03 and Trespass under Md. Code, Crim. Law § 6-409(b). *Id*.

The new citations carried much heavier penalties than the original citations, as COMAR 04.05.01.03 is a misdemeanor that can be penalized with a fine or imprisonment, and Md. Code, Crim. Law § 6-409(b) can be penalized by a fine of up to $1,000.00 and imprisonment of 6 months. Exhibit D (Citations).

Defendant Wilson ordered this considerable upcharge despite knowing the impact that increasing charges from one that capped possible imprisonment at 60 days to charges that potentially could involve six months of incarceration would have on the Hulberts:

> Q. Doesn't common sense just tell you when you charge a man with something that says he might spend six months in jail that that's going to bother him, he's going to worry about it?
> MR. FREDERICKSON: Objection.
> THE WITNESS: I assume it would bother me. It would bother me.
> BY MR. HANSEL:
> Q. Actually it would bother anybody worried about their freedom, wouldn't it?
> A. Yes.

Exhibit E (Wilson Deposition) at 131-132.

**The False Criminal Citation for Obstructing a Public Sidewalk**

The first additional citation ordered by Defendant Wilson against both Hulbert brothers was a criminal citation for obstructing a public sidewalk in violation of COMAR 04.05.01.03. Under that provision, an "individual shall be subject to arrest if the individual: … (5) Obstructs: … (b) Walks."

As Defendant Pope admitted multiple times under oath, neither of the Hulberts were obstructing pedestrian or vehicle traffic. Defendant Pope did not even witness any other individuals in the area—prior to his arrest of the Hulberts—who *could* have been obstructed by the presence of the Hulberts on the public sidewalk.

Defendant Pope walked by and interacted with the Hulberts and Patriot Picket several times on the evening of February 5, 2018, an evening in the middle of winter with few pedestrians. Every time, Defendant Pope testified that he did not see anyone else around that was not associated with Patriot Picket. *See* Exhibit C (Pope Deposition) at 80-81; 90-91. Further, Defendant Pope testified that there was no obstruction that kept pedestrian or vehicle traffic from freely flowing. *See* Exhibit C (Pope Deposition) at 80-81; 90-91; 93-95. In fact, Defendant Pope himself was able to move freely on the sidewalk when approached the Hulberts and Patriot Picket prior to the arrest. *See* Exhibit C (Pope Deposition) at 93-95. The only time that any obstruction of the sidewalk or road occurred was after Defendant Pope called for backup, and eight police officers responded, partially blocking traffic and causing a few unrelated passerby to stop and start filming the officers. *See* Exhibit C (Pope Deposition) at 114-117. As Defendant Pope stated:

> Q. … Prior to the officers' arrival, the way you described it to me, there was no disturbance or disruption of the normal business in the area by these people being there?
> A. Not at that time, no.

Q. Prior to the officers being there?[1]
A. Correct.

Exhibit C (Pope Deposition) at 129-130.

Defendants Wilson and Pope nevertheless arrested the Hulberts and issued criminal citations under COMAR 04.05.01.03, which *requires* that an obstruction *actually occur* to support a citation. Defendants Wilson and Pope did so on the false premise that the arrest was "to allow for pedestrians to freely use the sidewalk, crosswalks and to reduce conditions for distracted vehicle operators approaching the intersection." Exhibit F (Arrest Report) at 5.

### The False Criminal Citation for Trespass on Public Grounds

The first additional citation ordered by Defendant Wilson against both Hulbert brothers was a criminal citation for trespass. Under Md. Code, Crim. Law § 6-409(b), it is a crime for an individual to refuse to leave a public building or public grounds, during regular business hours, if requested to do so by an appropriate government employee. The elements of a criminal trespass under the statute include: (1) an individual entering a public building or public grounds, (2) during regular business hours, (3) who is requested to leave by an authorized government employee, (4) the circumstances indicate to a reasonable person that they have no apparent lawful business at the location or are acting in a manner disruptive of normal business, and (5) the individual refuses to

---

[1] A disorderly conduct charge cannot be based on a disruption caused by police action. In *Diehl v. State*, 294 Md. 466 (1982), the Court of Appeals reversed a defendant's conviction for disorderly conduct where a police officer unlawfully ordered the defendant to get back in his car during a traffic stop and the defendant verbally protested the illegal order. The commotion caused by the police action had drawn a crowd of onlookers, but the Court of Appeals found that a disturbance had not been created where "[p]eople might have begun to stop, look and listen, forming a crowd," because of the police conduct, as those individuals "probably were mere curiosity seekers." *Id*. at 472. *See also Higginbotham v. Brauer*, No. CV DKC 18-1067, 2020 WL 4569520, at *4 (D. Md. Aug. 7, 2020) (finding that summary judgment was not appropriate where plaintiff introduced evidence that "a crowd already existed, and his actions did not draw the crowd," leading to the absence of probable cause for a disorderly conduct charge).

14

leave.

As with the criminal citation for obstruction of a public sidewalk, Defendant Pope admitted

under oath that these elements were not met. First, Defendant Pope admitted that the Hulberts and

Patriot Picket had a right to be on the public sidewalk engaging in a peaceful demonstration:

> Q. I want to make that clear for you on the record. And obviously based on your
> training, people have a right to be there even when the lieutenant governor might
> walk by?
> MR. FREDERICKSON: Objection.
> THE WITNESS: Yes.

Exhibit C (Pope Deposition) at 127. Further, Defendant Pope admitted that the Hulberts were not

disrupting any business in any way:

> Q. Did you ever observe either of the Hulberts disturbing any normal business that
> was going on there before the police arrived, before the group of eight officers was
> there?
> A. What do you mean, disturb normal business?
> Q. Disturbing the conduct of any normal business.
> A. No.
> Q. Did you see the Hulberts disturbing the peace in any way before the eight officers
> were on the scene?
> A. No.
> Q. Now after the eight officers arrived, did you see the Hulberts disrupting normal
> business or disturbing the peace?
> A. No.

Exhibit C (Pope Deposition) at 142-143 & 107.

At Defendant Pope's deposition, Defendant Pope was played a recording of the call that

originated from the Governor's Mansion, which complained about the presence of the Hulberts

and Patriot Picket. After listening to the call, Defendant Pope agreed that there was no concern

about public safety that justified the request, and admitted that asking picketers to move just so

that the lieutenant governor would not have to interact with them is not a lawful request:

> Q. You agree with me there's no mention of safety anywhere in there, right?
> A. No.
> Q. Okay, right, which means there's no mention of safety?

A. No.

Q. Okay, all right. So instead, what I heard was that the governor's mansion called your office and said that the lieutenant governor was about to talk to the senate building or from the senate building, and they didn't want the protesters to interact with the lieutenant governor; do you agree with me that that's a synopsis of what we heard?

MR. FREDERICKSON: Objection to the form.

THE WITNESS: Yes.

BY MR. HANSEL:

Q. Having heard that, and with your training as a 20-plus year police officer, and given that you know people have a First Amendment right to protest, **do you agree with me that preventing people from interacting with the lieutenant governor is an inappropriate reason to ask somebody that is picketing to move?**

MR. FREDERICKSON: Objection.

MR. McFARLAND: Objection. Go ahead.

THE WITNESS: **I guess that would be.**

BY MR. HANSEL:

**Q. And do you agree with me that if this call -- if this is the reason why people were asked to move, it's against their constitutional rights?**

MR. FREDERICKSON: Objection.

MR. McFARLAND: Objection. Go ahead.

THE WITNESS: **It sounds like it.**

Exhibit C (Pope Deposition) at 125-127. Defendant Pope further admitted that if he had known the full context of the call that was made, he would have acted differently and not even approached the Hulberts or Patriot Picket at all:

Q. Had you known at the time that this was the basis or the genesis of what happened, would you have done something differently, would you have not asked them to move had you known at the time?

MR. McFARLAND: Objection.

MR. FREDERICKSON: Objection.

THE WITNESS: Yes.

BY MR. HANSEL:

Q. What would you have done differently?

A. Based on that, that's different than what I was told. I probably would have never went out there at all.

Exhibit C (Pope Deposition) at 129.

The Hulberts did not disrupt or disturb normal government business, as explicitly required for an arrest for a trespass under Md. Code, Crim. Law § 6-409(b).  Yet, Defendants Wilson and

Pope arrested the Hulberts on this charge.

In an attempt to justify this unlawful arrest, Defendants Wilson and Pope baselessly claimed "[t]here were several safety issues and concerns" such as the "Maryland Legislative Session [set] to convene at 2000 hours." Exhibit F (Arrest Report) at 7-8. But, neither Defendant observed any obstruction of traffic or any unsafe conditions. Not surprisingly, the State's Attorney's Office declined to prosecute the case. *See* Exhibit C (Pope Deposition) at 226-227; Exhibit E (Wison Deposition) at 63.

Although Defendant Wilson has seen the Hulberts and Patriot Picket continue to demonstrate on the same sidewalk since the events described above, Defendant Wilson has not charged them again. Exhibit E (Wilson Deposition) at 135.

### The Phone Call from The Governor's Mansion

While the Plaintiffs and Patriot Picket had picketed in the same location without issue on several prior occasions, the demonstration on February 5, 2018, was different because the demonstration had attracted the attention of the "Governor's Mansion." As the demonstration was underway, the Maryland Capitol Police received a call from State Police executive protection.

