IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

JEFF HULBERT, *et al.*                *

    Plaintiffs                *

    v.                *        Case No. 1:18-CV-00461-SAG

SGT. BRIAN T. POPE, *et al.*                *

    Defendants                *

*   *   *   *   *   *   *   *   *   *   *   *   *

DEFENDANTS' REPLY MEMORANDUM IN SUPPORT
OF THEIR MOTION FOR SUMMARY JUDGMENT

I.    PLAINTIFFS SPENT THE LION'S SHARE OF DISCOVERY, THE MOTION TO COMPEL,
AND OPPOSITION TO THE MOTION FOR SUMMARY JUDGMENT TRYING TO MAKE
THE SUBSTANCE OF THE CALL FROM THE GOVERNOR'S MANSION SEEM
MATERIAL AND, DESPITE THOSE EFFORTS, IT IS SIMPLY IMMATERIAL.

When the theory outlined in Plaintiffs' Complaint that the arrests were motivated by Col.

Wilson's allegiance to certain democratic members of the General Assembly did not pan out,

Plaintiffs' theory of the case transformed into a belief that the republican lieutenant governor of

Maryland orchestrated the arrests.  The basis for Plaintiffs' new theory is a call that originated

from a Maryland State Police officer who was assigned to the governor's mansion in Annapolis to

the dispatcher for the Maryland Capitol Police inquiring about an unknown group setting up a

demonstration on the sidewalk by Lawyers' Mall.  The fact that the call happened is relevant—not

material—to the issues in this case.[1]  It is relevant because it caused Sgt. Brian Pope to seek advice

from his superior officer about how to respond.  This later resulted in Sgt. Pope's first conversation

with Kevin Hulbert.  But that is it.  The undisputed material facts show that, at the time, Sgt. Pope

---

[1] If anything, the call shows how the Maryland Capitol Police's and, specifically, Sgt. Pope's actions were reasonable in responding to an external call to their agency.

did not hear the substance of the call.  Ex. B: Pope, 123:9-12, 127:11-14.  The undisputed material facts show that, at the time, Col. Wilson did not hear the substance of the call.  Ex. E: Wilson, 24:14 – 25:3.  "Probable cause is determined from *the totality of the circumstances known to the officer at the time* of the arrest."  *Brown v. Gilmore*, 278 F.3d 362, 367 (4th Cir. 2002) (internal citation omitted) (emphasis added).  The substance of the call could not have informed Sgt. Pope's or Col. Wilson's decision making because they had no knowledge of it during the relevant times.  The substance of the call is simply not a factor, no matter how hard the Plaintiffs try to force it into an issue.

After Sgt. Pope's first conversation with Kevin Hulbert, all future communications with members of Patriot Picket occurred for unrelated reasons; namely, Sgt. Pope saw them on the sidewalk later in the evening ignoring the order that he gave to Kevin Hulbert, and not because of a call to the Maryland Capitol Police dispatcher, Lakisha Wesby.  Ex. B: Pope, 85:14 – 86:10, 91:8-18.  Moreover, after Ms. Wesby recited her version of the call to Sgt. Pope—that because no permits were issued for demonstrations on February 5, 2018, Ms. Wesby asked Sgt. Pope to "straighten that out," *see* Ex. B: Pope, 64:21 – 65:9—but before his first encounter with Kevin Hulbert, Sgt. Pope sought guidance from his superior officer, Sgt. Dennis Donaldson, about how to respond.  Ex. B: Pope, 69:10 – 70:4.  The first encounter with Kevin Hulbert was a product of Sgt. Pope's consultation with Sgt. Donaldson.

### Plaintiffs' Have Exhausted Efforts to Make the Substance of the Call Seem Material

Plaintiffs have made tremendous efforts to find a way to make the substance of the call seem material.  Every employee of the Maryland Capitol Police who Plaintiffs deposed was asked

about it.  ECF 84-2 at 30[2] (Plaintiff's Ex. C: Pope, 125:2, 7); Ex. E: Wilson, 28:8; Exhibit Y: Supplemental Deposition of Rebecca Labs, 119:4, 16; Exhibit Z: Supplemental Deposition of Dennis Donaldson, 52:9-10; Exhibit AA: Supplemental Deposition of Lakisha Wesby, 66:2.  Then, specifically to learn more about the substance of call and seek evidence that would allegedly connect the arrests to the lieutenant governor, Plaintiffs deposed several Maryland State Police officers who work in executive protection, including Corporal Ryan Bitter, Sgt. Angelo Shusko, Trooper Joseph Walder, Sgt. Catherine DeCerbo, and Sgt. Kevin Roby.  Plaintiffs also attempted to take the deposition of Lt. Governor Boyd Rutherford, and were successful in getting his written deposition.  Exhibit BB: Written Deposition of Lt. Governor Boyd Rutherford.  Lt. Governor Rutherford confirmed that he had no knowledge of any fact relevant to this case or to the theory that the arrests were politically motivated by the lieutenant governor.  Ex. BB, *passim*.  After his written deposition, Plaintiffs indicated that, in addition to the discovery disputes about the State's documents produced pursuant to a subpoena, renewed efforts to take a traditional deposition of the lieutenant governor would likely follow.

Plaintiffs' subpoena to the State sought a significant volume of emails.  After production, Plaintiffs disputed the redactions made to several of the emails.  After months of discussion and narrowing of the issues, Plaintiffs filed a motion to compel regarding a small fraction of the emails produced, which ostensibly asked this Court to consider whether a chain of emails responsive to a media inquiry from FOX 45 News WBFF was subject to the deliberative process privilege.  A significant portion of the "Factual Background" for the motion to compel, however, was a focused attempt to make the call from the governor's mansion appear material.  ECF 80-2 at 4, ¶ 3 – 9, ¶ 13; 10, ¶ 18.  The motion bluntly articulated the theory that "the motivation behind Defendant

---

[2] Throughout this reply memorandum, the pinpoint citations for an ECF document will be to the page number assigned by the ECF filing system rather than the page number of the particular document.

