## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **JEFF HULBERT,** *et al.***,** | \* |
| | \* |
| **Plaintiffs,** | \* |
| | \* |
| **v.** | \*     **Civil Case No. SAG-18-00461** |
| | \* |
| **SGT. BRIAN T. POPE,** *et al.***,** | \* |
| | \* |
| **Defendants.** | \* |
| | \* |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## MEMORANDUM OPINION

Plaintiffs Jeff and Kevin Hulbert ("the Hulberts") and Maryland Shall Issue, Inc. ("MSI") (collectively "Plaintiffs") have accused Sergeant Brian T. Pope and Colonel Michael Wilson (collectively "Defendants") of violating their rights under the First and Fourth Amendment and the Maryland Declaration of Rights. ECF 1. Plaintiffs also have alleged two common law claims of false arrest and false imprisonment against Sgt. Pope. *Id.* Defendants now move for summary judgment on all counts. ECF 76. Plaintiffs filed a response in opposition, ECF 83, and Defendants replied, ECF 87. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2018). For the reasons explained below, the Court will deny in part and grant in part Defendants' motion.

### I.     FACTUAL BACKGROUND

Jeff and Kevin Hulbert are brothers and founders of an informal group of Maryland gun rights advocates known as "The Patriot Picket." ECF 1 ¶ 20. The Hulberts are also both members of MSI, a nonprofit organization "dedicated to the preservation and advancement of gun owners' rights in Maryland." *Id.* ¶¶ 11–13. Sgt. Pope and Col. Wilson are Maryland Capitol Police officers. *Id.* ¶¶ 17–18. This case arises out of an incident on February 5, 2018, when the Hulberts were arrested during a demonstration outside the Maryland State House.

### A.  The Events of February 5, 2018

On the evening of February 5, 2018, the Hulberts and other Patriot Picket members assembled in Annapolis, as they had done on several other Mondays during the legislative session, to display signs and talk to voters and legislators about "[their] belief . . . that government needs to follow constitutional principles."  ECF 84 at 36:15–37:6, 41:1–12.  They planned to set up on the public sidewalk at the intersection of College Avenue and Bladen Street.  *Id.* at 39:10–18–40:6.  This area was desirable to the group because it is where they "believe [they're] seen by the most people and the most legislators."  *Id.*  Directly adjacent to the public sidewalk is a grassy square called Lawyers' Mall, a location frequently used for political demonstrations.[1]  Oftentimes larger groups need a permit from the Capitol Police to hold an event in Lawyers' Mall.  *See* ECF 76-3; COMAR 04.05.02.02.

Sgt. Pope was working in his office when he received a call from dispatch alerting him that a group was setting up a demonstration in front of Lawyers' Mall.  ECF 84-2 at 61:2–5; ECF 76-4 at 66:7–11.  The dispatcher told Sgt. Pope that someone at the Governor's Mansion had called about the group and that Sgt. Pope should "straighten out" what the group was doing, or something to that effect.  ECF 76-4 at 65:2–9 (recalling that the dispatcher said something to like "the governor's mansion calls and there's a group set up, can we straighten that out").  Sgt. Pope knew that no group had a pre-approved demonstration scheduled for that evening.  ECF 84-2 at 61: 2–5.  He walked to the dispatcher's office to view the monitors that showed live video of the area near Lawyers' Mall.  ECF 76-4 at 66:7–11.  At the time, he only observed one person, later

---

[1] Since this incident occurred, Lawyers' Mall has been deconstructed and redesigned.  *See* Maryland State Archives, Lawyers' Mall: A Brief Illustrated History (Apr. 1, 2021), https://governor.maryland.gov/wp-content/uploads/2021/04/Lawyers-Mall_-A-Brief-Illustrated-History-_reduced4.pdf.  The descriptions of Lawyers' Mall and the surrounding area in this opinion describe the conditions at the time of the incident in February, 2018.

identified as Kevin Hulbert, standing on the public sidewalk in front of Lawyers' Mall with a number of signs on the ground around him. *Id.* at 67:1–11. The dispatcher informed Sgt. Pope that more people had been standing there, but recently left the area. *Id.* at 71:8–15. It was not clear to Sgt. Pope what action he needed to take, so he sought guidance from his supervisor, Sgt. Donaldson. *Id.* at 69:17–70:9.

Sgt. Donaldson told Sgt. Pope that he would call the Chief of the Maryland Capitol Police, Col. Wilson, for more guidance. *Id.* at 74. Sgt. Donaldson told Col. Wilson that the Patriot Picket was engaging in an unscheduled demonstration near Lawyers' Mall, which could potentially cause a safety issue. ECF 76-7 at 20:15–21:17. Col. Wilson told Sgt. Donaldson to send someone to evaluate the situation, and, if necessary, to move the group to a safer location. ECF 84-4 at 22. Sgt. Donaldson then told Sgt. Pope to let the picketers continue their demonstration in Lawyers' Mall, even though the group did not have a permit to use the mall. ECF 76-4 at 70, 74.

Sgt. Pope went to Lawyers' Mall, where Kevin Hulbert was still standing by himself with the Patriot Picket signs in the middle of the public sidewalk. *Id.* at 81. Kevin Hulbert told Sgt. Pope that the other members of his group had gone to get something to eat. *Id.* at 82. Although he did not note any particular safety hazards at the time, Sgt. Pope told Kevin Hulbert that because of safety concerns, even though they did not have a permit, he wanted the group to move their demonstration off the sidewalk and into Lawyers' Mall. *Id.* Kevin Hulbert did not object at the time. ECF 76-15 at 23 (explaining that he "just simply accepted that" and "didn't have a response"). Sgt. Pope then left the scene, believing Kevin Hulbert would convey the command to move to Lawyers' Mall to the rest of the Patriot Picket group when they returned. ECF 76-4 at 83:19–85:6 (recalling that Kevin Hulbert "just said he would let the rest of the group know when they come").

About an hour later, Sgt. Pope returned to the area for other business and noticed that Kevin Hulbert and the other members of his group were still demonstrating on the sidewalk.  Sgt. Pope told the entire group that that they needed to back up their demonstration approximately fifteen feet into Lawyers' Mall.  ECF 76-4 at 95:20–96:6; ECF 76-15 at 25–26 (stating that Sgt. Pope was "speaking loudly as if to have the entire group hear him"); *see* ECF 76-10 (showing Google Maps distance between the curb of the sidewalk that meets the street and lawyers square to be 15.50 feet).  The group started to comply with the order until Jeff Hulbert spoke up and said they were not going to move anywhere.  ECF 76-4 at 96:2–13.  Sgt. Pope repeated his command to move to Lawyers' Mall at least two more times and warned the group that if they did not comply, he would arrest them.  *Id.* at 96:14–20, 98–99.  The group refused to comply, so Sgt. Pope called for additional officers to assist him.  *Id.*  Multiple officers and police vehicles responded to the scene. Sgt. Pope started placing Jeff Hulbert under arrest, since he was the leader of the group who had told the others not to comply with Sgt. Pope's previous orders.  *Id.* at 101.  Multiple people were filming the interaction including apparent passersby, a member of the media, and Kevin Hulbert. *Id.* at 107–08; ECF at 27–29.  Sgt. Pope told Kevin Hulbert and two others who were also filming to back up.  ECF 76-4 at 113, 108.  The two other people complied, but Kevin Hulbert did not.  *Id.* Sgt. Pope then placed Kevin Hulbert under arrest.  *Id.* at 107–08.  Jeff and Kevin Hulbert were subsequently searched, placed in the back of police vehicles, and taken to the Annapolis city police station for processing at approximately 7:45 p.m.

