# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### NORTHERN DIVISION

JEFF HULBERT, *et al.*        *

      Plaintiffs       *

      v.       *       Case No. 1:18-CV-00461-SAG

SGT. BRIAN T. POPE, *et al.*       *

      Defendants       *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## REPLY MEMORANDUM IN SUPPORT OF DEFENDANT
## SGT. BRIAN T. POPE'S MOTION FOR RECONSIDERATION

Defendant Sgt. Brian T. Pope, by undersigned counsel, hereby submits this reply memorandum in support of his motion for reconsideration.

## ARGUMENT

### I. THE VIDEO RESOLVES A FACTUAL DISPUTE IDENTIFIED IN THIS COURT'S MEMORANDUM OPINION.

This Court's memorandum opinion mentions alleged factual disputes five times in its partial denial of Sgt. Pope's motion for summary judgment, which are reiterated throughout plaintiffs' opposition. ECF 88 at 15, 17-18, 23, 27; ECF 101 at 10, 12, 22. When viewed in context, there is only one alleged factual dispute in this Court's memorandum opinion. The way in which this Court articulated the alleged factual dispute is important to break down in light of this motion for reconsideration.

The first three references to an alleged factual dispute arise in this Court's opinion discussing a significant government interest. First, this Court stated that "there are factual

disputes requiring jury resolution as to whether a legitimate government interest was served by the police action." ECF 88 at 15. But this Court also concluded that "[t]here is no doubt that the state has a significant interest 'in maintaining the safety, order, and accessibility of its streets and sidewalks.'" ECF 88 at 13 (citation and quotation omitted). The alleged factual dispute appears to concern whether Sgt. Pope's orders successfully achieved the government's significant interest. The facts—as outlined by this Court—demonstrate that it does, but even if it did not, it would not matter.

This alleged factual dispute was articulated immediately after acknowledging that factually similar cases existed from other circuits where similar restrictions materially advanced the government's interests. ECF 88 at 14-15. This included *Kass v. City of New York*, 864 F.3d 200 (2d Cir. 2017), a Second Circuit decision where an individual who was not impeding pedestrian or vehicular traffic was ordered to move. *Id.* at 204; ECF 88 at 14-15. The plaintiff in *Kass* refused to comply and was arrested. *Kass*, 864 F.3d at 204. Despite the lack of immediate safety concerns, the Second Circuit rejected reasoning "that to avoid liability [law enforcement] officers needed to refrain from intervening until [plaintiffs] actually impeded pedestrian traffic or caused a security issue." *Id.* at 209. A law enforcement officer's duty necessarily involves anticipating threats to safety and guarding against them, rather than waiting until someone has already "caused a security issue." *Id.* Indeed, it would be absurd if law enforcement could not intervene until *after* public safety has been compromised.

This Court's statement that there is a factual dispute "as to whether a legitimate government interest was served by the police action" is incorrect.  Moving a group of protestors from the sidewalk to the adjacent grassy area will make the sidewalk safer.  Clearing the sidewalk certainly will not make the sidewalk less safe.  This Court also acknowledged the safety concerns that Sgt. Pope encountered when he arrived at the scene on February 5, 2018 were largely undisputed, because "*the parties agree* that the Hulbert brothers and approximately six other people were holding large signs somewhere in the middle of a fifteen- and one-half-foot walkway in front of Lawyers' Mall in downtown Annapolis.  It was dark, and the Maryland legislative session was expected to convene within a few hours."  ECF 88 at 15 (emphasis added).

