**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 21-1608

CLAYTON R. HULBERT, as personal representative of the Estate of Jeffrey W. Hulbert; KEVIN HULBERT; MARYLAND SHALL ISSUE, INC., for itself and its members,

        Plaintiffs - Appellees

v.

BRIAN T. POPE, Sgt.

        Defendant - Appellant

and

MICHAEL WILSON, Colonel

        Defendant

-------------------------------

NATIONAL POLICE ASSOCIATION

        Amicus Supporting Appellant.

Appeal from the United States District Court for the District of Maryland at Baltimore. Stephanie A. Gallagher, District Judge. (1:18−cv−00461−SAG)

Argued:  May 3, 2023                Decided:  June 14, 2023

Before WILKINSON, AGEE, and HEYTENS, Circuit Judges.

───────────

Reversed and remanded by published opinion. Judge Wilkinson wrote the opinion, in which Judge Agee and Judge Heytens joined.

───────────

**ARGUED:** James Nelson Lewis, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellant. Cary Johnson Hansel, III, HANSEL LAW, P.C., Baltimore, Maryland, for Appellees. **ON BRIEF:** Brian E. Frosh, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellant. Robert S. Lafferrandre, Jeffrey C. Hendrickson, PIERCE COUCH HENDRICKSON BAYSINGER & GREEN, L.L.P., Oklahoma City, Oklahoma, for Amicus Curiae.

───────────

WILKINSON, Circuit Judge:

Sergeant Brian Pope, a Maryland Capitol Police officer, appeals the district court's denial of qualified immunity on several First and Fourth Amendment claims brought by picketers whom he arrested on the sidewalk outside the Maryland State House. Pope arrested the picketers after they disobeyed his orders to back up off the sidewalk and protest instead from an adjoining square. Because a reasonable officer in Pope's position could have believed that the orders constituted lawful time, place, or manner restrictions on the picketers' First Amendment rights, Pope is entitled to qualified immunity. We therefore reverse and remand with directions to the district court to enter judgment for Pope.

I.

A.

Brothers Jeff and Kevin Hulbert created an informal group, "The Patriot Picket," that advocates for gun rights. The group stages regular picketing demonstrations near the Maryland State House in Annapolis during the legislative session.

On the evening of February 5, 2018, the Hulbert brothers and six other members of the group began picketing on a 15.5-foot-wide strip of public sidewalk at the intersection of two streets in downtown Annapolis. They chose the location for its visibility to the public and state lawmakers. The picket was situated one block from the State House, separated only by a grassy square known as Lawyers' Mall.

Sergeant Brian Pope, an officer with the Maryland Capitol Police (MCP), was in his office when a dispatcher told him that picketers were gathering in front of Lawyers' Mall.

3

The dispatcher specified that an aide with the Governor's Mansion had requested the Capitol Police sort out the situation.

Pope went over to the dispatcher's office and obtained a video feed of the area. He observed an individual—later identified as Kevin Hulbert—standing alone on the sidewalk with signs around him. The dispatcher explained that the other picketers had recently left.

Pope next sought the guidance of his supervisor, Sergeant Dennis Donaldson, who in turn called the chief of the Capitol Police, Colonel Michael Wilson. After discussing potential safety issues, Wilson advised Donaldson to have Pope evaluate the demonstration and, if necessary, relocate it. Donaldson relayed the order to Pope, instructing him to let the picketers continue their demonstration from Lawyers' Mall.

Pope went out to the sidewalk and encountered Kevin Hulbert, who remained alone. Kevin Hulbert told Pope that the other picketers were getting food. Pope did not observe the immediate obstruction of vehicular or pedestrian traffic but contends that he anticipated safety issues would arise. He instructed Kevin to move the demonstration off the sidewalk and onto the adjoining Lawyers' Mall, thereby creating a buffer between the picketers and traffic on the sidewalk and streets. Kevin did not respond.