The caller from the Governor's Mansion was Corporal Ryan Bitter, who was manning the "console," a desk at the Governor's Mansion which monitors the building's security camera feeds, radio, and telephone communications. Exhibit G (Bitter Deposition) at 24; 50. As the officer in charge of the console, Corporal Bitter was responsible for relaying any communication from the Lt. Governor's detail to the Maryland Capitol Police. Exhibit G (Bitter Deposition) at 91-92. In the five years prior, Corporal Bitter had never called the Maryland Capitol Police about any other protestors or picketers; the typical issues he would call about were improperly parked vehicles blocking the vehicle lot or the Lt. Governor's parking space. Exhibit G (Bitter

17

Deposition) at 36.

Corporal Bitter had received a call on the radio from the detail leader assigned to the Lt. Governor. Exhibit G (Bitter Deposition) at 64. The detail leader relayed to Corporal Bitter that the Lt. Governor did not want to hear Patriot Picket's message or interact with them in any way—and Corporal Bitter faithfully relayed the message to the Maryland Capitol Police:

> Q: In communicating this message to the Maryland Capitol Police, I heard you say that the concern was that they would give him a bunch of stuff for whatever reason. Did you hear that language?
> A: Yes.
> Q: My understanding of what you're telling me is that you were communicating a message that ultimately came from somebody else. Sitting here today, do you know what you meant by or what they meant in asking you to communicate it, however the particular words were chosen, what was meant by, "give him a bunch of stuff for whatever reason"?
> …
> A: As far as approaching the lieutenant governor, whatever their message was they wanted to relay to him, being arrogant to him, using derogatory language towards him.
> Q: So it had to do in the first instance with avoiding the communicating of the message, and in the second instance, avoiding any unpleasant wording in the message; is that fair?
> A: Correct.
> Q: The goal in sending an officer out was to avoid those things; is that right?
> A: Correct.
> Q: That's how it was communicated to you by the people who were with the lieutenant governor; is that right?
> …
> A: Correct.
> Q: As you've described it, you don't know what their message was because you couldn't see the signs; is that right?
> A: Correct.
> Q: Do you know how the people with the lieutenant governor determined that it might be a message he didn't want to hear or that they might be rude to him or however you would describe it?
> A: No.
> Q: But since you couldn't see the signs, obviously that was a determination that they made; is that right?
> A: Yes.
> Q: And then they communicated it to you, and then you communicated it to the Maryland Capitol Police; is that correct?
> A: Correct.

……

> Q: In communicating that, the intent was obviously that they would send a
> trooper out and do whatever could be done to try to avoid the interaction?
> A: Correct.
>
> ……
>
> Q: That's the message you got from the people with the lieutenant governor, and
> you relayed it to the people at the Maryland Capitol Police?
>
> ……
>
> A: Correct.

Exhibit G (Bitter Deposition) at 111-116. Corporal Bitter did not observe Patriot Picket break any

laws at any point. Exhibit G (Bitter Deposition) at 78.

The call originated from a member of the Lt. Governor's executive protection team, which

consists of "an advance person" and a "protection officer." Exhibit G (Bitter Deposition) at 64.

On February 5, 2018, Trooper Joseph Walder was assigned as Lt. Governor Rutherford's

protection officer. Exhibit H (Walder Deposition) at 39.  Sergeant Roby, filled in as Lt. Governor

Rutherford's advance person. Exhibit H (Walder Deposition) at 42.

Trooper Walder could not confirm who placed the call to Corporal Bitter, or who gave the

order for the call to be placed. As a protection officer, he would not have known what messages

the Lt. Governor would find unpleasant or offensive, and could not make the decision himself to

remove the picketers; the only person who could make that call would be the Lt. Governor.  Exhibit

H (Walder Deposition) at 87-89.

Sergeant Roby was Lt. Governor Rutherford's advance person on the evening of February

5, 2018. Exhibit I (Roby Deposition) at 28-30. As the advance person, it was his responsibility to

communicate directly with the desk at the Governor's Mansion. Exhibit I (Roby Deposition) at 20-

21. If the advance person encountered picketers, the advance person would generally read the signs

the picketers are carrying and sometimes share the message with their protectee. Exhibit I (Roby

Deposition) at 22; 25.

Regardless of his responsibility to communicate directly with the desk manned by Corporal Bitter, Sergeant Roby contends that he was never "part of communicating to anyone at the console that the lieutenant governor wanted to avoid a message that some picketers had on some signs or avoid any unpleasant wording in the message." Exhibit I (Roby Deposition) at 42-45; 48.

Ultimately, as a result of this line of communication, the Maryland Capitol Police were instructed to move peaceful demonstrators that were lawfully demonstrating on a public sidewalk. The civil communications officer who took the call, Lakeshia Wesby, knew that this type of call from or on behalf of elected officials must be treated urgently "because of the importance of the people who [are] calling." Exhibit J (Wesby Deposition) at 51. She also knew the likely outcome of the call, as she receives similar calls on a regular basis, approximately twice a month, and always forwards the calls to a sergeant for the express purpose of helping the official to avoid interaction with demonstrators. Exhibit J (Wesby Deposition) at 45-48. The usual response was "to have the officer in the field move people," a direction that she had received before. Exhibit J (Wesby Deposition) at 52-54. Even though she knew what would likely happen, Lakeshia Wesby directed the call to Defendant Sgt. Brian T. Pope.

Defendant Pope admitted that the phone call alerted the Maryland Capitol Police to the presence of the Hulberts and Patriot Picket near Lawyer's Mall, and was the reason that Defendant Pope approached and ultimately arrested the Hulberts. *See* Exhibit C (Pope Deposition) at 60-61. Defendant Wilson admitted that the phone call from the Governor's Mansion that "put the process in motion," resulting in the Hulberts' arrest. *See* Exhibit E (Wilson Deposition) at 25.

## PROCEDURAL HISTORY

After initial motions practice, the remaining Counts are as follows:

**Count I, against both Defendants**: Violation of Plaintiffs' First Amendment Freedom of Speech as to Lawfully Demonstrating

**Count II, against both Defendants**: Violation of Plaintiffs' First Amendment Freedom of Speech as to Lawfully Filming Officers

**Count III, against both Defendants**: Violation of Plaintiffs' First Amendment Freedom of Speech with regards to Retaliation

**Count IV, against Defendant Pope Only**: Violation of Plaintiffs' Fourth Amendment Rights with regards to False Arrest and Unreasonable Search and Seizure

**Count V, against Defendant Pope Only**: Violation of Plaintiffs' Fourth Amendment Rights with regards to Unconstitutional Excessive Force

**Count VI, against both Defendants**: Violation of Plaintiffs' Right to Free Speech under the Maryland Declaration of Rights

**Count VII, against both Defendants**: Violation of Plaintiffs' Rights to be Free from False Arrest and Unreasonable Search and Seizure under the Maryland Declaration of Rights

**Count VIII, against both Defendants**: Violation of Plaintiffs' Rights to be Free from Excessive Force under the Maryland Declaration of Rights

**Count IX, against Defendant Pope Only**: False Arrest

**Count X, against Defendant Pope Only**: False Imprisonment

## ANALYSIS

**I.     The Defendants are Not Entitled to Qualified Immunity in this Case, as Both Defendants Violated Plaintiffs' Clearly Established Constitutional Rights to Freedom of Speech and Freedom from False Arrest.**

### A.     The Applicable First Amendment Standard.

As the Supreme Court stated in *United States v. Grace*, 461 U.S. 171, 180 (1983), in striking down a statute that made it a crime to protest on the public sidewalk in front of the Supreme Court building:

> Traditional public forum property occupies a special position in terms of First Amendment protection and will not lose its historically recognized character for the reason that it abuts government property that has been dedicated to a use other than as a forum for public expression. Nor may the government transform the character of the property by the expedient of including it within the statutory definition of what might be considered a non-public forum parcel of property. The public sidewalks forming the perimeter of the Supreme Court grounds, in our view, are public forums and should be treated as such for First Amendment purposes.

*See also Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983) ("[S]treets and parks… 'have immemorially been held in trust for the use of the public, and, time out of mind,

have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" (quoting *Hague v. CIO*, 307 U.S. 496, 515 (1939))).

Requesting that Plaintiffs relocate impeded upon their rights of freedom of expression and assembly. *Schneider v. State of New Jersey, Town of Irvington*, 308 U.S. 147 (1939).  As explained by the Court in *Schneider*:

> The streets are natural and proper places for the dissemination of information and opinion; and one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place.

*Id*. at 163.  Even in a non-public forum, such as an airport, "a government official cannot 'suppress expression merely because [they] oppose the speaker's view.'" *Tobey*, 706 F.3d at 391 (4th Cir. 2013), quoting *United States v. Kokinda*, 497 U.S. 720, 721, 571 (1990).  *See also, McCullen v. Coakley*, 134 S. Ct. 2518, 2529 (2014) ("Consistent with the traditionally open character of public streets and sidewalks, we have held that the government's ability to restrict speech in such locations is very limited.")

Defendants argue that this Court should apply a "reasonable time, place, and manner restriction" analysis to the Defendants' conduct, to analyze whether Defendant Pope's order for the Hulberts and Patriot Picket to move from where they were lawfully and peacefully demonstrated acted as a "reasonable time, place, and manner restriction" on Plaintiffs' right to free speech. As stated by Defendants, "the government may impose reasonable restrictions on the time, place, or manner of protected speech, so long as the restrictions (1) are content neutral, (2) serve a significant government interest (3) leave open ample alternative channels for communication of the information, and (4) are narrowly tailored to the government's interest." ECF 76-1 at 26 (citing *Ross v. Early*, 758 F. Supp. 2d 313, 320).