Pope's attempt to relocate Plaintiffs and the subsequent arrests was the call from the Governor's Mansion." ECF 80-2 at 10, ¶ 18.  None of this was relevant to whether the deliberative process privilege was correctly asserted.

Now, with a motion for summary judgment pending, Plaintiffs continue efforts to make the substance of the call appear material.  The call from the governor's mansion is a theme for Plaintiffs that is woven throughout their opposition to the motion for summary judgment, which even permeates MSI's standing arguments in alleging that "[t]he 'mansion' thus directed the police to suppress the lawful presence of Jeff and Kevin and others on a public sidewalk and the defendants here were happy to oblige, all without a second thought to plaintiffs' First Amendment rights." ECF 83 at 54.

### The Standard of Review for a Motion for Summary Judgment is Different From a Motion to Dismiss, and Plaintiffs Cannot Make Bald Allegations About the Substance of an Immaterial Call to Survive Summary Judgment

Plaintiffs survived the motion to dismiss, primarily, because their Complaint alleged throughout that the Maryland Capitol Police were enforcing a new "policy" when the Plaintiffs were arrested.  Judge Russell could not grant Sgt. Pope or Col. Wilson qualified immunity because "the Court needs to know the content of the alleged new policy in order to determine . . . whether Defendants violated Plaintiffs' constitutional rights."  ECF 17 at 13.  Moreover, this Court noted that "Plaintiffs do not plead the content of the policy."  ECF 17 at 14.  The Court wanted "discovery regarding the precise contours of the policy, if it exists."  ECF 17 at 14.  Plaintiffs survived the state constitutional claims at the motion to dismiss stage because "Plaintiffs plead that Defendants' conduct amounted to an intentional effort to injure them by subjecting them to criminal charges on the basis of disagreement with their political views.  The facts, if proven, could amount to malice or gross negligence."  ECF 17 at 20.  Plaintiffs survived the state tort claims as to Sgt. Pope because, again, Sgt. Pope allegedly gave an order to enforce a "new policy devised by Col.

Wilson." ECF 17 at 21. This Court could not dismiss the claims because "it is not clear whether the Hulberts' arrest was justified by a preceding lawful order such that Sgt. Pope acted within his legal authority and without malice or gross negligence," which, again, was dependent on the alleged new "policy" in Plaintiffs' Complaint. ECF 17 at 21.

At the motion to dismiss stage, this Court was required to accept the well-pleaded facts as true. Plaintiffs survived because they alleged that there was a new policy, but no evidence of such a new policy came out during discovery. In fact, the word "policy" only appears once in Plaintiffs' opposition and it is in support of MSI's standing argument. ECF 83 at 56 ("An organization has standing to challenge a 'policy frustrates the organization's goals and requires the organization 'to expend resources in representing clients they otherwise would spend in other ways.'"). Instead of a new policy, the undisputed material facts show that Sgt. Pope was enforcing a time, place, and manner restriction on speech by ordering the group to move roughly fifteen feet away to continue the demonstration for safety reasons. Plaintiffs survived because they alleged that the arrest occurred based on political disagreement. Instead, the undisputed material facts show that Sgt. Pope had no knowledge of Plaintiffs' political ideology at the time of the arrest. Ex. B: Pope, 177:13 – 178:3. Plaintiffs survived because it was unclear whether Sgt. Pope gave a lawful order within his legal authority and without malice or gross negligence. As argued in Defendants' memorandum of law, not only was Sgt. Pope's order lawful, but failure to obey it would give a reasonable officer belief that a crime was committed in their presence. *Brown v. Gilmore*, 278 F.3d 362, 367 (4th Cir. 2002); *see also Ross v. Early*, 899 F.Supp.2d 415, 431 (D. Md. 2012).

Plaintiffs have never amended the Complaint, nor sought leave to have it amended.[3] Unlike the motion to dismiss, Plaintiffs are now attempting to survive summary judgment with the same

---

[3] It is important to distinguish who is and who is not a party. Plaintiffs are only suing Sgt. Pope and Col. Wilson. Plaintiffs did not sue the Maryland State Police officer who called the dispatcher. The dispatcher—who told

tactic.  The repeated attempts to make the substance of the call from the governor's mansion appear material is misplaced because there are no facts to support that the substance of the call bears any relevance—let alone material import—to assist this Court in resolving the issues before it.  Sgt. Pope and Col. Wilson never heard the substance of the call before the arrests and it was not part of the "totality of the circumstances known to the officer at the time of arrest."  *Brown v. Gilmore*, 278 F.3d 362, 367 (4th Cir. 2002).  The standard of review does not permit this Court to accept Plaintiffs unsupported allegations at face value like it would in a motion to dismiss.