When they arrived at the Annapolis police station, Sgt. Pope issued Jeff and Kevin Hulbert citations for disobeying a lawful order under the Section 10-201 of the Criminal Law Article of the Maryland Code.  ECF 76-4 at 140–41; ECF 76-18.  Sgt. Pope had also intended to write them a citation for blocking the public sidewalk.  *Id.*  However, this was the first time he had ever issued

a criminal citation and he could not locate the proper section of the COMAR to write up the second charge in a timely manner. *Id.* at 120, 140–41, 155. He therefore released the Hulberts at 8:50 p.m., after only issuing the citation for disobeying a lawful order. *Id.* at 155 (explaining he "felt that [it] would have been unnecessary" to make the Hulberts "sit there" and wait for him to locate the appropriate citation because he "already had one charge to charge them with" and "knew we could amend the charge"); ECF 76-18; ECF 76-8 (reporting the Hulberts were transported to the police station and held for one hour and five minutes including travel time). After the Hulberts were released, Sgt. Pope spoke with Sgt. Donaldson about what happened. ECF 76-4 at 154–55. Sgt. Donaldson told Sgt. Pope that he should have issued the separate other citations, and the two discussed the steps to add the charges. *Id.* at 155–57 (stating their conversation was "about how to get those other charges on there since I released them already"); ECF 76-5 at 102, 106 (stating that he told Pope it would not be a problem to issue the other citations since "the Hulberts are always in that area" and would be easy to serve).

At some point that evening, after the Hulberts were already in custody, Sgt. Donaldson called Col. Wilson and informed him that Sgt. Pope had arrested the Hulberts and they were being issued criminal citations. ECF 76-7 at 67–69. Later, at 9:59 p.m., Col. Wilson sent an email to other members of the Capitol Police reporting that two protestors were arrested at Lawyers' Mall. ECF 76-19 at 3–4. In his email he also stated that the two protestors were given criminal citations and listed two specific citations: Md. Code Ann., Crim. Law § 6-409(b) (Refusal or Failure to Leave Public Building or Grounds) and § 10-201 (Disorderly Conduct, Disturbance of the Public Peace). *Id.* The Hulberts' arrest had apparently already garnered the attention of some Maryland legislators and a member of the media. *Id.* at 4 (reporting that "[s]everal legislators were made

aware of this arrest, as one of the Senators announced the arrests on the Senate floor"); Bryan P. Sears, *supra*.

**B.  The Events of February 6, 2018**

The next morning, Col. Wilson read media reports about the Hulberts' arrest.  ECF 76-7 at 80.  This prompted him to look further at the Capitol Police's records regarding the incident.  *Id.* at 86.  Col. Wilson noted that it did not appear that the Hulberts were issued the citations he had specified in his email from the night before.  *Id.* at 86–87 (stating that it did not appear that the charges were "filled out correctly" and that he thought they were "not even the right changes").  He told Sgt. Donaldson to reach out to the state's attorney's office to see what they needed to do to add the charges.  *Id.* at 88.  The state's attorney's office advised it would be fine to add the charges, so Col. Wilson told Sgt. Donaldson to tell Sgt. Pope "to write two more criminal citations for the more appropriate charges."  *Id.* at 91.

Meanwhile, the Hulberts had agreed to do media interviews about their arrests.  The brothers returned to Lawyers' Mall where reporters interviewed them on camera.  ECF 84-4 at 118; ECF 76-13 at 101–02.  Sgt. Pope, Sgt. Donaldson, Col. Wilson, and another Capitol Police officer went to Lawyers' Mall to serve the additional charges.  ECF 76-4 at 173.  Although ordinarily the chief of police would not serve charges on an individual himself, he wanted to be there to explain to the Hulberts why new charges were being added.  ECF 76-7 at 115 (explaining he felt it was his responsibility to ensure they understood the situation).  In the following days, Col. Wilson had discussions with the state's attorney's office about the incident, and on February 9, 2018, the charges against the Hulberts were dismissed.  ECF 76-24; ECF 76-25.  A few days later, the Hulberts filed this lawsuit.  ECF 1.

### C. The Call from the Governor's Mansion

As previously mentioned, this entire chain of events was apparently precipitated by a call from the Governor's Mansion.  A person on the Lieutenant Governor of Maryland's security detail radioed Corporal Ryan Bitter, a security officer at the Governor's Mansion responsible for sending communications from the Lt. Governor's security detail to the Maryland Capitol Police.  ECF 84-6 at 64, 91–92.  Cpl. Bitter then called the dispatcher of the Maryland Capitol Police, relaying that the Lieutenant Governor "did not want [the protestors] giving him a bunch of stuff for whatever reason."[2]  *Id.* at 114.  Cpl. Bitter did not say anything about the substance of the protestors' message, since he himself did not know the content.  *Id.* at 112 (agreeing that he did not know their message because he could not see their signs).  Neither Sgt. Pope nor Col. Wilson ever heard the substance of the call from Cpl. Bitter until after the initiation of this lawsuit.

## II.    LEGAL STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The moving party bears the burden of showing that there is no genuine dispute of material facts.  *See Casey v. Geek Squad*, 823 F. Supp. 2d 334, 348 (D. Md. 2011) (citing *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987)).  If the moving party establishes that there is no evidence to support the non-moving party's case, the burden then shifts to the non-moving party to proffer specific facts to show a genuine issue exists for trial.  *Id.*  The non-moving party must provide enough admissible evidence to "carry the burden of proof in [its] claim at trial."  *Id.* at 349 (quoting *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315–16 (4th Cir. 1993)).  The mere existence of a "scintilla of evidence" in

---

[2] https://apps.oag.state.md.us/Recorded_05-Feb-2018.mp3 (audio recording of the call).

support of the non-moving party's position will be insufficient; there must be evidence on which

the jury could reasonably find in its favor. *Id.* at 348 (quoting *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 251 (1986)). Moreover, a genuine issue of material fact cannot rest on "mere

speculation, or building one inference upon another." *Id.* at 349 (quoting *Miskin v. Baxter*

*Healthcare Corp.*, 107 F. Supp. 2d 669, 671 (D. Md. 1999)).

Additionally, summary judgment shall be warranted if the non-moving party fails to

provide evidence that establishes an essential element of the case. *Id.* at 352. The non-moving

party "must produce competent evidence on each element of [its] claim." *Id.* at 348-49 (quoting

*Miskin*, 107 F. Supp. 2d at 671). If the non-moving party fails to do so, "there can be no genuine

issue as to any material fact," because the failure to prove an essential element of the case

"necessarily renders all other facts immaterial." *Id.* at 352 (quoting *Coleman v. United States*, 369

F. App'x 459, 461 (4th Cir. 2010) (unpublished)). In ruling on a motion for summary judgment,

a court must view all of the facts, including reasonable inferences to be drawn from them, "in the

light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 587-88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654,

655 (1962)).

## III.   ANALYSIS

### A.  Plaintiffs' First Amendment Claims

Plaintiffs have asserted three separate First Amendment claims: Count I, violation of the

right to speech and assembly, Count II, violation of the right to film officers, and Count III,

violation of the right to be free from retaliation for their lawful First Amendment activities. In

their opposition, Plaintiffs clarify that they are alleging that Sgt. Pope is directly liable for Counts

I, II, and II, and that Col. Wilson is directly liable for Count III and liable under a supervisory

liability theory for Counts I and II.  ECF 83 at 41–42.  Defendants contend that neither Sgt. Pope's nor Col. Wilson's actions violated Plaintiffs' First Amendment Rights and that Defendants are entitled to qualified immunity.

Qualified immunity seeks to balance the need to hold irresponsible public officials accountable with the need to protect government officials who "perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  Qualified immunity is properly invoked where an officer's conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam). "Clearly established" should not be "defined 'at a high level of generality.'"  *Id.* at 551–52 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)).  Although a previous case need not be "'directly on point' for a right to be clearly established, 'existing precedent must have placed the statutory or constitutional question beyond debate.'"  *Id.* at 551 (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam)).