It is undisputed that pedestrians had previously been struck by vehicles at the intersection where Patriot Picket chose to hold its demonstration, a consideration that is among the safety reasons that were cited in Sgt. Pope's report.  As this Court noted, those prior incidents "occurred during daylight hours in June, not, as here, when the Maryland Legislature was in session."  ECF 88 at 17.  But such distinctions offer little comfort to law enforcement officers responsible for protecting against threats to public safety in a location where pedestrians had been struck.  The government is "entitled to advance its interests by arguments based on appeals to common sense and logic . . . particularly where, as here, the burden on speech is relatively small."  *Ross v. Early*, 746 F.3d 546, 556 (2017) (citations and quotations omitted).  Common sense suggests that the intersection would be more, rather than less, dangerous during the legislative session, when more people than usual are

attracted to the area.  Similarly, it is eminently reasonable for officers to presume that the danger to pedestrians is greater in evening darkness, when pedestrians become less visible to motorists.  *Id.* at 556 (finding that the government's public safety interest was adequately demonstrated when "[t]he undisputed evidence reveals that the sidewalks surrounding the Arena suffer from sever congestion during performances of the Circus and that, at least once—in the year preceding the issuance of the Policy—the presence of protestors caused a significant safety hazard").  A single safety hazard within the past year was sufficient for the Fourth Circuit to conclude the government's safety interest was served in *Ross*.  *Id.* The facts here are more pronounced than they were in *Ross* because two people were struck by vehicles at the intersection within the prior eight months.

The record before this Court exclusively contains evidence that Sgt. Pope was attempting to "avert anticipated safety risks."  ECF 88 at 10; ECF 88 at 11 (finding that Sgt. Donaldson and the dispatcher spoke to each other and "[t]he testimony uniformly shows these conversations were about potential safety concerns . . ."); ECF 88 at 32.  There is no evidence of any other reason for what happened and, therefore, no dispute of fact that Sgt. Pope "believed there was a potential safety concern caused by the Hulberts' demonstration on the sidewalk next to the roadway," *see* ECF 88 at 32, and he attempted to protect the public safety by moving the group a short distance.  Moreover, whether Sgt. Pope is entitled to qualified immunity is not determined by the subsequent success or failure of his efforts to protect public safety.  Instead, "qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'"  *Mullenix v. Luna*, 577

4

U.S. 7, 12 (2015) (quoting *Malley v. Briggs*, 475 U.S. 335 (1986)).  Officers are protected from claims for alleged constitutional violations "for reasonable mistakes as to the legality of their action."  *Merchant v. Bauer*, 677 F.3d 656, 661 (4th Cir. 2012) (quoting *Saucier v. Katz*, 457 U.S. 800, 818 (1982)).  Sgt. Pope did not "knowingly violate the law" and, according to this Court's memorandum opinion, he "believed there was a potential safety concern caused by the Hulberts' demonstration on the sidewalk next to the roadway."  ECF 88 at 32.  Sgt. Pope's orders were reasonable efforts to protect public safety under these circumstances or, at least, were "reasonable mistakes" entitling him to qualified immunity. *Id.*

For the second alleged factual dispute in the memorandum opinion, this Court stated "[m]oreover, *as discussed*, there is a factual dispute as to whether *any of the Patriot Picket members* were in the street or crosswalks prior to Sgt. Pope ordering the group to move."  ECF 88 at 17 (emphasis added).  The use of the phrase "as discussed" in this context ties this alleged factual dispute to the prior alleged factual dispute.  Regardless of whether they were in the street or crosswalks, Sgt. Pope is still entitled to qualified immunity for the reasons discussed above.  Even if members of Patriot Picket were not in the streets and crosswalks, the undisputed facts remain that "the Hulbert brothers and approximately six other people were holding large signs somewhere in the middle of a fifteen- and one-half-foot walkway in front of Lawyers' Mall in downtown Annapolis.  It was dark, and the Maryland legislative session was expected to convene within a few hours."  ECF 88 at 15

(emphasis added).  Moreover, this was the same intersection where pedestrians had been recently struck by vehicles under less dangerous circumstances.