An hour later, Pope returned to the area and noticed that the other picketers had come back and were demonstrating on the sidewalk. He approached the group and ordered them to back up onto Lawyers' Mall. Some members of the group initially complied, but Jeff Hulbert then declared that they were not moving. Pope repeated his command at least two more times, threatening to arrest those who did not comply.

The picketers held firm. Pope called for backup. Once several officers arrived on the scene, Pope arrested Jeff Hulbert. Kevin Hulbert and multiple passersby filmed the arrest, and Pope ordered them to back up off the sidewalk as well. After Kevin alone failed to comply, Pope placed him under arrest too.

The Hulbert brothers were searched and transported to a city police station for processing. At the station, Pope issued each brother a single criminal citation for disobeying a lawful order under § 10-201(c)(3) of the Maryland Criminal Law Article. He then released the brothers, who had been in custody for just over an hour.

The following day, per a decision by Colonel Wilson, Pope and other officers issued the Hulbert brothers additional citations for hindering passage in a public place and for refusing to leave public grounds under § 10-201(c)(1) and § 6-409(b) of the Criminal Law Article, respectively. Three days later, all charges against the Hulbert brothers were dropped.

### B.

The Hulbert brothers and Maryland Shall Issue, Inc.—a non-profit organization to which they belong—sued Pope and Wilson in the U.S. District Court for the District of Maryland. They brought federal First Amendment and Fourth Amendment claims under 42 U.S.C. § 1983 as well as several state-law claims. Pope and Wilson moved for summary judgment primarily on the grounds of qualified immunity. The district court granted summary judgment to the defendants on all counts except for four of the claims against Pope: Count I (First Amendment right to demonstrate); Count II (First Amendment right to film police officers); Count III (First Amendment right to be free from retaliation for

lawful speech); and Count IV (Fourth Amendment right to be free from unreasonable seizure).

With respect to Count I, the district court analyzed Pope's orders for the picketers to move off the sidewalk as time, place, or manner restrictions on speech. The court concluded that genuine disputes of material fact precluded summary judgment for Pope. Applying the Supreme Court's test for whether a time, place, or manner restriction in a public forum passes constitutional muster, the court held that Pope's orders satisfied two of the three criteria. *See* J.A. 745–46 (citing *United States v. Grace*, 461 U.S. 171, 177 (1983)). First, the orders were "content-neutral" because "[t]he testimony uniformly show[ed]" that the conversations between Pope, his dispatcher, and Donaldson "were about potential safety concerns and the fact that the Plaintiffs did not have a pre-approved permit"; "[n]othing in the record . . . entailed any discussion of the content of the Plaintiffs' message." *Id.* at 747. Second, the orders left open "ample alternative channels" because the Hulberts were allowed to continue demonstrating in the same manner and only needed to move, at most, about fifteen feet. *Id.* at 747–48.

When it came to the third criterion for a constitutional speech restriction, however, the court found that genuine disputes of material fact precluded a finding that "a significant government interest was served" by his orders. *Id.* at 754. The court recognized that the state generally has a significant interest "in maintaining the safety, order, and accessibility of its streets and sidewalks." *Id.* at 749 (quoting *Ross v. Early*, 746 F.3d 546, 555 (4th Cir. 2014)). But the court determined that there remained "factual disputes requiring jury resolution as to whether [that] interest was served by the police action." *Id.* at 751. In

6

particular, it noted that there was no evidence that the picketers were impeding pedestrian or vehicular traffic at the moment when they were asked to move onto Lawyers' Mall. It also pointed to a factual dispute over whether any picketers were in the street or using the crosswalk. In the court's view, "whether any real, non-conjectural safety issue was aided by Sgt. Pope's actions" was a "genuine issue of material fact" that precluded summary judgment on Count I. *Id.* at 753–54.

With respect to Count II, the court held that Kevin Hulbert had a clearly established right to film the police despite the lack of binding Supreme Court or Fourth Circuit caselaw because a majority of other circuits had recognized such a right. The court found that Pope arrested Kevin "because he did not comply with repeated orders to move to Lawyers' Mall, not because he was filming." *Id.* at 756. But it framed Pope's interference with the demonstration as a time, place, or manner restriction on Kevin's right to film and concluded that summary judgment was inappropriate because of the genuine dispute of material fact as to whether the interference served a significant government interest.