At the outset, it is important to note that the "time, place and manner" test is best suited to *ex ante* restrictions, not unique individual police orders.  Courts wrestling with this issue have reached varying conclusions, with some concluding that a heightened standard of review should apply to a police officer's extemporaneous order.  *See McTernan v. City of York*, 564 F.3d 636, 655–56 (3d Cir. 2009); *Case v. City of New York*, F.Supp.3d 372 (S.D. New York. February 10, 2017); *see also Madsen v. Women's Health Ctr., Inc*., 512 U.S. 753, 765, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994).

In *Ross v. Early*, 746 F.3d 546, 553 (4th Cir. 2014),[2] the Court applied the traditional "time place and manner" analysis to a police officer's on the scene order, but noted after discussing the heightened Third Circuit standard, "we need not definitely resolve this issue for the purposes of this appeal," due to a stipulation by the parties.  *Ross v. Early*, 746 F.3d 546, 554 (4th Cir. 2014).

While the Ross opinion does generally side with the traditional analysis, the issue was not implicated in or "definitively decided" in *Ross*, and a strong dissent urged adoption of the Third Circuit standard.  The Plaintiffs urge this court to adopt and apply the standard used by the Third Circuit for the reasons detailed in *McTernan v. City of York*, and *Case v. City of New York*.

Having made this argument first, the Plaintiffs will address the standard applied in *Ross* and in the Defendants' papers.

### B.    <u>The Defendants' Actions Fail the "Time, Place and Manner" Test</u>.

It is important to note that the defense does not contend, nor does the case law seem to support, that the "time, place and manner" test should be applied to the First Amendment

---

[2] The defense cites two trial court opinions in the *Ross* matter, but ignores the superseding 4th Circuit opinion.  The Plaintiff relies on the appellate opinion.

retaliation claim.  As the defense only directs this argument at Pope's actions, the Plaintiffs will address the arguments made.

Defendants rely entirely on alleged public safety justifications to meet three of the elements of the time, place, and manner restriction analysis. Defendants claim that Defendant Pope "issued the order for safety reasons and not because of their message." ECF 76-1. They state that Defendant Pope had a significant governmental interest in issuing the order because "safety issues were reasonably anticipated in the area." ECF 76-1 at 29. Defendants claim that "[i]t is clear that Sgt. Pope's order promoted the government's substantial interest in maintaining public safety, and that the order did not burden more of the Hulberts' speech than was necessary to further that interest." ECF 76-1 at 32.

Each of these arguments ignores a considerable portion of Defendant Pope's testimony. First, as detailed at length in the Fact section above, Defendant Pope has admitted that he observed no safety concerns on the scene. Exhibit C (Pope Deposition) at 80-83; 90-91, 93-95, 114-117, 129-130.  As the defense conclusively concedes, "it is true that Sgt. Pope did not observe the presence of any immediate safety hazards during the Patriot Picket's demonstration on February 5, 2018." ECF 76-1 at 27-28; 31.

The defense argument that safety hazards may have existed at any other point in time involving any other group of people is simply irrelevant to this issue, where Defendant Pope himself testified that he did not see *anything* to indicate that a safety hazard existed with regards to *Patriot Picket and the Hulberts*, on the evening of February 5, 2018.

Content neutrality cannot be established where the sole argument is that Defendant Pope was motivated by public safety, but simultaneously admits that there were no "immediate safety hazards." The order cannot serve a significant governmental interest when the interest is promoting

24

safety *where no danger exists*, and where *no one was even around to be placed in danger*. The order cannot be narrowly tailored to meet a significant governmental interest in public safety where there is no legitimate government interest under the circumstances.  The government cannot simply restrict individual's liberties on the *unsubstantiated fear* that something might possibly happen in the future.

Defendants cite to *Kass* to assert that Defendant Pope did not need to wait until he witnessed an actual safety concern before acting. ECF 76-1 at 31. In *Kass*, the court stated that the officers did not need to "refrain from intervening until Kass actually impeded pedestrian traffic or caused a security issue," but did *not* find that the officers could act even where there was no indication that any issue could arise. 864 F.3d at 209. For example, the *Kass* court specifically noted that Kass "became agitated and hostile" when interacting with the officers, which "further increase[ed] the risk that he would impede traffic or pose a security threat." *Id*.

There was simply *no fact* to indicate that the Hulberts or Patriot Picket were any risk to public safety. Defendant Pope himself—as well as many other officers including Defendant Wilson—had seen the Hulberts and Patriot Picket demonstrate in the same manner on prior occasions and never attempted to move them, and there was no difference on the night of February 5, 2018 to justify Defendant Pope's attempt to move them that night.  Exhibit C (Pope Deposition) at 53. The idea that the Defendants concluded that Patriot Picket was a security risk on this occasion but not the others—where there are no facts to differentiate February 5, 2018 from any of the other days that Patriot Picket demonstrated—is simply ridiculous, especially given that Defendants claim such amorphous potential security risks as someone randomly getting hit by a car. *See* ECF 76-1 at 32 ("The intersection where the Hulberts stood had in fact been the site of

previous accidents in which pedestrians were struck by vehicles, including two in the past year alone.").

   In addition, while it is not necessary to defeat the Defendants' arguments, there is sufficient evidence in the record for a reasonable juror to infer that Defendant Pope *did* order the Hulberts and Patriot Picket to move because of the content of their demonstration. Defendant Pope knew that the Maryland Capitol Police had been notified as to the Hulberts' presence by the Governor's Mansion, and he knew that the call was unusual.  Exhibit C (Pope Deposition) at 63-64. Defendant Pope knew that he had been instructed to stop a lawful and peaceful protest, and to move them to another location. Defendant Pope knew that this same group had been in the same location on numerous prior occasions, and had not been moved on those prior occasions. A reasonable juror could conclude that even if Defendant Pope did not read the signs himself, or have any opinion himself on Second Amendment rights, that Defendant Pope knew they were being moved because they had *a message* and that someone in the Governor's Mansion simply did not want to be confronted with any First Amendment activity.

   Lastly, the Defendants claim that "ample alternatives" remained for the Hulberts to continue protesting, as Defendant Pope had ordered them to move to Lawyer's Mall. However, Lawyer's Mall was not "virtually the same location," and moving to Lawyer's Mall would, in fact, have "barred [them] from the general dissemination of their message." ECF 76-1 at 30. As Defendants' image of the area shows, Lawyer's Mall is further from the road and surrounded by cement blocks. *See* ECF 76-11. Moving to this area, late at night on a winter night with few light sources, would have kept the Hulberts' and Patriot Picket's messages from being seen by pedestrians traversing the sidewalk and drivers driving down the road. As Patriot Picket relies on signage and interaction with passerby to disseminate their message, not being able to be seen or

nearby anyone who may traverse the area inherently keeps them from being able to communicate at all. Exhibit A (Jeff Hulbert Deposition) 37-42.

Indeed, the explicit purpose of the order from the Governor's Mansion was to place the Hulberts in an area where they would be denied the ability to meaningfully interact with the Lt. Governor – or any other passersby for that matter.  This fact alone defeats any argument that Lawyer's Mall was a reasonable alternative.

### C.   A Reasonable Juror Could Conclude that Defendant Pope Arrested Kevin Hulbert for Filming the Arrest of Jeff Hulbert, as Kevin Hulbert Was Not Doing Anything Else, <u>and the Right to Record Police is Clearly Established Law.</u>

Defendants next claim that they are entitled to qualified immunity with regard to Plaintiffs' Count II, which relates to Kevin Hulbert's unconstitutional arrest for filming the arrest of Jeff Hulbert. They argue that "Kevin Hulbert's arrest did not have anything to do with his decision to take out his cell phone and begin filming," but that he was arrested "for failing to obey Sgt. Pope's order to move into Lawyers' Mall." ECF 76-1 at 33-34.

This argument ignores the fact that Kevin Hulbert was not obstructing the sidewalk, nor even picketing, and, thus, the order to move was unlawful.  *See* Fact section, *supra*.

Instead, Kevin Hulbert was filming Pope's misconduct when Pope decided to arrest him:

> Q. And in fact, other than not leaving the sidewalk, we'll talk about that, other than that, did the Hulberts do anything to interfere or frustrate with your police authority other than not leaving the sidewalk?
> A. No. **The second Hulbert was up on me filming when I asked him to back up. He goes well, and I wasn't sure what he was going to do. He refused to back up, and I placed him under arrest as well**.

Exhibit C (Pope Deposition) at 107 (emphasis added).

The Hulberts dispute portions of Pope's description.  Kevin Hulbert testified as follows:

> A. He turned and began to walk west, towards us again, meaning towards the center of the area where we were standing. He had walked to the east to make his radio

transmission, which we could overhear partially. Then he turned west and came walking back. And Jeff attempted to ask him a question. And I recall he put his hand up and said no, you're all under arrest.

Q. And how close were you to Sergeant Pope when he said that?
A. **I was video recording him at that time, and he walked from a position maybe 20 feet away to within maybe 10 feet of me when he put his hand up and made that statement.**
…
Q. What did Sergeant Pope do next?
A. He continued to walk towards me and passed me on the sidewalk. I maintained my position, and I kept the camera on Sergeant Pope as he walked towards me. I recall he coughed heavily as he passed me. I pivoted as he walked past me, continuing to the west. **And he walked past me another five to seven feet, and turned around, and faced east again toward me**. I had pivoted and maintained him in my camera view the entire time.