> **The Call Was Produced to Plaintiffs and Used Extensively During Discovery, But For Something So Important to the Theme of Their Case, It Is Absent From Their Opposition to the Motion for Summary Judgment**

The audio recording was produced during discovery and played for several witnesses during depositions.  Defendants did not include it as an exhibit to their motion for summary judgment because the substance of the call is immaterial.  Curiously, Plaintiffs also did not include it as an exhibit for their opposition despite their frequent reliance upon its alleged importance.  The substance of the call is simply immaterial to the relevant issues in this case.  Regardless, Defendants are including a link to the audio of the call in this reply memorandum to avoid any confusion or curiosity.[4]  Even if the substance of the call ordered Sgt. Pope to arrest the Plaintiffs because the lieutenant governor hates their message, it would still be irrelevant because Sgt. Pope never heard it, Col. Wilson never heard it, and that is not the message that Ms. Wesby

---

Sgt. Pope to "straighten that out" because there were no permits issued for demonstrations that evening—was not sued.  The lieutenant governor, who is allegedly behind the arrests, was not sued.  The State's Attorney, whose office gave the longstanding advice that the Maryland Capitol Police relied upon, was not sued.  The assistant state's attorney who assisted with the charges was not sued.  Officer Stewart, who assisted Sgt. Pope with the arrests, was not sued.  Sgt. Donaldson—who (1) told Sgt. Pope to speak to the group and keep them away from the street, (2) who remembers telling Sgt. Pope he could select the time and place of events in Annapolis, (3) who told Sgt. Pope to draft criminal citations instead of a statement of charges when Sgt. Donaldson arrived on scene and learned what happened, (4) who did not tell Sgt. Pope to uncuff or release the Plaintiffs when he responded to Sgt. Pope's call for backup, and (5) who ordered Sgt. Pope to draft the additional charges, *see* ECF 76-1 at 10, 16-18, 21-22—was not sued, nor did Plaintiffs cite to any of his deposition testimony in their opposition.

[4] Link to Audio of Call: https://apps.oag.state.md.us/Recorded_05-Feb-2018.mp3.

communicated to Sgt. Pope.  The undisputed material facts require a finding that the Plaintiffs'

rights were not violated because Sgt. Pope had probable cause to arrest the Plaintiffs, that

Defendants are entitled to qualified immunity, and that Defendants are entitled to state personnel

immunity under the Maryland Tort Claims Act.

### Plaintiffs' Retaliation Claim as it Relates to the February 5, 2018 Events Relies Heavily On The Immaterial Substance of the Call

Like Plaintiffs' other arguments, they allege that summary judgment should be denied on

the retaliation claim because "[t]he evidence clearly shows that the reason why Defendant Pope

went to Lawyer's Mall and interacted with the Hulberts was the call from the Governor's

Mansion."  ECF 83 at 33.  As noted above, the fact that a call came in—rather than the substance

of the call—prompted Sgt. Pope to seek guidance from his superior officer, which led to Sgt.

Pope's first encounter with Kevin Hulbert.  Nothing that occurred thereafter was related to the call.

Instead, Sgt. Pope observed Patriot Picket ignoring the order he gave to Kevin Hulbert and that

observation led to the events that followed.  It was the Plaintiffs' failure to obey several time,

place, and manner orders to move roughly fifteen feet that is the but-for cause of the Plaintiffs'

arrests.[5]  Video of Kevin Hulbert's arrest shows that Sgt. Pope even gave him another opportunity

to comply before arresting him.[6]  *1st Amendment Video*, at 1:46-1:57.

---

[5] A misrepresented fact about Lawyers' Mall in Plaintiffs' opposition is that Lawyers' Mall always requires a permit for a demonstration.  It does not.  COMAR 04.05.02.02.  Lawyers' Mall is such a popular place for demonstrations in Annapolis, so the Department of General Services will issue permits to groups wishing to use the space.  Permitted groups have priority over the space if there are other unpermitted groups that also wish to use it.  If no permits have been issued, then any group can use it subject to any other restrictions in regulation.

[6] The events on February 6, 2018 fail for a separate reason.  Sgt. Pope intended to charge the Plaintiffs with disobeying a lawful order and obstructing sidewalks, *see* Ex. B: Pope, 140:6 – 141:13, 157:5 – 158:1; *see also* Ex. P, but he filled out the charges incorrectly, *see* Ex. C: Donaldson, 102:4-20; *see also* Ex. O: Labs, 62:15 – 63:6, 69:3-20.  He spoke with Sgt. Donaldson about adding the charges for which the brothers were arrested.  Sgt. Donaldson spoke with Col. Wilson and they discussed the trespass charge that they typically use based on longstanding advice from the State's Attorney's Office.  Col. Wilson confirmed the trespass charge was to be added in an email he sent the day before the Hulbert brothers engaged in any additional speech.  Ex. Q; *see also* Exhibit CC: Cleaner Copy of Exhibit Q (missing first email from August 20, 2019).  The next day, the Maryland Capitol Police confirmed the charges and method for amending them with an assistant state's attorney and acted consistent with the advice from that office.

II.    **PLAINTIFFS' OPPOSITION IGNORES THAT THE CHARGING DECISIONS WERE BASED ON LONGSTANDING ADVICE OF THE STATE'S ATTORNEY'S OFFICE.**

Plaintiffs' opposition ignored that the charging decisions were based on the advice of the Anne Arundel County State's Attorney's Office ("SAO").  Ex. E: Wilson, 132:7 – 133:9 (stating that "I've had several meetings throughout the years with the state's attorney's office on what they will prosecute and what they won't prosecute as it relates to demonstrators in Lawyers' Mall. . . . [T]hese are the charges they recommend that we charge with in the mall."); Ex. O: Labs, 70:7-13 ("normally when we charge somebody at our demonstrations, it's usually for trespassing after we've asked them to comply and they don't two or three times").  There is significant, undisputed, evidence that the citations used on February 6, 2018 were based on longstanding advice of the SAO and that adding those charges was confirmed in writing on February 5, 2018.  Ex. Q; Ex. CC.