### 1.  Speech and Assembly

The Supreme Court has said that "[t]here is no doubt that as a general matter peaceful picketing and leafletting are expressive activities involving 'speech' protected by the First Amendment."  *United States v. Grace*, 461 U.S. 171, 176 (1983).  In traditional public forums, such as "streets, sidewalks, and parks . . . the government's ability to permissibly restrict expressive conduct is very limited."  *Id.* at 177.  Still, the "the first Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Herffron v. Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981).  The government may restrict protected speech by regulations that (1) are "content-neutral," (2) are "narrowly tailored to serve a significant government interest," and (3) "leave open ample alternative channels

of communication." *Grace*, 461 U.S. at 177 (quoting *Perry Educ. Ass'n v. Perry Local Educator's Ass'n*, 460 U.S. 37, 45 (1983)); *Ross v. Early*, 746 F.3d 546, 552 (4th Cir. 2014).

Here, there is no dispute that Jeff Hulbert was engaged in constitutionally protected speech, by holding signs and talking to passersby and public officials, in a traditional public forum, the public sidewalk. The issue is whether the decision to move his demonstration off the sidewalk for safety reasons was a permissible time, place, and manner restriction, which therefore would not violate the First Amendment. Since Jeff Hulbert has made an initial showing that his rights were violated, the government has the burden of proving the constitutionality of its restriction. *Reynolds v. Middleton*, 779 F.3d 222, 226 (4th Cir. 2015).

### a. Content-Neutral

The evidence establishes that Sgt. Pope's actions were content neutral. "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). Here, Sgt. Pope's stated justification for moving the protestors was to avert anticipated safety risks. In fact, he testified that he did not know what the group was specifically protesting about before ordering them to move, ECF 76-4 at 177 (explaining that he "didn't read any of their signs"). Plaintiffs argue that a reasonable juror could "infer" that Sgt. Pope acted based on the speech content because Sgt. Pope knew someone in the Governor's Mansion had inquired about the group, and because Sgt. Pope had seen the group protest in the same location on other occasions without incident. ECF 83 at 29. Without more evidence, these inferences do not rise above "mere speculation." *See Casey*, 823 F. Supp. 3d at 349 (explaining a party opposing summary judgment cannot create a factual dispute merely by "building one inference upon another"). Sgt. Pope was told about the call from the Governor's Mansion by the dispatcher and alerted Sgt. Donaldson of

the call. Nothing in the record, however, indicates that his conversations with the dispatcher and Sgt. Donaldson entailed any discussion of the content of Plaintiffs' message. The testimony uniformly shows these conversations were about potential safety concerns and the fact that the Plaintiffs did not have a pre-approved permit for their demonstration. Furthermore, there is no evidence that Sgt. Pope or any one he spoke with that evening harbored any hostility towards the views of the Patriot Picket whatsoever. *Cf. Swagler v. Sheridan*, 837 F. Supp. 2d 509, 526–27 (D. Md. 2011) (finding order for protestors to disperse was a content-based restriction where officers explained that several complaints from passing motorists about the content of the demonstrator's signs, which citizens described as "graphic," "gruesome," and "disgusting" were the impetus for their action). The content of Plaintiffs' speech simply did not play a role in Sgt. Pope's decision to move the demonstration, which was, therefore, a content-neutral restriction. *See Ward*, 452 U.S. at 647 ("Government regulation of expressive activity is content neutral so long as it is '*justified* without reference to the content of the regulated speech.'").

### b. Ample Alternative Channels

It is also clear that the Jeff Hulbert had ample alternative channels to continue his First Amendment activities. For a restriction to leave open alternative channels, "the available alternatives need not 'be the speaker's first or best choice' or 'provide [ ] the same audience or impact for the speech.'" *Ross*, 746 F.3d at 559 (alteration in original) (quoting *Gresham v. Peterson*, 225 F.3d 899, 906 (7th Cir. 2000)). Rather, the relevant standard is that the regulation "provides avenues for 'the more general dissemination of a message.'" *Id.* (quoting *Green v. City of Raleigh*, 523 F.3d 293, 301 (4th Cir. 2008)). Regulations that merely limit an individual's activity to a portion of a forum usually are deemed to leave open ample alternative channels. *See, e.g.*, *id.* ("readily conclude[ing]" that a policy that "directs protestors to stand in designated areas

located mere feet from their intended audience" leaves open alternative channels); *Kass v. City of N.Y.*, 864 F.3d 200, 209 (2d Cir. 2017) (finding officers' direction to enter a designated demonstration space instead of standing on the public sidewalk left open ample alternative channels); *Marcavage v. City of Chi.*, 659 F.3d 626, 631 (7th Cir. 2011) (finding asking demonstrators to move to an area adjacent to the sidewalk or across the street were permissible alternatives); *Cmt. for Creative Non-Violence v. Turner*, 893 F.2d 1387, 1393 (D.C. Cir. 1990) ("[T]he [Supreme] Court has generally upheld regulations which merely limit expressive activity to a specific part of the regulated area . . . ."); *cf. Hill v. Colorado*, 530 U.S. 703, 730 (2000) (noting that "[s]igns, pictures, and voice itself can cross an 8-foot gap with ease," so requiring demonstrators to stay eight feet away from others entering healthcare facilities does not foreclose adequate means of communicating).

Here, Jeff Hulbert was standing in the middle of the public sidewalk, which is approximately fifteen- and one-half-feet wide and extends from the curb of the street to the grassy edge of Lawyers' Mall. *See* ECF 76-9; ECF 76-10 (depicting the sidewalk area). Sgt. Pope told the group they could continue demonstrating in the same manner, but needed to move all the way into the grassy area, or, at most, fifteen and one-half feet back from where they were standing. Plaintiffs claim this prevented them from "being able to be seen or nearby anyone who may traverse the area" because it was nighttime and there were few light sources. ECF 83 at 29–30. The assertion that they could be seen and heard by no one is simply not credible. As depicted in the photos attached to Defendants' motion, Jeff Hulbert could have complied with Sgt. Pope's order and still stood directly next to the sidewalk, or "mere feet from their intended audience." *Ross*, 746 F.3d at 559. Concrete planters divide the sidewalk approximately in half. *See* ECF 76-9 through ECF 76-12 (showing there is about five and one-half feet of sidewalk on either side of

the planters).  However, the planters are only a few feet tall and would not block the group's large signs or voices from being seen or heard by people on the sidewalk or the street.  *See* 2A_for_MD, *First Amendment Under Attack*, YouTube (Feb. 16, 2018) https://www.youtube.com/ watch?v=oIu6SPpFG4A (showing Sgt. Pope, Jeff Hulbert, and other Patriot Picket members standing next to the concrete planters, which only come up about waist-high).  A video of the incident shows one Patriot Picket member holding a sign in the sidewalk area behind the planters, which is clearly visible to the person recording the video from the other side.  *Id.* at 1:17–1:20.  Even though some members of their intended audience might have more difficulty seeing their signs or hearing their message, this does not render the available alternative channel inadequate, since providing the "same audience or impact" is not necessary for the restriction to be constitutional.  *See Ross*, 746 F.3d at 559.  Jeff Hulbert could have continued disseminating his message in the same manner just steps away.  Therefore, the Court concludes the requirement for ample, alternative channels is met.