Nevertheless, this Court stated that such a factual dispute existed.  There is no need for a jury to resolve such a factual dispute when video evidence of the incident exists.  The video opens at roughly 7:15:15 p.m. with several people on the sidewalk with signs.  There are two individuals across the street with signs and using the crosswalks to walk in a circle around the intersection in a clockwise pattern.  One of the individuals walking in the circle stops at a crosswalk at roughly 7:16:20 causing traffic to stop.  After traffic continues again, the individual walks the circular pattern again.  At roughly 7:17:06, two other members step into the street with signs; one in a crosswalk and one in the street near a crosswalk.  The individual on the right stopped in the street at roughly 7:17:12 and stood there for a few seconds before continuing most of the way across the street.  That same individual waits for a car to pass and returns across the street again.  At roughly 7:17:42, a different individual was crossing in the crosswalks with his sign and caused a vehicle to momentarily brake.  This kind of conduct continues throughout the video.[1]  Importantly, this conduct

---

[1] Rather than rehash all of these instances, the video speaks for itself.  Plaintiffs' point out one scene in the video involving a third party "who improperly crosses the street at time mark 7:24:22, causing two cars to stop and let the pedestrian pass." ECF 101 at 18. That individual may not have been affiliated with the Patriot Picket, but their conduct does highlight the same safety concerns that Sgt. Pope was trying to protect against, particularly in light of the individuals of who had been struck by vehicles at this intersection under less dangerous circumstances.  Plaintiffs also focused on the fact that "neither of the Hulbert brothers ever crossed the street or entered the crosswalk or roadway . . . ." ECF 101 at 18. But, of course, this Court stated that the dispute of fact was "whether *any of the Patriot Picket members* were in the street or crosswalks . . . ." ECF 88 at 17 (emphasis added).

6

was occurring *before* an anticipated increase in pedestrian and vehicular traffic, which would have elevated safety concerns even more.  ECF 88 at 15 ("the Maryland legislative session was expected to convene within a few hours"); *see also* ECF 88 at 15 (citing *Kass*, 864 F.3d at 208 for the position that "not allowing passersby to engage with protestors while standing in the public sidewalk 'in the heart of Manhattan, shortly before 5 p.m.' was justified" for the same reason that there would soon be in increase in pedestrians and vehicular traffic).

The third and final reference to a factual dispute in the section of the opinion discussing a significant government interest stated that "there is a genuine issue of material fact as to whether any real, non-conjectural safety issue was aided by Sgt. Pope's actions, or whether the police involvement caused the situation to become more disruptive and potentially hazardous."  ECF 88 at 17-18.  This alleged factual dispute is also incorrect. The first half of this statement ("whether any real, non-conjectural safety issue was aided by Sgt. Pope's actions," *see* ECF 88 at 17-18) is substantially similar language to the first alleged factual dispute ("whether a legitimate government interest was served by the police action," *see* ECF 88 at 15).  As noted above, "[t]here is no doubt that the state has a significant interest 'in maintaining the safety, order, and accessibility of its streets and sidewalks.'"  ECF 88 at 13 (citation and quotation omitted).  The record exclusively contains evidence that Sgt. Pope was attempting to "avert anticipated safety risks."  ECF

---

Regardless, according to Jeff Hulbert, he told his group members where to go and where to picket.  ECF 76-13 at 14.

88 at 10; ECF 88 at 11, 32.   Clearing the sidewalks by having the group move a short distance would make the sidewalks safer, and the evidence of safety concerns are throughout this Court's opinion.   ECF 88 at 15-17.   The safety concerns included people being struck by vehicles at this intersection under less dangerous conditions.

Since the second reference to an alleged factual dispute was tied to the first, reason suggests that this alleged factual dispute is also tied to the Patriot Picket members who crossed the streets and crosswalks.   As noted above, the video evidence resolves this alleged factual dispute.