The court denied summary judgment on Count III, the First Amendment retaliatory-arrest claim, and Count IV, the Fourth Amendment unreasonable-seizure claim, for a similar reason. It noted that the existence of probable cause would defeat both claims, *see Nieves v. Bartlett*, 139 S. Ct. 1715, 1725 (2019) (retaliatory arrest); *Brown v. Gilmore*, 278 F.2d 362, 367 (4th Cir. 2002) (unreasonable seizure), but the failure to obey an *unconstitutional* order could not serve as the basis for probable cause. Reasoning that factual disputes precluded the court from determining whether Pope's orders complied with the First Amendment, it denied summary judgment on these claims.

7

Pope filed a motion for reconsideration, which the district court denied. He proceeded to file this interlocutory appeal.

## II.

We review a "district court's denial of qualified immunity on summary judgment . . . de novo, applying the same legal standards as the district court did on summary judgment." *Yates v. Terry*, 817 F.3d 877, 883 (4th Cir. 2016). "Generally, our jurisdiction is limited to final decisions of the district court." *Williams v. Strickland*, 917 F.3d 763, 767 (4th Cir. 2019); *see* 28 U.S.C. § 1291. But qualified immunity is an "*immunity from suit* rather than a mere defense to liability" and is "effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). A district court's denial of qualified immunity at summary judgment is therefore a collateral order "subject to immediate appellate review, despite being interlocutory." *Williams*, 917 F.3d at 768.

We have jurisdiction to review the denial of qualified immunity "to the extent that the court's decision turned on an issue of law," *Danser v. Stansberry*, 772 F.3d 340, 344 (4th Cir. 2014), or an "ostensibly fact-bound issue that may be resolved as a matter of law," *Al Shimari v. CACI Int'l, Inc.*, 679 F.3d 205, 221–22 (4th Cir. 2012) (en banc). We may "determine as a matter of law whether the defendants violated [plaintiff's] constitutional rights, considering the facts as the district court viewed them as well as any additional undisputed facts." *Danser*, 772 F.3d at 345. And even where certain facts remain disputed, we have jurisdiction to decide the legal question of whether those facts are "material" to the question of the officer's qualified immunity. *Jackson v. Long*, 102 F.3d 722, 727 (4th Cir. 1996); *see Johnson v. Caudill*, 475 F.3d 645, 649–50 (4th Cir. 2007).

An officer is entitled to qualified immunity unless he (1) "violated a federal statutory or constitutional right, and (2) the unlawfulness of [his] conduct was clearly established at the time." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quotation marks omitted). Qualified immunity thus shields officers "from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Ray v. Roane*, 948 F.3d 222, 228 (4th Cir. 2020) (quoting *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)). It thereby requires the dismissal of suits against "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

The doctrine of qualified immunity addresses the concern that "permitting damages suits against government officials can entail substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties." *Anderson*, 483 U.S. at 638. To that end, it protects officers by providing them with a sphere of limited discretion in which to perform their duties— "breathing room to make reasonable but mistaken judgments." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011); *see Anderson*, 483 U.S. at 638.

So if, on the undisputed facts, Pope's "actions could reasonably have been thought consistent with" the Hulberts' First and Fourth Amendment rights, *Anderson*, 483 U.S. at 638, he is entitled to qualified immunity as a matter of law. For the reasons that follow, this case presents a classic exercise of reasonable judgment that qualified immunity protects.

III.

Pope challenges on appeal the district court's denial of qualified immunity on the plaintiffs' First and Fourth Amendment claims. We discuss each in turn.

A.

Pope first argues that he deserves qualified immunity from the plaintiffs' claim that he violated their First Amendment right to lawfully demonstrate. He does not dispute that this right encompassed the Hulberts' February 5, 2018 demonstration. Rather, he maintains that his on-the-spot intervention—ordering the picketers to move off the sidewalk—"could reasonably have been thought consistent" with this First Amendment right. *Anderson*, 483 U.S. at 638. Pope's actions must be evaluated based on their "objective legal reasonableness," *id.* at 639, and on this score, Pope contends that he is entitled to qualified immunity even if he was ultimately mistaken.