Q. And by that you mean that you had followed him for the distance; is that right?
A. With my camera. I did not move. **I was stationary from the very beginning of him walking back towards us, making the statement about you're all under arrest. And then he continued walking toward me, but he walked past me because there was room to pass me on the sidewalk, the public sidewalk.**

Exhibit B (Kevin Hulbert Deposition) at 29-31. This testimony demonstrates that Mr. Hulbert was filming silently from a safe distance and not interfering in any way with the officer's conduct of his duties. In turn, there were no grounds to order him away or arrest him – other than the illegal desire to frustrate his right to film.

A reasonable juror could conclude that Defendant Pope *did* make the decision to arrest Kevin Hulbert because he was filming, given that *Kevin Hulbert was not doing anything else* at the time that could remotely substantiate being placed under arrest.

The right to record police activity is clearly established and uniform across a majority of circuits, and this has bene the case since years before this incident. *See*, *e.g*., *Gericke v. Begin*, 753 F.3d 1, 7–8 (1st Cir. 2014) (holding that an arrest of a citizen for illegal wiretapping when she recorded a traffic stop without interfering with the police activity violated her First Amendment rights); *American Civil Liberties Union of Ill. v. Alvarez*, 679 F.3d 583 (7th Cir.2012) (enjoining

the enforcement of a state anti-eavesdropping statute against the audiovisual recording of police officers performing their duties in public because "[a]udio recording is entitled to First Amendment protection," and such protection includes "prohibit[ing] government from limiting the stock of information from which members of the public any draw"); *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2002) ("The First Amendment protects the right to gather information about what public officials do on public property, and specifically, a right to record matters of public interest"); *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir.1995) (recognizing a "First Amendment right to film matters of public interest" in a case where police officers interfered with a citizen seeking to film a public demonstration directed in part against the police); *see also Robinson v. Fetterman*, 378 F.Supp.2d 534 (E.D. Penns. 2005) ("Videotaping is a legitimate means of gathering information for public dissemination and can often provide cogent evidence, as it did in this case.").

"In the absence of 'directly on-point, binding authority,' courts may also consider whether 'the right was clearly established based on general constitutional principles or a consensus of persuasive authority.'" *Ray v. Roane*, 948 F.3d 222, 229 (4th Cir. 2020) (quoting *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 543 (4th Cir. 2017). Here, there is a clear consensus of persuasive authority in the other circuits, which indicate that the right is clearly established and well-known.

Tellingly, the principle is established and well-known to the point that *Defendant Pope himself knew that it was lawful for individuals to record*. Exhibit C (Pope Deposition) at 107-108. There is no qualified immunity defense available to Pope because he cannot meaningfully argue that he was unaware that citizens have a right to film law enforcement officers in the performance of their duties in public. Not only had this been the law for years prior to Kevin Hulbert's arrest, but Pope actually knew it.

**D.      There is Considerable Evidence to Demonstrate that the Defendants' Addition of New Charges on February 6, 2018 was in <u>Retaliation for Plaintiffs Exercising their Right to Free Speech</u>.**

Defendants ask this Court to grant summary judgment as to Plaintiffs' Count III, alleging that no causal connection exists between (1) Plaintiffs' free speech and the arrests on February 5, 2018, and (2) Plaintiffs' free speech and the additional charges that were issued against the Plaintiffs on February 6, 2018.

**i.      The Defendants were Alerted to Plaintiffs' Presence on February 5, 2018 by the Governor's Mansion, and a Reasonable Juror Could Conclude that the Defendants then Arrested Plaintiffs Specifically to <u>Preclude them from Lawfully Demonstrating</u>.**

Defendants claim that Defendant Pope's arrest of the Hulberts was entirely motivated by the refusal to relocate to Lawyer's Mall, and for no other purpose. This is simply not what the evidence has shown.

The evidence clearly shows that the reason why Defendant Pope went to Lawyer's Mall and interacted with the Hulberts was the call from the Governor's Mansion. Both Defendant Pope and Defendant Wilson admitted under oath that the call was the impetus for the arrests.  *See* Exhibit E (Wilson Deposition) at 25; Exhibit C (Pope Deposition) at 60-61. The dispatch officer who took the call from the Governor's Mansion and dispatched Defendant Pope to the scene stated that she understood the request from the Governor's Mansion was to move people, *for the express purpose of preventing the official avoid interaction with demonstrators*. Exhibit J (Wesby Deposition) at 45-48; 52-54. The caller from the Governor's Mansion, Corporal Ryan Bitter, understood that the goal of the request was to have an officer prevent demonstrators from communicating any message to the Lieutenant Governor. Exhibit G (Bitter Deposition) at 111-116.

This testimony demonstrates that each party in the chain knew what the intention was behind asking the protestors to move—specifically to avoid any possibility of confrontation or

communication between the Lieutenant Governor and the demonstrators. The individual officers part of this communication chain—from Defendant Pope through to the original caller in the Governor's Mansion—do not need to know the *specific* message that the Plaintiffs are communicating to retaliate against the content of Plaintiffs' speech when they each knew that Plaintiffs were being moved and arrested because they had *any message at all* that the Lieutenant Governor did not want to hear.

As Defendants note, the standard is whether the retaliation for the First Amendment speech was the "but-for cause" of the injury—in this case, the false arrest. *Lozman v. City of Riviera Beach, Fla.*, 138 S. Ct. 1945, 1952 (2018). That standard is clearly met here, as both Defendant Pope and Defendant Wilson admit that the *entire reason* Defendant Pope approached the Hulberts and requested that they move was because of the call from the Governor's Mansion. Defendant Pope admitted that the phone call alerted the Maryland Capitol Police to the presence of the Hulberts and Patriot Picket near Lawyer's Mall, and was the reason that Defendant Pope approached and ultimately arrested the Hulberts. *See* Exhibit C (Pope Deposition) at 60-61. Defendant Wilson admitted that the phone call from the Governor's Mansion that "put the process in motion," resulting in the Hulberts' arrest. *See* Exhibit E (Wilson Deposition) at 25.

In other words, *but-for* the officers at the Governor's Mansion calling the Maryland Capitol Police, letting them know that Plaintiffs were demonstrating in the area and requesting that they take action to prevent them from continuing, it is unlikely that Defendants would have arrested the Hulberts, especially given that they had seen the Hulberts demonstrate on several other occasions in the same spot and never sought to move them or arrest them. The only difference on February 5, 2018, and the reason behind the order and the arrest, was the call from the Governor's Mansion.

**ii.     Defendants Retaliated Against the Hulberts for
Speaking About Their Arrests By Charging the
<u>Hulberts With Additional Crimes on February 6, 2018</u>.**

Defendants argue that the decision was made to issue additional charges before the
Hulberts made any statements to the media regarding their arrests. Defendant Wilson's own
testimony demonstrates that this is not the case.

On the morning of February 6, 2018, Defendant Wilson started his workday by reading
media reports about the arrests the following night. Exhibit E (Wilson Deposition) at 82. These
media reports included "TV and social media and […] interviews." Exhibit E (Wilson Deposition)
at 32-34. Immediately after reading the media reports, Defendant Wilson pulled Defendant Pope's
report from the previous night. Exhibit E (Wilson Deposition) at 82-83. It was at this point—after
reading the news articles and pulling Defendant Pope's report—that Defendant Wilson made the
decision to add additional charges, and spoke with Sergeant Donaldson about how to issue those
charges. Exhibit E (Wilson Deposition) at 86-87.

It was also at this time, also after reading the news articles and pulling Defendant Pope's
report, that Defendant Wilson ordered that Defendant Pope edit the arrest report to add in the new
charges:

> Q. Isn't it true that when you read the report you directed that changes and edits be
> made to it, on the morning of the 6th?
> A. Yes.

Exhibit E (Wilson Deposition) at 93-95.

Defendant Wilson also testified that the news articles were negative and critical of the
Maryland Capitol Police.  He was clearly upset that the Maryland Capitol Police had been "thrown
under the bus," as he described it. Exhibit E (Wilson Deposition) at 32-34. When the new citations
were complete, Defendant Wilson, the Chief of the Maryland Capitol Police, went himself to serve

the citations on the Hulberts; an unusual decision, given that chiefs of police do not typically serve criminal citations themselves. In fact, Defendant Pope had only ever witnessed Defendant Wilson serve criminal citations that one time. Exhibit C (Pope Deposition) at 164-165.

A reasonable juror could conclude that *but-for* Defendant Wilson reading the news articles on the morning of February 6, 2018, and becoming upset at the negative news coverage and the statements that had been made by the Hulberts, Defendant Wilson would not have proceeded to order the issuance of two additional criminal charges against each Hulbert brother.

### iii.   The Doctrine of Qualified Immunity is Unconstitutional.

The Plaintiffs acknowledge the widespread adoption and application of the doctrine of qualified immunity.  Nevertheless, the Plaintiffs assert a good faith argument for a change in existing law.

Qualified immunity appears nowhere in the Constitution or the laws of the United States. Instead, it is a judicially-created doctrine that burdens pre-existing substantive rights under the U.S. Constitution and the Civil Rights Act of 1871.  Indeed, qualified immunity did not exist for the first 150 years of United States history.

Qualified immunity operates to deny relief in cases of unconstitutional misconduct.  In so doing, the doctrine violates every constitutional right to which it applies.  In many cases, the doctrine of qualified immunity renders constitutional rights entirely nugatory and meaningless, thus violated the rights themselves.