The additional charges were also based on discussions with an assistant state's attorney that same day.  Lt. Labs, a senior officer with the Maryland Capitol Police, contacted the SAO. The assistant state's attorney reviewed the charges and method for serving them, and agreed with what was being done.  Ex. E: Wilson, 90:2-17 (Jason Miller, an assistant state's attorney, said "yes, we could do that, all you have to do is write two more criminal citations and loop the three together with the citation numbers and it would be fine.  He said we had time to do that."); Ex. O: Labs, 77:11 – 78:3 (Lt. Labs reviewed the corrected charges and "as I normally do, I, just out of common practice and what I'm used to doing is, contacting the state's attorney or assistant state's attorney and get direction, because there was a mess up here [filling out the paperwork for the original charges], and the Hulbert brothers already signed the ones they were already issued, so I wanted to make sure I was doing it appropriately.  So, I contacted the State's Attorney's Office in Annapolis, waited until somebody got back to me.  I want to say Miller, Assistant State's Attorney Miller --"), 78:4-13 (Lt. Labs spoke with an assistant state's attorney, and "explained the situation,

I asked for direction, he said I have a year and a day to still serve the two that we want to.  If I remember correctly, I may have asked him should I void the other two, and I want to say he said, 'You don't need to, because wait till we go to court, that can happen.'  So, I said, 'Thank you,' and that was the rest of the conversation."), 78:14 – 79:4 (Lt. Labs had this discussion before the second set of charges were brought and they "also discussed the proper charges, two charges on the new ones and he said they fit, they fit better, so he agreed with me."), 79:9 – 80:22 (Lt. Labs explained that "normally, when I call state's attorneys and I get their opinions and ask questions, I give them a brief synopsis of what I'm dealing with.  He knew at that time, when I told him, that two charges were done on one.  He said, basically, 'Don't worry about that.'  So, I told him about the two charges that we were going to charge, gave him a brief synopsis and he said, 'That seems to fit.'"); Ex. C: Donaldson, 111:5-13 ("Somebody called over to the State's Attorney's Office to verify is that correct, are we on the right line here.  Do you have a year and a day and can we reissue these the next day and they said absolutely."), 117:12 – 118:1 ("Somebody called the States Attorney to confirm is what we're doing correct, can we add these and reserve them today with the proper charges and they said yes.  And these are the charges we want to use, is that correct and they said yes.").

These undisputed facts weigh "heavily *toward* a finding that [an officer] is immune." *Wadkins v. Arnold*, 214 F.3d 535, 541 (4th Cir. 2012) (emphasis in original).  When a prosecutor authorizes charges, it "is compelling evidence and should appropriately be taken into account in assessing the reasonableness of [an officer's] actions."  *Id.* at 542 (citing *Pritchett v. Alford*, 973 F.3d 307, 316 (4th Cir. 1992) ("[T]he most obvious possibility [of exceptional circumstances supporting qualified immunity despite the violation of a clearly established constitutional right] is mistaken official advice by legal counsel.") (alteration in the *Wadkins* citation to *Pritchett*)).  An

assistant state's attorney reviewed this case with Lt. Labs the day after the arrests and agreed with the decision to add citations based on conduct that occurred on February 5, 2018.  A prosecutor—who was not asked to make a judgment about arrests or charges in the moment like Sgt. Pope was and who had the benefit of hindsight—agreed with the charges.

If a prosecutor agreed with the charges the day after the arrests, then Sgt. Pope's actions were certainly sufficient "to warrant the belief of a reasonable officer that an offense has been or is being committed."  *Brown v. Gilmore*, 278 F.3d 362, 367 (4th Cir. 2002).  Even if Sgt. Pope charged the Plaintiffs with the wrong crime, the prosecutor's agreement with the new charges further supports that Sgt. Pope had probable cause to arrest the Plaintiffs because "[t]he test for assessing probable cause is an objective one.  An officer can arrest a person subjectively believing that the individual committed one offense when the individual had committed a completely different offense.  In other words, an officer's 'subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause.'"  *McCormick v. State*, 211 Md. App. 261, 270 (2013) (quoting *Devenpeck v. Alford*, 543 U.S. 146 (2004)).  As Judge Russell said in his opinion on the motion to dismiss, "[q]ualified immunity protects government officials when they have made 'mere mistakes in judgment, whether the mistake is one of fact or one of law.' . . . [and qualified immunity] is effectively lost if a case is erroneously permitted to go to trial.'"  ECF 17 at 9 (internal citations omitted).  The undisputed material facts show that Sgt. Pope and Col. Wilson did not make mistakes, but rather that Sgt. Pope was appropriately measured in his approach by seeking advice from his superior officer before confronting the demonstrators, gave the demonstrators several opportunities to comply with his time, place, and manner restriction on speech, and that he had probable cause the arrest the Plaintiffs.  The charging decision that followed was also the product of a measured approach because the Maryland Capitol

10

Police sought the advice of the SAO to confirm their actions, which were premised on longstanding advice from that same office.  But, even if this Court were to find that these were mistakes by Sgt. Pope and Col. Wilson, then "[q]ualified immunity protects [them] when they have made 'mere mistakes in judgment, whether the mistake is one of fact or one of law.'"  ECF 17 at 9 (internal citations omitted).  If denied and the case goes to trial, then "[qualified immunity] is effectively lost."  ECF 17 at 9.

## III.   PLAINTIFFS' OPPOSITION WHOLLY IGNORES VIDEO OF THE ARRESTS.

Plaintiffs never cited to video of the arrests and, instead, try to present an alternate version of the facts.  The video is particularly useful because the moment that Sgt. Pope made the decision to call for backup to arrest Jeff Hulbert is captured, and because Kevin Hulbert's arrest itself is captured on video.  In both instances, repeated orders to move to Lawyers' Mall are made and ignored, which is corroborated by deposition testimony detailed more fully in Defendants' motion for summary judgment.  ECF 76-1 at 11-15.