### c.   Significant Government Interest

The Defendants claim moving the demonstration to a nearby location "address[ed] the threats to sidewalk congestion and public safety."  ECF 76-2 at 35.  There is no doubt that the state has a significant interest "in maintaining the safety, order, and accessibility of its streets and sidewalks."  *Ross*, 746 F.3d at 555 (quoting Green, 523 F.3d at 301); *Schneider v. State of N.J.*, 308 U.S. 147, 160 (1939) ("Municipal authorities, as trustees for the public, have the duty to keep their communities' streets open and available for movement of people and property . . . .").  However, the government must do more than "identify an interest that is significant in the abstract."  *Ross*, 746 F.3d at 556.  It must demonstrate that the harm or risk of harm the restriction seeks to address is "real, not merely conjectural," "substantial and real instead of merely

symbolic." *Id.* (quoting *Satellite Broad. & Commc'ns Ass'n v. FCC*, 275 F.3d 337, 356 (4th Cir. 2001); then quoting *Marcavage v. City of N.Y.*, 689 F.3d 98, 105(2d Cir. 2012)).  "If a regulation places even incidental burdens on speech without yielding some genuine benefit, it must be struck down." *Satellite Broad.*, 275 F.3d at 356.  However, the government is not required to "present a panoply of empirical evidence to satisfy this standard." *Ross*, 746 F.3d at 556.  The Fourth Circuit has emphasized, "particularly, where . . . the burden on speech is relatively small," such as when requiring demonstrators to move a number of feet, the government may "advance its interests by arguments based on appeals to common sense and logic." *Id.*; *see Reynolds v. Middleton*, 779 F.3d 222, 229–30 (4th Cir. 2015) (finding "common sense and logic compel[led] the conclusion" that an ordinance prohibiting roadway solicitation served a significant government interest where "roadway solicitors had increased to a number sufficient to worry a law-enforcement officer with 40 years' experience and to prompt hundreds of citizen complaints").

The Fourth Circuit has held that police officers did not violate a leafleter's First Amendment rights by requiring him and all other demonstrators to confine their activities to certain designated portions of the public sidewalk surrounding a performance arena in downtown Baltimore while the Circus was in town. *Ross*, 746 F.3d at 555–60.  The court found the undisputed evidence showed that "the sidewalks surrounding the Arena suffer from severe congestion during performances of the Circus and that, at least once . . . the presence of [Circus] protestors caused a significant safety hazard." *Id.* at 556.  Therefore, the court concluded there was a "plausible threat to the orderly flow of pedestrian traffic and, concomitantly, public safety," that justified the government's intervention.

Other circuits have held similar restrictions materially advance the government's significant interests where the government presented actual evidence of demonstrators causing

walkway obstructions, or where logical arguments clearly showed the potential for hazardous conditions to arise. For example, the Seventh Circuit upheld police officers' decision to require demonstrators to move off of walkways at busy tourist locations in Chicago (Soldier Field, Navy Pier, Wrigley Field) during an annual cultural and athletic event where video evidence confirmed other pedestrians were repeatedly forced to walk around the protestors. *Marcavage*, 659 F.3d at 630–31. Likewise, the Second Circuit concluded confining Occupy Wall Street protestors to a barricaded area and not allowing passersby to engage with protestors while standing in the public sidewalk "in the heart of Manhattan, shortly before 5 p.m." was justified. *Kass*, 864 F.3d at 208; *see also, e.g.*, *Marcavage*, 689 F.3d at 105 (creating a "no-demonstration zone" outside the 2004 Republican National Convention in the middle of New York City, was justified by the government's "altogether extraordinary" security concerns).

Here, however, there are factual disputes requiring jury resolution as to whether a legitimate government interest was served by the police action. The circumstances of Jeff Hulbert's February 5, 2019 protest, taken in the light most favorable to plaintiffs, appear more ordinary and benign. The parties agree that the Hulbert brothers and approximately six other people were holding large signs somewhere in the middle of a fifteen- and one-half-foot walkway in front of Lawyers' Mall in downtown Annapolis. It was dark, and the Maryland legislative session was expected to convene within a few hours. There is no evidence that Jeff Hulbert and the rest of his group were actually impeding the flow of pedestrian or vehicular traffic prior to being told to move to Lawyers' Mall. Indeed, Sgt. Pope repeatedly testified at his deposition that he did not see the group blocking traffic or creating any unsafe conditions and that, prior to the arrival of multiple police officers and police vehicles, people could "come and go freely" and there was "no disturbance or disruption of the normal business in the area." ECF 84-2 at 80–83 (stating

15

there were no unsafe conditions when he first told Kevin Hulbert to have the group move to Lawyers' Mall); *id.* at 90–95 (observing no safety issues when he approached the entire group and told them to move a second time); *id.* at 114–17, 129–30 (describing the same conditions when he called for other officers to assist him); *see also* ECF 76-1 (acknowledging that "Sgt. Pope did not observe the presence of any immediate safety hazards").

Defendants argue that, contrary to both the Hulberts' and Sgt. Pope's description, some of the Patriot Picket members entered the roadway because their fellow protestors had already obstructed the sidewalks. ECF 76-1 at 6–7 n.6. They point to a video which shows one protestor holding a large sign and walking in the crosswalks at the intersection. *See*, Bryan P. Sears, *Breaking*, Facebook (Feb. 5, 2018), https://www.facebook.com/bpsears/posts/101552484942 47286. However, the video was taken after Jeff Hulbert was already placed under arrest and multiple police cars were at the scene. Despite acknowledging that on at least one other occasion, which occurred after this incident, members of their group had repeatedly crossed the street using the crosswalks during a demonstration, Jeff and Kevin Hulbert denied that any Patriot Picket members were using the crosswalks on the night in question. ECF 76-13 at 51 (explaining that because they had a small group "[t]here's no reason for us to be in the crosswalks . . . that night there would not have been a crosswalk crossing plan"); ECF 76-15 at 37–40 (testifying that protestors had "no reason to go into the street" and that he didn't "recall that there was anyone using any part of the street for the demonstration"). Kevin Hulbert acknowledged that "after the police showed up to make the arrests, and there were cars parked at the location, patrol cars, and the police were crowding the sidewalks, [he thought] there were people who walked into the street, off the curb, to get around the police." ECF 76-15 at 39–40. This testimony is generally consistent with the video footage cited by the Defendants, see Sears, *supra* (depicting multiple police cars

parked in the intersection and multiple officers standing on the sidewalk arresting the Defendants), and Sgt. Pope's testimony that the area became more congested once other police officers arrived. ECF 84-2 at 114–17.  Nothing in the video or testimony before the Court suggests pedestrians' efforts to use the sidewalk were frustrated by the group prior to the arrests.

Still, Defendants argue that even though the demonstration was not immediately unsafe, an emerging threat to safety justified Sgt. Pope's actions.  Specifically, Defendants argue that because "[p]edestrians had been hit by cars at this intersection within the prior year, safety issues were reasonably anticipated in the area."  ECF 76-1 at 33 (citation omitted).  They also note that there have been dozens of unrelated complaints to the police about cars not stopping for pedestrians.  ECF 176-7 at 109.  However, unlike in *Ross*, where there was a clear link between a past incident with a circus protestor and the plaintiff's conduct, there is no evidence that the circumstances surrounding these vehicle accidents or complaints had anything in common with the Patriot Picket's February 5 demonstration.  There is nothing suggesting the safety threats had occurred in conjunction with any kind of First Amendment activity, and the accidents appear to have occurred during daylight hours in June, not, as here, when the Maryland Legislature was in session.  *See* ECF 76-20 (reporting that pedestrians "were struck by passing vehicles on June 6, 2017 at 3:08 pm and June 21, 2017 at 6:48 pm").  Moreover, as discussed, there is a factual dispute as to whether any of the Patriot Picket members were in the street or crosswalks prior to Sgt. Pope ordering the group to move.

The Court appreciates that the government's burden is not particularly high in establishing that some safety concern was materially served in moving the demonstration a few feet off the sidewalk.  However, taking the evidence in the light most favorable to Plaintiffs, there is a genuine issue of material fact as to whether any real, non-conjectural safety issue was aided by Sgt. Pope's

actions, or whether the police involvement caused the situation to become more disruptive and potentially hazardous.  Thus, although the restriction on Jeff Hulbert's speech was content neutral and left ample alternative channels for his expression, summary judgment is inappropriate as to whether a significant government interest was served and whether Jeff Hulbert's First Amendment rights were violated.[3]

Moreover, the right to peacefully protest on the public sidewalk was clearly established at the time of the incident.  *See, e.g.*, *Grace*, 461 U.S. at 180 (striking down law that prohibited carrying flags and banners on the public sidewalk outside the Supreme Court where such activities did not "obstruct[] the sidewalks or access to the Building, threaten[] injury to any person or property, or in any way interfere[] with the orderly administration of the building or other parts of the grounds").[4]  Therefore, Sgt. Pope is not entitled to qualified immunity, and this Court will deny Sgt. Pope's motion for summary judgment on Count I.