The second half of this statement ("whether the police involvement caused the situation to become more disruptive and potentially hazardous," *see* ECF 88 at 18) is wholly irrelevant.   Sgt. Pope already told the group to move to Lawyers' Mall and decided to make an arrest before any other officer arrived on scene.   In fact, the other officers only showed up because Sgt. Pope decided to make an arrest.   Sgt. Pope was outnumbered and had to call for additional officers as a standard safety measure to ensure officer safety during an arrest.   ECF 76-4 at 49; ECF 76-5 at 16.   None of those officers were present when Sgt. Pope told the group to move, the group ignored Sgt. Pope, and Sgt. Pope decided to make an arrest.   Sgt. Pope had no control over the number of officers who would respond to his call.   The conduct of third-party officers who responded to a call has no relevance to the plaintiffs' claims or Sgt. Pope's alleged liability because all of the relevant facts occurred prior to their arrival.   Plaintiffs cannot bolster their claims *against Sgt. Pope* based

on after-the-fact conduct of different officers and it has no bearing on Sgt. Pope's claim for qualified immunity.

The fourth and fifth references to a factual dispute summarily reference the same factual dispute discussed above.  In the fourth reference, this Court stated "*as this Court has explained*, factual disputes preclude the court from determining, at summary judgment, whether Sgt. Pope's orders were lawful or unlawful."  ECF 88 at 23 (emphasis added). This is provided in the Court's analysis of the First Amendment retaliation claim and it refers back to the same alleged factual dispute discussed above.  In the fifth reference, this Court stated "[*a*]*s discussed in the previous section*, factual disputes prevent the Court from ruling as a matter of law on the lawfulness and reasonableness of Sgt. Pope's orders."  ECF 88 at 27 (emphasis added).  This is provided in the Court's analysis of the Fourth Amendment unreasonable search and seizure claim and it also refers back to the same alleged factual dispute discussed above.

In the context of this Court's memorandum opinion, the only factual dispute articulated by this Court was whether any members of the Patriot Picket were in the streets or crosswalks.  Sgt. Pope filed this motion for reconsideration and included video to resolve the alleged factual dispute.  The facts are undisputed.  "[*T*]*he parties agree* that the Hulbert brothers and approximately six other people were holding large signs somewhere in the middle of a fifteen- and one-half-foot walkway in front of Lawyers' Mall in downtown Annapolis.  It was dark, and the Maryland legislative session was expected to convene within a few hours."  ECF 88 at 15 (emphasis added).  This was the same intersection

where two pedestrians were struck by vehicles within the prior eight months under less dangerous conditions.  ECF 88 at 17.  As the video shows, members of the Patriot Picket were using the streets and crosswalks as part of the demonstration.  Before Sgt. Pope approached the group, Sgt. Pope's supervisor spoke with the dispatcher and the "testimony uniformly shows these conversations were about potential safety concerns . . . ."  ECF 88 at 11.  Sgt. Pope was attempting "to avert anticipated safety risks."  ECF 88 at 10.  In fact, "[a]lthough he recognized no apparent immediate threat to public safety, based on his discussion with dispatch and [his supervisor], Sgt. Pope believed there was a potential safety concern caused by the Hulberts' demonstration on the sidewalk next to the roadway."  ECF 88 at 32.  Not only is it responsible, but it is also Sgt. Pope's job to anticipate threats to safety and guard against them.  Telling the group to move from the sidewalk to the immediately adjacent grassy area would clear the sidewalks and make the area safer.

If there is any doubt whether Sgt. Pope committed a constitutional violation on these undisputed facts, then Sgt. Pope is entitled to qualified immunity.  If there is a challenging question of constitutional law, even with the benefit of a robust record and access to relevant appellate opinions to guide the analysis, then it would be unfair to subject a police officer to money damages for potentially making a mistake during real-time interactions with the public.  Indeed, that is the very purpose for qualified immunity.

II. **COUNSEL FOR SGT. POPE ENCOUNTERED TECHNICAL DIFFICULTIES WHEN ATTEMPTING TO PROVIDE THE SURVEILLANCE VIDEO TO THIS COURT.**

If the interlocutory appeal remains necessary after this Court's ruling on this motion for reconsideration, then Sgt. Pope will argue, among other things, that the video that was included with the motion for reconsideration establishes a fact that is immaterial for purposes of the qualified immunity analysis. ECF 23 at 4-6 (4th Cir.). But this Court concluded that there is a dispute of fact. That dispute can be resolved by the video. The motion for reconsideration provides this Court with an opportunity to resolve the alleged dispute of fact and its impact on the qualified immunity analysis.