We agree. Any "unlawfulness of [Pope's] conduct" with respect to the picketers' First Amendment right to demonstrate was not "clearly established at the time," *Wesby*, 138 S. Ct. at 589 (quotation marks omitted), or "beyond debate," *White v. Pauly*, 580 U.S. 73, 79 (2017) (quotation marks omitted). That is, a reasonable officer in Pope's shoes could have believed that his orders were consistent with the picketers' First Amendment rights.

The First Amendment's monumental rights to speech and assembly are not without limit. As the district court recognized, the First Amendment does not guarantee a right to protest "at all times and places or in any manner that may be desired." J.A. 745 (quoting *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981)). Rather, the Supreme Court has long recognized that the government may impose reasonable "time,

10

place, or manner" restrictions on First Amendment freedoms. *McCullen v. Coakley*, 573 U.S. 464, 486 (2014); *see Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); *Linmark Assocs., Inc. v. Willingboro Twp.*, 431 U.S. 85, 93 (1977). Such restrictions, which specify when, where, or how speech may be delivered, "stand on a different footing from laws prohibiting speech altogether." *Linmark*, 431 U.S. at 93.

Pope's orders constituted an *ad hoc* restriction on the picketers' time and place of protest, commanding them to retreat for a time from the strip of sidewalk where they stood. Because Pope was imposing a time, place, or manner restriction in a public forum, his orders were lawful if they (1) were "content neutral," (2) preserved "ample alternative channels for communication," and (3) were "narrowly tailored to serve a significant governmental interest." *Ward*, 491 U.S. at 791 (quotation marks omitted).

The record makes clear that Pope's orders satisfied the first two of these criteria. The district court found "no evidence" suggesting that Pope was hostile to the picketers' views or motivated by the content of their speech. J.A. 747. Indeed the arrests here were plainly based on the failure of the protesters to obey a lawful order, not on anything related to the message the protesters sought to convey. Based on the uncontradicted testimony that Pope was responding to safety concerns, the court properly held that his orders were content-neutral. Likewise, the court was correct to find that Pope's orders had left the picketers with wide "avenues for the more general dissemination of [their] message." *Id.* (quotation marks omitted) (quoting *Ross*, 746 F.3d at 559). Pope had indeed proposed a close alternative: The picketers could continue their demonstration from Lawyers' Mall,

11

an area bordering the sidewalk that was "frequently used for political demonstrations." *Id.* at 738.

To assess whether Pope's orders were lawful, then, the only remaining question would be whether the orders were also "narrowly tailored to serve a significant governmental interest." *Ward*, 491 U.S. at 791 (quotation marks omitted). This third criterion of a permissible time, place, or manner restriction would be satisfied if Pope's orders both "promot[ed] a substantial government interest" and did "not burden substantially more speech than [wa]s necessary to further the government's legitimate interests." *Ross*, 746 F.3d at 552–53 (quotation marks omitted).

1.

We start with whether Pope's orders promoted a substantial governmental interest. There is no doubt that Pope's proffered interest, "public safety," can be "substantial." *Ross*, 746 F.3d at 555; *see* J.A. 332 ("Out of concern for public safety . . . the demonstrating group was asked to relocate to Lawyers' Mall."). We have repeatedly held that the "safety, order, and accessibility of . . . streets and sidewalks" are interests sufficient to justify a time, place, or manner restriction. *Ross*, 746 F.3d at 555 (quotation marks omitted); *see Green v. City of Raleigh*, 523 F.3d 293, 301 (4th Cir. 2008); *Cox v. City of Charleston*, 416 F.3d 281, 284 (4th Cir. 2005); *see also McCullen*, 573 U.S. at 496–97 (noting the government's "undeniably significant interests in maintaining public safety on . . . streets and sidewalks"). Pope's safety rationale may thus constitute a substantial state interest.