Qualified immunity violates the right to due process because it is a judicially-created doctrine which limits the substantive and procedural rights overwise available under the Civil Rights Act of 1871 and the Constitution.

Qualified immunity violates the separation of powers because it usurps the power of the legislature to modify the Civil Rights Act of 1871 and the power of the States and the people to amend the Constitution.

Qualified immunity violates the Civil Rights Act of 1871 itself by grafting requirements for recovery onto the Act which do not appear in the Act itself, thereby raising the legal requirements for recovery higher than those anticipated in the Act or approved by Congress.

Qualified immunity impermissibly narrows both the Constitutional rights to which it applies; the Civil Rights Act of 1871 and other laws, the purposes of which are frustrated by qualified immunity.

Finally, qualified immunity violates due process and equal protection because of its disproportionate impact on minorities who, themselves, are disproportionately the victims of civil rights violations.  Indeed, qualified immunity was expressly adopted to deny recovery to Freedom Riders challenging racist and unconstitutional discrimination.  *Pierson v. Ray*, 386 U.S. 547 (1967).  While the Plaintiffs are white, they have standing on this point because racism and racist doctrines demean the whole of humanity.  For these reasons, any defense based on qualified immunity should be rejected.

> **E.    Defendant Pope Did Not Have Probable Cause to Arrest the
> Hulbert Brothers on February 5, 2018 for Disorderly Conduct.**

Defendants ask that this Court grant summary judgment as to Plaintiffs' Count IV, arguing that Defendant Pope's order that the Plaintiffs relocate to Lawyer's Mall was a "reasonable time, place, and manner restriction of speech under the circumstances." ECF 76-1 at 39. However, the test for whether probable cause existed to arrest the Plaintiffs is whether *the elements of the crime charged* were met, not whether a First Amendment violation existed, as Defendants appear to assert.

As explained in *Collins v. State*, 322 Md. 675, 678–79 (1991), probable cause is a non-technical concept based upon an analysis of the totality of the circumstances which gives reasonable grounds for belief of guilt. *Id*.  "Probable cause exists where the facts and circumstances taken as a whole would lead a reasonably cautious person to believe that a felony had been or is being committed by the person arrested," or when a misdemeanor is committed in the presence of an officer. *Id*.  It is a "totality-of-the circumstances" approach. *Illinois v. Gates*, 462 U.S. 213, 230 (1983).  It is an objective standard of probability that reasonable and prudent persons apply in everyday life. *Id*. The probable-cause inquiry "turns on two factors: the suspect's conduct as known to the officer, and the contours of the offense thought to be committed by that conduct." *Smith v. Munday*, 848 F.3d 248, 253 (4th Cir. 2017) (internal quotations and citations omitted).

The elements of a crime of disorderly conduct based on the failure to obey the command of a law enforcement officer are simple: (1) a person that willfully fails (2) to obey a reasonable and lawful order (3) made by a law enforcement officer (4) to prevent a disturbance to the public peace. Md. Code, Crim. Law § 10-201(c)(3). A refusal to abide by a police officer's order is permitted where "the circumstances show conclusively that the police officer's direction was purely arbitrary and was not calculated in any way to promote the public order." *Spry v. State*, 396 Md. 682, 692–93 (2007) (quoting Drews v. State, 224 Md. 186, 192 (1961)); *see also Attorney Grievance Comm'n of Maryland v. Mahone*, 435 Md. 84, 105 (2013)).

The key element of this crime is that the order is made to prevent a disturbance to the public peace—it is not sufficient to say that a law enforcement officer declared any order of any kind, and all individuals must simply abide by that or risk committing a crime. It is only the failure of an individual to follow specifically an order promoting *public peace* that gives rise to criminal liability.

For all of the reasons previously detailed above and in the Fact section, a reasonable juror could conclude that the order given by Defendant Pope did not meet the required elements of the crime charged, and conclude that there was no justification for Defendant Pope to order the Plaintiffs to move to Lawyer's Mall.  Simply put, neither brother was disturbing the public peace and Pope admitted as much in his testimony.   Therefore, this Court should decline to grant summary judgment on Plaintiffs' Count IV.

      **G.**      **<u>All Force is Excessive Force When the Defendants Have No Right to Arrest</u>**.

Defendants ask this Court to grant summary judgment as to Plaintiffs' Count V, which relates to Defendant Pope's unconstitutional use of excessive force, on the theory that the force used was not severe enough.

The defense underplays the force used by describing it as merely including tight handcuffs. This case involved being handcuffed in a painful fashion with hands "twisted in different directions…, arms…contorted" and "one hand up and one hand down."  Exhibit B (Kevin Hulbert Deposition) at 44; Exhibit A (Jeff Hulbert Deposition) at 88-89; *see also* Exhibit A (Jeff Hulbert Deposition) at 88-95 ("I mean, something to know that they are articulating handcuffs, these were hinged handcuffs. And I told him I was in pain. He said you're just going to have to deal with it."…Q. And do you recall how long that transport took between Lawyer's Mall area and the Annapolis City Police Precinct? A. It seemed to take forever because I was in pain. I had my handcuffs cuffed behind me. And I complained again that I was in pain….I sustained wrist abrasions and muscle cramps as a function of having my arms forcefully pulled behind my back and put into handcuffs that did not allow any movement, despite the fact that I asked for some relief."); Exhibit B (Kevin Hulbert Deposition) at 45-48 ("After the handcuffs were placed on me extremely tightly, painfully tight, my arms were still contorted behind me, and Sergeant Pope lead

me over to the corner of the patrol vehicle, opened the rear door on the passenger's side, and he

placed me in the vehicle.").

    Once they arrived at the precinct, the Hulberts were left handcuffed to a metal bench for

nearly two hours.  Exhibit B (Kevin Hulbert Deposition) at 49-50; Exhibit A (Jeff Hulbert

Deposition) at 92-93.

    Other force, left unaddressed by the defense motion, was also used:

> …He had some difficulty in attaching my seatbelt. He reached over with the
> seatbelt stretching out, attempting to belt me in, but he couldn't seem to reach the
> buckle. At that point **Sergeant Pope drove his shoulder into my chest and upper
> body to drive me backwards in the seat**, to gain, I assume, more space in which
> to reach the buckle.
> Q. And were you secured by the seatbelt?
> A. Eventually. **He compressed his body weight against me to hold me back
> against the seat. I cried out in pain because my hands still contorted behind
> me at the small of my back made a fulcrum. There was a space for my upper
> back which I was bent backwards by the force of his body weight against me.
> And it hurt so much I cried out involuntarily.**
>                * * *
> A. Sergeant Pope pulled up to the rear of the precinct.… I think he left the vehicle
> and attempted to find someone to open the gate. **I'm still in pain because my
> handcuffs are so tight that my hands are falling asleep. My back still hurts,
> and I'm crushed against my own hands because the seatbelt is tight as it could
> be. It was actually under tremendous tension because it had been stretched to
> the maximum.**

Exhibit B (Kevin Hulbert Deposition) at 45-48.

    While the force at issue in this case did not involve permanent injury or death, it was

unconstitutionally excessive.  In reaching this determination, it is important to recall that *where no*

*force is authorized, any force is excessive*.  A gratuitous use of force against an unsuspecting

citizen, who does not present a danger, a threat, or is not willingly disobeying lawful orders, is *per*

*se* an unlawful use of force. *Jones v. Buchanan*, 325 F.3d 520, 532 (4th Cir. 2003) (citing *Graham*

*v. Connor*, 490 U.S. 386, 394 (1989)); *Park v. Shiflett*, 250 F.3d 843, 848, 853 (4th Cir. 2001)

(holding that the plaintiff, having committed no crime, was subjected to excessive force by police officer).

The cases that Defendants cite to for the proposition that insubstantial injury cannot substantiate a Fourth Amendment excessive force claim are outdated, and do not recognize recent developments in the law. Defendants' cases[3] predate the Supreme Court's decision in *Wilkins v. Gaddy*, 559 U.S. 34 (2010), where the Supreme Court expressly overruled the Fourth Circuit's *de minimis* requirement in Eight Amendment excessive force cases. *See Hill v. Crum*, 727 F.3d 312, 316 (4th Cir. 2013) ("While Hill's case was pending on appeal to this Court, the Supreme Court decided *Wilkins v. Gaddy*, 559 U.S. 34, 130 S.Ct. 1175, 175 L.Ed.2d 995 (2010), holding that there is no *de minimis* injury threshold for an excessive force claim, specifically rejecting the Fourth Circuit's approach in *Norman*."). The same approach is appropriate in Fourth Amendment cases, where the core inquiry must shift "from the extent of the injury to the nature of the force"; applying "some arbitrary quantity of injury" to dismiss or grant summary judgment on an excessive force claim "improperly bypasses this core inquiry." *Wilkins*, 559 U.S. at 40.

## II.   Defendant Wilson is Directly Liable for the Counts Pled Against Him, And Also Subject to Supervisory Liability for the Acts of His Employees.