In the opposition, Plaintiffs clarify that only Jeff Hulbert has a claim for Count I and only Kevin Hulbert has a claim for Count II.  ECF 83 at 5 ("Kevin Hulbert, who was not picketing, but merely exercising his right to film events.").  Kevin Hulbert attempts to make this distinction despite being the first person with Patriot Picket to speak to Sgt. Pope, and would refer to himself and the rest of the group as "we" and "us." *E.g.*, Ex. M: Kevin, 20:2 – 23:19.  Kevin Hulbert may now claim that he was not actually demonstrating, but he was the first person to interact with Sgt. Pope about the order to move.  Kevin Hulbert—a "co-leader" of Patriot Picket—had knowledge about the demonstration, which he shared with Sgt. Pope.  Kevin Hulbert had knowledge about the whereabouts of the rest of the group, which he shared with Sgt. Pope during their first conversation.  Ex. B: Pope, 80:20 – 82:12.  Kevin Hulbert was standing with the demonstrators during his final conversation with Sgt. Pope before his arrest.  *1st Amendment Video*, at 1:46-1:57.

11

As noted above, the "totality of the circumstances known to the officer at the time of arrest" would tell Sgt. Pope that Kevin Hulbert was part of the Patriot Picket demonstration.  *Brown v. Gilmore*, 278 F.3d 362, 367 (4th Cir. 2002)

The video of Kevin Hulbert's arrest is one example of its value in deciding this case.  The video makes clear that Kevin Hulbert's arrest had nothing to do with his decision to film.  Sgt. Pope said to Kevin Hulbert, "Sir, I gave you, sir, inside Lawyers' Mall or you're going to jail." *1st Amendment Video*, at 1:46-1:52.  Sgt. Pope did not say "stop filming or you're going to jail." There is no evidence at all that Kevin Hulbert's decision to film was related to his arrest.[7]  It was his failure to comply with Sgt. Pope's many, repeated orders to move to Lawyers' Mall.

## IV.   THE TIME, PLACE, AND MANNER RESTRICTION ON SPEECH IS RELEVANT TO PLAINTIFFS' FIRST AMENDMENT CLAIMS, BUT ALSO TO THE LAWFUL ORDER THAT SGT. POPE GAVE PLAINTIFFS.

As argued ad nauseum, Sgt. Pope gave the Plaintiffs a lawful time, place, and manner restriction on their speech.[8]  The repeated orders, and the Plaintiffs decision to ignore those orders,[9] is dispositive of all issues and claims in this case.  That set of facts means that there was no violation of Plaintiffs' First Amendment rights.  It means that the Plaintiffs committed a crime in the presence of an officer, which gave Sgt. Pope probable cause to arrest them; thus, there was no violation of their Fourth Amendment rights.  Even if Sgt. Pope was mistaken, he was acting reasonably based on the totality of the circumstances known to him at the time.

---

[7] Plaintiffs argue that "there is a clear consensus of *persuasive authority* in the other circuits, which indicate that the right [to film law enforcement] is clearly established and well-known."  ECF 83 at 32 (emphasis added).  Since there is only persuasive authority, the right is not "clearly established" for purposes of qualified immunity.

[8] Plaintiffs cite to *McCullen v. Coakley*, 573 U.S. 464, 477 (2014) in order to cite to a recent Supreme Court decision that says, "[c]onsistent with the traditionally open character of public streets and sidewalks, we have held that the government's ability to restrict speech in such locations is very limited."  In the very next paragraph, however, the Supreme Court explains the "wider leeway" to impose reasonable time, place, or manner restrictions on protected speech. *Id.*

[9] Plaintiffs did, in fact, ignore Sgt. Pope's orders.  Plaintiffs theory of the case is not that they obeyed Sgt. Pope's orders, but rather that they were justified in ignoring them.

For the same reasons, this is dispositive of their analogous state constitutional tort claims. And, because there was probable cause to arrest, it is dispositive of their tort claims for false arrest and false imprisonment.

These facts have a cascading effect on all claims presented by Plaintiffs in this case. Because the undisputed material facts show that Sgt. Pope gave a lawful time, place, and manner restriction on their speech, and because the repeated orders were ignored by Plaintiffs, this Court should grant judgment in favor of Defendants.

**Time, Place, and Manner Restrictions Are Proper In Cases Like This**

Like in *Kass v. City of New York*, 864 F.3d 200 (2nd 2017),[10] Sgt. Pope was not enforcing a broad policy about where to protest (as Plaintiffs alleged in the Complaint), but rather he was responding to a fact-specific circumstance that required attention. *See also Marcavage v. City of Chicago*, 659 F.3d 626, 630-31 (7th Cir. 2011) (finding that orders to move off of a sidewalk and onto an adjacent gravel area or across the street were ample alternatives, and that "plaintiffs were only limited by their own stubborn refusal to move there."). The order was for safety reasons, which Plaintiffs' admitted were present in their opposition. Plaintiffs admit that it was "late at night on a winter night with few light sources" and moving roughly fifteen feet would make messaging harder to show to "pedestrians traversing the sidewalk and drivers driving down the road." ECF 83 at 29. Plaintiffs allege that it was so late and dark that they would be unable to get their message out unless they were less that fifteen feet away from people and cars. This is not to

---

[10] Plaintiffs attempt to distinguish *Kass* because of a passing mention that Kass "became agitated and hostile" after being asked to move away from the barricades. ECF 83 at 28; *Kass*, 864 F.3d at 209. The Second Circuit went on to say that "Kass became agitated and hostile, thereby *further increasing* the risk that he would impede traffic or pose a security threat." *Id.* at 209 (emphasis added). Even before Kass became "agitated and hostile," he posed a risk that he would impede traffic or pose a security threat, despite being "the only individual [on the sidewalk] speaking with the two protestors and he was not then impeding pedestrian or vehicular traffic." *Id.* at 2019. The change in behavior was only noted because it further increased an already present risk.

mention, among other things, the recent history of people being struck by vehicles that Plaintiffs attempt to downplay in their opposition.  It was also during the middle of the General Assembly's session, which was nearing an end for the day, and pedestrian and vehicular traffic was expected to increase.