### 2.  Filming

Plaintiffs' second First Amendment claim is that Kevin Hulbert was unlawfully prevented from filming the police.  The majority of circuits have found the First Amendment protects a citizen's right to record police performing their duties in public.  *See, e.g.*, *Fields v. City of Phila.*,

---

[3] The parties apparently dispute how narrow tailoring should be defined in this case.  *Compare* ECF 76-1 (citing the standard applied in *Ross v. Early*, 746 F.3d 546, 557 (4th Cir. 2014), which requires the challenged restriction not "burden[] *substantially more* speech than is necessary" to further the government's interests (emphasis added)); *with* ECF 83 at 22–23 (arguing the Court should apply the somewhat more stringent test espoused in *Madsen v. Women's Health Center Inc.*, 512 U.S. 753, 765 (1994), requiring the challenged restriction to "burden *no more* speech than necessary" to serve the government's interests (emphasis added)).  Because the Court has determined the Government has not established the government interest prong of the intermediate scrutiny test, the Court need not address the narrow tailoring prong.

[4] Defendants do not argue that Plaintiffs' right to protest, if violated, was not clearly established.  Their qualified immunity argument is premised only on the first prong of the qualified immunity inquiry, that Plaintiffs' constitutional rights were not actually violated.

862 F.3d 353, 355–56 (3d Cir. 2017) ("[T]he First Amendment protects the act of photographing, filming, or otherwise recording police officers conducting their official duties in public."); *Turner v. Lieutenant Driver*, 848 F.3d 678, 689–90 (5th Cir. 2017) ("We agree with every circuit that has ruled on this question . . . the First Amendment protects the right to record police."); *Gericke v. Begin*, 753 F.3d 1, 8 (1st Cir. 2014) (recognizing a "First Amendment right to film police activity carried out in public"); *ACLU v. Alvaraez*, 679 F.3d 583, 595–96 (7th Cir 2012) ("The act of making an audio or audiovisual recording is necessarily included within the First Amendment's guarantee of speech and press rights . . . ." (emphasis omitted)); *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000) (recognizing plaintiffs had a First Amendment "right to videotape police activities"); *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995) (recognizing a plaintiff who was attempting to videotape a demonstration had a "First Amendment right to film matters of public interest"); *cf. Chestnut v. Wallace*, 947 F.3d 1085, 1090 (8th Cir. 2020) (recognizing the "right to watch police-citizen interactions" as a prerequisite to the right to "record[] police activity").  Neither the Fourth Circuit nor the Maryland Court of Appeals has addressed this issue.  However, this Court agrees with the majority of other circuits and with other district court judges in this circuit who have found the First Amendment encompasses such filming protections, subject to reasonable time, place, and manner restrictions.  *See Dyer v. Smith*, No. 3:19-cv-921, 2021 WL 694811, at *8 (E.D. Va. Feb. 23, 2021) (Gibney, J.);  *J.A. v. Miranda*, No. PX 16-3953, 2017 WL 3840026, at *6 (D. Md. Sept. 1, 2017) (Xinis, J.); *Garcia v. Montgomery Cnty., Md.*, 145 F. Supp. 3d 492, 507–08 (D. Md. 2015) (Chaung, J.); *Szymecki v. City of Norfolk*, No. 2:08-cv-142, 2008 WL 11441862, at *4 (E.D. Va. 2008) (Morgan, J.).  Plaintiffs assert Sgt. Pope unlawfully interfered with this right by arresting Kevin Hulbert while he was filming the Patriot Picket demonstration and his brother's arrest.  Defendants counter that Keven Hulbert's

right to record was not violated because Sgt. Pope did not arrest him for filming, but because he did not leave the sidewalk as ordered.

The Court agrees with Defendants that the evidence shows Sgt. Pope arrested Kevin Hulbert because he did not comply with repeated orders to move to Lawyers' Mall, not because he was filming.  It is undisputed that Sgt. Pope told Kevin Hulbert multiple times to move off of the sidewalk and that Kevin Hulbert refused to do so.  In fact, video of the incident shows Sgt. Pope attempting to command Kevin Hulbert to move to Lawyers' Mall again immediately before placing him under arrest.  *See* 2A_for_MD, *First Amendment Under Attack*, *supra*, at 1:45 (showing Sgt. Pope telling Kevin Hulbert, "Sir, I gave you, Sir, inside Lawyers' Mall or you're going to jail," and then placing him under arrest).  Additionally, there is no evidence that Sgt. Pope ever told Kevin Hulbert that he could not film.  Multiple other people were filming the interaction and were not arrested or otherwise prevented from recording the event.  This Court therefore is not persuaded that a reasonable jury could find Kevin Hulbert was arrested because he was filming the police.

However, undoubtedly, Kevin Hulbert's arrest prevented him from further exercising his First Amendment right to film officers and demonstrators.  As discussed in the previous section, viewing the facts in the light most favorable to the non-movant Plaintiffs, the Court cannot say that Sgt. Pope's order to move the demonstration (and the filming of the demonstration) to Lawyers' Mall conformed with the First Amendment.  Thus, Defendants' position—that Kevin Hulbert was arrested for not moving to Lawyers' Mall—even if true, does not conclusively show that Sgt. Pope did not violate Kevin Hulbert's right to film.  As explained *supra* in connection with Count I, if Sgt. Pope's interference with the demonstration did not actually serve any significant government interest, then it was not a proper time, place, and manner restriction on Kevin

Hulbert's First Amendment rights.  This is true even though it is clear that the restriction was not content-based or intended to silence Plaintiffs' viewpoints.

Alternatively, the Defendants argue they are entitled to qualified immunity because the right to record is not clearly established in the Fourth Circuit or in Maryland.  In an unpublished opinion issued over a decade ago, the Fourth Circuit held that as of 2007, the "First Amendment right to record police activities on public property was not clearly established in this circuit." *Szymecki v. Houk*, 353 F. App'x 852, 853 (4th Cir. 2009).  Although the Fourth Circuit and the Maryland Court of Appeals still have yet to rule on this issue, since *Szymecki*, five more circuits addressing this issue have agreed the First Amendment includes a right to record police interaction and other public events.  *See Fields*, 862 F.3d at 355–56; *Turner*, 848 F.3d at 689–90; *Gericke*, 753 F.3d at 8; *ACLU*, 679 F.3d at 595–96; *Chestnut*, 947 F.3d at 1090; *see also Dyer*, 2021 WL 694811, at *8 n.11 (noting that "[w]ith the exception of the Tenth Circuit, courts in every circuit have held that there is a general First Amendment right to film police activities in public, subject to reasonable time, manner, and place restrictions" (citation omitted)).  In a recent case considering the contours of a qualified immunity defense, the Fourth Circuit explained that "[i]n the absence of 'directly on-point, binding authority,' courts may also consider whether 'the right was clearly established based on general constitutional principles or a consensus of persuasive authority.'" *Ray v. Roane*, 948 F.3d 222, 229 (4th Cir. 2020) (quoting *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 543 (4th Cir. 2017)).  In *Ray*, the court concluded that "[t]he consensus of our sister circuits leaves no doubt that [the plaintiff's right] was clearly established," and therefore the officer defendant was not entitled to qualified immunity.  *Id.* at 230.