The video was first referenced to in the memorandum of law in support of the motion for summary judgment. ECF 76-1 at 6, n.6 (citing to different video evidence and explaining that "the lengthier surveillance video depicts demonstrators regularly using the crosswalks"). The video is maintained in a format that is not acceptable for filing with this Court. ECF 18-2 at 2-3 (4th Cir.).

Then, when the motion for reconsideration was filed, counsel for Sgt. Pope continued to have "technical difficulties preparing a link or shared drive to serve as the method of citing to the video . . . . As a result of ongoing technical difficulties—and that today is the due date for the filing of a motion for reconsideration—the video will be put onto a DVD on Monday for filing and service." ECF 91 at 2, n.1; ECF 93.

The proprietary nature of the video prevents it from being converted to one of the file formats acceptable to this Court. ECF 18-2 at 2-3 (4th Cir.). In order for the video to

be provided to this Court, a recording of the video—not the video itself—was created by playing it and recording it with a screen capture feature.  ECF 18-2 at 2-3 (4th Cir.); ECF 18-3 (4th Cir.).

### III.   THIS COURT SHOULD RECONSIDER ITS RULING AS TO WHETHER SGT. POPE HAD PROBABLE CAUSE TO ARREST.

"Probable cause is determined from the totality of the circumstances known to the officer at the time of the arrest."  *Brown v. Gilmore*, 278 F.3d 362, 367 (4th Cir. 2002). "The proper focus of the inquiry is not any subjective reason for arresting [plaintiff], but only the objective facts surrounding the arrest."  *Pegg v. Herrnberger*, 845 F.3d 112, 119 (4th Cir. 2017).  An officer can arrest a person subjectively believing that the individual had committed one offense when the individual had committed a completely different offense.  "As the Supreme Court has previously explained, the 'subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause.'"  *Id.* (quoting *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004)).

"Even if probable cause to arrest is ultimately found not to have existed, an arresting officer will still be entitled to qualified immunity from a suit for damages if he can establish that there was 'arguable probable cause' to arrest."  *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004); *Orem v. Gillmore*, 813 Fed. Appx. 90, 92-93 (4th Cir. 2020) (quoting and citing to the Eighth Circuit to recognize that qualified immunity applies if there is "'arguable probable cause,' which 'exists even where an officer mistakenly arrests a suspect believing it is based in probable cause if the mistake is objectively reasonable'" (citation omitted)).

This Court analyzed whether probable cause existed by focusing solely on the order to move from the sidewalk to Lawyers' Mall.  ECF 88 at 27.  It was denied due to the alleged factual dispute discussed more fully above and resolved by the surveillance video.  This Court should reconsider its ruling to determine whether probable cause or arguable probable cause existed.

In addition to Sgt. Pope believing in good faith that he had given a reasonable and lawful order, he also arrested the Hulbert brothers for obstructing sidewalks.  ECF 88 at 4-5.  Moreover, trespass charges were later added, based on longstanding advice of the Anne Arundel County State's Attorney's Office.  ECF 88 at 24.  This Court did not analyze whether probable cause, or arguable probable cause, existed for those violations.[2]  This Court should reconsider its ruling in light of these violations because the subjective reason for making an arrest "need not be the criminal offense as to which the known facts provide probable cause.'"  *Pegg*, 845 F.3d at 119.