Our inquiry does not stop there, however. Mere lip service to "an interest that is significant in the abstract" does not show that an officer's conduct actually *promoted* the

12

stated interest. *Ross*, 746 F.3d at 556. So Pope's orders were lawful only to the extent "the recited harms [were] 'real, not merely conjectural,'" and his orders "'alleviate[d] these harms in a direct and material way.'" *Id.* (quoting *Satellite Broad. & Commc'ns Ass'n v. FCC*, 275 F.3d 337, 356 (4th Cir.2001)). The district court ruled that summary judgment was improper on this basis—due to "a genuine issue of material fact as to whether any real, non-conjectural safety issue was aided by Sgt. Pope's actions." J.A. 753–54.

The unresolved factual disputes noted by the district court—such as whether picketers "were in the street or crosswalks"—are not "material" in light of the undisputed facts of this case. J.A. 753. Given those *undisputed facts*, it was objectively reasonable for Pope to anticipate a real safety threat and respond with the modest directive that the picketers back up, at most, fifteen feet. Those facts are as follows: It was dark out, and accidents "may result from the darkness of the night." *The Teutonia*, 90 U.S. 77, 84 (1874). Pope's supervisor had warned of a safety issue related to the demonstration. The Maryland legislature was set to soon convene just one block away, generating significant pedestrian traffic. And the picketers were brandishing large signs at an intersection where pedestrians had twice been struck by vehicles in the preceding year.

Even if the picketers were merely crowded along the sidewalk and not on the street, a reasonable officer could have inferred a safety risk from these facts. In determining whether there is a substantial state interest, an officer may rely on "common sense and logic, particularly where, as here, the burden on speech is relatively small." *Ross*, 746 F.3d at 556 (citation and quotation marks omitted). And the intuitions supporting Pope's orders, made under the pressure of the moment, are not difficult to follow. That large signs will

13

attract notice from passing cars and that "distracted" drivers could endanger pedestrians, J.A. 332, are "common-sense conclusions," *Wesby*, 138 S. Ct. at 587 (quotation marks omitted). Pope's solution—making the sidewalk a buffer between picketers and roadway—in turn placed a "relatively small" burden on the picketers' rights. *Ross*, 746 F.3d at 556. Pope did not say "disperse"; all he said was to move back a few feet. His directive logically served to make the picket less striking to passing traffic, thereby reducing the risk of an accident in a "direct and material way." *Id.* (quotation marks omitted).

Plaintiffs counter that the level of traffic congestion was low at the time Pope gave his orders. But if every fact had to favor his intervention, the doctrine of qualified immunity would be a dead letter. Qualified immunity protects reasonable judgments precisely when some facts cut the other way. Pope's inference that activity would soon pick up was, in any case, "not merely conjectural." *Satellite*, 275 F.3d at 356. A legislative session was "expected to convene within a few hours." J.A. 751. Pope thus had grounds to suppose that legislators, staffers, and lobbyists would soon be converging on the capitol grounds.

One can quibble over when exactly Pope should have acted. But no law, clearly established or otherwise, required Pope to wait for an imminent traffic accident. Preventive measures to promote public safety are a basic contribution of government. *See, e.g.*, *Ross*, 746 F.3d at 550, 556 (upholding municipal policy "to manage the potential disruption to pedestrian and automotive traffic caused by protesters"); *Kass v. City of New York*, 864 F.3d 200, 209 (2d Cir. 2017) (upholding order to disperse although plaintiff had not yet "actually impeded pedestrian traffic or caused a security issue"); *Evans v. Sandy City*, 944 F.3d 847, 858 (10th Cir. 2019) (stating that the government need not "wait for

14

accidents to justify safety regulations"). Prophylactic traffic-safety measures serve a substantial governmental interest.

Pope's assessment of safety risks and attempts to mitigate them were informed by common sense and the facts on the ground, not animus or conjecture. It was at least *reasonable* for him to believe that his orders promoted a substantial governmental interest.

2.