The Defendants broadly claim that Plaintiffs have not established supervisory liability with respect to Defendant Wilson, without differentiating between the different counts pled against Defendant Wilson. However, Defendant Wilson is directly liable for his actions with regards to

---

[3] The only case that does not, *McGainey v. Prince George's Cty.*, Md., No. CIV. JKS 12-2080, 2013 WL 6062007 (D. Md. Nov. 15, 2013), relies entirely upon a Fourth Circuit opinion that does predate *Wilkins*. *Brown v. Gilmore*, 278 F.3d 362, 369 (4th Cir. 2002).

his decision to issue additional criminal charges against the Hulberts on February 6, 2018 and serve them with the citations himself, as pled under Counts III, VI, and VII.[4]

For Counts I, II, and VIII, Plaintiffs have established that Defendant Wilson is liable for the actions of Defendant Pope under supervisory liability. Liability of supervisory officials under § 1983 "is not based on ordinary principles of respondeat superior, but rather is premised on a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care." *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (*citing Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir.1984) cert. denied, 470 U.S. 1035 (1985) (internal quotations omitted)). "The principle is firmly entrenched that supervisory officials may be held liable in certain circumstances for the constitutional injuries inflicted by their subordinates." *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (citing *Slakan*, 737 F.2d at 372-73; *Orpiano v. Johnson*, 632 F.2d 1096 (4th Cir.1980), *cert. denied*, 450 U.S. 929 (1981); *Withers v. Levine*, 615 F.2d 158 (4th Cir.1980)).

Supervisory liability pursuant to § 1983 claims must be supported by evidence that: "(1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there

---

[4] Count III involves Defendant Wilson's direct liability for his retaliation against the Hulberts for exercising their free speech and talking with the media about their arrests by issuing additional criminal citations with significantly higher penalties, which is discussed at length above.

Count VI involves Defendant Wilson's direct liability for the same retaliatory violation of Plaintiffs' free speech under the Maryland Declaration of Rights.

Count VII involves Defendant Wilson's direct liability for falsely arresting and charging the Hulberts with the additional charges on February 6, 2018 without probable cause under the Maryland Declaration of Rights.

was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." *Shaw*, 13 F.3d at 799 (internal quotations omitted).

Thus, a supervisory official can be liable for injuries based on a supervisor's knowledge that the subordinate engaged in conduct that posed a risk of constitutional injury to citizens when the supervisor's response showed deliberate indifference to the conduct and there is a causal link between the supervisor's inaction and the plaintiff's injuries. *Id*. Under the analysis, deliberate indifference can be shown through "continued inaction in the face of documented widespread abuses." *Slakan v. Porter*, 737 F.2d at 373; *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir.1977).

Here, as Defendants themselves admit, Defendant Wilson was notified of the situation prior to the arrests on the night of February 5, 2018. *See* ECF 76-1 at 5. Defendant Wilson claimed that he told Sergeant Donaldson to move demonstrators to a "safe location":

> A. That was about it. I told him to go up himself or send somebody up to look and evaluate the situation, if there was unsafe conditions, tell people to make it safe, tell people to move where it would be a safe location.

Exhibit E (Wilson Deposition) at 22. Defendant Pope, in turn, was told that Defendant Wilson had ordered that the demonstrators be moved to Lawyer's Mall, even though the demonstrators did not have a permit. Exhibit C (Pope Deposition) at 74. At that time, prior to the arrests, a reasonable juror could conclude that Defendant Wilson knew that problems could arise as a result of the situation, as Defendant Wilson very quickly identified the arrests as potentially "politically significant" as soon as he was informed, and notified the Secretary of the Department of General Services immediately. Exhibit E (Wilson Deposition) at 74-75. Contrary to Defendants' argument, it is absolutely possible that Defendant Wilson knew, or had reason to suspect, what might occur, given his familiarity with the Hulberts, his knowledge that they do not obtain permits, and his knowledge that they always protest on the sidewalk and not in Lawyer's Mall, given that they do

not obtain permits. Exhibit E (Wilson Deposition) at 16-18. Further, given Defendant Wilson's involvement in issuing orders prior to the arrest and immediately being prepared to brief the Secretary of the Department of General Services after the arrest, a reasonable juror could find that Defendant Wilson had actual or constructive knowledge that Defendant Pope was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to Plaintiffs.

In fact, a reasonable juror could conclude that Defendant Wilson not only knew about the unconstitutional conduct, but ordered it, as it was Defendant Wilson's order, delivered through Sergeant Donaldson, that caused Defendant Pope to leave the station and approach the Plaintiffs near Lawyer's Mall.

A reasonable juror could also conclude that Defendant Wilson's actual or constructive knowledge that Defendant Pope would illegally attempt to stop Plaintiffs' demonstration and force Plaintiffs to move to Lawyer's Mall, or, in the alternative, that Defendant Wilson directly ordered Defendant Pope to do so, constituted a response so inadequate as to show deliberate indifference or tacit authorization of the conduct. Given the severity of the constitutional rights at issue here— the right to freedom of speech and the right to be free from false arrest and excessive force—any juror would be reasonable in concluding that Defendant Wilson's failure to do anything at all to ensure that the abuses did not occur constituted deliberate indifference to Plaintiffs' constitutional rights.

The third prong is also met in this case, as there is a distinct causal link between Defendant Wilson's express instruction to Defendant Pope, through Sergeant Donaldson, to move the Plaintiffs to Lawyer's Mall and the harm that resulted, as the order issued by Defendant Wilson through Defendant Pope illegally deprived Plaintiffs of their First Amendment rights, and it was

directly due to the illegal nature of the order that Plaintiffs chose to remain on the public sidewalk

rather than move to Lawyer's Mall, which led to their arrests.[5]

### III. Summary Judgment is Not Appropriate for Plaintiffs' State Law Claims as Malice and Gross Negligence Are Issues for the Jury to Decide.

Defendants attempt to claim statutory immunity under the Maryland Tort Claims Act, Md.

Code, State Gov't § 12-104, et seq. ("**MTCA**"), on the basis that there is allegedly no evidence

demonstrating either malice or gross negligence in this case.

"To state a claim for gross negligence the plaintiff must allege that the defendant

"'intentional[ly] fail[ed] to perform a manifest duty in reckless disregard of the consequences as

affecting the life or property of another'" or "'thoughtless[ly] disregard [ed] the consequences [of

its breach of duty] without the exertion of any effort to avoid them.'" *Brooks v. Jenkins*, 220 Md.

App. 444 (2014), quoting *Barbre v. Pope*, 402 Md. 157 (2007) (emphasis removed) (citation

omitted)). "Gross negligence has been equated with 'wilful and wanton misconduct,' a 'wanton

or reckless disregard for human life or for the rights of others.'" *Foor v. Juvenile Services Admin.*,

78 Md. App. 151, 170, (quoting *White v. King*, 244 Md. 348 (1966)).

The Court of Appeals has defined "gross negligence" for purposes of governmental

liability in *Newell v. Runnels*, 407 Md. 578, 638 (2009). In *Newell*, the court ruled that the standard

for "gross negligence" under the MTCA was "something more than simple negligence, and likely

more akin to reckless conduct," and included "a thoughtless disregard of the consequences without

the exertion of any effort to avoid them." *Newell*, 407 Md. at 638; *see also Liscombe v. Potomac*

---

[5] Defendants also appear to claim that Defendant Wilson not liable for his decision to issue the additional charges against the Hulberts, as "[t]he overwhelming evidence shows that the decision to add more charges was made on the evening of February 5, 2018." ECF 76-1 at 44. Plaintiffs interpret this paragraph as arguing that Defendant Wilson did not retaliate against Plaintiffs for exercising their First Amendment rights, and not as an argument as to supervisory liability. This argument is addressed at length above in Section I.C.ii.

*Edison Co.*, 303 Md. 619, 635 (1985); *Romanesk*, 248 Md. at 423; *Catterton v. Coale*, 84 Md. App. 337, 344 (1990) ("Again, the allegation of a fabrication by Coale is sufficient to show malice or gross negligence. She is, therefore, not entitled to the immunity provided in the Maryland Tort Claims Act.").

Defendants' conduct, as described herein, easily constitutes a "thoughtless disregard" of the First Amendment and Fourth Amendment rights of Plaintiffs. Defendant Pope ordered the Plaintiffs to move to Lawyer's Mall without any consideration to the impact on Plaintiffs and without any indication that there was any reason to do so, given that Defendant Pope admitted that he had observed on several occasions prior to arresting the Plaintiffs that he did not observe any safety concerns, any obstruction of pedestrian or vehicular traffic, or any other justification to support his insistence that the Plaintiffs move. Defendant Pope then arrested Plaintiffs without any indication of probable cause for the crime alleged, and used excessive force in ensuring the arrest of two completely compliant individuals.

Defendant Wilson either thoughtlessly disregarded the potential impact that ordering his subordinate, Defendant Pope, to illegally and unjustifiably move the Plaintiffs would have on the Plaintiffs, or directly ordered that the move be done regardless of the illegality. When he learned about the negative press the next morning, Defendant Wilson immediately retaliated against the Plaintiffs for exercising their First Amendment rights in speaking with the press by finding a way to add new charges against both brothers, significantly increasing the potential penalties that the Hulberts faced.

Further, both Defendants admitted that the motivation behind moving the demonstrators, and ultimately arresting the Hulberts, was the call that originated from the Governor's Mansion. Defendant Pope admitted that the phone call alerted the Maryland Capitol Police to the presence

43

of the Hulberts and Patriot Picket near Lawyer's Mall, and was the reason that Defendant Pope approached and ultimately arrested the Hulberts. *See* Exhibit C (Pope Deposition) at 60-61. Defendant Wilson admitted that the phone call from the Governor's Mansion that "put the process in motion," resulting in the Hulberts' arrest. *See* Exhibit E (Wilson Deposition) at 25. As Lakeshia Wesby, the dispatcher, testified, it was understood that receiving a call like that meant that the official calling wanted to Maryland Capitol Police to move demonstrators simply so that the official did not have to communicate with them—an illegitimate reason to deprive an individual of their First Amendment rights. Exhibit J (Wesby Deposition) at 45-4 ("She knew the likely outcome of the call, as she receives similar calls on a regular basis, approximately twice a month, and always forwards the calls to a sergeant for the express purpose of helping the official to avoid interaction with demonstrators.").