**The Conduct of the Plaintiffs Gave Sgt. Pope Probable Cause to Arrest Them**

On February 5, 2018, Sgt. Pope charged the Plaintiffs with violating Md. Code Ann., Crim. Law § 10-201(c)(3), which is identical to the charge given in *Ross v. Early*, 746 F.3d 546 (4th Cir. 2014);[11] a factually similar case to this one.  Under this statute, it is a misdemeanor for a person to "willfully fail to obey a reasonable and lawful order that a law enforcement officer makes to prevent a disturbance to the public peace."  Crim. Law § 10-201(c)(3).  As previously argued, Sgt. Pope sought direction from his superior officer, Sgt. Donaldson.  Sgt. Donaldson conferred with Col. Wilson and they concluded that the group was "on the sidewalk in front of Lawyers' Mall and could cause a possible safety or hazardous issue."  Ex. E: Wilson, 21:10-17.  Sgt. Pope did not think safety issues were immediately present, but based on what he learned, they were anticipated to exist in the near future.  Ex. B: Pope 75:4 – 76:1; Ex. L.  The goal, as conveyed to Sgt. Pope by Sgt. Donaldson, was to keep them away from the street.  Ex. B: Pope, 75:17 – 76:1.  Sgt. Pope did not need to see violations himself because the totality of the circumstances available to the officer—informed advice from superior officers who are more intimately familiar with unique safety concerns at this intersection—gave him reason to believe that it would pose a safety concern for the demonstration to continue.  Officers are not required to wait for demonstrators to actually impede pedestrian traffic or cause a security issue before intervening.  *Kass*, 864 F.3d at 209 ("we do not think that to avoid liability the officers needed to refrain from intervening until [Plaintiff]

---

[11] Plaintiffs allege that Defendants ignored the Fourth Circuit opinion in *Ross*.  Defendants cited to the Fourth Circuit decision in *Ross* as well as the two reported District Court opinions, where appropriate.  ECF 76-1 at 29, n.16.

actually impeded pedestrian traffic or caused a security issue"); *Marcavage*, 659 F.3d at 106-07 (rejecting argument that because "Plaintiffs are just two people standing out of the way" that the congestion and security risks justifying a non-demonstration zone did not apply to them).

Sgt. Pope gave reasonable and lawful orders for the purpose of preventing a disturbance to the public peace.  Plaintiffs willfully ignored those repeated orders.  *E.g. Patriot Picket Interview*, at 4:00-4:09; *see also 1st Amendment Video*, at 1:06-1:11.  The totality of the circumstances gave reasonable grounds for Sgt. Pope to believe a crime was committed in his presence.  Plaintiffs' argument that the presence of backup officers caused a disruption is irrelevant to the basis for the arrests themselves.  Sgt. Pope called for backup as a standard safety measure *because* he had already decided to arrest Jeff Hulbert.  *1st Amendment Video*, at 0:30-0:43; Ex. B: Pope, 99:1-11; Ex. C: Donaldson, 70:8-14.

## V.   PLAINTIFFS' EIGHTH AMENDMENT EXCESSIVE FORCE ARGUMENTS ARE MISPLACED AS RELATED TO THEIR FOURTH AMENDMENT CAUSES OF ACTION.

Plaintiffs attempt to bolster their claimed injuries that they sustained when they were handcuffed, and Kevin Hulbert attempts to reinforce his claimed injury when Sgt. Pope buckled him into the police vehicle, which was done for Kevin Hulbert's safety during transport.  In doing so, Plaintiffs claim that Defendants cited to outdated cases that have allegedly been overruled by the Supreme Court's decision in *Wilkins v. Gaddy*, 559 U.S. 24 (2010), which "overruled the Fourth Circuit's *de minimis* requirement in Eighth Amendment excessive force cases."  ECF 83 at 41.  This, of course, is not an Eighth Amendment case.  Claims for violation of the Eighth Amendment do not arise until after conviction and sentencing.  *Burton v. Mumford*, 219 Md. App. 673, 701 (2014).

Plaintiffs bring their claims under the Fourth Amendment.  Seven days after Plaintiffs' arrests, the Fourth Circuit reaffirmed and applied its holding from *Brown v. Gilmore*, 278 F.3d 362

(4th Cir. 2002); which is one of the cases that Defendants relied upon. *E.W. v. Dolgos*, 884 F.3d 172, 180, 186 (4th Cir. 2018). Whether an injury is de minimis is only one factor to be considered, but the Fourth Circuit has continued to hold that "this Court previously stated that the use of handcuffs would 'rarely' be considered excessive force when the officer has probable cause for the underlying arrest." *Id.* at 186. Judge Shedd, concurring the judgment only, wrote that "[g]iven the universal acceptance of handcuffing as an appropriate safety measure incident to arrest, we have previously stated that 'a standard procedure such as handcuffing would rarely constitute excessive force where the officers were justified in effecting the underlying arrest.' *Brown v. Gilmore*, 278 F.3d 362, 369 (4th Cir. 2002). *Although we have not since elaborated on the type of circumstance that would constitute the rare exception where an excessive force handcuffing claim might be permissible*, we held prior to *Brown* that an arrestee's claim that her handcuffs were too tight 'is so insubstantial that it cannot as a matter of law support her claim under the Fourth Amendment.'" *Id.* at 193 (emphasis added to highlight that any such finding would not be clearly established) (citation omitted) (thereafter citing to federal circuit courts with similar findings).