This case presents a similar issue, where every circuit considering the question has found the First Amendment right to record police exists.  Indeed, even Sgt. Pope agreed at his deposition

that "the public has a First Amendment right to film police officers in the conduct of their . . . official duties in public." ECF 76-4 at 54. Therefore, the Court agrees with Plaintiffs that the right to record police officers and other matters of public concern in a safe manner that does not interfere with the police's ability to carry out their duties was clearly established at the time of the incident. *See Dyer*, 2021 WL 694811, at \*8 ("Although neither the Supreme Court nor the Fourth Circuit has recognized a right to record government officials performing their duties, both the general constitutional rule and a consensus of cases clearly establish this right."). Thus, Sgt. Pope is not entitled to qualified immunity on Count II, and summary judgment will be denied.[5]

### 3. Retaliation

Finally, Plaintiffs claim they were retaliated against for exercising their First Amendment rights when they were arrested on February 5, 2018, and when the additional charges were issued on February 6. The First Amendment protects "not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000). To prove a retaliation claim, the plaintiff must show (1) "that [plaintiff's] speech was protected"; (2) "defendant's alleged retaliatory action adversely affected the plaintiff's constitutionally protected speech"; and (3) "a casual relationship exists between [plaintiff's] speech and the defendant's retaliatory action." *Tobey v. Jones*, 706 F.3d 379, 387 (4th Cir. 2013) (quoting *Suarez*, 202 F.3d at 685–86). The first two elements are

---

[5] It is worth noting that Defendants' only justification for impeding Kevin Hulbert's right to record is that Sgt. Pope was enforcing a reasonable time, place, and manner restriction on the picketers to maintain public safety and access to the streets and sidewalks. They specifically do not distinguish Kevin Hulbert's activities from the activities of the other demonstrators and present no evidence that his filming created some different or greater threat to public safety and pedestrian traffic than picketers like Jeff Hulbert who were holding signs. Defendants make no claim, nor is there evidence in the record, that Kevin Hulbert's filming otherwise impeded the officers' execution of their duties or their ability, for example, to safely and effectively arrest Jeff Hulbert.

undisputedly met: Plaintiffs were voicing their political views through a demonstration and talking

with the media and were arrested and issued criminal charges.  Defendants, however, contend that

Plaintiffs' retaliation claim fails because there is no evidence of a causal relationship between the

Hulberts' speech and either their arrest or the issuing of charges.

To establish causation, the "claimant must show that 'but for' the protected expression the

[government official] would not have taken the alleged retaliatory action." *Tobey*, 706 F.3d at 390

(alteration in original).  In the retaliatory arrest or prosecution context, a claim ordinarily fails if

probable cause justified the officer's actions. *See Nieves v. Barlett*, 139 S. Ct. 1715, 1725 (4th Cir.

2019).  Once a plaintiff shows an absence of probable cause, he "must show that the retaliation

was a substantial or motivating factor behind the arrest." *Nieves*, 139 S. Ct. at 1725.  Then, "if

that showing is made, the defendant can prevail only by showing that the [arrest] would have been

initiated without respect to retaliation." *Id.* (quoting *Lozman v. Riviera Beach*, 138 S. Ct. 1945,

1952–53 (2018)).

First, regarding the arrest on February 5, 2019, Defendants claim there is no causal

connection between Plaintiffs' speech and the arrest because the arrest was based on probable

cause that the Hulberts disobeyed Sgt. Pope's lawful orders.  However, as this Court has explained,

factual disputes preclude the Court from determining, at summary judgment, whether Sgt. Pope's

orders were lawful or unlawful.  Where an officer's order is unconstitutional, "the failure to obey

a lawful order statute cannot serve as the basis for probable cause." *Swagler*, 837 F. Supp. 2d at

531; *see also Johnson v. Prince George's Cnty.*, No. DKC 10-0582, 2012 WL 6086875, at *3 n.3

(D. Md. Dec. 5, 2012) ("It is well-established in Maryland that the offense of failure to obey an

order 'is contingent on the order being both reasonable and lawful.'" (citation omitted)).

Therefore, this argument is unavailing at this juncture.  Additionally, Defendants argue that even

if there is no probable cause, Plaintiffs' retaliation claim fails because there "is no evidence that the arrests were motivated by their message."  ECF 76-1 at 41.  This contention, however, is immaterial to the claim.  Even if Sgt. Pope was not motivated by animus of Plaintiffs' particular message, a jury could believe that he was motivated by their conduct, which consisted entirely— at least upon viewing the facts most favorably to Plaintiffs—of protected First Amendment activity.  There is no evidence that Sgt. Pope would have arrested the Hulberts if they had merely been standing on the sidewalk and not communicating their political beliefs.  Therefore, Sgt. Pope is not entitled to summary judgment for Plaintiffs' retaliation claim as to their initial arrest.

Plaintiffs' retaliation claim based on the additional charges they received on February 6, however, meets a different result.  The undisputed evidence shows that Sgt. Pope discussed how to issue other charges to the Hulberts with Sgt. Donaldson shortly after the Hulberts were released from custody, and that these additional charges are ones that are traditionally issued to protestors based on long-standing guidance from the State's Attorney's office.  Additionally, Sgt. Pope's testimony indicates that he, individually, intended to issue additional citations to the Hulberts before they were released and only failed to do so because he could not locate the code provision to write-up the citations properly and knew he could add the charges later.  These initial charging decisions could not have been affected by the Hulberts' subsequent media interactions.  The Court acknowledges that a reasonable jury could infer that the Hulberts' discussions with the media the next day, which were critical of the Capitol Police, could have generated some animus in either Sgt. Pope or Col. Wilson.  However, because the undisputed evidence shows the Capitol Police would have issued the additional charges even if the Hulberts had not further exercised their First Amendment rights, a retaliation claim based upon the issuing of the additional charges fails as a

matter of law.  Summary judgment will be granted on Count III as to Col. Wilson in its entirety and granted as to Sgt. Pope with respect to the additional charges but denied as to the initial arrest.

### 4.   Supervisory Liability for Plaintiffs' First Amendment Claims

Plaintiffs also allege that Col. Wilson is liable for Counts I and II under a supervisory liability theory.  A supervisor may be liable for a subordinate's conduct under § 1983 if a plaintiff can show that (1) "the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed 'a pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff," (2) "the supervisor's response to that knowledge was so inadequate as to show' deliberate indifference to or tacit authorization of the alleged offense practices,'" and (3) "that there was an 'affirmative causal link' between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff."  *Randall v. Prince George's Cnty., Md.*, 302 F.3d 188, 206 (4th Cir. 2002) (quoting *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994)).  This liability "is not premised upon *respondeat superior*," so a claimant "must show more than mere supervision."  *Campbell v. Florian*, 972 F.3d 385, 398 (4th Cir. 2020).  The Fourth Circuit has described this as a "heavy burden," particularly because "ordinarily, the plaintiff 'cannot satisfy [this] burden of proof by pointing to a single incident or isolated incidents.'"  *Shaw*, 13 F.3d at 799; *Campbell*, 972 F.3d at 398 (quoting *Slakan v. Porter*, 737 F.2d 368, 373 (4th Cir. 1984)).

There is no evidence that Sgt. Pope's decision to remove protestors from the sidewalk was any more than an isolated incident.  In fact, Plaintiffs argue throughout their opposition that ordinarily their group and other protestors are allowed to demonstrate on the sidewalk and that this incident was unusual.  Still, Plaintiffs aver that Col. Wilson may be liable because a reasonable juror could infer that he issued an order that the picketers be relocated.  ECF 83 at 44.  This inference, however, is unsupported by the evidence.  Sgt. Pope testified that he was told by Sgt.

Donaldson that Col. Wilson said it would be okay to move the demonstration to Lawyers' Mall even though they did not have a permit.  Sgt. Pope may have been under the impression that this was what his supervisors wanted him to do, but there is no evidence that Col Wilson actually directed anyone to do it.  Both Col. Wilson's and Sgt. Pope's testimony indicates that Col. Wilson merely told his subordinates to evaluate the situation and, if it was necessary, to move the protestors to a safer location, Lawyer's Mall, even though they did not have a permit.  ECF 84-4 at 22 ("I told [Donaldson] to go up himself or send somebody up to look and evaluate the situation, if there was unsafe conditions, tell people to make it safe, tell people to move where it would be a safe location."); ECF 76-4 at 74 (agreeing that "it was reported to [him] by Sergeant Donaldson that Chief Wilson had said to allow this group to go to Lawyers' Mall").  Col. Wilson was not contacted again about the situation until after the Hulberts were already arrested.  ECF 76-7 at 66.