The Maryland Capitol Police contacted an Assistant State's Attorney for advice the morning after the arrests and, with the benefit of 20/20 hindsight, the prosecutor agreed with adding new charges.  ECF 88 at 6.  One of Sgt. Pope's superior officers, Lt. Rebecca Labs, is the officer who contacted the State's Attorney's Office.  In her deposition, Lt. Labs testified that she reviewed the new charges and approved them "[w]ith the help of the

---

[2] Unlike failing to obey a lawful order, the charge for obstructing sidewalks has never been the subject of an appellate decision, *see* COMAR 04.05.01.03, which would aid in defining the scope and contours of the violation.  Without review by the courts, law enforcement officers are left to enforce the law as it is plainly written to the best of their abilities.

13

state's attorney." ECF 76-17 at 13-14. She elaborated that it is "common practice" for her to contact "the state's attorney or assistant state's attorney to get direction." ECF 76-17 at 15-16. Here, Lt. Labs spoke with Jason Miller, an Assistant State's Attorney, because she "wanted to make sure [she] was doing it appropriately." ECF 76-17 at 15-16. Lt. Labs "explained the situation" and sought his guidance. ECF 76-17 at 15-16. Mr. Miller gave Lt. Labs advice on several matters, including the time to serve additional charges, how to handle the previously-issued charges, and, importantly, they "discussed the proper charges" and Mr. Miller "said they fit, they fit better, so he agreed with [Lt. Labs]." ECF 76-17 at 16-17. Mr. Miller provided his opinion that the charges were appropriate when Lt. Labs told him "about the two charges that we were going to charge, gave him a brief synopsis and he said, 'That seems to fit.'" ECF 76-17 at 18.

In this case, several other officers agreed that it was appropriate to add new charges. ECF 88 at 5-6. More significantly, on the day after the arrests, an Assistant State's Attorney also agreed that new charges should be added. *Wadkins v. Arnold*, 214 F.3d 535, 541-42 (4th Cir. 2012) (holding that a prosecutor's authorization of charges weighs "heavily *toward* a finding that [the officer] is immune" and it "is compelling evidence and should appropriately be taken into account in assessing the reasonableness of [an officer's] actions.") (emphasis in original)). Thus, if probable cause existed for a different violation, as several other officers and a prosecutor concluded it did, then the officer did have probable cause.

The facts of this arrest were sufficient to make several officers and at least one prosecutor believe that a criminal offense occurred.  As a result, Sgt. Pope had probable cause or, at least, arguable probable cause to arrest.  Even if this Court believes that Sgt. Pope made a mistake, then, under the circumstances and based upon the undisputed facts, it was the kind of "reasonable mistake" to which qualified immunity applies.

## CONCLUSION

This Court should grant the motion for reconsideration and enter summary judgment in favor of defendant Sgt. Brian T. Pope.

Respectfully submitted,

BRIAN E. FROSH
Attorney General of Maryland

/s/ James N. Lewis
_____

James N. Lewis
Fed. Bar No. 30220
Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
jlewis@oag.state.md.us
(410) 576-7005 (telephone)
(410) 576-6955 (facsimile)

September 28, 2021

Attorneys for Defendant
Sgt. Brian T. Pope

15

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 28th day of September 2021, a copy of the

foregoing Reply Memorandum in Support of Defendant Sgt. Brian T. Pope's Motion for

Reconsideration was served electronically via CM/ECF to:

Cary Johnson Hansel, III, Esquire
Federal Bar No. 14722
cary@hansellaw.com

Erienne Sutherell, Esquire
Federal Bar No. 20095
esutherell@hansellaw.com

Justin Stefanon, Esquire
Federal Bar No. 20087
jstefanon@hansellaw.com

HANSEL LAW, P.C.
2514 North Charles Street
Baltimore, Maryland 21218

Attorneys for Plaintiffs

John C. Fredrickson, Esquire
Federal Bar No. 02566
john.fredrickson@maryland.gov

OFFICE OF THE ATTORNEY GENERAL
Department of General Services
300 West Preston Street, Suite 608
Baltimore, Maryland 21201

Attorneys for Former Defendant Col. Michael Wilson


/s/ James N. Lewis
_____

James N. Lewis

16