The narrow-tailoring criterion also requires that the time, place, or manner restriction "not burden substantially more speech than is necessary to further the government's legitimate interests." *Ross*, 746 F.3d at 555 (quotation marks omitted). On the record at summary judgment, Pope's orders did not substantially exceed their safety-enhancing purpose so, *a fortiori*, their unlawfulness was not clearly established.

To satisfy this criterion, Pope's orders need not have been "the least restrictive or least intrusive means" to achieve the stated governmental interest. *Ward*, 491 U.S. at 798. Here, however, it is difficult to imagine narrower orders that Pope could have given to realize the desired effect. Although Pope told the picketers to move off the sidewalk, he allowed them to continue their demonstration mere steps away and did not seek any change to their "manner or type of expression." *Id.* at 802. For the purposes of qualified immunity, then, it was at the very least reasonable for Pope to suppose that such a directive did not burden substantially more speech than was necessary.

In sum, the undisputed material facts establish Pope acted reasonably when he arrested the Hulbert brothers for disobeying clear orders. *See* Md. Code Ann., Crim. Law § 10-201(c)(3) (criminalizing the willful failure to obey a police officer's reasonable and

lawful order). Pope is thus entitled to qualified immunity on plaintiffs' First Amendment right-to-demonstrate claim.

## B.

Pope next challenges the district court's denial of qualified immunity on Kevin Hulbert's First Amendment right-to-film claim. The court denied qualified immunity because it held that there was a genuine dispute of material fact as to whether Pope's interference with Kevin's filming served a significant governmental interest. The trial court erred, however, because "the unlawfulness of [Pope's] conduct" with respect to the filming was not "clearly established at the time." *Wesby*, 138 S. Ct. at 589 (2018) (quotation marks omitted).

We first note the district court's finding that Pope arrested Kevin "because he did not comply with repeated orders to move to Lawyers' Mall, not because he was filming." J.A. 756. "[T]here is no evidence that Sgt. Pope ever told Kevin Hulbert that he could not film"; Pope simply ordered him off the sidewalk. *Id.* Pope only arrested Kevin after he disobeyed this order; Pope did not stop or arrest others who were filming. *Id.* Given these facts, Pope is entitled to qualified immunity unless it was clearly established that ordering Kevin to move back while he was filming would violate his First Amendment rights.

Pope's order imposed a reasonable time, place, or manner restriction on Kevin's filming: Kevin could continue to film but had to do so from off the sidewalk. This order did not violate Kevin's clearly established rights. Neither this court, nor the Supreme Court, nor any other circuit has recognized an unlimited First Amendment right to film police free of otherwise reasonable limitations. In fact, the circuits that recognized a right to film

16

explicitly noted that it "may be subject to reasonable time, place, and manner restrictions." *Turner v. Lieutenant Driver*, 848 F.3d 678, 690 (5th Cir. 2017) (quotation marks omitted); *see Fields v. City of Philadelphia*, 862 F.3d 353, 360 (3d Cir. 2017); *ACLU of Illinois v. Alvarez*, 679 F.3d 583, 605 (7th Cir. 2012); *Glik v. Cunniffe*, 655 F.3d 78, 84 (1st Cir. 2011); *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000). So even assuming that there was some clearly established right to film police, that right would have been subject to reasonable time, place, and manner restrictions.

"Viewing these circumstances as a whole, a reasonable officer could conclude" that ordering Kevin to move back less than fifteen feet and film from off the sidewalk was a permissible time, place, and manner restriction. *Wesby*, 138 S. Ct. at 588. The order "could reasonably have been thought consistent with" any First Amendment right to film. *Anderson*, 483 U.S. at 638. On the undisputed facts, the order was "content neutral" because it had nothing to do with the content of what Kevin was filming. *Ward*, 491 U.S. at 791. It left open "ample alternative channels for communication" because Kevin was allowed to continue filming from off the sidewalk, just a little farther away. *Id.* at 802. And a reasonable officer could have believed that moving Kevin and the other onlookers farther away, off the sidewalk and a greater distance from Pope and Jeff, was "narrowly tailored to serve a significant governmental interest." *Id.* at 796 (quotation marks omitted).