Finally, it is well settled that "gross negligence, is a question for the jury to decide." *Romanesk v. Rose*, 248 Md. 420, 424 (Md. 1968); *Keesling v. State*, 288 Md. 579, 591 (Md. 1980) ("It is a question for the jury to decide whether this conduct of the police fell so far below the duty of police to protect the welfare of the public as to amount to negligence."); *Brooks v. Jenkins*, 220 Md. App. 444, 463 (2014) (in a police dog shooting case, "it is 'for the trier of fact' to determine whether a defendant acted with gross negligence"); *Taylor v. Harford County Dept. Of Social Services*, 384 Md. 213, 229 (2004) (holding that "[o]rdinarily, unless the facts are so clear as to permit a conclusion as a matter of law, it is for the trier of fact to determine whether a defendant's negligent conduct amounts to gross negligence."); *see also Artis v. Cyphers*, 100 Md. App. 633, 652 (1994).

**IV.**     <u>**Defendant Pope Did Not Have Probable Cause to Arrest the Plaintiffs**</u>.

Defendants argue that this Court should grant summary judgment with respect to Counts IX and X, for false arrest and false imprisonment, because "the Hulbert brothers ignored repeated orders to move a short distance and a reasonable fact-finder could not conclude that the Hulbert brothers obeyed Sgt. Pope's orders." ECF 76-1 at 49. Defendants do not state the elements of the crimes for which Plaintiffs were arrested, and make no attempt to explain how the evidence satisfies each individual element. Parsing the Defendants' argument, it appears that their claim is that probable cause existed for Plaintiffs' arrest based on a single fact: that Plaintiffs did not obey Defendant Pope's (unlawful) orders.

The common law tort claims of false arrest and false imprisonment consist of the deprivations of one's liberty without consent or legal justification. *Cooper v. Dyke*, 814 F.2d 941, 946 (4th Cir. 1987) (holding that whether the officer's arrest of complainant was legally justified was a question for the jury.); *Okwa v. Harper*, 360 Md. 161, 189–90, 757 A.2d 118, 133 (2000) ("Although the intentional torts of false arrest and false imprisonment are separate causes of action, they share the same elements."). As explained in *Cooper v. Dyke*, "[u]nder Maryland law, the existence of 'legal justification' is judged according to the principles derived from the law of arrest." 814 F.2d at 946.  Thus, in the case of police officers, "a warrantless arrest is justified only if (a) a misdemeanor or felony was committed in their presence—not even arguably the case here, or (b) if the officers have probable cause to believe that a felony has been, or is about to be, committed." *Id.  See also Okwa v. Harper*, 360 Md. at 190 (citing former Article 27, recodified in Md. Crim. Proc. § 2-202, which states, "[a] police officer may arrest without a warrant a person who commits or attempts to commit a felony or misdemeanor in the presence or within the view of the police officer.").

In *Okwa v. Harper*, the Maryland Court of Appeals held that the factual allegations against officers for false arrest and false imprisonment presented a jury question where the appellant argued that the officers did not have probable cause for his arrest. *Id*. at 187.  In that case, the officers argued that the appellant was "waiving his hands in the air, yelling, repeatedly refusing to obey Officer Potter's orders to cease and desist this activity in the Airport," and that "a reasonable person observing Mr. Okwa's conduct could believe that Mr. Okwa committed the offense of disorderly conduct." *Id*.  The Court reversed the circuit court's granting of summary judgment in favor of the officers, explaining that a jury question existed as to probable cause for the arrest, and therefore the court was precluded from ruling on the claims of false arrest and false imprisonment. *Id*. at 191 (The court likewise held that the officers were not entitled to qualified immunity).

Defendant Pope ultimately issued three citations each for the Hulbert brothers, covering three different criminal acts. The first citation, issued on the night of February 5, 2018, was for disorderly conduct; as Plaintiffs have explained at length in Section I.D., the elements of this crime were not met in this case as the crime only applies to certain orders issued by law enforcement involving a disturbance to the public peace, which is not applicable here.

On February 6, 2018, Defendant Pope issued two additional citations to each Hulbert brother on the order of Defendant Wilson: "Obstructing public walks" under COMAR 04.05.01.03 and Trespass under Md. Code, Crim. Law § 6-409(b). As with the initial citation for Disorderly Conduct, Defendant Pope did not have any probable cause to issue citations for obstruction of public walkways or trespass.

Obstruction of public walkways requires that an individual *actually* obstruct the walkway; pursuant to the plain language of the regulation, an individual is not subject to arrest if an officer just *thinks* that a person *may* obstruct a walkway. *See* COMAR 04.05.01.03 (an "individual shall

be subject to arrest if the individual: … (5) Obstructs: … (b) Walks."). Defendant Pope walked by
the Hulberts and Patriot Picket several times, and at no point did Defendant Pope ever witness an
actual obstruction of any walkway, noting that pedestrian traffic could continue to freely flow. See
Exhibit C (Pope Deposition) at 80-81; 90-91; 93-95. In fact, Defendant Pope never even saw
anyone else around that was not associated with Patriot Picket who even *could* have had their
pathway obstructed until after he had arrested the Hulberts. Exhibit C (Pope Deposition) at 80-81;
90-91; 93-95; 114-117. As Defendant Pope confirmed:

> Q. … Prior to the officers' arrival, the way you described it to me, there was no
> disturbance or disruption of the normal business in the area by these people being
> there?
> A. Not at that time, no.
> Q. Prior to the officers being there?
> A. Correct.

Exhibit C (Pope Deposition) at 129-130.

Defendant Pope similarly had no probable cause for the trespass citation. The elements of
a criminal trespass under the statute include: (1) an individual entering a public building or public
grounds, (2) during regular business hours, (3) who is requested to leave by an authorized
government employee, (4) the circumstances indicate to a reasonable person that they have no
apparent lawful business at the location or are acting in a manner disruptive of normal business,
and (5) the individual refuses to leave. See Md. Code, Crim. Law § 6-409(b). As with the
Disorderly Conduct claim, it is clear that this statute does *not* apply to all orders made by law
enforcement personnel, but only applies to *some* orders made by the appropriate law enforcement
officers in particular circumstances.

As Defendant Pope admitted:

> Q. … obviously based on your training, people have a right to be there even when
> the lieutenant governor might walk by?
> MR. FREDERICKSON: Objection.

THE WITNESS: Yes.

Exhibit C (Pope Deposition) at 127.  Given this admission, the only way that Defendant Pope could meet the elements of the citation he issued would be if he observed the Hulberts acting in a manner disruptive of normal business.

Finally, Defendant Pope did not witness acts by either Hulbert that were disruptive in any way.  Exhibit C (Pope Deposition) at 142-143; *see also* Exhibit C (Pope Deposition) at 107.

## V.     MSI Has Both Organizational and Representational Standing.

Jeff and Kevin were members of MSI at the time of their arrest and they remain members to this day.  Yet, the defense remarkably asserts that MSI "has nothing to do with this case." ECF 76 at 4; ECF 76-1 at 50.  Indeed, the defense asserts that the "interests it seeks to protect are not germane to the issues in this lawsuit." *Id*. For the reasons set for below, the Defendant's arguments are unavailing.

At the very least, there are disputed issues of fact that preclude summary judgment for the State on MSI's representational and organizational standing.  *See Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 212 (4th Cir. 2020) (reversing summary judgment on standing grounds, concluding that "the district court improperly weighed the evidence, which was error at the summary judgment stage").

The Supreme Court has long recognized a right of association, which helps to enable "[e]ffective advocacy of both public and private points of view." *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460 (1958); *see Buckley v. Valeo*, 424 U.S. 1, 65-66 (1976) (per curiam). The Court further has stated that the "[i]nviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs." *Patterson*, 357 U.S. at 462.

MSI is an advocacy organization dedicated to the use of First Amendment rights to promote Second Amendment rights.  https://www.marylandshallissue.org/jmain/about-us.  As explained in the deposition of MSI's President, MSI has participated in advocacy during the legislative session for the very purpose of "encourage[ing] people to come and vocalize their support for the constitutional rights that we advocate on behalf of." Exhibit K (Pennak Deposition) at 72. MSI "encourage[s] people to exercise their constitutional rights; to make their views known . . . including on the public sidewalks . . . to talk to their legislators, not only in their offices but on the sidewalks of Annapolis." *Id*. In short, MSI urged its members to "exercise their rights guaranteed by the First Amendment and Article 13 of the State Declaration of Rights," including "in the streets of Annapolis." *Id*. at 72-73. Indeed, the President of MSI has conducted advocacy at the very sidewalk location at which the Hulberts were arrested and has encouraged MSI members to do likewise. Exhibit K (Pennak Deposition) at 89-90.

Here, when Jeff and Kevin Hulbert were arrested they were engaged in the sort of advocacy activities that MSI encourages its members to conduct.  The Defendants concede that Jeff and Kevin are members of MSI, but argue that Kevin and Jeff were members of the Patriot Pickets, that MSI and Patriot Pickets were separate and that therefore the arrests could not possibly harm MSI.  But that argument is a strawman.  Patriot Pickets was not an entity, it was simply an informal name adopted by a group of like-minded individuals, many (if not most) of whom are members of MSI. Exhibit K (Pennak Deposition) at 92. The exercise of their First Amendment protected speech is at the core of the mission of MSI.