When the Hulbert brothers were handcuffed, and when Kevin Hulbert was buckled into the police car prior to being transported, it is the kind of force that naturally occurs incident to arrest and is not actionable under the Fourth Amendment. Plaintiffs allegation that this was "excessive force in ensuring the arrest of two completely compliant individuals" is directly contrary to one of the themes of their case. ECF 83 at 46. Plaintiffs have never alleged that they were compliant. If they were, then they would have moved roughly fifteen feet into Lawyers' Mall and continued their demonstration. Plaintiffs' theme has been, instead, that their non-compliance was justified.

## VI.   THERE IS NO EVIDENCE FOR SUPERVISORY LIABILITY AGAINST COL. WILSON.

Col. Wilson was notified about an unscheduled group showing up, but he never learned about arrests until after they occurred. Plaintiffs' attempts to hold him liable for things he did not

know about is inconsistent with how the law treats supervisory liability.[12]  Col. Wilson could not

have predicted the events that unfolded before they happened.  The speculative theories presented

in Plaintiffs' opposition would have required Col. Wilson—who was not present in Annapolis—

to make several judgments about Sgt. Donaldson, Sgt. Pope, and individual members of Patriot

Picket, and all of those judgments would have had to be negative.  Plaintiffs allege that "[a]

reasonable juror could conclude that Defendant Wilson not only knew about the unconstitutional

conduct, but ordered it" and that "[a] reasonable juror could also conclude that Defendant Wilson's

actual or constructive knowledge that Defendant Pope would illegally attempt to stop[13] Plaintiffs'

demonstration and force Plaintiffs to move to Lawyer's Mall."  ECF 83 at 44.  There is no evidence

to support these allegations and no reasonable juror would make such a finding.  There is no

evidence that Col. Wilson communicated in any way with Sgt. Pope on February 5, 2018 when

the arrests occurred.[14]

## VII.   A REASONABLE JURY COULD NOT FIND THAT SGT. POPE AND COL. WILSON ACTED WITH MALICE OR GROSS NEGLIGENCE, AND THEY ARE ENTITLED TO STATE PERSONNEL IMMUNITY.

In *E.W. v. Dolgos*, 884 F.3d 172 (4th Cir. 2018), a school resource officer was sued by the

parents of a student after handcuffing "a calm, compliant elementary school student for fighting

with another student three days prior."  *Id.* at 176.  Judge Motz granted a motion for summary

judgment finding that "the officer's conduct did not amount to a constitutional violation and that

---

[12] Importantly, the theory of supervisory liability was never articulated in Plaintiffs' Complaint.  It first appeared in Plaintiffs' opposition to the motion to dismiss.  ECF 14 at 29.

[13] Plaintiffs' opposition sometimes alleges that Defendants wanted to "stop" the demonstration.  There is no evidence to support this.  Sgt. Pope ordered that the demonstration move roughly fifteen feet away and, after the Plaintiffs were arrested, the other members of Patriot Picket moved to Lawyers' Mall and continued the demonstration. Sgt. Pope's only interest was in moving the demonstration for public safety reasons, not stopping it altogether.

[14] The new charges that were issued on February 6, 2018 were decided on February 5, 2018 and based on the advice of the SAO.  Therefore, those citations were unrelated to any of Plaintiffs' speech.  When Col. Wilson issued those charges, he did not "arrest" Plaintiffs as they sometimes allege in their opposition, but rather he simply had them sign new charges and left.  *See Martinez v. Carr*, 479 F.3d 1291, 1299 (10th Cir. 2007) (holding that issuance of a citation does not rise to the level of a Fourth Amendment seizure).

the officer was entitled to both federal qualified immunity and state statutory immunity under the Maryland Tort Claims Act." *Id.* The Fourth Circuit affirmed. *Id.*

With respect to the question of whether the school resource officer acted with malice or gross negligence, the Court—as a threshold matter—had already concluded that the officer did use excessive force in violation of the Fourth Amendment and Article 26 of the Maryland Declaration of Rights.[15] The Court ultimately concluded, however, "that there is insufficient evidence in the record for a reasonable jury to conclude that [the officer] acted maliciously or with gross negligence when she handcuffed E.W." *Id.* at 188. The Fourth Circuit recognized that the officer "was not reasonably in fear for her or anyone else's safety. Instead, [the officer] was bothered by E.W.'s lack of remorse and concern for hitting [another student]." *Id.* When E.W. did not show remorse or seem to care, and "[d]ue to E.W.'s attitude, [the officer] handcuffed her." *Id.* E.W. began crying and apologized "because she was afraid of going to jail." *Id.* The officer removed the handcuffs because E.W. was crying and showed remorse. *Id.*

Reviewing these facts, the Fourth Circuit held that "[t]his evidence does not demonstrate 'an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure' E.W." *Id.* (internal citations omitted). The Fourth Circuit also held that "a reasonable jury could not find that [the officer's] actions demonstrate 'a reckless disregard of the consequences of affecting' E.W.'s life or 'a thoughtless disregard of the consequences' that would arise from handcuffing her." *Id.* (internal citations omitted). The Court noted that "a reasonable jury could infer that [the officer's] actions were motivated by a desire to dissuade E.W.'s apathy and induce remorse. Though callous, such a motive does not amount to malice or gross negligence." *Id.* (comparing with *Barbre v. Pope*, 402 Md. 157 (2007) wherein the Maryland Court of Appeals

---

[15] While the officer did violate those rights, the Court found that the officer was entitled to qualified immunity because those rights were not clearly established at the time. *Dolgos*, 884 F.3d at 186-87.

held "that unarmed plaintiff had 'presented sufficient facts to demonstrate gross negligence on the part of' deputy sheriff who ordered him to raise his hands, saw him comply, approached with gun drawn, and shot him in the neck").