Thus, Plaintiffs have not established that Col. Wilson was deliberately indifferent to any potential First Amendment violation.  Although he was notified of the demonstration, he gave his subordinates appropriate guidance: to evaluate the situation and only interfere with the protest if there was a genuine safety issue.  Additionally, he specifically told his subordinates, if necessary, to allow the protest to continue in a nearby area, which, as the Court has discussed, would be a permissible alternative under the First Amendment if a genuine safety concern existed.  Therefore, Col. Wilson cannot be held liable under either Counts I or II, and summary judgment in his favor is warranted.

### B.  Plaintiffs' Fourth Amendment Claims

Next, the Court addresses Plaintiffs' Fourth Amendment claims.  Counts IV and V of Plaintiffs' complaint allege Sgt. Pope violated their Fourth Amendment Rights to be free from (1)

unreasonable search and seizure and (2) excessive force.  Defendants contend that the Hulberts'
Fourth Amendment rights were not violated and that Sgt. Pope is entitled to qualified immunity.

### 1.  Unreasonable Search and Seizure

The Fourth Amendment protects an individual from being arrested and searched without a
warrant or probable cause.  U.S. Const. amend. IV; *Brown v. Gilmore*, 278 F.2d 362, 367 (4th Cir.
2002).  Probable cause requires "enough evidence to warrant the belief of a reasonable officer that
an offense has been or is being committed; evidence sufficient to convict is not required." *Brown*,
278 F.3d at 368–69 (citing *Wong Sun v. United States*, 371 U.S. 471, 479 (1963)).  Defendants
argue that the Hulberts' arrest and search incident to arrest did not violate their Fourth Amendment
rights because Sgt. Pope had probable cause that they committed a criminal offense, violating his
orders to move off the public sidewalk.  However, in Maryland, "where the order is neither
reasonable nor lawful, 'the failure to obey a lawful order statute cannot serve as the basis for
probable cause.'" *Johnson*, 2012 WL 6086875, at *3 n.3 (citation omitted).  As discussed in the
previous section, factual disputes prevent the Court from ruling as a matter of law on the lawfulness
and reasonableness of Sgt. Pope's orders.  Therefore, summary judgment will also be denied as to
Plaintiffs' unreasonable search and seizure claim, Count IV.

### 2.  Excessive Force

Additionally, the Fourth Amendment prohibits officers from using excessive force in
making an arrest. *Graham v. Connor*, 490 U.S. 386, 387 (1989); *E.W. by and through T.W. v.
Dolgos*, 884 F.3d 172, 179 (4th Cir. 2018); *Jones v. Buchanan*, 325 F.3d 520, 527–28 (4th Cir.
2003).  The Court analyzes whether the amount of force used was reasonable by assessing the
totality of the circumstances including "the severity of the underlying offense," "whether the

suspect poses an immediate threat to the safety of the officer or others," and "whether the suspect is actively resisting arrest or attempting to evade arrest by flight." *E.W.*, 884 F.3d at 180–82.

Plaintiffs argue that in this case "*where no force is authorized, any force is excessive.*" ECF 83 at 40.[6]  The Fourth Circuit has rejected this argument and explained that although "lack of probable cause for the arrest" is relevant to the overall reasonableness inquiry, "we consider the crime that is alleged to have been committed in connection with our overall analysis of *all* of the circumstances surrounding the use of force." *See Hupp v. Cook*, 931 F.3d 307, 322 (4th Cir. 2019) (denying claim that "because [plaintiff] was unlawfully arrested, the use of *any* force was necessarily unconstitutional"); *see also Cortez v. McCauley*, 478 F.3d 1108, 1126 (10th Cir. 2007) ("[I]n a case where police effect an arrest without probable cause . . . but use no more force than would have been reasonably necessary if the arrest . . . [was] warranted, the plaintiff has a claim for unlawful arrest . . . but not an additional claim for excessive force."); *Jackson v. Sauls*, 206 F.3d 1156, 1171 (11th Cir. 2000) ("[A] claim that any force in an illegal stop or arrest is excessive is subsumed in the illegal stop or arrest claim and is not a discrete excessive force claim."). Therefore, other circumstances which make the seizure unreasonable must be shown for Plaintiffs' distinct excessive force claim to arise.

Plaintiffs also allege that the way they were handcuffed and transported to the police station amounted to excessive force.  The Fourth Circuit has held that "a standard procedure such as handcuffing would rarely constitute excessive force." *Id.* at 179 (quoting *Brown v. Gilmore*, 278 F.3d 362, 369 (4th Cir. 2002)).  Although the Court has clarified that there is no "*per se* rule" that

---

[6] The cases Plaintiffs cite to support this proposition involve claims of unjustified seizures and a heightened use of force that warranted distinct excessive force claims, including jumping on an arrestee and crushing his nose, lacerating his face, and bruising his ribs, *Jones v. Buchanan*, 325 F.3d 520 (4th Cir. 2003), and repeatedly using pepper spray at close range, *Park v. Shiflett*, 250 F.3d 843 (4th Cir. 2001).

handcuffing cannot be excessive force, a valid excessive force handcuffing claim is "the rare exception" given "the universal acceptance of handcuffing as an appropriate safety measure incident to arrest." *Id.* at 193 (Shedd, J., concurring) (surveying case law that demonstrated "the prevailing federal rule appears to be that an arrestee may pursue a Fourth Amendment excessive force claim based on the use of handcuffs only in very limited circumstances, such as when the handcuffing causes physical injury").

The first time the Fourth Circuit identified a case of handcuffing that rose to the level of a Fourth Amendment excessive force violation was in *E.W. by and through T.W. v. Dolgos*, which was decided after the Hulberts' arrest. 278 F.3d at 180–85. In that case, a school resource officer handcuffed a compliant ten-year-old child, who was surrounded by multiple adults in a closed room, for hitting another child three days beforehand. *Id.* at 185–86. However, the court concluded that the officer was entitled to qualified immunity because the student's right had not been clearly established at the time of his arrest. *Id.* at 186–87. In the present case, the arrest of two adult males occurred at night on the street in front of a group of other protestors. Although Plaintiffs complained the handcuffs were "painfully tight," they did not suffer significant physical injury. *See* ECF 84-1 at 45; ECF 84 at 94–95 (claiming he sustained "wrist abrasions and muscle cramps" but never sought any medical treatment or discussed any physical or mental injuries with a health care provider). The evidence presented, including videos of the arrests, do not bear the

hallmarks of an "obvious case"[7] of excessive force or any similarity to the situation the Fourth

Circuit addressed in *E.W.*  This Court therefore concludes that Sgt. Pope is entitled to qualified

immunity on Plaintiffs' excessive force claim, because any constitutional right that was potentially

violated by placing the Hulberts in handcuffs was not clearly established at the time of the arrest.

*See Pearson*, 555 U.S. at 236 (holding courts have the discretion to determine a right was not

clearly established before definitively deciding whether a constitutional violation occurred).

Summary judgment will be granted for Sgt. Pope on Count V.[8]

## C. Plaintiffs' State Law Claims

Finally, the Court turns to Plaintiffs' state law claims.  Counts VI, VII, and VIII claim

violations of the Maryland Declaration of Rights, which mirror Plaintiffs' First and Fourth

Amendment claims.  Counts IX and X allege false arrest and false imprisonment.  Defendants

argue that the Maryland Tort Claims Act ("MTCA") bars these claims.  Under the MTCA,

Defendants are immune from liability for acts or omissions within the scope of their public duties

that are "made without malice or gross negligence."  Md. Code Ann., State Gov't § 12-105; Cts.