First, as explained above, it was reasonable to believe that the order served a significant governmental interest in ensuring the safety of pedestrians and drivers in the area. *See supra* Section III.A.1. Second, Kevin was filming while standing relatively close "behind" Pope as he arrested Jeff. J.A. 540–41 ("The second Hulbert was up on me filming

17

when I asked him to back up. . . . [A]nd I wasn't sure what he was going to do."). A reasonable officer could have believed that ordering Kevin and the other onlookers to stand farther away while the officer arrested Jeff served a significant interest in reducing any possible risk to the officer's safety. In fact, we recently held that prohibiting the subject of a traffic stop from livestreaming the encounter because of a potential threat to an officer's safety did not violate a clearly established First Amendment right in 2018. *Sharpe v. Winterville Police Dep't*, 59 F.4th 674, 684 (4th Cir. 2023). Given the "relatively small" limitation imposed by Pope's order to back up a few feet, Pope reasonably could have believed that limitation was justified by either traffic safety or his own safety. *Ross*, 746 F.3d at 556. And given that Kevin was allowed to continue filming, Pope also reasonably could have believed the order was "narrowly tailored" because it did not "burden substantially more speech than [was] necessary" to further these interests. *Ward*, 491 U.S. at 799.

In sum, the caselaw on the right to film has explicitly recognized the permissibility of time, place, and manner restrictions and has not clearly delineated "the limits of this constitutional right." *Fields*, 862 F.3d at 360; *see also, e.g.*, *Turner*, 848 F.3d at 690 (declining to decide "which specific time, place, and manner restrictions would be reasonable"). And Pope reasonably could have believed that his order was a permissible time, place, or manner restriction given the general criteria governing such restrictions. *See Ward*, 491 U.S. at 791. The right to film police, to the extent one existed, was not the right to a close-up. "[E]xisting law" thus failed to "place[] the constitutionality of the officer's conduct beyond debate" because that law was not sufficiently particularized to "clearly

18

prohibit the officer's conduct in the particular circumstances before him." *Wesby*, 138 S. Ct. at 589–90 (quotation marks omitted). Pope is therefore entitled to qualified immunity for ordering Kevin to move off the sidewalk while he was filming.

Because Pope reasonably could have believed that his order was consistent with any First Amendment right to film, it was also reasonable for him to believe that arresting Kevin for disobeying that order was constitutional. *See* Md. Code Ann., Crim. Law § 10-201(c)(3) (failure to obey a police officer's reasonable and lawful order). While the arrest effectively prevented Kevin from continuing to film, we are aware of no precedent suggesting that there is a First Amendment right to continue filming even after one has been formally arrested and subjected to custody. Pope is therefore entitled to qualified immunity on Kevin Hulbert's First Amendment right-to-film claim.

## C.

Because Pope reasonably could have believed that his orders to Jeff and Kevin Hulbert were lawful, he is also entitled to qualified immunity on their First Amendment retaliatory-arrest and Fourth Amendment unreasonable-seizure claims. A First Amendment retaliatory-arrest claim fails as a matter of law if there was "probable cause for the arrest." *Nieves*, 139 S. Ct. at 1724. So does a Fourth Amendment unreasonable-seizure claim. *See Brown*, 278 F.3d at 367 ("To establish an unreasonable seizure under the Fourth Amendment, [one] needs to show that the officers decided to arrest . . . without probable cause."). But as established above, a reasonable officer in Pope's shoes could have believed that his orders for the Hulberts to back up off the sidewalk were lawful time, place, or manner restrictions on their speech. It was therefore reasonable for Pope to believe

19

he had probable cause to arrest them for disobeying these orders, *see* Md. Code Ann., Crim. Law § 10-201(c)(3), and hence reasonable for him to believe that the arrests did not violate their rights. Pope is thus entitled to qualified immunity on these claims.

IV.