The defense also argues that MSI could not be harmed by the arrest of two of its members because MSI's President has refused to release MSI's membership list on First Amendment grounds. Exhibit K (Pennak Deposition) at 32-34.  The defense fatuously suggests that "Mr.

Pennak does not explain how MSI's members are both required to remain secret in order to be free from inherent retaliation, but also chilled from being vocal about their beliefs." ECF 76-1 at 51. The point is not hard. MSI members "understand that [the] defense [of the Second Amendment] is politically unpopular in this State, and they don't wish to be revealed and identified as such so that they can be open to retaliation by third parties." Exhibit K (Pennak Deposition) at 33. Persons who gather on the sidewalk do so anonymously. They don't wear name tags.  Such persons are not open to the same sort of "doxing" that a wholesale release of MSI's detailed membership list, with full names, email and postal addresses, would entail.

### A.     <u>MSI Has Representational Standing</u>.

A plaintiff has personal standing when he can demonstrate: (1) an injury-in-fact; (2) that is fairly traceable to the challenged statute; and (3) that will likely be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–62 (1992). An association has standing to assert its own rights as well as its members' rights, and thus has representational standing if any of its members would have individual standing. *See*, *e.g.*, *Warth v. Seldin*, 422 U.S. 490, 511 (1975); *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 342 (1977); *Outdoor Amusement Business Association, Inc. v. DHS*, slip op. at 7, --- F.3d ----2020 WL 7410295 (4th Cir. 2020).  Here, the defense questions only whether MSI and/or its members have suffered an injury, as the remaining elements are obviously present here.

MSI has representational standing to seek to remedy the chilling on behalf of Kevin and Jeff (who are MSI members) as well as on behalf of its other members.  The arrests of Jeff and Kevin flowed from a call from the Governor's "mansion" expressing concern that "there are people setting up signs at College Ave and Layer mall," that the "Lt. Gov. is in the Miller Senate [Building] and has to walk that way" and that these individuals "are going to be asking for stuff."

ECF 76-8. It is thus more than a fair inference that Jeff and Kevin were arrested because the "mansion" did not like the "signs" and did not want to hear what Kevin and Jeff and the other "people" holding signs wanted to "ask." The "mansion" thus directed the police to suppress the lawful presence of Jeff and Kevin and others on a public sidewalk and the defendants here were happy to oblige, all without a second thought to plaintiffs' First Amendment rights. *See Bretemps v. Town of Brentwood*, 9 F.Supp.3d 571, 579 (D.Md. 2014). Kevin and Jeff were arrested when they lawfully insisted on their First Amendment rights to hold those signs in a public forum where, as this Court has already held, they had every constitutional right to be. *Hulbert v. Pope*, slip op. at 6, 2019 WL 1409707 (D. Md. 2019).

Lakeisha Wesby, a civilian police communications operator for the Capitol Police, testified that she took the call from the "mansion" that night of the arrests and that such requests from the mansion for police action occurred twice a month and were thus common. Exhibit J (Wesby Deposition) at 11-14; 34-37. The inference is fair that the Capitol Police and the "mansion" have a tacit practice of such calls and resulting police action. Every member of MSI bears the same risk of offending the "mansion" with their speech and being arrested if they were so bold as to insist on their constitutional rights, as Jeff and Kevin did in this case.

These arrests and the tacit practice between the "mansion" and the Capitol Police chills speech. "The test is not whether [plaintiffs'] First Amendment rights were chilled, but whether a person of reasonable firmness in [plaintiffs'] situation would have been chilled." *Ruttenberg v. Jones*, 283 Fed.Appx. 121, 130 (4th Cir. 2008). *See also Blankenship v. Manchin*, 471 F.3d 523, 530 (4th Cir.2006) (noting that this is an "objective inquiry"); *Suarez Corp. Industries v. McGraw*, 202 F.3d 676, 686 (4th Cir. 2000). A reasonable jury could easily find that, by arresting Jeff and Kevin, defendants and the mansion "'engaged the punitive machinery of the government in order

to punish'" these individuals "'for speaking out.'" *Blankenship*, 471 F.3d at 531, quoting *Garcia v. City of Trenton*, 348 F.3d 726, 729 (8th Cir. 2003).

Such a "chilling" is sufficient injury for purposes of standing. *See*, *e.g.*, *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2006). Government action is "sufficiently chilling when it is likely to deter a person of ordinary firmness from the exercise of First Amendment rights." *Benham v. City of Charlotte*, 635 F.3d 129, 135 (4th Cir. 2011). Under this test, a plaintiff need not show that he actually ceased exercising his rights. *Kenny v. Wilson*, 885 F.3d 280, 289 n.3 (4th Cir. 2018); Cooksey v. Futrell, 721 F.3d 226, 237 (4th Cir. 2013). A personal of ordinary firmness would be "chilled" by the display of raw governmental power in which the "mansion" and the defendants engaged. This conduct also chills all members of MSI who may wish to engage in similar advocacy. *See Cooksey*, 721 F.3d at 235 ("In First Amendment cases, the injury-in-fact element is commonly satisfied by a sufficient showing of "self-censorship, which occurs when a claimant is chilled from exercising h[is] right to free expression."). A strong factual showing is not required for such standing. *See Davison v. Randall*, 912 F.3d 666, 678 (4th Cir. 2019) (In First Amendment cases, "standing requirements are somewhat relaxed . . . particularly regarding the injury-in-fact requirement").

## B.    MSI Has Organizational Standing.

If MSI has representational standing, the Court need not address organizational standing. North Carolina State Conference of the *NAACP v. Raymond*, 981 F. 295, 301 (4th Cir. 2020). That said, MSI also has organizational standing because the arrest of two of its members chills the very exercise of First Amendment advocacy activities in which MSI, as an organization, constantly engages and urges its members to do likewise. The arrests have undermined the ability of MSI to function, caused MSI to divert resources to counteract the chilling effect caused by the arrests and

adversely impacted MSI's capability to attract and retain members. These injuries satisfy the requirements for organizational standing. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) ("[C]oncrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests.").

An organization has standing to challenge a "policy frustrates the organization's goals and requires the organization 'to expend resources in representing clients they otherwise would spend in other ways,'" *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 943 (9th Cir. 2011) (en banc) (citation omitted). *See also Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2562 (2019) (a "diversion of resources" satisfies the injury requirement); *Fair Emp't Council of Greater Washington, Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994) (sustaining organizational standing where the defendant's actions "have interfered with these [plaintiff's] efforts and programs and have also required the [plaintiff] to expend resources to counteract" defendant's challenged conduct); *New York v. DHS*, 969 F.3d 42, 61 (2d Cir. 2020) ("An organization need only show a "perceptible impairment" of its activities in order to establish injury in fact.") (citation omitted).

Here, defendants' and the mansion's practice impair the ability of MSI to function as an advocacy organization. For example, during the legislative session, the President of MSI (who speaks for MSI, Exhibit K (Pennak Deposition) at 23), engages in advocacy on the very sidewalks where the Hulberts were arrested. Exhibit K (Pennak Deposition) at 89-91. He now must consider whether he will face arrest if the "mansion" and defendants do not like his speech. That is a sufficient chilling to establish standing. *Kenny*, 885 F.3d at 289 n.3.  MSI also has been forced to divert resources "to ameliorate the effects that the chilling has caused by the actions of these

Defendants and the Capitol Police" by spending time and money in order to convince its members to exercise their First Amendment rights, notwithstanding these arrests.   Exhibit K (Pennak Deposition) at 66.  The arrests thus undermine that vital function of MSI. *Id*. at 67.

MSI's "membership has been affected, because people are more afraid of being arrested or otherwise being retaliated against to the extent that they express support for the Second Amendment in this State." *Id*. at 66.  People "are not going to join our organization if they're afraid that somehow that joining [] the organization might lead to retaliation."  *Id*. at 68.

**VI.**   **Punitive Damages are an Issue That Should Be Reserved for the Jury.**

As with Plaintiffs' argument above in Section III regarding statutory immunities under the MTCA based on malice or gross negligence, questions of motivation are best resolved by the jury, and not by this Court on summary judgment.

A reasonable juror could conclude that the motivation behind the order to move the demonstrators to Lawyer's Mall and the arrests of the Hulberts when they did not move from the public sidewalk was to silence the Hulberts and discourage their viewpoints, for the sole reason that someone from the Governor's Mansion objected to interacting with the demonstrators. This implies an evil motive, to illegally silence Plaintiffs, or a recklessness or callous indifference to whether or not the actions undertaken were constitutional or deprived Plaintiffs of their rights.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court deny Defendants' Motion for Summary Judgment.

## REQUEST FOR HEARING

Plaintiffs request a hearing.

Respectfully submitted,

HANSEL LAW, PC

_____
/s/ Cary J. Hansel
Cary J. Hansel (Bar No. 14722)
cary@hansellaw.com
2514 N. Charles Street
Baltimore, MD 21218
Phone: (301) 461-1040
Fax: (443) 451-8606
*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 10th day of February, 2021, I caused the foregoing to be filed

via the Court's electronic filing system, which will make service on all parties entitled to service.

_____
/s/ Cary J. Hansel
Cary J. Hansel