There is no evidence that Sgt. Pope's and Col. Wilson's actions amount to ordinary negligence, let alone malice or gross negligence. Sgt. Pope sought guidance from his superior officer before first approaching Kevin Hulbert. He gave repeated orders to move a short distance for public safety reasons. After several orders to move with warnings about the consequences for non-compliance, he placed the Plaintiffs under arrest. He had probable cause to arrest them for failing to obey his lawful orders (as well as obstructing walks and trespass), to search them incident to arrest, to have them handcuffed, and to have them safely secured in a police vehicle before transporting them to another location. After one hour and five minutes, Plaintiffs signed their citations and were released. The decision to add charges was based on longstanding advice from the SAO. Officers with the Maryland Capitol Police contacted an assistant state's attorney for guidance on the process for adding charges and whether the charges were appropriate. After confirmation from the assistant state's attorney, new charges were drafted and served on the Plaintiffs when they were conveniently in the vicinity of the Maryland Capitol Police offices. After further consultation with the SAO about these specific charges, they were dropped four days later.

None of this conduct remotely comes close to malice or gross negligence. There is no evidence that this was done with "an evil or rancorous motive influenced by hate," nor is there evidence that Sgt. Pope's or Col. Wilson's actions demonstrate "a reckless disregard of the consequences of affecting [Plaintiffs' lives] or a thoughtless disregard of the consequences that would arise from [arresting them]." *Dolgos*, 884 F.3d at 188 (internal citations and quotations omitted). The evidence shows that Sgt. Pope had probable cause to arrest the Plaintiffs and he did

19

not act with malice or gross negligence because he was acting as a reasonable officer would based on the totality of the circumstances known to him.  This Court should find that Sgt. Pope and Col. Wilson are entitled to state personnel immunity under the Maryland Tort Claims Act.

## VIII. PATRIOT PICKET AND MSI ARE SEPARATE ENTITIES, AND ARGUING THIS UNDISPUTED FACT IS NOT A STRAWMAN.

MSI attempts to establish standing, in part, by arguing that Patriot Picket "was not an entity, it was simply an informal name adopted by a group of like-minded individuals, many (if not most) of whom are members of MSI."  ECF 83 at 52.  The co-leaders of Patriot Picket had likely formed a partnership when they informally agreed to create Patriot Picket two years before the arrests. Md. Code Ann., Corps. & Ass'ns § 9A-202 (LexisNexis 2014); Ex. K: Jeff, 33:3-13, 53:11-13. One of the co-leaders made the existence and purpose of Patriot Picket clear soon after the arrests. Paul Brockman was a "co-leader" of Patriot Picket with Jeff and Kevin Hulbert.  Jeff 43:20 – 44:10; Kevin 66:14-17.  On February 23, 2018, Mr. Brockman registered "The Patriot Picket" with the Department of Assessments and Taxation, Charter Division. [16]  Exhibit DD: Registration of The Patriot Picket.  Mr. Brockman identified himself as the owner and described its purpose was to "[d]efend liberty and the Second Amendment."  Ex. DD.  Regardless, as argued in the motion for summary judgment, every Plaintiff agreed that MSI and Patriot Picket are separate entities. Ex. X: Pennak, 93:9-20, 95:16-21; Ex. K: Jeff, 123:13-18; Ex. M: Kevin 86:2-5.

## CONCLUSION

For the foregoing reasons, the Court should enter summary judgment in favor of defendants Sergeant Brian T. Pope and Colonel Michael Wilson.

---

[16] Mr. Brockman also registered "Patriot Pick Gear" on September 21, 2019, which is involved in "[s]ales of patriotic themed clothing and all lawful purposes."  Exhibit EE: Registration of Patriot Picket Gear.

Respectfully submitted,

BRIAN E. FROSH
Attorney General of Maryland

  /s/ James N. Lewis

_____

James N. Lewis
Fed. Bar No. 30220

  /s/ John C. Fredrickson

_____

John C. Fredrickson
Fed. Bar No. 02566
Assistant Attorneys General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
jlewis@oag.state.md.us
john.fredrickson@maryland.gov
(410) 576-7005 (telephone) – Lewis
(410) 576-6955 (facsimile) – Lewis
(410) 767-1825 (telephone) – Fredrickson
(410) 333-7654 (facsimile) – Fredrickson

March 5, 2021                                    *Attorneys for Defendants*

21

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 5th day of March 2021, a copy of the foregoing

Defendants' Reply Memorandum in Support of their Motion for Summary Judgment, was served

electronically via CM/ECF to:

Cary Johnson Hansel, III, Esquire
Federal Bar No. 14722
cary@hansellaw.com

Erienne Sutherell, Esquire
Federal Bar No. 20095
esutherell@hansellaw.com

Justin Stefanon, Esquire
Federal Bar No. 20087
jstefanon@hansellaw.com

HANSEL LAW, P.C.
2514 North Charles Street
Baltimore, Maryland 21218
*Attorneys for Plaintiffs*

and a courtesy copy will be sent within one business day to:

The Honorable Stephanie A. Gallagher
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND
ATTN: Clerk's Office for the Honorable Stephanie A. Gallagher
101 West Lombard Street
Chambers 7C
Baltimore, Maryland 21201

/s/ John C. Fredrickson                             /s/ James N. Lewis

_____             _____

*John C. Fredrickson*                               *James N. Lewis*