& Jud. Proc., § 5-522(b).  This immunity applies to state constitutional torts and intentional torts.

---

[7] By comparison, an example of an "obvious case" of excessive force is found in *Turmon v. Jordan*, 405 F.3d 202 (4th Cir. 2005), which involved an officer pointing a gun in the face of an arrestee who was wholly compliant with all of his commands and causing injury which required six-months of rehabilitation.  There, the Fourth Circuit explained, "it was obvious the officer 'could not point his gun at an individual's face,' pull the individual out of his hotel room, and 'handcuff him when there was no reasonable suspicion that any crime had been committed, no indication that the individual posed a threat to the officer, and no indication that the individual was attempting to resist or evade detention.'"  *E.W.*, 884 F.3d at 186 (quoting *Turmon*, 405 F.3d at 208).

[8] Plaintiffs also asks the Court to rule that the doctrine of qualified immunity is unconstitutional. As the Supreme Court and the Fourth Circuit have continued to recognize the validity of the qualified immunity defense, as recently as within the past month, the Court declines to adopt Plaintiffs' argument.  *E.g.*, *Halcomb v. Ravenell*, No. 19-6843, 2021 WL1182911 (4th Cir. Mar. 30, 2021).

*Lee v. Cline*, 384 Md. 245, 266 (2004); *E.W.*, 884 F.3d at 187.  Malice requires an "evil or wrongful motive, intent to injure, knowing and deliberate wrongdoing, ill-will or fraud." *Barbre v. Pope*, 402 Md. 157, 182 (2007); *Sherrill v. Cunningham*, No. JKB-18-476, 2019 WL 6067286, at *9 (D. Md. Nov. 15, 2019) ("[M]alice is established by proof that the defendant-officer 'intentionally performed an act . . . with an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure the plaintiff.'" (citation omitted)).  Gross negligence is "an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another," and "implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them." *Cooper v. Rodriguez*, 443 Md. 680, 708 (2015) (quoting *Barbre*, 402 Md. at 187).  Ordinarily, malice or gross negligence is found when state actors exhibit ill-will or discriminatory motive towards the plaintiff.  *See, e.g.*, *Barbre*, 402 Md. at 190 (finding gross negligence of an officer who ordered the unarmed plaintiff to raise his hands and, after he complied, "approached with his gun drawn and shot him in the neck"); *Lee*, 384 Md. at 269–70 (holding a jury could find malice where an officer unnecessarily extended a routine traffic stop for forty minutes and referred to the plaintiff as an uncooperative "suspect" because he was an African-American male driving a luxury car).  Although, as Plaintiffs' point out, the question of malice or gross negligence typically is a factual determination for the jury, it "can be determined as a matter of law when the facts clearly show that no reasonable jury could find that the defendant's actions amounted to gross negligence." *E.W.*, 884 F.3d at 187 (citing *Cooper*, 443 Md. at 680).  The Court finds that this is such a case.

Considering all facts and reasonable inferences in Plaintiffs' favor, there is simply no evidence for a jury to find Defendants acted with the kind of reckless disregard or intentional wrongdoing required to show malice or gross negligence.  Sgt. Pope, who had been working in

Annapolis for only about a month, sought guidance from his supervisor, Sgt. Donaldson, before addressing the Hulberts.  Although he recognized no apparent immediate threat to public safety, based on his discussion with dispatch and with Sgt. Donaldson, Sgt. Pope believed there was a potential safety concern caused by the Hulberts' demonstration on the sidewalk next to the roadway.  He did not order the Hulberts to cease their demonstration, but asked them to move off the sidewalk, away from the street.  Although a jury could find that this decision was an overreach of his power that needlessly infringed on Plaintiffs' rights, there is no evidence that the decision was made "without the exertion of any effort to avoid" inflicting injury or a "thoughtless disregard of the consequences" of moving the demonstrators approximately fifteen feet.  *See E.W.*, 884 F.3d at 187 (quoting *Cooper*, 443 Md. at 118).  Similarly, Sgt. Pope only arrested the Hulberts after giving them multiple opportunities to comply with his orders and allowed the other members of their group to continue their activities inside Lawyers' Mall.  Although a jury may determine the orders and subsequent arrest were not reasonable or lawful, gross negligence requires "more than simple negligence" or an uncaring approach.  *Cooper*, 334 Md. at 708; *see E.W.*, 884 F.3d at 188 (holding an officer was not grossly negligent, though his actions towards a ten-year-old arrestee were "callous" an amounted to an excessive use of force).  Likewise, as the Court has already explained in its discussion of the supervisory liability and retaliation claims, Col. Wilson gave appropriate guidance to his subordinates that showed respect for their First Amendment rights.  He recommended the issuing of additional charges after noting apparent deficiencies in the initial charging documents executed by Sgt. Pope, based on longstanding guidance from the state's attorney's office.

Plaintiffs attempt to establish malice or gross negligence by arguing that it was not a safety concern but a call from the Governor's Mansion by someone who didn't want the Hulberts to

exercise their First Amendment rights that motivated Defendants' actions.  ECF 83 at 43–44.

Although it is not disputed that the phone call initiated a chain of events which led to the Hulberts'

arrest, that alone does not establish Defendants acted with the intent to deprive the Hulberts of

their rights.  As the Court has previously explained, the evidence produced shows that Defendants

had no knowledge of the contents of the phone call from the Governor's Mansion prior to initiating

the arrest and that their discussions with dispatch and Sgt. Donaldson were about safety and

whether the protestors had or needed a permit.  There is no evidence or reason to believe

Defendants acted out of animus towards the Plaintiffs or their message.  Defendants are therefore

entitled to immunity for Plaintiffs' state law claims under the MTCA, and summary judgment will

be granted as to Counts VI through X.

### D.  Punitive Damages

Defendants also seek summary judgment on Plaintiffs' claims for punitive damages.

Punitive damages are only permitted in § 1983 claims "for conduct that involves 'reckless or

callous indifference to the federally protected rights of others,' as well as for conduct motivated

by evil intent."  *Morris v. Bland*, 666 F. App'x 233, 240 (4th Cir. 2016) (quoting *Cooper v. Dyke*,

814 F.2d 941, 948 (4th Cir. 1987)).  This standard is substantially similar to the "malice or gross

negligence" standard required under the MTCA for an officer to be liable for state law claims.  As

discussed in the previous section, there is no evidence that Sgt. Pope acted with such indifference

or ill intent.  Therefore, Defendants' motion for summary judgment will be granted as to Plaintiffs'

claims for punitive damages.

### E.  MSI's Standing

Finally, Defendants ask that judgment be entered against MSI because it does not have

standing to pursue these claims on behalf of itself or its members.  However, "once it is established

that at least one party has standing to bring the claim no further inquiry is required as to another party's standing to bring that claim." *Md. Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 209 (4th Cir. 2020); *Watt v. Energy Action Educ. Found.*, 454 U.S. 151, 160 (1981) (declining to determine the standing of additional plaintiffs at summary judgment where it was clear that other plaintiffs had standing to pursue each claim); *Bostic v. Schaefer*, 760 F.3d 352, 370 (4th Cir. 2014) ("[T]he Supreme Court has made it clear that 'the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.'" (quoting *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006))).  Because Jeff and Kevin Hulbert clearly have standing to pursue the claims that survive this motion, the Court will not opine on whether MSI also has standing in the case.

## IV.   CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment will be GRANTED as to all claims against Col. Wilson.  Defendants' motion will also be GRANTED entirely as to Counts V through X and as to all claims for punitive damages, and will be GRANTED IN PART as to the claims in Count III relating to the charges filed on the day after the arrest.  The motion will be DENIED as to the remaining claims alleged against Sgt. Pope in Counts I through IV.  A separate Order follows.

Dated:  April 22, 2021                                            /s/
                                                      _____
                                                      Stephanie A. Gallagher
                                                      United States District Judge