This case is not without its context. The Hulbert brothers were not just protesting anywhere, and Pope was not just a member of any police force. That the controversy arose near the Maryland State House sets a backdrop to this case.

It is undeniable that capitol grounds occupy a special place in our First Amendment tradition. For example, protests during the civil rights movement often took place in the proximity of the state house grounds. *See, e.g.*, *Cox v. Louisiana*, 379 U.S. 536, 545–46 (1965) (college students peacefully protesting segregation at state capitol building); *Edwards v. South Carolina*, 372 U.S. 229, 235 (1963) (civil rights protesters peacefully marching on sidewalk around state house grounds). The right to petition in the First Amendment would seem hollow if it did not encompass those venues where petitioning was most likely to bear fruit. As natural symbols of the political process, state capitols are places where the public is understandably drawn to express its views. Peaceful protest can thus strengthen the bond between government and governed when citizens speak most directly to their elected representatives. At their best, state house protests show democracy in action.

But there is another side of the coin. State houses are more than mere monuments. They are the working offices of lawmakers whose business is essential to the whole art and practice of governance. Lawmakers must be able to carry out their constitutional duties

20

without disturbances that "divert their time, energy, and attention from their legislative tasks." *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 503 (1975). In addition, capitol grounds are traditionally "open to the public." *Adderly v. Florida*, 385 U.S. 39, 41 (1966). The visitors, journalists, lobbyists, and staffers who stroll their pathways are entitled to safety, just as they would be on any public sidewalk or street. *See McCullen*, 573 U.S. at 496–97.

Protest must therefore respect the "ordered liberty" that is the hallmark of free and functioning democratic governments. *Palko v. Connecticut*, 302 U.S. 319, 325 (1937). Both liberty and order must be held in balance; one without the other would ensure that neither is preserved. One may take notice of recent incidents where this balance has not been struck. In Michigan, armed protesters in military-style gear prompted the cancelation of a legislative session. *See, e.g.*, David Welch, *Michigan Cancels Legislative Session to Avoid Armed Protesters*, Bloomberg (May 14, 2020). In Tennessee, unruly crowds disrupted House proceedings. *See, e.g.*, *Hundreds Protest at Tennessee Capitol for Tighter Gun Controls after Nashville Shooting*, CBS News (Mar. 20, 2023). And a mob stormed our national Capitol on January 6, 2021, prompting the evacuation of lawmakers during a joint session of Congress dedicated to the peaceful transfer of power. *See, e.g.*, *Trump v. Thompson*, 20 F.4th 10, 18 (D.C. Cir. 2021).

We realize the protest here did not rise to the level of those incidents. But our decisions ripple beyond the parties before us. Given the critical and sensitive issues they address, legislatures will no doubt remain a focus of the most passionate protest. And it is in this context that time, place, and manner restrictions have a vital role to play. They allow

protests to proceed, while ensuring that legislative sessions can go forward and that the safety of the public is guaranteed.

Not every time, place, or manner restriction will prove lawful. But to yank the leash on capitol police officers too tight would at this most delicate of moments prevent them from taking necessary measures out of an "undue apprehension of being sued." *Nieves*, 139 S. Ct. at 1725. The upshot would be to discourage actions, even the most modest and incremental, that guard the sanctity of legislative proceedings and provide for the safety of the public. Hence the "breathing room" that qualified immunity affords. *al-Kidd*, 563 U.S. at 743. Properly and carefully applied, the doctrine protects the reasonable judgments that help sustain our constitutional democracy.

Pope's conduct is an example of the "split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving"—that those responsible for securing our capitols are regularly called to make. *Plumhoff v. Rickard*, 572 U.S. 765, 775 (2014) (quotation marks omitted). Because his "actions could reasonably have been thought consistent with" the First and Fourth Amendments, Sergeant Pope is entitled to qualified immunity. *Anderson*, 483 U.S. at 638. Judgment on the claims herein must thus be entered on remand for Pope.

Capitol police officers are asked to preserve a delicate balance between protest and order. Neither that balance nor the officers who maintain it should ever be taken for granted.

*REVERSED AND REMANDED*